1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   AMERIPRIDE SERVICES, INC.,
     A Delaware corporation,
12                                      NO. CIV. S-00-113 LKK/JFM
             Plaintiff,
13
         v.
14
     VALLEY INDUSTRIAL SERVICE, INC.,
15   a former California corporation,
     et al.,
16
             Defendants.
17   _____/
     AND CONSOLIDATED ACTION AND
18   CROSS- AND COUNTER-CLAIMS.
     _____/
19

20       Pending before the court is plaintiff and counter-defendant

21   Huhtamaki Foodservice Inc.'s ("Huhtamaki") motion for sanctions.[1]

22   Huhtamaki alleges that defendant and counter-claimant, AmeriPride

23   Services Inc. ("AmeriPride") intentionally destroyed crucial

24   _____

25       [1]    Also pending before the court are ten motions for summary
     judgment.  These motions are set for oral argument on September 1,
26   2006.  The court will issue a separate order as to those motions
     sometime after the hearing.

                                    1

1   evidence relating to Huhtamaki's claim that hazardous substances

2   were being released from AmeriPride's wastewater system.  Huhtamaki

3   requests that the court enter default judgment against AmeriPride

4   on the issue of liability under the Comprehensive Environmental

5   Response, Compensation & Liability Act ("CERCLA") and Huhtamaki's

6   tort claims as well as dismissing AmeriPride's counterclaims

7   against Huhtamaki, or, in the alternative, award any sanction that

8   the court deems appropriate.  The court decides the matter based

9   on the parties' papers and after oral argument.

10                                  **I.**

11                          **BACKGROUND FACTS**

12  **A.    BRIEF OVERVIEW OF THE <u>HUHTAMAKI v. AMERIPRIDE</u> CASE**

13          This case involves the migration of contaminated groundwater

14  from an industrial laundry facility in Sacramento that is currently

15  owned by AmeriPride to neighboring properties, including property

16  owned by Huhtamaki.  The hazardous substance at issue is

17  perchloroethene, also known as "perc" or "PCE."  Before the

18  groundwater was contaminated, Huhtamaki used the groundwater

19  (pumped through two wells located on Huhtamaki's property) to

20  manufacture paper plates.  Huhtamaki seeks an order requiring

21  AmeriPride to remove the contamination and to compensate Huhtamaki

22  for its response costs, including the cost of procuring clean

23  replacement water.  Huhtamaki also seeks damages.[2]

24  _____

25          [2]  Huhtamaki's complaint raises seven causes of action: (1)
    cost recovery under CERCLA; (2) cost recovery under the California
    Carpenter Presley-Tanner Hazardous Substances Account Act; (3)
26  public nuisance; (4) private nuisance; (5) trespass; (6)

1   AmeriPride brought three counterclaims against Huhtamaki: (1)

2   contribution under CERCLA; (2) negligence; and (3) equitable

3   indemnity.

4   **B.   FACTS RELEVANT TO THE MOTION FOR SANCTIONS**

5   Huhtamaki maintains that the day before it was to inspect the

6   AmeriPride plant, AmeriPride began construction of a new on-site

7   groundwater treatment system.  The court reviews the key facts in

8   chronological order.

9   **1.   Construction Schedule**

10  In May of 2003, the Central Valley Regional Water Control

11  Board ("Regional Board") ordered that a new groundwater treatment

12  system be installed at the AmeriPride facility.  The new

13  groundwater system was one of several provisions in the Cleanup and

14  Abatement order that governed the AmeriPride facility.  Over the

15  course of several negotiations, the time-table to begin

16  construction was set for the fall of 2005.  Cleanup and Abatement

17  Order, Ex. B to Lee Smith Dec. in Supp. of AmeriPride's Opp'n to

18  Mot. for Sanctions ("Smith Dec.").[3]

19  On September 19, 2005, AmeriPride's hired consultant, Delta

20  Environmental, informed the Regional Board that construction would

21  begin on October 17, 2005.  Email from Jeffery Thuma to Water

22  

23  negligence; and (7) declaratory judgment.

24  [3] AmeriPride asserts that the general schedule was "contained
    in a public documents [sic] that had been reviewed and received by
25  Huhtamaki."  AmeriPride's Opp'n at 3-4.  Huhtamaki denies having
    learned of the fact through public record and AmeriPride fails to
26  provide any evidence to the contrary.

1  Board, Ex. C to Smith Dec.

2      **2.   Huhtamaki's Rule 34 Notice of Inspection**

3      On October 12, 2005, Huhtamaki served on AmeriPride a Notice

4  of Inspection pursuant to Fed. R. Civ. P. 34.  The notice requested

5  an on-site inspection of AmeriPride's facility beginning on October

6  18, 2005.  Huhtamaki Rule 34 Notice, Ex. D to Smith Dec.  The

7  request stated that Huhtamaki sought to "examine the location of

8  releases of hazardous substances from the AmeriPride facility and

9  its  infrastructure,  hazardous  materials  handling  equipment  or

10  areas, and wastewater treatment equipment and/or areas." Id.  The

11  request specified forty-two (42) separate areas, including: (8)

12  wastewater treatment system; (10) any discharge to sewer lateral

13  and  discharge  points;  (11)  lateral  to  main,  if  on  AmeriPride

14  property; (16) concrete wash pad to east of building; (25) sewer

15  compliance sampling point; and (28) all sewer floor drains.  Id.

16  All these identified areas are located in the southeast corner of

17  the AmeriPride facility.

18      Around this same time, AmeriPride objected to the inspection,

19  stating that there was too little time to allow four parties and

20  their respective consultants to schedule the inspection for October

21  18.  AmeriPride Opp'n at 4.[4]

22      No site inspection occurred on October 18, 2005.

23  ////

24  ────────────

25      [4]  On October 20, 2005, Mission Linen Supply also objected to
the inspection because they failed to get notice until the 18th of
26  October. Mission Linen Objections, Ex. D of Smith Dec.

1       **3.**    **Commencement of Construction & Removal of Soil and Pipes**

2     On October 17, 2005, the day before Huhtamaki asked to inspect

3 the facility, construction began on the new groundwater treatment

4 system. Jeff Thuma Dec., Ex. E of Stephen J. Darmody Dec. in Supp.

5 of Mot. for Sanctions ("Darmody Dec."). Construction was ongoing

6 from this date until October 30th. Craig Johnson Dec., Ex. F to

7 Smith Dec.

8     The construction took place outside of the facility in the

9 southeast corner of the property. The construction involved the

10 removal of the concrete wash pad and "associated soils at the front

11 of the building." Jeffery Thuma Dep., Ex. E to Darmody Dec.

12 Approximately 110 tons of soil was taken from the area.

13 Huhtamaki's Mot. for Sanctions at 4, citing Don Tilford Excavation

14 invoices, Ex. I to Darmody Dec.

15     During the construction process, two wastewater pipes were

16 broken and the broken portions of the pipes were ultimately removed

17 and discarded. The soil around the broken pipes was also removed.

18 The first break occurred on October 19, 2005. A drain pipe 12

19 inches in diameter that ran from the plant to the sump was

20 accidentally broken during excavation around the pad area.

21 Although both ends of the pipe were capped, the pipe spilled about

22 50 gallons of wastewater for several minutes into the excavated

23 area. Johnson Dec., Ex. F of Smith Dec. The released water was

24 later pumped back into the sump. Id. The broken pipe was removed

25 and discarded. Id. It is important to note that the broken and

26 removed section of pipe remained at the AmeriPride facility until

January 17, 2006, when it was discarded.   Thuma Dec., Ex. E of Darmody Dec.

The second pipe break occurred on October 24, 2005.   While digging a trench as part of the new groundwater system, the subcontractors damaged the sewage pipe that ran from the sump to the main sewer line.   Johnson Dec., Ex. F and Field Notes, Ex. G of Smith Dec.   Although a small hole was created at the top of the pipe, no water ran out.   The contractors waited until the plant stopped operating and replaced a 16-inch portion of the pipe. During repairs, a "cupful" of water was spilled and returned to the sump. Id.   The 16 inch portion of broken pipe was removed and discarded at an unknown time.

No samples were taken of the materials inside either of the removed wastewater pipes prior to their disposal.   Thuma Dep., Ex. H to Darmody Dec.

The 110 tons of soil was removed from the AmeriPride site between October 19, 2006 and October 29, 2006.   This soil was randomly sampled to determine "whether, in the aggregate, the soil needed to be disposed of as hazardous waste under the Solid Waste Disposal Guidelines."   The soil was then disposed of in a landfill. Thuma Dec., Ex. E to Darmody Dec.

**4.   Communication Between Huhtamaki and AmeriPride**

On October 19, 2005, one of Huhtamaki's plant managers observed the construction and removal of soil at AmeriPride's facility.   Dec. of Craig Komulainen, Ex. G of Darmody Dec.   On October 25, 2005, counsel for Huhtamaki contacted counsel for

1  AmeriPride concerning the on-site construction.  On or about the

2  same date, counsel for AmeriPride in turn contacted the

3  AmeriPride facility and "for the first time discovered that

4  construction had actually begun and was ongoing."  AmeriPride's

5  counsel then instructed AmeriPride's consultants to ensure that

6  their subcontractor test any soil that was excavated at the site.

7  Smith Dec ¶ 14.

8       On October 26, 2005, AmeriPride's counsel transmitted the

9  construction schedule to Huhtamaki's counsel to indicate to him

10 that the construction had been scheduled for October 17, 2005

11 since September of that year.  The same letter noted that

12 Huhtamaki had not yet attempted to reschedule the inspection.

13 October 26, 2005 Letter from Smith to Darmody, Ex. J of Smith

14 Dec.

15      On October 28, 2005, Huhtamaki's counsel transmitted a

16 letter to AmeriPride.  The letter expressed concern that the

17 excavation was occurring in the exact areas identified in the

18 Rule 34 notice.  The letter stated:  "Huhtamaki and its experts

19 had intended to analyze the concentration of contaminants in

20 these areas to pinpoint the sources of contaminants released from

21 the AmeriPride facility.  Now that may be impossible."  Letter

22 from Darmody to Smith, Ex. D of Darmody Dec.  The letter went on:

23 "Huhtamaki is quite concerned that the actions taking place on

24 the AmeriPride facility may be destroying evidence that is

25 relevant to this action."  Id.

26 ////

7

1  On November 4, 2005, AmeriPride's counsel responded to the
2  October 28, 2005 letter, indicating that additional sampling of
3  the soil that was removed during construction would take place.
4  November 4, 2005 Letter from Smith to Darmody, Ex. L of Smith
5  Dec.  The letter also stated that "no material evidence has been
6  lost or will be lost."  <u>Id</u>.

7  **5.  <u>Subsequent Rule 34 Notices Filed by Huhtamaki</u>**

8  On December 16, 2005, Huhtamaki submitted a revised Rule 34
9  Notice to inspect AmeriPride's facility on January 13, 2006.
10 Revised Notice of Rule 34 Inspection, Ex. J to Darmody Dec.  The
11 only change from the original request was the addition of the
12 following language to item 11 of the specific items or areas
13 Huhtamaki sought to inspect: ". . . and all plumbing and water
14 supply infrastructure." <u>Id</u>.  AmeriPride claims this revised
15 request attempted to "retroactively include the areas of
16 construction, absent from Huhtamaki's original Rule 34
17 inspection." Opp'n at 6.

18 On December 28, 2005, AmeriPride again filed objections to
19 this revised request.  Among other things, AmeriPride claimed
20 that the descriptions of the areas that Huhtamaki sought to
21 inspect were too broad.  With respect to the request to view the
22 concrete wash pad, AmeriPride stated that "the concrete in this
23 area was replaced during the scheduled installation of the onsite
24 treatment center."  AmeriPride's Objections dated Dec. 27, 2005,
25 Ex. K to Darmondy Dec.
26 ////

1        On January 6, 2006, Huhtamaki served AmeriPride with a final

2   request for inspection.   This notice was one page and set the

3   inspection date for February 11, 2006.   Revised Rule 34 Notice,

4   Ex. O of Smith Dec.   On February 6, 2006, Huhtamaki provided

5   AmeriPride with a work plan, that included the testing protocol

6   and indicated that the inspection might take two days.   Work

7   Outline, Ex. P of Smith Dec.

8        **6.   The Rule 34 Inspection & Beyond**

9        On February 11 and 12, 2006, Huhtamaki conducted its

10  inspection of AmeriPride's facility.   During the inspection,

11  Huhtamaki observed newly paved areas in AmeriPride's parking lot

12  and videotaped the inside of AmeriPride's wastewater pipes,

13  "discovering for the first time that portions of the pipes had

14  been replaced."   Mot. for Sanctions at 6.

15       On February 20, 2006, Huhtamaki requested production of the

16  missing pipes and soil that AmeriPride removed from its facility.

17  Request for Production of Evidence, Ex. N of Darmody Dec.

18       On March 20, 2006, AmeriPride filed its response to

19  Huhtamaki's request for production, stating, inter alia, that it

20  no longer had control over the items in question.   AmeriPride's

21  Objections, Ex. O of Darmody Dec.

22       On May 15, 2006, the assigned magistrate judge ordered that

23  by the end of the day AmeriPride produce the requested items or

24  to have a person with authority at AmeriPride file a declaration

25  stating that the items sought were not in AmeriPride's custody

26  or subject to its control. May 15, 2006 Order, Ex. Q to Darmody

1   Dec.

2       On May 15, 2006, AmeriPride filed the declaration of Jeffery

3   Thuma, which stated that the items were not under AmeriPride's

4   custody or subject to its control.  Thuma Dec., Ex. E to Darmody

5   Dec.

6   **III.**

7   **STANDARD FOR THE IMPOSITION OF SANCTIONS**

8       Courts are invested with inherent powers that are "governed

9   not by rule or statute but by the control necessarily vested in

10   courts to manage their own affairs so as to achieve the orderly

11   and expeditious disposition of cases."  Chambers v. NASCO, Inc.,

12   501 U.S. 32, 43 (1991).  As part of its powers, courts have

13   "broad discretion to make discovery and evidentiary rulings

14   conducive to the conduct of a fair and orderly trial."  Campbell

15   Indus. v. M/V Gemini, 619 F.2d 24, 27 (9th Cir. 1980) (citations

16   omitted).  This includes sanctioning parties for spoliation or

17   destruction of evidence.  Unigard Sec. Ins. Co. v. Lakewood

18   Engineering & Mfg. Corp., 982 F.2d 363, 368 (9th Cir. 1992).[5]

19   ────────────────

20        [5]  The court notes that sanctions pursuant to Rule 37 are not
applicable in this case.  Generally, discovery violations are

21   properly remedied pursuant to Rule 37 of the Federal Rules of Civil
Procedure. Rule 37 permits the district court, in its discretion,

22   to enter a default judgment against a party who fails to comply
with an order compelling discovery. Fed. R. Civ. P. 37(b)(2)(C);

23   Computer Task Group, Inc. v. Brotby, 364 F.3d 1112, 1115 (9th Cir.
2004). In the case at bar, however, there was no outstanding court

24   order which AmeriPride violated. Therefore, Rule 37 is
inapplicable.  See, e.g., Unigard Sec. Ins. Co. v. Lakewood

25   Engineering & Mfg. Corp., 982 F.2d 363 (9th Cir. 1992)(Rule 37
sanctions do not apply in cases where party's alleged

26   discovery-related misconduct is not encompassed by language of
rule.)

1    A party's destruction of evidence need not be in "bad faith"

2 to warrant the imposition of sanctions. Glover v. BIC Corp., 6

3 F.3d 1318, 1329 (9th Cir. 1993); Unigard, 982 F.2d at 368 n. 2.

4 The Court may impose sanctions against a party that merely had

5 notice that the destroyed evidence was potentially relevant to

6 litigation. Glover, 6 F.3d at 1329; Akonia v. United States, 938

7 F.2d 158, 161 (9th Cir. 1991), cert. denied, 503 U.S. 962 (1992).

8    Indeed, as soon as a potential claim is identified, a

9 litigant is under a duty to preserve evidence which it knows or

10 reasonably should know is relevant to the action. National Ass'n

11 of Radiation Survivors v. Turnage, 115 F.R.D. 543, 556-57 (N.D.

12 Cal. 1987).

13    A court may sanction parties responsible for spoliation of

14 evidence by instructing the jury that it may draw an inference

15 adverse against the party or witness responsible for destroying

16 the evidence. See Glover, 6 F.3d at 1329; Akonia, 938 F.2d at

17 161. As our sister court has held, "[w]here one party

18 wrongfully denies another the evidence necessary to establish a

19 fact in dispute, the court must draw the strongest allowable

20 inferences in favor of the aggrieved party." National Ass'n of

21 Radiation Survivors, 115 F.R.D. 543, 557 (N.D. Cal. 1987).

22    The adverse inference is based on two rationales, one

23 evidentiary and one prophylactic:

24    The evidentiary rationale is nothing more than the common
     sense observation that a party who has notice that a
25   document is relevant to litigation and who proceeds to
     destroy the document is more likely to have been threatened
26   by the document than is a party in the same position who

11

1   does not destroy the document . . . .  The other rationale
    for the inference has to do with its prophylactic and
2   punitive effects. Allowing the trier of fact to draw the
    inference presumably deters parties from destroying
3   relevant evidence before it can be introduced at trial.

4   Akiona, 938 F.2d at 161 (quoting Nation-Wide Check Corp. v.

5   Forest Hills Distribs., Inc., 692 F.2d 214, 218 (1st Cir.

6   1982)).[6]

7                                IV.

8                             ANALYSIS

9       For the reasons discussed herein, the court concludes that

10  evidence was destroyed by AmeriPride and that sanctions are

11  warranted.

12  A.   DESTRUCTION OF EVIDENCE

13       1.   AmeriPride's Duty to Preserve The Evidence

14       Neither party disputes that over 110 tons of soil and two

15  pieces of pipe were removed from the AmeriPride facility and

16  discarded.  The court must determine if AmeriPride had a duty to

17  preserve this evidence.

18       As our sister court remarked,

19  _____

20       [6]  Although not explicitly adopted by the Ninth Circuit,
    several unpublished cases from the Northern and Central Districts
    have concluded that a moving party seeking an adverse inference
21  must establish that: (1) the party with control over the evidence
    had an obligation to preserve it at the time it was destroyed; (2)
22  the party that destroyed the evidence had a sufficiently culpable
    state of mind; and (3) some evidence suggests that a document or
23  documents relevant to substantiating the claim of the party seeking
    sanctions would have been included among the destroyed files. See
24  Housing Rights Center v. Sterling  2005 WL 3320739, *7 (C.D. Cal.
    2005); Hamilton v. Signature Flight Support Corp., 2005 WL 3481423
25  (N.D. Cal. 2005)(citing Residential Funding Corp. v. DeGeorge Fin.
    Corp., 306 F.3d 99, 105 (2d Cir. 2002)).

26

                                12

> Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.

Wm. T. Thompson Co. v. General Nutrition Corp., 593 F.Supp. 1443, 1455 (C.D. Cal. 1984).[7]

In the case at bar, AmeriPride was well aware of the nature of Huhtamaki's claim and should have known that the evidence removed from the facility was relevant to the pending action. To compound the matter, AmeriPride was explicitly given notice that Huhtamaki sought to inspect the very evidence that was removed and discarded.

As both parties know well, one of the key issues in the pending case is whether AmeriPride discharged PCE into the soil. Huhtamaki's complaint specifically alleges that "[o]perations at the AmeriPride Site have resulted in the release of contaminants into the soil and groundwater . . . [these] operations have contaminated the groundwater beneath the Huhtamaki facility with PCE and its degradation compounds." Complaint at ¶¶ 6 & 7.

---

[7] See also Graham v. Teledyne-Continental Motors, 805 F.2d 1386, 1390 n. 9 (9th Cir. 1986)("sanctions available to punish those who alter or destroy evidence"); Struthers Patent Corp. v. Nestle Co., 558 F.Supp. 747, 765-66 (D.N.J. 1981) (the destruction of documents which the party knew or should have known would be relevant to a lawsuit soon to be filed is sanctionable).

1    AmeriPride claims that the PCE detected in both the soil and
2    groundwater was caused by previous owners of the facility and
3    that AmeriPride did nothing to contribute to the contamination.
4    See AmeriPride's SUF 1 & 2 in Supp. of its Motion for Summary
5    Judgment on Huhtamaki's State Law Claims.  AmeriPride maintains
6    that there is no evidence that the pipes and wastewater system
7    leaked after 1983 (the year AmeriPride took ownership of the
8    facility).  See, e.g., AmeriPride's Opp'n to Huhtamaki's Mot. for
9    Summ. J. for Cost Recovery Under Federal and State Law, at 7:17-
10   8:16.  ("Huhtamaki has not cited any evidence that AmeriPride's
11   discharges to the sanitary sewer have contaminated the
12   property.")

13   The removed evidence would have either revealed that there
14   were no leaks and thus, no on-going contamination (which is what
15   AmeriPride claims); or that there were leaks and that there was
16   on-going contamination (which is what Huhtamamki claims).   For
17   these reasons, the removed soil and pipes were clearly relevant
18   to the pending action.

19   This dispute – whether the PCE-contaminated wastewater
20   leaked through the pipes at the AmeriPride facility – centers on
21   the exact area where the October 2005 construction occurred and
22   where 110 tons of soil and two pipes were removed.   AmeriPride
23   should have been aware that the removed soil and pipes were
24   important and relevant to the issues at play in the pending case.

25   Even if AmeriPride was not independently aware of the
26   importance of the soil and pipes in the pending case (a somewhat

1  implausible conclusion), Huhtamaki provided ample notice that it

2  wanted to test and inspect the exact area where the soil and

3  pipes were removed.  Thus, not only should AmeriPride have known

4  to preserve this evidence, AmeriPride <u>did</u> know that the evidence

5  was important to Huhtamaki.

6       On October 12, 2005, Huhtamaki served a Notice of Inspection

7  pursuant to Rule 34 on AmeriPride.  The notice stated that

8  Huhtamaki sought to "examine the location of releases of

9  hazardous substances from the AmeriPride Facility, as well as the

10 structure of the AmeriPride Facility and its infrastructure,

11 hazardous materials handling equipment or areas, and wastewater

12 treatment equipment and/or areas."  Huhtamaki Rule 34 Notice, Ex.

13 C, Darmody Dec.  Among other things, the Notice specifically

14 requested inspection of the wastewater treatment system; any

15 discharge to sewer lateral and discharge points; lateral to main,

16 if on AmeriPride property; concrete wash pad to east of building;

17 drainage pipe to southwest of building from drop inlet to

18 drainage ditch; sewer compliance sampling point; and all sewer

19 floor drains.  The Notice requested that the inspection occur on

20 October 18, 2005.

21      Although the court notes that neither party explained the

22 meaning of some of these terms, from what the court can decipher,

23 several items mentioned in the Rule 34 notice were either removed

24 or altered during the October construction.  The concrete pad

25 which was identified in the Rule 34 notice was removed during

26 construction, as was soil surrounding the "wastewater treatment"

1   area.   Moreover, a part of the sewer pipe that ran from the
2   lateral to main was removed.   These removals occurred after
3   Huhtamaki served its Rule 34 notice that specifically identified
4   these areas for inspection.

5       The first Rule 34 Notice was not the only time that
6   AmeriPride was made aware of Huhtamaki's intent to inspect the
7   area where the soil and pipes were removed.   On October 28, 2006,
8   while construction was ongoing, Huhtamaki wrote to AmeriPride's
9   counsel expressing concern that "the actions taking place on the
10  AmeriPride facility may be destroying evidence that is relevant
11  to this action."   Oct. 28 Letter from Darmody to Smith, Ex. F of
12  Darmody Dec.   Counsel for Huhtamaki concluded the letter by
13  stating, "please let me know immediately what actions AmeriPride
14  has taken to preserve the physical evidence Huhtamaki notified
15  you it intends to inspect."   Id.   As noted above, this letter was
16  written while construction was ongoing and at a time when
17  AmeriPride could have taken steps to preserve the removed pipes
18  and soil.

19      Counsel for AmeriPride responded to Huhtamaki's letter on
20  November 4 and stated that "no material evidence has been or will
21  be lost."   November 4, 2005 Letter from Smith to Darmody, Ex. N
22  of Smith Dec.

23      AmeriPride was once again given notice of the importance of
24  this evidence when, on December 16, 2005, Huhtamaki filed a
25  revised Rule 34 notice in which it specifically sought to inspect
26  "all plumbing and water supply infrastructure." Revised Notice

1  of Rule 34 Inspection, Ex. J to Darmody Dec.  Despite this
2  notice, AmeriPride failed again to take any steps to preserve the
3  pipes and soil that was removed from the site.  As mentioned
4  previously, one of the two removed pipes remained on AmeriPride's
5  property until January 16, 2006, when it was discarded.

6      **2.   AmeriPride's Failure To Preserve the Evidence in
          Question**
7

8      On October 17, 2005, the day before Huhtamaki had asked to
9  inspect the facility, construction began at the AmeriPride site.
10 On October 25, after learning of the construction, Huhtamaki's
11 counsel contacted counsel for AmeriPride.  Counsel for AmeriPride
12 "in turn, contacted the AmeriPride plant and for the first time
13 discovered that construction had actually begun and was ongoing.
14 Counsel for AmeriPride then instructed the consultants to ensure
15 that their subcontractors tested any soil that was excavated at
16 the site."  AmeriPride Opp'n at 5.  Despite this instruction,
17 over 110 tons of soil and two pipes were removed and discarded.

18     AmeriPride's counsel clearly failed to preserve evidence
19 that he knew or should have known was relevant to the immediate
20 litigation.    See National Ass'n of Radiation Survivors v.
21 Turnage, 115 F.R.D. 543, 556-57 (N.D. Cal. 1987).  AmeriPride's
22 actions are unacceptable.

23     The court rejects AmeriPride's contention that the
24 litigation counsel was unaware of the construction schedule and
25 therefore had no way of knowing that the destruction of evidence
26

was occurring.[8]  This is no excuse.  Counsel should have been in contact with his client.  As one district court remarked, the "obligation [to preserve evidence runs] first to counsel, who ha[s] a duty to advise his [or her] client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." <u>Donato v. Fitzgibbons</u>, 172 F.R.D. 75, 79 (S.D.N.Y. 1997).  Counsel for AmeriPride should have known when the construction was to begin, especially in light of Huhtamaki's request to conduct a site visit on the day after construction was set to begin.

It is evident to the court that AmeriPride failed to take appropriate action to preserve the evidence in question.  Upon receipt of Huhtamaki's Rule 34 notice, the October 28 Letter and the Revised Rule 34 notice, AmeriPride should have taken steps to preserve the evidence at issue.  Instead, time passed and the evidence was removed and discarded.  As previously noted, the last of the soil was not removed until October 29, 2005 and one of the two broken pipes remained on AmeriPride's property until January 17, 2006.

Moreover, AmeriPride appears to admit that evidence requested by Huhtamaki was removed and discarded.  On March 20, 2006, Huhtamaki filed a second request for production of

---

[8]   The court notes that this contention is also somewhat disingenuous. AmeriPride argues that the construction schedule was public knowledge, and thus Huhtamaki should have known about it, and yet, AmeriPride's own counsel apparently did not even know when the construction began.  Clearly, the construction start date was not as well publicized as AmeriPride maintains.

1  documents.  Among other things, Huhtamaki requested any and all

2  soil removed from the AmeriPride facility on or after October 12,

3  2005.  Huhtamaki also requested any and all wastewater pipes

4  removed from the facility.  AmeriPride responded and stated that

5  Huhtamaki's request "calls for the production of materials which

6  plaintiff is well aware have been already removed from the site."

7  AmeriPride's Response to Huhtamaki's Request for Production, Ex.

8  O to Darmody Dec.  In short, AmeriPride destroyed evidence

9  clearly relevant to the pending case.

10      **3.  <u>Prejudice to Huhtamaki</u>**

11      There are numerous ways in which Huhtamaki was prejudiced

12  by the destruction of the evidence in question.  Most obviously,

13  AmeriPride destroyed evidence which may have revealed that PCE

14  contaminated wastewater was released into the soil through

15  AmeriPride's wastewater system and pipes.  Huhtamaki's Mot. For

16  Sanctions at 13.  AmeriPride's own environmental consultant

17  concedes that the highest concentrations of contaminates released

18  from sewer leaks are likely to be observed in a "linear pattern

19  along the sewer line."  Thuma Dep., Ex. H to Darmody Dec.  Thus,

20  the soil that was adjacent to the pipes and wash pad may have

21  shown this "linear pattern."

22      AmeriPride, meanwhile, is using the lack of evidence to its

23  advantage and to Huhtamaki's disadvantage.  For example, in

24  AmeriPride's Opposition to Huhtamaki's Motion for Summary

25  Judgment for Cost Recovery Under Federal and State Law,

26  AmeriPride states "Huhtamaki has not cited any evidence that

1    AmeriPride's discharges to the sanitary sewer have contaminated

2    the property." Opp'n to Huhtamaki's Mot. for Summ. J. for Cost

3    Recovery Under Federal and State Law at 7:17-8:16.   Similarly,

4    in AmeriPride's Opposition to Huhtamaki's Motion for Summary

5    judgment on Tort Causes of Action, AmeriPride states: "The

6    evidence is disputed as to whether any activities that occurred

7    after 1983 at the site contributed to the groundwater

8    contamination."   AmeriPride's Opp'n to Huhtamaki's Mot. for

9    Summ. J. on Tort Causes of Action at 11:11-18.

10        In short, AmeriPride is using the lack of evidence as proof

11   that a disputed fact remains regarding AmeriPride's contribution

12   to the groundwater contamination.   Because of the missing

13   evidence, it is impossible for Huhtamaki to determine with any

14   degree of certainty whether the lack of evidence means that there

15   were no leaks in the pipes or if the evidence was simply

16   destroyed.

17        In its defense, AmeriPride lists several reasons why

18   Huhtamaki is not prejudiced by the destruction of evidence.

19   These arguments are unavailing.

20        First, AmeriPride contends that the "soils tested were

21   subjected to the same testing that Huhtamaki indicated in its

22   outline for the site inspection." AmeriPride Opp'n at 11.   This

23   argument is without merit.   There is no evidence that the testing

24   performed on the soil was similar to the testing Huhtamaki would

25   have performed.   Although AmeriPride attaches as Exhibit H the

26   results of the tested soil, this document is incomprehensible to

1  a non-scientist.   What the court can decipher, however, is that

2  the removed soil was tested in the aggregate and at random.   In

3  other words, the soil that was directly adjacent to pipes, the

4  wash pad, and close to where the spills occurred was not

5  segregated from the rest of the soil and specially tested.   See

6  Thuma Dec., Ex. E to Darmody Dep.; AmeriPride Documents, Ex. I

7  to Darmody Dec.

8       Similarly, the contention that the 12-inch wide pipe had not

9  been in use is also without merit.   It is undisputed that when

10 contractors broke the pipe, wastewater came out of the pipe.

11 Clearly, there was liquid in the pipe.   Moreover, there is simply

12 no evidence before the court as to whether or not the pipe was

13 in use.

14      The court further agrees with Huhtamaki that although the

15 removal of the pipes was fully documented and photographed,

16 "[s]cientific testing cannot be conducted on field notes.

17 Samples cannot be taken from photographs."  Huhtamaki's Reply at

18 8.

19      Finally, AmeriPride also asserts that Huhtamaki was provided

20 with a full opportunity to test anywhere on the facility on

21 February 11, and even if the pipes had not been removed, testing

22 the pipes would have been impossible since the pipes were

23 underground.   Again, this argument is unavailing.   First, when

24 Huhtamaki's experts inspected the property, they were able to

25 videotape the inside of the other pipes, so clearly, the fact

26 that pipes are underground does not preclude inspection.   See

1  Mot. for Sanctions at 6.  Second, although Huhtamaki extensively

2  tested the soil and pipes that remained at the facility on

3  February 11, the fact remains that parts of two pipes and 110

4  tons of soil were not available to be tested and inspected.

5      For these reasons, Huhtamaki clearly suffered prejudice from

6  the destruction of the evidence at issue.  The court turns next

7  to the question of sanctions.

8  **B.   SANCTION: ADVERSE INFERENCE**

9      In a case such as this, the court may permit a jury to draw

10 an adverse inference from the destruction or spoliation of

11 evidence against the party or witness responsible for that

12 behavior. Glover, 6 F.3d at 1329; Akiona, 938 F.2d at 161.

13     An adverse inference may be appropriate even absent "bad

14 faith" on the part of the party responsible for destroying the

15 evidence. "Surely a finding of bad faith will suffice, but so

16 will simple notice of 'potential relevance to the litigation.'"

17 Glover, 6 F.3d at 1329 (citing Akiona, 938 F.2d at 161); See also

18 B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1108 (9th Cir. 2002)

19 (bad faith does not require actual ill will; substantial and

20 prejudicial obduracy may constitute bad faith).[9]

21     AmeriPride, while perhaps not acting with ill-will, acted

22 with "substantial and prejudicial obduracy," when it failed to

23 _____

24     [9]  See also Residential Funding Corp. v. Degeorge Financial
   Corp., 306 F.3d 99 (2nd Cir. 2002)("Culpable state of mind" factor
25 required for adverse inference instruction based on breach of
   discovery obligation is satisfied by showing that destruction of
26 or failure to produce evidence was knowing or negligent, a showing
   of bad faith or gross negligence is not required).

1  take steps to preserve the soil and pipes in question, especially

2  in light of Huhtamaki's Rule 34 Notices and subsequent letters.

3  B.K.B., 276 F.3d at 1108.

4      There are several ways that AmeriPride acted with

5  "substantial and prejudicial obduracy."  First, when AmeriPride

6  received Huhtamaki's Rule 34 notice, it failed to alert Huhtamaki

7  that construction would begin the day before Huhtamaki sought to

8  inspect the facility.  As discussed previously, this construction

9  took place in the exact areas Huhtamaki sought to inspect.

10 Second, AmeriPride was completely unaware of construction

11 occurring  at  its  own  facility,  construction  which  directly

12 impacted evidence in the pending litigation.  Third, once

13 AmeriPride was alerted to the construction and the removal of

14 soil, it did little to preserve the evidence that was

15 specifically identified by Huhtamaki.

16     The rationale on which the adverse inference principal is

17 based  also  lends  support  to  imposing  such  a  sanction  in  this

18 case.  A party who is on notice that evidence is relevant and

19 then destroys that evidence is "more likely to have been

20 threatened" by that evidence.  Akiona, 938 F.2d at 161.  Here,

21 AmeriPride vehemently argues that it did not contribute to the

22 discharge of PCE into the soil.  As Huhtamaki aptly points out,

23 "AmeriPride's destruction of the pipes and adjacent soils has

24 conveniently made its claims that those particular wastewater

25 pipes were not leaking into the soils and were not the source of

26 the PCE contamination extraordinarily difficult to counter."

23

1  Huhtamaki's Reply at 8.

2       The other rationale, that an adverse inference acts as a

3  deterrent, is also relevant.  In the case at bar, it is

4  imperative that AmeriPride fully understand and appreciate the

5  consequences of destroying evidence.  Drawing an adverse

6  inference addresses this prophylactic rationale.

7       In short, the court finds that drawing an adverse inference

8  against AmeriPride is an appropriate sanction.[10]  Specifically,

9  the court will instruct the jury that the removed pipes leaked

10 PCE-contaminated wastewater into the soil and groundwater and

11 that this contamination was a cause of the contamination on the

12 Huhtamaki property.  AmeriPride will be prohibited from

13 presenting any evidence which denies that AmeriPride contributed

14 to the soil and groundwater contamination.

15 ////

16 ////

17 ////

18 _____

19      [10]  The court notes that Huhtamaki's motion for sanctions
   focused primarily on imposing default judgment as a sanction.

20 Where a dismissal or entry of default judgment is contemplated as
   a sanction pursuant to the court's inherent authority, several

21 factors must be considered: (1) whether willfulness, bad faith, or
   fault can be attributed to the offending party, (2) whether certain

22 extraordinary circumstances exist, (3) whether lesser sanctions
   would be efficacious, (4) the relationship or nexus between the

23 misconduct and the matters in controversy in the case; and (5) the
   prejudice to the party victim of the misconduct.  Halaco v. Costle,

24 843 F. 2d 376, 380 (9th Cir. 1988).  In the case at bar, several
   of the Halaco factors weigh in favor of default judgment.  However,

25 as discussed herein, lessor sanctions (such as drawing an adverse
   inference) are just as efficacious and thus, default judgment is

26 not appropriate.

1

**IV.**

2

**CONCLUSION**

3        Huhtamaki's motion for sanctions is GRANTED.  The court

4    imposes sanctions as detailed in the order.

5        All parties shall file supplemental briefs no longer than

6    ten (10) pages addressing how the adverse inference affects the

7    pending motions for summary judgment and for good faith

8    settlement.  The supplemental briefs are due no later than August

9    15, 2006 at 10:00 a.m.

10        IT IS SO ORDERED.

11        DATED:  August 8, 2006.

12

13                                    LAWRENCE K. KARLTON
                                     SENIOR JUDGE
14                                   UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26