1

2

3

4

5

6

7

8

9                        UNITED STATES DISTRICT COURT

10                       EASTERN DISTRICT OF CALIFORNIA

11

12   AMERIPRIDE SERVICES, INC.,
     A Delaware corporation,
13                                          NO. CIV. S-00-113 LKK/JFM

             Plaintiff,
14
         v.                                      O R D E R
15
     VALLEY INDUSTRIAL SERVICE, INC.,
16   a former California corporation,
     et al.,
17
             Defendants.
18   _____/
     AND CONSOLIDATED ACTION AND
19   CROSS- AND COUNTER-CLAIMS.
     _____/
20

21       This litigation addresses the environmental cleanup of the

22   soil and groundwater at 7620 Wilbur Way, Sacramento, California.

23   The property at issue was used as a laundry facility.  AmeriPride,

24   the current owner of the facility, brought suit against Mission

25   Linen ("Mission") and several other parties who were, at some point

26

                                      1

1  and some manner, connected to the property.[1]

2  Pending before the court are three motions for summary

3  judgment.  Two are brought by Mission.  The first seeks summary

4  judgment on AmeriPride's breach of contract claim.  Specifically,

5  Mission argues that it never agreed to indemnify Ameripride for

6  environmental liability.  The second motion filed by Mission seeks

7  summary judgment on the remainder of AmeriPride's claims, alleging

8  that Mission was never an "owner" as defined by CERLCA and

9  therefore cannot be liable as a potentially responsible party.

10  AmeriPride also seeks summary judgment to enforce an indemnity

11  provision in the sales contract with Mission.

12  **I.**

13  **FACTS**[2]

14  The property at issue was developed into a dry cleaning and

15  uniform-washing facility by Valley Industrial Services ("Valley

16  Industrial") in 1965.  The solvent used in the dry cleaning process

17  was PCE.  Dry cleaning was discontinued someone time 1981 or 1982.

18  In the early 80's, Mission began negotiations with Petrolane

19  (the company which wholly owned Valley Industrial) to purchase five

20  industrial laundry facilities, including the property located at

21

22  [1]  AmeriPride brought nine causes of action against Mission
Linen: (1) CERCLA cost recovery; (2) CERCLA contribution; (3)
23  Liability un the California Hazardous Substance Accountability Act;
(4) Breach of contract (against Mission only); (5) Contribution
24  under Porter-Colegne Act; (6) Contractual indemnity; (6) equitable
indemnity; (7) mandatory injunction; and (8) declaratory relief.
25

26  [2]  Undisputed unless otherwise noted.

2

1   Wilbur Way.  On March 1, 1983, Mission entered into a purchase
2   agreement with Valley Industrial and Petrolane to purchase the
3   facilities for $17 million.  The president of Petrolane
4   specifically asked that the federal government be involved because
5   he was concerned about antitrust issues.

6       Prior to closure of the sale, Mission provided the purchase
7   agreement to the Federal Trade Commission ("FTC") for approval.
8   Mission agreed  not to consummate the March 1, 1983 purchase
9   agreement before June 9, 1983 without the FTC's consent.

10      The FTC reviewed the agreement and determined that due to
11  Mission's other holdings, the sale of all five properties to
12  Mission would violate antitrust law.  Mission would be permitted
13  to operate only two of the facilities it had negotiated to
14  purchase, one in Union City and the other in Anaheim.   The FTC
15  informed Mission of its determination on March 16, 1983.

16      In order to comply with the FTC's mandate, Mission was
17  required by the FTC to acquire all five of the businesses it had
18  negotiated to purchase and then divest itself of the forbidden
19  businesses (including the property at Wilbur Way) immediately upon
20  closing of the transactions.  In short, the FTC required that
21  Mission purchase and sell the property simultaneously.

22      Accordingly, Mission entered into negotiations for Welch's to
23  purchase the businesses that the FTC barred Mission from owning.
24  At the closing of the sales transactions, all five businesses were
25  deeded from Valley Industrial to Mission, and Mission immediately
26  deeded parcels associated with the three "barred" businesses –

1    including the property at Wilbur Way – to Welch's.  Defendant

2    Valley Industrial executed a deed to Mission on June 9, 1983 and

3    Mission executed a deed to Welche's on June 10, 1983.  The deeds

4    were recorded concurrently on June 30, 1983.

5    Fourteen years later, in 1997, it was discovered that the soil

6    at the Wilbur Way property was contaminated with PCE.  AmeriPride

7    filed suit in 2000 and asserted, among other things, that Mission

8    was liable as a former owner under CERCLA.

9    **II.**

10    **STANDARDS**

11    Summary judgment is appropriate when it is demonstrated

12    that there exists no genuine issue as to any material fact, and

13    that the moving party is entitled to judgment as a matter of

14    law.  Fed. R. Civ. P. 56(c); <u>See also</u> <u>Adickes v. S.H. Kress &</u>

15    <u>Co.</u>, 398 U.S. 144, 157 (1970); <u>Secor Limited v. Cetus Corp.</u>, 51

16    F.3d 848, 853 (9th Cir. 1995).

17    Under summary judgment practice, the moving party

18   
19
20
21
22

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

23    <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here

24    the nonmoving party will bear the burden of proof at trial on a

25    dispositive issue, a summary judgment motion may properly be

26    made in reliance solely on the 'pleadings, depositions, answers

4

1  to interrogatories, and admissions on file.'"  Id.  Indeed,

2  summary judgment should be entered, after adequate time for

3  discovery and upon motion, against a party who fails to make a

4  showing sufficient to establish the existence of an element

5  essential to that party's case, and on which that party will

6  bear the burden of proof at trial.  See id. at 322.  "[A]

7  complete failure of proof concerning an essential element of the

8  nonmoving party's case necessarily renders all other facts

9  immaterial."  Id.  In such a circumstance, summary judgment

10 should be granted, "so long as whatever is before the district

11 court demonstrates that the standard for entry of summary

12 judgment, as set forth in Rule 56(c), is satisfied."  Id. at

13 323.

14     If the moving party meets its initial responsibility, the

15 burden then shifts to the opposing party to establish that a

16 genuine issue as to any material fact actually does exist.

17 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

18 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv.

19 Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

20     In attempting to establish the existence of this factual

21 dispute, the opposing party may not rely upon the denials of its

22 pleadings, but is required to tender evidence of specific facts

23 in the form of affidavits, and/or admissible discovery material,

24 in support of its contention that the dispute exists.  Fed. R.

25 Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First

26 Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

1   (9th Cir. 1998).  The opposing party must demonstrate that the

2   fact in contention is material, i.e., a fact that might affect

3   the outcome of the suit under the governing law, Anderson v.

4   Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local

5   No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347,

6   355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific

7   Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

8   that the dispute is genuine, i.e., the evidence is such that a

9   reasonable jury could return a verdict for the nonmoving party,

10  Anderson, 477 U.S. 248-49; see also Cline v. Industrial

11  Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1228

12  (9th Cir. 1999).

13      In the endeavor to establish the existence of a factual

14  dispute, the opposing party need not establish a material issue

15  of fact conclusively in its favor.  It is sufficient that "the

16  claimed factual dispute be shown to require a jury or judge to

17  resolve the parties' differing versions of the truth at trial."

18  First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv.,

19  809 F.2d at 631.  Thus, the "purpose of summary judgment is to

20  'pierce the pleadings and to assess the proof in order to see

21  whether there is a genuine need for trial.'"  Matsushita, 475

22  U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

23  note on 1963 amendments); see also International Union of

24  Bricklayers & Allied Craftsman Local Union No. 20 v. Martin

25  Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

26      In resolving the summary judgment motion, the court

6

1  examines the pleadings, depositions, answers to interrogatories,

2  and admissions on file, together with the affidavits, if any.

3  Rule 56(c); See also In re Citric Acid Litigation, 191 F.3d

4  1090, 1093 (9th Cir. 1999).  The evidence of the opposing party

5  is to be believed, see Anderson, 477 U.S. at 255, and all

6  reasonable inferences that may be drawn from the facts placed

7  before the court must be drawn in favor of the opposing party,

8  see Matsushita, 475 U.S. at 587 (citing United States v.

9  Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); See also

10  Headwaters Forest Defense v. County of Humboldt, 211 F.3d 1121,

11  1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

12  out of the air, and it is the opposing party's obligation to

13  produce a factual predicate from which the inference may be

14  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.

15  1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

16  Cir. 1987).

17  Finally, to demonstrate a genuine issue, the opposing party

18  "must do more than simply show that there is some metaphysical

19  doubt as to the material facts. . . . Where the record taken as

20  a whole could not lead a rational trier of fact to find for the

21  nonmoving party, there is no 'genuine issue for trial.'"

22  Matsushita, 475 U.S. at 587 (citation omitted).

23  **III.**

24  **ANALYSIS**

25  The court first addresses the owner/control issue and then

26  turns to the question of indemnity.  For the reasons discussed

7

below, the court concludes that Mission was not an "owner"

within the meaning of CERCLA and therefore, cannot be liable as

a potentially responsible party ("PRP").  The court also

concludes that a plain reading of the contract supports a

finding that Mission is not obligated to indemnify AmeriPride

for environmental liability.

**A.   OWNERSHIP**

In its third amended complaint, AmeriPride brought claims

against Mission for, inter alia, cost recovery pursuant to

CERCLA, 42 U.S.C. 9607(a), and contribution pursuant to CERCLA,

42 U.S.C. 9613(f).[3]   Both parties agree that AmeriPride's other

claims against Mission are derivative of the CERCLA claims and

that the both federal and state law rely on the same definition

of "owner."  Mission seeks partial summary judgment on the

grounds that it was never an "owner" of the facility.

**1.   "Ownership" within context of CERCLA liability**

In order to succeed on either of its CERCLA claims against

Mission, AmeriPride must establish that Mission is a potentially

---

[3]      Under Section 113, "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f).  See also Fireman's Fund Ins. Co. v. City of Lodi, Cal., 302 F.3d 928, 945 (9th Cir. 2002) ("CERCLA § 107 and CERCLA § 113 provide different remedies: a defendant in a § 107 cost-recovery action may be jointly and severally liable for the total response cost incurred to cleanup a site, whereas a defendant in a § 113(f) contribution action is liable only for his or her pro rata share of the total response costs incurred to cleanup a site.")

1    responsible party.  Ameripride must demonstrate that (1) the

2    site on which the hazardous substances are contained is a

3    "facility" under CERCLA's definition of that term; (2) a

4    "release" or "threatened release" of any "hazardous substance"

5    from the facility has occurred; (3) such "release" or

6    "threatened release" has caused the plaintiff to incur response

7    costs that were "necessary" and "consistent with the national

8    contingency plan,"; and (4) that Mission is within one of four

9    classes of persons subject to the liability provisions of

10   Section 107(a).  <u>3550 Stevens Creek Assoc. v. Barclays Bank</u>, 915

11   F.2d 1355, 1358 (9th Cir. 1990); 42 U.S.C. §§ 9613(f); 9607(a).

12       The four classes of responsible persons are defined as

13   follows:

14

         1) The owner and operator of a vessel or a facility;

15
         2) Any person who at the time of disposal of any hazardous
16       substance owned or operated any facility at which such
         hazardous substances were disposed of;
17
         3) Any person who by contract, agreement, or otherwise
18       arranged with a transporter for transport for disposal or
         treatment, of hazardous substances owned or possessed by
19       such person, by any other party or entity, at any facility
         or incineration vessel owned or operated by another party
20       or entity and containing such hazardous substances; and

21       4) Any person who accepts or accepted any hazardous
         substances for transport to disposal or treatment
22       facilities, incineration vessels or sites selected by such
         person, from which there is a release, or a threatened
23       release which causes the incurrence of response costs, of a
         hazardous substance.
24

25       42 U.S.C. §§ 9607(a)(1)-(4).

26       Given that Mission is not the current owner, the court must

9

1  determine if Mission, at the time of a disposal of a hazardous

2  substance, owned the Wilbur Way property.  See Nurad, Inc. v.

3  William E. Hooper & Sons Co., 966 F.2d 837, 846 (9th Cir. 1992)

4  ("The trigger to liability under § 9607(a)(2) is ownership or

5  operation of a facility at the time of disposal, not culpability

6  or responsibility for the contamination.")

7      The word "owner" is defined in CERCLA as "any person owning

8  or operating [a] facility" where a disposal of hazardous

9  substances occurred.  42 U.S.C. § 9601(20)(A)(ii).  As the

10 Circuit has remarked, this definition is hardly helpful:

11          CERCLA gives no definition of "owner" and therefore
            does not tell us whether parties owning an interest
12          that is much less than a fee-such as an easement-are
            to be deemed owners for purposes of CERCLA liability.
13          Rather, 42 U.S.C. § 9601(20)(A) defines "owner or
            operator" as "any person owning or operating" a toxic
14          waste facility, which is a bit like defining "green"
            as "green."

15

16 Long Beach Unified School Dist. v. Dorothy B. Godwin California

17 Living Trust, 32 F.3d 1364, 1368 (9th Cir. 1994).  Despite the

18 lack of a statutory definition, the Long Beach court explained

19 that "[c]ircularity too provides a clue to the legislature's

20 purpose, for it 'strongly implies . . . that the statutory terms

21 have their ordinary meanings rather than unusual or technical

22 meanings.'"  Id. at 1368 (internal citations omitted).  See

23 also Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d

24 1489, 1498 (11th Cir. 1996) (in the absence of any unique

25 definition of "ownership" in CERCLA, court looks to state law to

26 define the ownership).

10

1    Under California law, "ownership" is defined as "the right

2  of one or more persons to possess and use it to the exclusion of

3  others."  Cal. Civ. Code § 654. "Owner" in its general sense

4  means one who has full proprietorship in and dominion over

5  property.  Directors of Fallbrook Irr. Dist. v. Abila, 106 Cal.

6  355 (1895).

7    **2.   Whether Mission "Owned" the Property at Wilbur Way**

8    Mission argues that it was never an "owner" under

9  California law.   Mission maintains that it only held title to

10  the property for several seconds and that it never exercised any

11  control or exclusive use over the property.  AmeriPride responds

12  by arguing that although Mission did not yet possess the deed to

13  the property, Mission exercised equitable ownership over the

14  property between the time it signed the purchase agreement

15  (March, 1983) and the time it signed over the deed to Welch's

16  (June, 1983).  The question of whether Mission "owned" the

17  property may be analyzed with both a formal and function

18  perspective.

19    Mission did not formally own the property in question until

20  it had obtained the deed from Valley Industrial on June 9, 1983.

21  See Estate of Stephens, 28 Cal.4th 665, 671 (2002) ("a deed is a

22  written instrument conveying or transferring the title to real

23  property; it is an executed conveyance and operates as a present

24  transfer of the real property.")   It is undisputed that Valley

25  Industrial executed a deed to Mission on June 9, 1983 and

26  Mission executed a deed to Welche's on June 10, 1983.  The deeds

1  were recorded concurrently on June 30, 1983.  Thus, under a

2  formal view of the situation, Mission only technically owned the

3  property for the time it took for the deed to be transferred to

4  Welch's – less than 24 hours.  It is undisputed that in this

5  short amount of time, Mission did "possess and use [the

6  property] to the exclusion of others."  Cal. Civ. Code § 654.

7      AmeriPride suggests that the court should take a more broad

8  and functional approach to examining the question of ownership.

9  AmeriPride argues that even though Mission did not hold title to

10  the property, it equitably owned the property from the time

11  Mission signed the purchase agreement with Valley Industrial in

12  March of 1983, to the time Mission signed the deed over to

13  Welch's in June.  Even if the court were to accept AmeriPride's

14  argument that equitable ownership may constitute ownership for

15  purposes of CERCLA, there is simply no evidence that Mission did

16  in fact "possess and use to the exclusion of others" the

17  property in question.

18      Mission presents the testimony of John Greaver, who worked

19  at the laundry facility during that time.  Mr. Greaver states

20  that Mission personnel never operated the laundry business at

21  the property nor did they conduct business of any nature at the

22  property.  Mission SUF 16.  Indeed, none of the records,

23  business contacts or customer contacts for the three properties,

24  including the Wilbur Way property, were ever transferred to

25  Mission.  The FTC also made it clear that the sale was not to be

26  final until June of 1983.  In short, Mission presents undisputed

1  facts which demonstrate that, even when viewing the period from
2  March to June, Mission did not possess the property in a way
3  that is consistent with ownership.

4      The only evidence relied upon by AmeriPride is a inter-
5  office communication dated April 5, 1983.  The memo is from the
6  president of Valley Industrials to the president of Mission.
7  The memo reveals that at the time, Mission and Valley
8  Industrials were thinking through how Mission might structure
9  staffing and organization.  The memo does not make specific
10 reference to the Wilbur Way property.  Even when drawing all
11 reasonable inferences in favor of AmeriPride, the court cannot
12 conclude that this evidence establishes that Mission was
13 actually possessing and controlling the laundry facility at
14 Wilbur Way.  At most, the evidence reveals that Mission may have
15 been contemplating the day it took control, but the evidence
16 does not show that Mission was, in fact, in control of the
17 Wilbur Way property.

18     Concluding that Mission did not "own" the property for
19 purposes of CERCLA is consistent with the small body of case law
20 that exists on this point.  For example, in Robertshaw Controls
21 Co. v. Watts Regulator Co., 807 F. Supp. 144, 150 (D. Me. 1992)
22  the court found that defendants who only held ownership for 24
23 hours were not "owners" for purposes of CERCLA.  The court
24 concluded that the defendants were merely a conduit for the
25 title to transfer; it explained that, "[t]o impose owner
26 liability under Section 9607(a) on the basis of one twenty-four

1  hour period of title possession during a two-step sales

2  transaction seems beyond the bounds of congressional intent."

3  Robertshaw Controls Co., at  150.  See also In re Diamond Reo

4  Trucks, Inc.,  115 B.R. 559, 568 (Bkrtcy. W.D. Mich. 1990)

5  (holding that no CERCLA liability could be imposed on an entity

6  that held title to the site as a conduit and only momentarily).

7      The legislative history of CERCLA and the explicit purpose

8  of CERCLA provides additional support for the court's conclusion

9  that Mission did not "own" the property in question.  See

10  Perlman v. Catapult Entm't, Inc., 165 F.3d 747, 753 (9th Cir.

11  1999) (explaining that courts shall resort to legislative

12  history, even where the plain language is unambiguous, "where

13  the legislative history clearly indicates that Congress meant

14  something other than what it said.")

15      It is well established that CERCLA was enacted to "provide

16  for liability, compensation, cleanup, and emergency response for

17  hazardous substances released into the environment and the

18  cleanup of inactive hazardous waste disposal sites." 3550

19  Stevens Creek Assocs., 915 F.2d at 1357 (quoting Pub.L. No.

20  96-510, 94 Stat. 2767 (1980)).  However, CERCLA also has a

21  secondary purpose-assuring that "responsible" persons pay for

22  the cleanup:

23      CERCLA was a response by Congress to the threat to public
        health and the environment posed by the widespread use and
24      disposal of hazardous substances. Its purpose was [ (1) ]
        to ensure the prompt and effective cleanup of waste
25      disposal sites, and [ (2) ] to assure that parties
        responsible for hazardous substances bore the cost of
26      remedying the conditions they created.

14

1

2  <u>Carson Harbor Village, Ltd. v. Unocal Corp.</u>,  270 F.3d 863, 880

3  (9th Cir. 2001) (citations omitted).  Moreover, the House Report

4  on the legislation stated that " '[o]wner' is defined to include

5  not only those persons who hold title to a . . . facility, but

6  those who, in the absence of holding a title, possess some

7  equivalent indicia of ownership." H.R. Rep. No. 172, 96th Cong.,

8  2d Sess. 36, reprinted in 1980 U.S. Code Cong. & Admin. News

9  6119, 6160, 6181.  In short, the legislative history and

10 explicit purpose of CERCLA suggest that ownership means that

11 there needs to be a certain amount of control over the property.

12 Merely acting as a straw-man, without more, does not trigger

13 liability.

14      Finally, even if Mission were considered an "owner" under

15 CERCLA, there is no evidence that Mission owned the Wilbur Way

16 property "at the time of disposal of any hazardous substance."

17 42 U.S.C. § 9607(a)(2).  In other words, there needs to have

18 been a release from the property while Mission owned it.

19      In the case at bar, there is no evidence that any "release"

20 occurred between March of 1983 and June of 1983.  AmeriPride

21 merely states "if the Court determines that any alleged leaks

22 occurred, for any leaks that occurred from March to June 1983,

23 Mission is liable." AmeriPride Opp'n at 9.  AmeriPride fails,

24 however, to tender any evidence that there were in fact releases

25 between the months of March and June, 1983.  Although there is

26 general evidence that releases occurred prior to AmeriPride

taking ownership of the facility, there is no evidence as to whether these releases occurred during that four month period in 1983.  In short, there is no evidence of a release.  On this ground alone, the court may conclude that Mission is not an "owner" as defined by CERCLA.

In conclusion, the court finds that Mission cannot be liable as a potentially responsible party under CERLCA as it never owned the property in question.[4]

**B.    CONTRACTUAL INDEMNITY**

Even though Mission is not liable under CERLCA, AmeriPride maintains that the purchase agreement ("agreement") between Mission and AmeriPride indemnifies AmeriPride for costs associated with environmental litigation.  Both AmeriPride and Mission filed motions for summary judgment on this issue.

AmeriPride's fourth claim against Mission, for breach of contract, is premised entirely on certain language in Section 18 of the agreement.[5]  Mission argues that this section does not

---

[4] The case provided to the court during oral argument, United States v. Carolawn Co., is not instructive.  There, the court noted that the facts regarding ownership were "cloudy" and thus the court could not resolve the question of ownership.  United States v. Carolawn Co., 21 E.R.C. 2129 (D.S.C. 1984).

[5] Section 18 of the agreement reads as follows:

Records and Litigation.  For a period of seven (7) years subsequent to Closing Date, Purchaser agrees to preserve such of the records of the Rental Business pertaining to operations prior to the Closing Date, as are in Purchaser's possession, as were typically maintained by Seller prior to Closing Date, or, at its option, to return these records to Seller for preservation by Seller.  With respect to claims and items of litigation resulting from operations of the

16

1  provide for indemnification and that the parties never reached

2  an agreement, explicit or implied, regarding liability or

3  indemnification for environmental contamination.  AmeriPride, on

4  the other hand, argues more generally that the contract taken as

5  a whole does in fact provide for indemnification.  For the

6  reasons set forth herein, the court concludes that the agreement

7  does not cover indemnification against CERCLA liability.

8       **1.    Interpreting Indemnity Provisions in CERCLA Cases**

9       The court begins by recognizing that CERCLA contains a

10  provision expressly addressing the permissibility of

11  indemnification clauses:

12           No indemnification, hold harmless, or similar
             agreement or conveyance shall be effective to transfer
13           from the owner or operator of any vessel or facility
             or from any person who may be liable for a release or
14           threat of release under this section, to any other
             person the liability imposed under this section.
15           Nothing in this subsection shall bar any agreement to
             insure, hold harmless, or indemnify a party to such
16           agreement for any liability under this section.

17
    42 U.S.C. § 9607(e)(1).  The Ninth Circuit has interpreted this
18
    provision to mean "that enforcement of indemnification clauses
19
    ──────────────────────────
20           Rental Business prior to the Closing Date, Seller shall
             continue to defend such matters without regard to the
21           limitations on survival of representations and warranties set
             forth herein and will be liable for all liabilities and
22           expenses resulting therefrom.  Purchaser will, however, make
             available such of its personnel as Seller reasonably
23           requires, in connection with the defense of of such claims
             and items of litigation, but only on the condition that
24           Seller reimburse Purchaser for expenses incurred by it in
             making such persons available, such as wages, fringe
25           benefits, travel expenses and other out-of-pocket expenses.
             (emphasis added)
26

1  does not frustrate public policy as expressed in CERCLA."

2  Jones-Hamilton Co. v. Beazer Materials & Services, Inc., 973

3  F.2d 688, 692 (9th Cir. 1992).

4      California law controls the court's interpretation of the

5  indemnification provision.  Mardan Corp. v. C.G.C. Music, Ltd.,

6  804 F.2d 1454, 1458 (9th Cir. 1986).  Under California law, any

7  "contract must be construed as a whole, with the various

8  individual provisions interpreted together so as to give effect

9  to all, if reasonably possible or practicable."  City of

10 Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,  68

11 Cal. App. 4th 445, 473 (1998)(citing Cal.  Civ.  Code, § 1641;

12 Code Civ. Proc., § 1858; 1 Witkin, Summary of Cal. Law (9th ed.

13 1987) Contracts, § 686, pp. 619-620.)

14      Indemnity agreements are construed under the same rules

15 which govern the interpretation of other contracts.  Myers

16 Building Industries, Ltd. v. Interface Technology, Inc., 13 Cal.

17 App. 4th 949, 969 (1993).  Accordingly, the contract must be

18 interpreted so as to give effect to the mutual intention of the

19 parties. Cal. Civ. Code § 1636.  "The intention of the parties

20 is to be ascertained from the 'clear and explicit' language of

21 the contract.  And, unless given some special meaning by the

22 parties, the words of a contract are to be understood in their

23 'ordinary and popular sense.'" Continental Heller Corp. v.

24 Amtech Mechanical Services, Inc., 53 Cal. App. 4th 500, 504

25 (1997)(citing Cal. Civ. Code, §§ 1638-1639, 1644).  Indeed, in

26 "interpreting an express indemnity agreement, the courts look

1  first to the words of the contract to determine the intended
2  scope of the indemnity agreement." Smoketree-Lake Murray, Ltd.
3  v. Mills Concrete Construction Co., 234 Cal. App.3d 1724, 1737
4  (1991)

5       As a general matter, in determining whether a certain
6  indemnity provision covers environmental liabilities, courts
7  look at whether the clause in question is either "broad enough
8  to cover any and all claims, or clearly refer[s] to
9  environmental liability." City and County of Honolulu v.
10 Churchill, 167 F. Supp. 2d 1143, 1154 (D. Haw. 2000); see also
11 Purolator Products Corp. v. Allied-Signal, Inc., 772 F. Supp.
12 124, 132 (W.D.N.Y. 1991); Beazer East Inc. v. Mead Corp., 34
13 F.3d 206, 211 (3rd Cir. 1994)(stating that the clause must be
14 either specific enough to include CERCLA liability or general
15 enough to include any and all environmental liability).

16      Several jurisdictions have found that pre-CERCLA
17 indemnification provisions must express a clear and unequivocal
18 intent to include CERLCA liability.  See, e.g.,  Kerr-McGee
19 Chemical Corp. v. Lefton Iron & Metal, 14 F.3d 321 (7th Cir.
20 1994) (finding indemnification provision in purchase agreement
21 for any "claim . . .concerning pollution or nuisance"
22 sufficiently clear and unequivocal to indemnify seller for
23 CERCLA liability arising from seller's own negligence), Olin
24 Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15 (2d Cir.
25 1993)(finding indemnification agreements sufficiently broad so
26 as to state a clear and unmistakable intent to include CERCLA

19

1  liability in indemnification agreement even though there was no

2  mention of environmental liability in provision).

3      **2.   Whether the Purchase Agreement Contains an Indemnity
           Clause Which Covers Environmental Liability**

4

5      The court notes at the outset that the purchase agreement

6  contains an express indemnity provision.  Section 13(b), states

7  in relevant part:

8          (b)  Indemnification.  The Seller shall indemnify and hold
           the Purchaser harmless against and in respect of any
9          liabilities, claims, damages or deficiencies asserted
           against or suffered by Purchaser, its successors or
10         assigns, arising from any misrepresentation, breach of
           warranty or a non-fulfillment of any agreement on the part
11         of Seller under this Agreement, or any misrepresentation in
           or omission from any certificate or other instrument to be
12         furnished to Purchaser hereunder, and any and all actions,
           suits, proceedings, demands, assessments, judgments, costs
13         and expenses incident to any of the foregoing, subject,
           however, to the twelve (12) month limitation provided,
14         above (except as otherwise provided herein).

15     The twelve month limitation is in reference to Section

16 13(a), which states that:

17

           Subject to the provisions hereof, all covenants,
18         agreements, - representations and warranties of Seller and
           Purchaser under, this Agreement, with the exception of
19         Subsection 7(n), shall survive the Closing for a period of
           twelve (12) months following Closing...

20

21     Neither party appears to dispute that given the twelve

   month limitation, this indemnity provision explicitly does not
22
   cover the type of indemnity AmeriPride now seeks.
23
       Given that the indemnity provision of the agreement is of
24
   no assistance to AmeriPride, AmeriPride seeks indemnity
25
   elsewhere in the agreement.  It its complaint, AmeriPride
26

1   maintains that section 18 of the agreement provides for

2   indemnification.  Section 18 of the agreement reads as follows:

3

4       Records and Litigation.  For a period of seven (7) years
        subsequent to Closing Date, Purchaser agrees to preserve
5       such of the records of the Rental Business pertaining to
        operations prior to the Closing Date, as are in Purchaser's
6       possession, as were typically maintained by Seller prior to
        Closing Date, or, at its option, to return these records to
7       Seller for preservation by Seller.  With respect to claims
        and items of litigation resulting from operations of the
8       Rental Business prior to the Closing Date, Seller shall
        continue to defend such matters without regard to the
9       limitations on survival of representations and warranties
        set forth herein and will be liable for all liabilities and
10      expenses resulting therefrom.  Purchaser will, however,
        make available such of its personnel as Seller reasonably
11      requires, in connection with the defense of such claims and
        items of litigation, but only on the condition that Seller
12      reimburse Purchaser for expenses incurred by it in making
        such persons available, such as wages, fringe benefits,
13      travel expenses and other out-of-pocket expenses.

14

15      The parties contest whether this provision constitutes an

16  indemnification provision and if it does, whether it covers

17  environmental liabilities.

18      The court first examines the plain meaning of the words to

19  determine whether Section 18 is in fact an indemnification

20  provision.  See Cal. Civ. Code § 1648 ("When a contract is

21  reduced to writing, the intention of the parties is to be

22  ascertained from the writing alone.") The words of Section 18

23  denote Mission's duty to "continue to defend" ongoing litigation

24  which pertains to the rental business.  Prior the phrase

25  "continue to defend" is a qualifying statement: "with respect to

26  claims and items of litigation resulting from operations of the

Rental Business prior to the Closing Date."  The plain meaning

of "continue to defend" along with the qualifying phrase, mean

that the provision does not cover prospective liability and

instead covers litigation which is on-going at the time of the

agreement.

The Oxford University Press defines "continue" as

"persist in an activity or process; remain in existence,

operation, or a specified state; carry on with . . ."  In light

of the court's duty to view the words of a contract as to be

"understood in their 'ordinary and popular sense,'" Continental

Heller Corp., at 504, the court cannot agree that this provision

includes litigation which has not yet commenced at the time of

the agreement.

Reading the contract as a whole also supports the finding

that section 18 is not an indemnity provision.  See City of

Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68

Cal. App. 4th at 473 (contract must be construed as a whole).

As Mission correctly points out, the agreement explicitly

discusses indemnity in several different sections of the

agreement.  In four separate provisions, the agreement addresses

indemnity:

"Purchaser will indemnify and hold Seller harmless from

liability under the accrued contracts accruing or incurred

subsequent to closing." (Section 1 (after sub paragraph (d))

"Purchaser shall indemnify, defend and hold Seller Harmless

from all costs, expenses, fees. . ."  (Section 7(n) at bottom of

1  P.7 and top of 8);

2      "Seller shall indemnify and hold the Purchaser harmless

3  against and in respect of any liabilities, claims, damages, or

4  deficiencies. . . ." (Section 13(b));

5      "Seller and purchaser shall each indemnify the other and

6  hold it harmless against and in respect to any claim for

7  brokerage or other commissions" (Section 14); and

8      "Seller covenants and agrees to protect, defend, indemnify

9  and save and hold Purchaser harmless from and against any

10  obligations and liabilities of Seller...." (Section 16).

11  [Emphasis added in each instance.]

12      When construing the contract as a whole and when

13  looking "to the words of the contract to determine the intended

14  scope of the indemnity agreement," Smoketree-Lake Murray, 234

15  Cal. App. 3d at 1737, it is apparent that Section 18 is not an

16  indemnity provision.  The court cannot give a more expansive

17  reading of this section, as it is well established that,

18  "[h]owever broad may be the terms of a contract, it extends only

19  to those things concerning which it appears that the parties

20  intended to contract."  Cal. Civ. Code § 1648.  Here, based on a

21  plain reading of the words, it appears that Section 18 addresses

22  litigation which was commenced prior to the closing and which

23  continues.  Neither the words of Section 18, nor the other

24  provisions within the four corners of the agreement suggest that

25  the parties intended section 18 to be an indemnity provision

26  (much less an indemnity provision which covers environmental

23

1  liability).

2      Even if the court were to construe section 18 as an

3  indemnification provision, it cannot be read so as to cover

4  prospective environmental liability.  As previously noted, in

5  determining whether a certain indemnity provision covers

6  environmental liabilities, courts look at whether the clause in

7  question is either "broad enough to cover any and all claims, or

8  clearly refer[s] to environmental liability." City and County of

9  Honolulu, 167 F. Supp.2d at 1154.  In the case at bar, section

10 18 clearly does not expressly refer to environmental liability,

11 therefore, the question is whether the provision is broad enough

12 to cover any and all claims.

13     To interpret section 18 as being broad enough to encompass

14 environmental liability would frustrate other parts of the

15 purchasing agreement.  As Mission points out, to read Section 18

16 as imposing indemnity on any and all claims would be to create,

17 in essence, an "omnibus indemnification provision" making the

18 express indemnification provision (section 13(b)) moot.  See

19 Mission's Reply Br. at 4.  Indeed, section 13 specifically

20 imposes a one-year limit on certain enumerated representations

21 and warranties, a seven year limit on others and clearly lists

22 the representations and warranties covered by the indemnity

23 provision.   To read section 18 as covering all claims arising

24 from activities prior to the closing date would be to render

25 section 13 meaningless.

26     Reading section 18 in a way that makes section 13 moot

1    contracts well settled cannons of contract interpretation.

2    It is well established that any contract must be construed as a

3    whole, with the various individual provisions interpreted

4    together so as to give effect to all, if reasonably possible or

5    practicable.  Cal. Civ. Code, § 1641; Code Civ. Proc., § 1858; 1

6    Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 686, pp.

7    619-620.)  Indeed, courts must interpret contractual language in

8    a manner which gives force and effect to every provision, and

9    not in a way which renders some clauses inoperative or

10   meaningless.  New York Life Ins. Co. v. Hollender, 38 Cal.2d 73,

11   81-82, (1951); Titan Corp. v. Aetna Casualty & Surety Co., 22

12   Cal. App. 4th 457, 473-474 (1994) Reading Section 18 to be so

13   broad as to include environmental liability would be to make the

14   express indemnification provision (Section 13(b)) inoperative

15   and meaningless.[6]

16
17              [6]   The court also notes that section 18 is easily
     distinguishable from indemnity provisions which have been found to
18   be so broad as to encompass indemnity for environmental liability.
     For example, in Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d
19   10 (2nd Cir. 1993), the Second Circuit held that a provision
     obliging the indemnitor to indemnify the indemnitee for "all
20   liabilities, obligations and indebtedness of Olin related to [its
     aluminum business] ...as they exist on the Closing Date or arise
21   thereafter" was "sufficiently broad to encompass CERCLA liability."
     Id. at 15-16.  See also Joslyn Manufacturing Co. v. Koppers Co.,
22   Inc., 40 F.3d 750, 754 (5th Cir. 1995) (holding that two leases
     were sufficiently broad so as to require indemnification where the
23   leases read "Lessee forever shall . . . indemnify . . . Carrier .
     . . for . . . any and all liability, judgment, outlays and
24   expenses" and "[l]essee agrees to indemnity the Railway Company and
     save it harmless from any and all claims and expenses that may
25   arise or that may be made for death, injury, loss or damage ···"
     ); SmithKline Beecham Corp. v. Rohm and Haas Co., 89 F.3d 154 (3rd
26   Cir. 1996) (finding that an indemnification clause requiring
     indemnification for "all losses, liabilities, damages or

                                    25

1    Finally, it is well established that "[i]ndemnity

2 provisions are to be strictly construed against the indemnitee."

3 Heppler v. J.M. Peters Co., 73 Cal. App.4th 1265, 1278 (4 Dist.

4 1999).  California law also dictates that the specificity of the

5 language used is a key factor in construction of an indemnity

6 agreement. Indeed, "to obtain greater indemnity, more specific

7 language must be used."  Smoketree-Lake Murray, 234 Cal. App. 3d

8 at 1737.  In the case at bar, the language in Section 18 is not

9 specific and therefore, greater indemnity cannot be obtained.

10 In short, when strictly construing Section 18 against

11 AmeriPride, it is evident, for all the reasons discussed above,

12 that Section 18 does not provide indemnity for environmental

13 liability.

14                                 **III.**

15                              **CONCLUSION**

16 1.   Mission Linen's Motion for Summary Judgment regarding the

17        owner/control issue is GRANTED.

18 2.   Mission Linen's Motion for Summary Judgment regarding

19        contractual indemnity is GRANTED.

20 ─────────────────────

21 deficiencies "was sufficiently broad to express "the parties'
   intent to allocate all present and future liabilities" including
22 CERCLA response costs. Id. at 159-60) ; Purolator Prods. Corp. v.
   Allied-Signal, Inc., 772 F. Supp. 124, 131 (W.D.N.Y. 1991) ("all
23 liabilities and obligations ··· relating to or arising out of the
   Assets" sufficiently broad to include CERCLA indemnification);
24 Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc., 416 Mass. 684,
   624 N.E.2d 959, 966 (1993)(a promise to indemnify the indemnitee
25 for "all liability" arising from the indemnitor's services "broad
   enough to encompass liability under CERCLA").

26

3.      AmeriPride's Motion for Summary Judgment regarding

        contractual indemnity is DENIED.

        IT IS SO ORDERED.

        DATED: February 28, 2007.



                                    LAWRENCE K. KARLTON
                                    SENIOR JUDGE
                                    UNITED STATES DISTRICT COURT

27