1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   AMERIPRIDE SERVICES, INC.,
     A Delaware corporation,
12                                            NO. CIV. S-00-113 LKK/JFM
             Plaintiff,
13
         v.
14
     VALLEY INDUSTRIAL SERVICE, INC.,
15   a former California corporation,
     et al.,                                  O R D E R
16
             Defendants.
17   _____/
     AND CONSOLIDATED ACTION AND
18   CROSS- AND COUNTER-CLAIMS.
     _____/
19

20        This case is one more involving the cleanup of hazardous

21   chemicals at a site formerly used for dry cleaning.  The parties'

22   claims principally arise under the Comprehensive Environmental

23   Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §

24   9601 et seq.   Defendant Texas Eastern Overseas, Inc. ("TEO")

25   formerly owned the site, and released hazardous chemicals into the

26   soil during its ownership.  Plaintiff AmeriPride Services, Inc.

                                    1

("AmeriPride") then purchased the site and has conducted an ongoing effort to clean up the chemicals. AmeriPride seeks to recover the costs of this cleanup from TEO. TEO counter-argues that AmeriPride shares responsibility for the contamination and that AmeriPride's cleanup costs were excessive, such that AmeriPride's claims should be denied or offset. TEO presents these counter-arguments as both defenses to AmeriPride's claims and as counterclaims.

The case is before the court on AmeriPride's motion for summary judgment. AmeriPride seeks summary judgment on AmeriPride's CERCLA claims and on all counterclaims.[1] The court resolves the matter on the papers and after oral argument. For the reasons stated below, the court grants partial summary adjudication, as provided by Fed. R. Civ. P. 56(g). AmeriPride's costs are largely appropriate and AmeriPride's remediation effort was proper, but triable questions remain as to whether AmeriPride bears a portion of the responsibility for these costs.

### I.  STANDARD

Summary judgment is appropriate when there exists no genuine issue as to any material fact. Such circumstances entitle the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995). Under summary judgment practice, the moving party

---

[1] AmeriPride also brings state law claims, and AmeriPride initially moved for summary judgment as to these claims as well. AmeriPride's reply brief affirmatively abandoned this aspect of the motion.

2

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish the existence of a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853. In doing so, the opposing party may not rely upon the denials of its pleadings, but must tender evidence of specific facts in the form of affidavits and/or other admissible materials in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); see also First Nat'l Bank, 391 U.S. at 289. In evaluating the evidence, the court draws all reasonable inferences from the facts before it in favor of the opposing party. Matsushita, 475 U.S. at 587-88 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); County of Tuolumme v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001). Nevertheless, it is the opposing party's obligation to produce a factual predicate as a basis for such inferences. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The opposing party "must do more than simply show that

1  there is some metaphysical doubt as to the material facts . . . .

2  Where the record taken as a whole could not lead a rational trier

3  of fact to find for the nonmoving party, there is no 'genuine issue

4  for trial.'"  Matsushita, 475 U.S. at 586-87 (citations omitted).

5       Rule 56(g) provides that "If the court does not grant all the

6  relief requested by the motion, it may enter an order stating any

7  material fact — including an item of damages or other relief — that

8  is not genuinely in dispute and treating the fact as established

9  in the case."

**II.  BACKGROUND**

10

11      The court begins by summarizing the structure of CERCLA's

12  relevant provisions.  The court then discusses the facility itself,

13  TEO's operation of the facility, TEO's contentions that AmeriPride

14  contributed to the contamination at the facility, and the efforts

15  that have been taken to clean the facility.

**A.   CERCLA**

16

17      Congress enacted CERCLA in 1980 "in response to the serious

18  environmental and health risks posed by industrial pollution."

19  Burlington Northern & Santa Fe Railway Company v. United States,

20  --- U.S. ----, 129 S.Ct. 1870, 1874 (2009). "The Act was designed

21  to promote the timely cleanup of hazardous waste sites and to

22  ensure that the costs of such cleanup efforts were borne by those

23  responsible for the contamination."  Id.

24      Under CERCLA section 107(a), 42 U.S.C. § 9607(a), the federal

25  government, state governments, and private parties may all initiate

26  cleanup of toxic areas, and each such entity may sue potentially

1   responsible parties for reimbursement of response costs.  Carson

2   Harbor v. County of Los Angeles, 433 F.3d 1260, 1265 (9th Cir.

3   2006) (Carson Harbor II) (quoting Ascon Properties, Inc. v. Mobil

4   Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989)).  The Ninth Circuit

5   has identified four elements necessary to a private plaintiff's

6   prima facie case under section 107(a):

7           (1) the site on which the hazardous substances
            are contained is a "facility" under CERCLA's
8           definition of that term, Section 101(9), 42
            U.S.C. § 9601(9);

9
            (2) a "release" or "threatened release" of any
10          "hazardous substance" from the facility has
            occurred, 42 U.S.C. § 9607(a)(4);
11
            (3) such "release" or "threatened release" has
12          caused the plaintiff to incur response costs
            that were "necessary" and "consistent with the
13          national  contingency  plan,"  42  U.S.C.  §§
            9607(a)(4) and (a)(4)(B); and
14
            (4)  the  defendant  is  within  one  of  four
15          classes  of  persons  subject  to  the  liability
            provisions of Section 107(a).
16
    City of Colton v. American Promotional Events, Inc.-West, 614 F.3d
17
    998, 1002-03 (9th Cir. 2010) (quoting Carson Harbor Village, Ltd.
18
    v. Unocal Corp., 270 F.3d 863, 870-71 (9th Cir. 2001) (en banc)
19
    (Carson Harbor I)).[2]  A "release" for purposes of this section
20
    includes  "any  spilling,  leaking,  pumping,  pouring,  emitting,
21

22          [2] Government plaintiffs face a lesser burden under section
    107.  Whereas a private plaintiff must show that response costs
23   were consistent with the national contingency plan, City of Colton,
    614 F.3d at 1002-03, a government plaintiff need only show that the
24   costs were incurred, leaving it to the defendant to show that costs
    were inconsistent with the national contingency plan.  United
25   States v. W.R. Grace & Co., 429 F.3d 1224, 1232 n.13 (9th Cir.
    2005), United States v. Chapman, 146 F.3d 1166, 1169 (9th Cir.
26   1998).

emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22).[3]  The "four classes of persons subject to liability," also known as "potentially responsible parties," include, as is relevant to this case, "(1) the owner and operator of . . . a facility," and "(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a).  Under CERCLA section 113(g)(2), a party who prevails on a section 107 claim may also seek a declaratory judgment that it is entitled to reimbursement for future response costs as well.  See City of Colton, 614 F.3d at 1008.

Absent from the four elements of a prima facie case is any requirement that the plaintiff be innocent with regard to the contamination at issue.  United States v. Atlantic Research Corp., 551 U.S. 128, 139 (2007).  Thus, where one potentially responsible party remediates the damage and incurs response costs, that party may seek to recover these costs from another.  Id.

_____

[3] At oral argument, counsel for both parties suggested that under CERCLA, it is enough to show that a property owner used a hazardous chemical and that the chemical may be found in the soil. In other words, both parties suggested that no evidence of a specific release was necessary.  Neither party argued for this proposition in its briefing, and no counsel provided any authority for this proposition at oral argument.  As the Northern District of California recently recognized, "[t]he Ninth Circuit has not adopted this broad position," Walnut Creek Manor, LLC v. Mayhew Center, LLC, 622 F. Supp. 2d 918, 926 (N.D. Cal. 2009), although it does not appear that the Ninth Circuit has rejected it either. Because the parties' briefing does not rely on this interpretation of CERCLA, the court does not further address it here.  The parties may revisit this issue in their trial briefs.

1    With regard to allocating responsibility among potentially
2 responsible parties, CERCLA provides overlapping and somewhat
3 convoluted mechanisms.  Section 107 imposes strict liability on
4 potentially responsible parties.  Burlington Northern, 129 S.Ct.
5 at 1879, 1881.  Liability under section 107 is generally joint and
6 several as well.  Adobe Lumber, Inc. v. Hellman, 658 F. Supp. 2d
7 1188, 1192 (E.D. Cal. 2009).  A defendant seeking to avoid
8 liability for the entire response cost has two options under
9 CERCLA.  Under section 107, a defendant may avoid joint and several
10 liability by proving that "a reasonable basis for apportionment
11 exists."  Burlington Northern, 129 S.Ct. at 1881 (citing United
12 States v. Chem-Dyne Corp., 572 F. Supp. 802, 810 (S.D. Ohio 1983)).
13 Apportionment on this basis looks solely to whether the defendant
14 can "establish[] a fixed amount of damage for which [it] is
15 liable," and not to any equitable concerns.  Id. at 1882 n.9
16 (quotation omitted).  Alternatively, CERCLA section 113(f)(1)
17 authorizes claims for contribution "from any other person who is
18 liable or potentially liable under section 9607(a) of this title,
19 during or following any civil action under section 9606 of this
20 title or under section 9607(a) of this title."  42 U.S.C. §
21 9613(f)(1).  Section 113(f) does allow for consideration of
22 equitable factors.  Id. ("In resolving contribution claims, the
23 court may allocate response costs among liable parties using such
24 equitable factors as the court determines are appropriate."),
25 Burlington Northern, 129 S.Ct. at 1882 n.9.  Section 113(f)(1)
26 differs from section 107 in several other regards; for example,

1  section 113(f) provides a shorter statute of limitations.   <u>See</u>

2  <u>Atlantic Research</u>, 551 U.S. at 139; 42 U.S.C. § 113(g).

3  **B.   The Contaminated Facility**

4      This suit concerns perchloroethylene ("PCE") at a facility

5  located at 7620 Wilbur Way in Sacramento, California.   Plaintiff's

6  Statement of Undisputed Facts ("SUF") ¶ 1.[4]   PCE is listed as a

7  hazardous substance under CERCLA.   42 U.S.C. § 9601(14), 40 C.F.R.

8  § 302.4.   PCE and other chemicals (including but not limited to PCE

9  breakdown products) have been found in the soil at and near the

10  facility.   SUF ¶ 4.   These chemicals have also been found in the

11  groundwater at the facility.   SUF ¶¶ 8-9.   PCE is the most

12

13      [4] Pursuant to E.D. Cal. Local Rule 260(a), AmeriPride has
submitted a "Statement of Undisputed Facts," to which TEO has
14  responded.   The court cites only those facts that TEO has conceded
are undisputed.   Local Rule 260(b) permits TEO to oppose summary
15  judgment with a "Statement of Disputed Facts."   TEO has filed such
a document, although TEO mislabels it as another statement of
16  undisputed facts.   (Dkt. 716).   To avoid conflating TEO's filing
with AmeriPride's, the court refers to TEO's as a Statement of
17  Disputed Facts, or "SDF."
        Both parties' briefs and statements of facts rely heavily on
18  declarations submitted by counsel and experts.   Both parties in
turn object to portions of these declarations as lacking
19  foundation.   These objections raise issues regarding the degree to
which foundational documents must be tendered to the court in a
20  Federal Rule of Civil Procedure 56 motion for summary judgment.
For the most part, the court need not resolve these issues, because
21  the parties have either stipulated to sufficient foundational facts
or the foundation is provided by separately submitted deposition
22  testimony.   In discussing the underlying facts, the court generally
cites to the underlying testimony or admission, where possible,
23  rather than to the expert's restatement thereof.
        The parties also object to aspects of the expert declarations
24  as inadmissibly stating legal conclusions.   These objections are
generally well founded, and the court disregards the appropriate
25  sections of the challenged declarations.
        In all other regards, evidentiary objections not discussed in
26  this order are overruled.

widespread and highly concentrated of the contaminants, <u>id.</u>, and has been found at levels exceeding federal and state maximums, SUF ¶¶ 4, 6.

**C.   VIS/TEO's Ownership of the Facility**

The defendant in this case is Texas Eastern Overseas, Inc., appearing as successor in interest to Valley Industrial Services, Inc.   TEO is a dissolved Delaware corporation that has been reinstated under a receivership for purposes of this case.   <u>See In re Texas Eastern Overseas</u>, 2009 WL 4270799 (Del. Ch. Nov. 30, 2009), <u>aff'd by</u> 998 A.2d 852 (2010).   Fortunately for this court, TEO's curious legal posture is not at issue in this motion.   The parties similarly do not dispute that TEO is the successor in liability to VIS.   SUF ¶ 25-31, especially 31.[5]   For simplicity, the court refers to TEO and all its predecessors as "TEO."

Beginning in July 1972, TEO conducted industrial dry cleaning at the facility.   SUF ¶ 19.   This continued into the 1980s, and possibly through TEO's transfer of the facility to AmeriPride's predecessor-in-interest in March 1983.   <u>Id.</u>   During this time, TEO used "dense nonaqueous phase liquid" PCE ("DNAPL PCE") as a solvent

---

[5] TEO objects to many of these purportedly undisputed facts, but the objections generally do not raise relevant and triable disputes. Notably, TEO does not dispute that "TEO is a successor to VIS, Inc. by way of mergers," and that the "merger agreements contemplate the passage of liabilities of the merged entities, as of the time of the merger, to the resulting entities." Responses to SUF ¶ 28, 31.   TEO nonetheless asserts that "what liabilities may have passed as a result of those mergers is not undisputed." Response to SUF ¶ 28.   TEO has not articulated any argument as to *why* it should not be held liable for all of VIS's liabilities. This fleeting objection fails to raise a triable material question on the issue.

for its dry cleaning operations.  SUF ¶¶ 3, 11, 20.

On at least four occasions, TEO spilled DNAPL PCE.  SUF ¶¶ 21-24.  On at least two of these occasions, the spill was not contained:

*       In 1980 or 1981, a pipe broke while a storage tank for DNAPL PCE was being moved, and 50 to 100 gallons of DNAPL PCE spilled onto the ground at the facility.  SUF ¶ 21.

*       In the late 1970s, a delivery truck driver left the pump running while filling a PCE storage tank, causing a DNAPL PCE spill.  SUF ¶ 22.  TEO contends it is unclear what volume of PCE spilled.  Response to SUF ¶ 22.  The evidence cited *by TEO* states that a 1/8 to 1/4 inch deep puddle of PCE formed in the room when the spill occurred and that this spill formed a stream flowing out the door to a drainage canal.  Robert Smith Dep. 25:8-15, Oct. 24, 2005 (Dkt. 717-7) ("2005 Smith Dep.").  The cited testimony states that "it" was four to six feet wide, although it is unclear whether this refers to the width of the puddle or the stream.  <u>Id.</u>

At least two more spills occurred, but TEO contends that these spills were cleaned prior to reaching the environment:

////

////

////

10

1  *   Between 1976 and 1981 an approximately 20 gallon overflow of

2      DNAPL PCE occurred when operators forgot to turn off a pump.

3      SUF ¶ 24, SDF ¶ 3.

4

5  *   In the late 1970s a "boil-over" occurred, resulting in DNAPL

6      PCE being released.  SUF ¶ 23.

7

8  TEO's contention that these spills were cleaned is based on the

9  testimony of two employees.  The first testified that employees had

10 been instructed to use clothes to soak up spilled material.

11 Smelosky Dep. 21:6-13 (Dkt. 717-8).  The other testified that

12 employees would attempt to "soak up all the [PCE] [they] could,"

13 Flowers Dep. 64:18-19 (Dkt. 717-5).  None of the cited evidence

14 specifically states that any form of cleanup occurred in these

15 specific instances.  AmeriPride argues that even if this type of

16 cleanup was undertaken, no evidence indicates that these actions

17 would have cleaned the entire amount of the spill.  The court does

18 not resolve that issue here.  TEO admits, by way of its expert Jim

19 Warner, that at least one spill was not contained and that some of

20 the DNAPL PCE spilled by TEO "most likely" reached the soil and

21 impacted groundwater.  Warner Decl. ¶ 6 (Dkt. 718)

22 **D.   AmeriPride's Operation of the Facility**

23     The plaintiff in this action is AmeriPride Inc.  AmeriPride's

24 predecessor in interest purchased the facility from TEO in 1983.

25 SUF ¶¶ 32-35.

26     In arguing that TEO is entirely to blame for the

11

contamination, AmeriPride argues that it never conducted dry cleaning operations, stored or used PCE, or otherwise conducted activities that contributed to the PCE contamination at the site. TEO offers evidence purportedly indicating that AmeriPride contributed to the contamination in four ways: (1) by using and storing dry cleaning equipment, (2) by failing to respond to a 1983 discovery of PCE contamination, (3) by spilling waste in 1993, and (4) by discharging wastewater into the soil.  The court discusses each of these in turn.   TEO has presented evidence creating a triable question as to the first, second, and fourth arguments, but not the third.

**1.   Whether AmeriPride Used or Stored Dry Cleaning Equipment**

Dry cleaning equipment remained at the facility until sometime after AmeriPride purchased the facility.[6]   TEO argues that AmeriPride continued to use this equipment in dry cleaning operations.  Although the court concludes that TEO has raised a triable question as to this issue, the court notes that the majority of evidence TEO cites is incomplete. Thus, TEO's argument on this part rests on a thin foundation.

The one piece of evidence indicating that AmeriPride conducted

---

[6]   AmeriPride concedes this fact.  So long as the equipment remained in use (see following paragraph of the body), PCE would presumably have remained present.  The evidence offered by TEO, however, indicates that once the equipment was put into storage, all PCE was drained out of the equipment.  See Flowers Dep. 104 (Dkt. 717-5).  TEO cites the deposition of James Burlingame for the proposition that PCE remained onsite until 1985, but TEO has failed to provide the cited page of this deposition (page 34).  See Dkt. 717-9.

dry cleaning is an Environmental Assessment that states that dry cleaning was performed until 1987. Weissenberger Decl. Ex. Q, 12, 16 (Dkt. 717-16).  This assessment was prepared by Delta Consultants at the behest of AmeriPride. Id. AmeriPride argues that the 1987 date was merely a "typographical error" in the report. AmeriPride attempts to support this characterization by citing letters submitted by AmeriPride to the California water authorities.  See L. Smith Rebuttal Decl., Ex. H (Dkt. 727-6). AmeriPride also cites competing evidence indicating that dry cleaning stopped during TEO's ownership.  See Taylor Dep. 64 (Dkt. 714-4), Cal. Regional Water Quality Control Board Cleanup and Abatement Order No. R5-2003-0059 ¶ 7 (May 7, 2003) (Dkt. 298-7 page 76 of 228) ("2003 Abatement Order").  On AmeriPride's summary judgment motion, the court must assume that the trier of fact could credit the original report.[7]

TEO's other evidence does not support TEO's position, in that none of this other evidence specifies when dry cleaning halted. Jesse Taylor, a former employee at the facility, repeatedly and explicitly stated in the cited portion of his deposition that he

---

[7] The conclusion reached is somewhat anomalous since the trial of this case is to the court, and on the basis of the evidence submitted, it is unlikely that the court would find for the defendant on the issue.  Nevertheless, applying summary judgment standards, the court feels compelled to find there is a triable issue of fact.  See Minidoka Irrigation Dist. v. Dept. of Interior, 406 F.3d 567, 575 (9th Cir. 2005) (citing Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc)) (explaining that district court judges must apply the ordinary summary judgment standard even when the matter will subsequently be heard by the same district court judge in a bench trial).

1   did not know when dry cleaning was shut down.  Taylor Dep. 64 (Dkt.

2   717-4).   Tim Flowers, another former employee, stated in his

3   deposition that dry cleaning stopped 4-5 years before he quit.

4   Flowers Dep. 104 (Dkt. 717-5).  In the absence of evidence as to

5   when Flowers quit, this statement does not indicate that dry

6   cleaning occurred on AmeriPride's watch.  Robert Smith, a third

7   employee, states that dry cleaning stopped after Smith left a

8   position in the dry cleaning room but before Smith stopped working

9   at the facility altogether.  2005 Smith Dep. 45 (Dkt. 717-7).

10  Again, because TEO offers no evidence as to when Smith changed

11  positions or when he left the facility, this testimony does not

12  enable a trier of fact to conclude that AmeriPride conducted dry

13  cleaning.   Moving beyond employee testimony, TEO argues that

14  "AmeriPride continued to order dry cleaning products from 1986 to

15  1992 from Fabrilife products."  Weissenberger Decl. ¶ 19 (Dkt.

16  717).  TEO relies on the declaration of its counsel Weissenberger,

17  who has no personal knowledge of this fact.  Weissenberger instead

18  relies on a purported "vendor sales record."  Id.  The attached

19  document, however, provides no indication that it is a sales record

20  and does not mention Fabrilife.  Id. Ex. Q (Dkt. 717-16).  Under

21  a heading for "BRANCH: Sacramento," it lists only the details of

22  two dry cleaning machines.  Id.  The document is dated 1989.  Id.

23  Accordingly, this exhibit (if it could be properly authenticated)

24  might support the contention that equipment remained present after

25  AmeriPride's purchase, but does not demonstrate that the equipment

26  was in use.

1        **2.    Whether AmeriPride Discovered Contamination in 1983**

2        TEO contends that AmeriPride discovered the contamination in

3    1983, but that AmeriPride did not report this discovery.   Below,

4    I examine that evidence.

5        At some point, a trench at the facility was enlarged in

6    connection with expansion of laundry (non-dry-cleaning) facilities.

7    A trier of fact could conclude that this expansion occurred during

8    AmeriPride's ownership, in 1983 or 1984.   TEO relies on the 2005

9    deposition   testimony   of   former   employee   Robert   Smith,   who

10   explicitly states that the trench was expanded after AmeriPride

11   purchased   the   facility.    2005   Smith   Dep.   36   (Dkt.   717-7).

12   AmeriPride argues that Smith recanted this testimony in 2006.   In

13   the 2006 deposition, Smith stated that the expansion occurred prior

14   to AmeriPride's purchase.   R. Smith Dep. 14 (May 3, 2006) (Dkt.

15   727-6 Page 44 of 84) ("2006 Smith Dep.").   The 2006 testimony does

16   not refer to R. Smith's initial statement or address the conflict

17   between the two statements.   Id.   At the summary judgment stage,

18   the   court   must   assume   that   a   trier   of   fact   faced   with   this

19   conflicting   evidence   could   choose   to   credit   Smith's   2005

20   testimony.[8]

21       While the trench was being expanded, employees smelled fumes

22   that they identified as PCE coming from the exposed soil.   2005

23

---

24       [8] AmeriPride further provides the testimony of Mr. Dankoff,
     another employee, which also indicates that the expansion occurred
25   prior to AmeriPride's purchase.  This testimony does not defeat the
     existence of a triable question, although it raises the issue
26   discussed in the prior footnote.

1  Smith Dep. 36 (Dkt. 717-7).   Smith testified that "if [he]

2  remember[ed] correctly" employees, including those in a nearby

3  office, were sent home because the smell was so strong that it gave

4  them headaches.  Id. at 37.

5      It is undisputed that, whenever the trench was expanded, the

6  discovery of PCE fumes was not reported to any authorities.[9]

7  Instead, the only action that was taken was to replace concrete

8  over the soil and contain the fumes.

9      **3.   Whether AmeriPride Discharged Pollutants in 1993**

10     TEO contends that AmeriPride "released hazardous chemicals to

11  the subsurface" in 1993.   Warner Decl. ¶ 26 (Dkt. 718).   The

12  evidence cited in support of this contention is an inspection

13  report prepared by a County of Sacramento official.   Sacramento

14  County Environmental Management Dept. of Compliance, Inspection

15  Report (December 6, 1993) (Dkt. 707-49).  The report indicates that

16  a "waste oil drum [was] overflowing and leaking onto the ground."

17  TEO has not offered evidence indicating that this leak reached the

18  "subsurface," or that it otherwise could have contributed to the

19  soil and groundwater contamination at issue here.   Absent such a

20  showing, this fact is immaterial.

21     **4.   Whether AmeriPride's Operations Have Leaked Wastewater**

22     TEO argues that AmeriPride repeatedly discharged wastewater,

23

24     [9] At oral argument, TEO separately argued that AmeriPride
   "discovered" the PCE contamination in 1983 because AmeriPride
25  continued to employ persons with knowledge of the prior spills.
   Because this theory of discovery was not articulated in the brief,
26  the court discusses it only in passing.

16

1  primarily from laundry operations, into the soil.  TEO contends

2  that this wastewater aggravated the PCE contamination in two ways.

3  First, the wastewater allegedly mobilized the DNAPL PCE that was

4  already in the soil, pushing this PCE down to the water table and

5  spreading the contamination.  Second, the wastewater was allegedly

6  contaminated with additional PCE, as a result of washing clothes

7  that were contaminated with PCE.   The court first surveys the

8  evidence regarding discharge of wastewater, and then turns to the

9  evidence regarding the effects of this water.   As the court

10  explains, TEO has raised triable questions as to both theories.

11              **a.   A Trier of Fact Could Conclude that Several**

12                    **Wastewater Leaks Occurred**

13      TEO contends that AmeriPride discharged wastewater into the

14  soil on several discrete occasions, and also that the

15  wastewater/sewer system pervasively leaked wastewater.

16      The first asserted discrete discharge was in 1983 or 1984.

17  A triable question exists as to whether AmeriPride discharged

18  wastewater into the soil at this time.  Delossantos testified that

19  a pipe broke and was patched in 1983 or 1984.[10]  Delossantos Dep.

20  48 (Dkt. 717-6).   The pipe connected washing machines to a sewer

21  or sump pump and/or tank.  Id. at 49-50.  Delossantos presumed that

22  ──────────────

23          [10] The testimony regarding timing is as follows:
                Q: When was that?
                A. Just before I got out of there.

24              Q: Early '80's?
                A: Something like that.

25              Q: '83? '84?
                A: Yeah

26  Dkt. 717-6, at 48.

1   the leak was discovered during a weekly cleaning of a trench

2   adjacent to the pipe, suggesting that the pipe had been leaking for

3   at most a week.  Id. at 49.  Delossantos testified that the

4   facility used "[m]ore [water] than you want to know [per day].  I

5   don't know.  I can't take a number.  Thousands of gallons,

6   thousands." Id. at 50.[11]

7       A trier of fact could conclude that a second wastewater

8   discharge occurred in 1997.  Former employee James Burlingame

9   testified that in 1997, AmeriPride added a new style of washer that

10   required reconfiguration of a drainage trench.  Burlingame Dep. 132

11   (Dkt. 717-9).  In the course of this reconfiguration, a sewer line

12   draining a restroom was breached.  Id. at 133.  Burlingame opined

13   that this water flowed into the soil for "a day or two" and that

14   the only "whatever was in the line" leaked, which "may have been

15   just a few gallons." Id. at 135.  This leak reached the soil.  Id.

16   at 136.

17       Some evidence indicates that a third leak occurred in 2005.

18   Burlingame Dep. 119-21, 123 (Dkt. 717-9).  Burlingame testified

19   that at this time AmeriPride again damaged a wastewater pipe in the

20   course of an excavation, resulting in discharge of wastewater into

21   the soil.  Id.  Water leaked for a "few minutes." Id. at 121.  On

22

---

23       [11] Regarding this pipe breach, TEO also cites the declaration
of Jim Warner, ¶ 26 (Dkt. 718).  Warner merely cites the above

24   portions of the Dessantos deposition and opines that this leak
constituted a "potential release[] of PCE and other contaminants

25   by [AmeriPride] at the [facility]." Id.  This opinion is discussed
below.  The court notes it here merely to state that Warner adds

26   no additional facts regarding the timing, extent, etc. of the leak.

1   this occasion the top of another pipe was also broken, but because

2   of the nature of the breach "nothing really leaked out" of the

3   second pipe.  Id.

4        Fourth, the parties agree that the wastewater sump overflowed

5   "a couple" of times.  SDF ¶ 29.

6        Finally, in addition to these discrete leaks resulting from

7   damage or overflow, TEO raises a triable question as to whether the

8   system inherently leaks.  TEO marshals three types of evidence in

9   support of this argument.  First, TEO's expert Warner argues that

10  wastewater systems generally leak, implying that leaks may be

11  presumed here. Warner Decl. ¶ 30 (Dkt. 718).  Warner supports this

12  assertion with citations to various studies by the Environmental

13  Protection Agency and California regulators.  Id.  Second, the

14  parties agree that contaminants other than PCE breakdown products

15  have been found on the site.  Warner's expert opinion is that the

16  most  likely  source  of  these  contaminants  would  be  leaking

17  wastewater.  Id. ¶ 32.  Third, TEO seeks to rebut AmeriPride's

18  evidence regarding the integrity of the sewer system.  AmeriPride

19  argues that video and conductivity test demonstrated that the

20  system did not leak.  Warner offers testimony regarding limits

21  inherent in these studies, opining that the studies could not

22  reveal whether leaks exist.  Warner Decl. ¶ 31.[12]

23  _____

     [12] In a fourth argument about leaks in the wastewater system,
24  Warner contends that on site studies have found soil moisture in
     a pattern indicating wastewater leaks.  Warner Decl. ¶ 31 (Dkt.
25  718).  AmeriPride objects to this testimony on the ground that
     these underlying studies were not tendered in connection with TEO's
26  opposition to the present motion; TEO disputes whether Fed. R. Civ.

1           **b.   Effects of the Wastewater Leaks**

2      In the preceding section, the court concluded that TEO had

3 raised triable questions as to whether AmeriPride had discharged

4 wastewater into the soil.   TEO contends that these discharges

5 aggravated the groundwater contamination by contributing additional

6 PCE and by mobilizing the PCE that was already there.

7           **i.   PCE in the Wastewater**

8      The parties agree that AmeriPride received laundry that was

9 contaminated with PCE, notably laundry from automotive and print

10 shops.   Farr Decl. ¶ 25 (Dkt. 698-5), Warner Decl. ¶¶ 11-12 (Dkt.

11 718).   The parties further agree that dissolved PCE has been

12 detected in AmeriPride's wastewater, although AmeriPride disputes

13 Warner's conclusion that the wastewater "consistently contained

14 dissolved PCE."   Because there is a triable question as to whether

15 the wastewater system leaked, a trier of fact could conclude that

16 these leaks contributed additional PCE to the soil.

17           **ii.   Wastewater Can Move PCE Already in The Ground**

18      TEO's expert Warner testifies, on the basis of his

19 professional training and experience, that DNAPL PCE of the type

20 spilled by TEO moves through soil slowly absent something to push

21 it farther, such that "only a minor portion . . . would have most

22 likely impacted groundwater" as a result of the initial spills.

23 Warner Decl. ¶ 6 (Dkt. 718).   Warner similarly declares that

24 ───────────────

25 P. 56 required these studies to be submitted.   The court need not
resolve this dispute, because other aspects of Warner's testimony

26 are sufficient to create a triable question as to whether the
wastewater system leaked.

1   wastewater could have mobilized the DNAPL PCE in the soil, causing

2   it to travel further through the soil and therefore reach the

3   groundwater.    Id. ¶ 9.    A trier of fact could credit this

4   testimony.

5   **E.    Cleanup of the Facility**

6       The court now turns to the facts regarding AmeriPride's

7   investigation and remediation of PCE contamination.    TEO objects

8   to many of the facts in this section on hearsay grounds and by

9   arguing that the cited evidence fails to support the facts

10  asserted.    Except where otherwise noted, these objections are

11  overruled.    In particular, much of the evidence falls into the

12  public record and business record exemptions to the hearsay rule.

13      **1.    Discovery of PCE**

14      "In 1997, during remodeling work, AmeriPride detected . . .

15  PCE . . . in near-surface soil beneath the Site . . . . AmeriPride

16  conducted additional soil investigations . . . to determine the

17  extent of the PCE in the soil gas and possible soil cleanup

18  alternatives."    Cal. Regional Water Quality Control Board Cleanup

19  and Abatement Order RS-2009-0702 ¶ 10 (April 30, 2009) (Dkt. 698-7

20  page 173 of 228) ("2009 Abatement Order"); see also Marcus Dep. 14

21  (Dkt. 698-7 page 32 of 228).

22      AmeriPride reported this discovery to the Sacramento County

23  Environmental Management Department by telephone.    Marcus Dep. 14.

24  AmeriPride contends that this call was made "immediately," but the

25  cited evidence provides no indication as to timing.

26      After the discovery of the contamination, a series of soil

21

bores and groundwater monitoring wells were installed.  Marcus Dep.
16, 2009 Abatement Order ¶ 11 (indicating that well investigations
were done between 1997 and 2002).  These investigations revealed
that PCE was in the groundwater as well as the soil.  Id.

In August 2001, PCE was detected in water from two nearby
wells: a California-American Water Company municipal supply well
and a well used by Huhtamaki North America (formerly Chinet).  2003
Abatement Order ¶¶ 14-15 (Dkt. 698-7, page 77 of 228).  As a result
of this contamination, Cal-Am and Huhtamaki discontinued use of
these and neighboring wells.  Id.  ¶¶ 14-17.

**2.   Remedial Actions**

Also in 2002, the California Regional Water Quality Control
Board ("RWQCB") became the government agency with control over the
site investigation.  2009 Abatement Order ¶ 16 (Dkt. 698-7 page 173
of 228).  Under the direction of the RWQCB, two consulting firms,
Delta and Burns & McDonnell, have performed investigation and
remediation at the site on behalf of AmeriPride.  Stott Decl. ¶¶
12-13 (698-6 page 3 of 65); SUF ¶ 53.  The cleanup at the facility
is ongoing, as the work directed by the RWQCB has not been
completed.  SUF ¶ 54.  As such, additional costs will be incurred.
Id., SUF ¶ 60.  TEO has not performed any work to address the PCE
and its breakdown products in the soil and groundwater at and near
the facility.  SUF ¶ 55.

In connection with this investigation and remediation,
AmeriPride designed and executed a community relations plan which
included a number of public meetings.  SUF ¶ 89.  AmeriPride

conducted remedial investigation/feasibility study efforts, implemented interim remedial/removal actions involving public and private water supplies, and implemented final remedial measures. SUF ¶¶ 90, 92. AmeriPride further designed and conducted health and safety plans. SUF ¶ 93. AmeriPride's proposed remediation efforts were approved by regulators after public comment. SUF ¶ 94.

As part of AmeriPride's remediation, contaminated groundwater is pumped to the surface at Operating Units 2 and 3 of the facility. This groundwater is treated and then used in AmeriPride's laundry operations, after which it is discharged into the municipal sewer system.

AmeriPride places its total costs in connection with the action at over $18 million. This includes $7,331,528.25 for investigation and remediation as of August 2010, Bryant Decl. ¶ 48 (Dkt. 698-8 page 11 of 159), $474,729.67 in regulatory oversight through September 2010, Peter Decl. ¶ 30 (Dkt. 698-17 page 8 of 9), and $10.25 million in settlement paid to Huhtamaki and Cal-Am, SUF ¶ 62. TEO does not dispute that these amounts were spent.

The RWQCB determined that the facility was responsible for the PCE in the Huhtamaki and Cal-Am wells. SUF ¶ 64. The RWQCB then ordered AmeriPride to provide replacement water for these two companies. SUF ¶ 61. The RWQCB held that this obligation was discharged by the $10.25 million in settlements referred to in the preceding paragraph. SUF ¶¶ 68-69, 74-75.

////

### III. **ANALYSIS**

AmeriPride seeks summary judgment as to its claims under CERCLA sections 107 and 113(g)(2). AmeriPride further seeks summary judgment on TEO's counterclaims, which are brought under CERCLA section 113(f) and state law.

As summarized above, section 107 allows a party to recover "response costs" from parties who contributed to contamination. Once a party has paid costs under section 107, that party may use section 113(f) to seek indemnification or contribution from other parties, including the section 107 plaintiff. In this order, the court begins by discussing the elements of a prima facie case under section 107. The court then determines that AmeriPride is entitled to summary judgment as to satisfaction of the bulk of these elements, although questions remain as to the precise amount of response costs incurred. The court then turns to the question of allocating those costs between AmeriPride and TEO, whether through apportionment under section 107 or through a claim for contribution under section 113(f). Material questions preclude summary adjudication of these issues. Finally, the court addresses AmeriPride's section 113(g)(2) claim for declaratory judgment regarding liability for future response costs. AmeriPride's section 113(g)(2) claim is largely derivative of AmeriPride's section 107 claim, and therefore can only be partially resolved on this motion.

////

////

1   **A.    Section 107 Claim**

2       As explained above, a private plaintiff must show four

3   elements to demonstrate a prima facie case under section 107:

4               (1) the site on which the hazardous substances
                are contained is a "facility" under CERCLA's
5               definition of that term, Section 101(9), 42
                U.S.C. § 9601(9);
6
                (2) a "release" or "threatened release" of any
7               "hazardous substance" from the facility has
                occurred, 42 U.S.C. § 9607(a)(4);
8
                (3) such "release" or "threatened release" has
9               caused the plaintiff to incur response costs
                that were "necessary" and "consistent with the
10              national contingency plan," 42 U.S.C. §§
                9607(a)(4) and (a)(4)(B); and
11
                (4) the defendant is within one of four
12              classes of persons subject to the liability
                provisions of Section 107(a).
13
    City of Colton, 614 F.3d at 1002-03.  In this case, AmeriPride has
14
    satisfied the first, second, and fourth elements of this test; TEO
15
    does not meaningfully contest these issues.  The property is a
16
    "facility" "where a hazardous substance has . . . come to be
17
    located." 42 U.S.C. § 9601(9), SUF ¶ 4.  TEO released PCE into the
18
    soil at least once. 42 U.S.C. § 9601(22) (defining releases). TEO
19
    is a type of person potentially subject to liability, as TEO owned
20
    the facility at the time the PCE was disposed of.  42 U.S.C. §§
21
    9607(a)(2), 9601(21) (corporations are persons for purposes of
22
    CERCLA), 9601(29) ("disposal" includes "spilling").
23
        As to the third element, TEO intermingles two arguments,
24
    asserting that AmeriPride violated the national contingency plan
25
    and that AmeriPride seeks costs outside the scope of CERCLA section
26

107.[13]   The court first reviews the caselaw regarding compliance with the national contingency plan, and then turns to TEO's three arguments: that AmeriPride violated the plan's reporting requirements, that AmeriPride's response was not cost effective, and that AmeriPride seeks recovery for amounts that are not "response costs" within the meaning of section 107.   For the reasons explained below, AmeriPride is entitled to summary judgment on the overall issue of national contingency plan compliance. Nonetheless, it appears that the amount sought by AmeriPride must be reduced.   Furthermore, the court agrees that a second group of costs cannot be recovered under section 107, although the court will permit AmeriPride to seek these costs under section 113(f). The court postpones discussion of apportionment and contribution until part III(B) below.

1.   **The National Contingency Plan**

Response costs are considered consistent with the National Contingency Plan "if the action, when evaluated as a whole, is in *substantial compliance*" with it.   40 C.F.R. § 300.700(c)(3)(I) (emphasis added).   The National Contingency Plan is codified at 40

---

[13]   TEO also asserts without meaningful argument that AmeriPride's response costs were not "necessary," a separate aspect of the third section 107 element.   Response costs are considered necessary when "an actual and real threat to human health or the environment exist[s]."   <u>Carson Harbor I</u>, 270 F.3d at 871.   The Regional Water Quality Control Board identified such a threat, and TEO does not dispute that such a threat existed.   Instead, TEO's "necessity" argument merely rephrases TEO's cost-effectiveness argument.   That is, TEO argues that certain specific costs were unnecessary because cheaper alternatives were available.   The court addresses cost effectiveness below.

C.F.R. part 300.  This plan "specifies procedures for preparing and responding to contaminations and was promulgated by the Environmental Protection Agency (EPA) pursuant to CERCLA § 105." Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 161 n. 2 (2004).  "It is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." Carson Harbor II, 433 F.3d at 1265 (internal quotation marks omitted), see also City of Colton, 614 F.3d at 1003.

For purposes of a claim under CERCLA section 107(a)(4)(B), the court evaluates substantial compliance by looking to the provisions enumerated in 40 C.F.R. §§ 300.700(c)(5) and (c)(6) and to whether the response "results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3).  Subpart (c)(5) enumerates requirements for, among other things, worker health and safety, documentation, reporting of releases, site evaluation, and remedial investigation and feasibility studies. Subpart (c)(6) imposes requirements regarding public participation.  A "CERCLA-quality cleanup" is "(1) 'protective of human health and the environment,' (2) utilizes 'permanent solutions and alternative treatment technologies or resource recovery technologies,' (3) is cost-effective, and (4) is selected after 'meaningful public participation.'" Walnut Creek Manor, 622 F. Supp. 2d at 930 (quoting 55 Fed. Reg. 8666, 8793 (March 8, 1990)).  In this case, TEO does not dispute that AmeriPride has satisfied the majority of these requirements. See, e.g., SUF ¶¶ 89-90, 92-94.  Instead, TEO's sole national

1  contingency plan arguments are that AmeriPride violated reporting

2  requirements and that the response action was not cost effective.

3      The cases provide unclear guidance as to how compliance with

4  the contingency plan fits into the section 107 analysis.  CERCLA

5  allows recovery of "necessary costs of response incurred by any

6  other person consistent with the national contingency plan."  42

7  U.S.C. § 9607(a)(4)(B).  An en banc panel of the Ninth Circuit has

8  held that consistency with the national contingency plan is an

9  element of a private party's prima facie case under section 107.

10 Carson Harbor I, 270 F.3d at 870-71, see also Ascon Properties, 866

11 F.2d 1149.  A private plaintiff accordingly bears the burden of

12 proving that cleanup costs were consistent with this plan.  Carson

13 Harbor II, 433 F.3d at 1265.  Other cases prior to Carson Harbor

14 I had held, however, that "the question [of] whether a response

15 action is necessary and consistent with the criteria set forth in

16 the contingency plan is a factual one to be determined at the

17 damages  stage  of  a  section  107(a)  action."  Cadillac

18 Fairview/California, Inc. v. Dow Chemical Co., 840 F.2d 691, 695

19 (9th Cir. 1988), see also Mid Valley Bank v. North Valley Bank, 764

20 F. Supp. 1377, 1389-90 (E.D. Cal. 1991) (Karlton, J.) (following

21 Cadillac Fairview to hold that "a failure to comply with the

22 [National Contingency Plan] is not a defense to liability, but goes

23 only to the issue of damages.").[14]

24

25     [14]  Another  case  holding  that  national  contingency  plan
   noncompliance affected damages, but not liability, was Basic
   Management Inc. v. U.S., 569 F. Supp. 2d 1106, 1121 (D. Nev. 2008).

26 Although Basic Management was decided after Carson Harbor I and II,

1    As this court understands the issue, these cases may be
2  reconciled by noting that under the statutory text, the question
3  is whether any particular cost is consistent with the national
4  contingency plan, rather than whether the plaintiff has uniformly
5  adhered to the plan.    Thus, different types of substantial
6  violations of the national contingency plan warrant different
7  treatment.  Total failure to comply with the procedural aspects of
8  the national contingency plan completely bars recovery.  City of
9  Colton, 614 F.3d at 1004.  Similarly, the Northern District of
10 California has held that a plaintiff who failed to provide "any
11 meaningful opportunity for public participation [had committed]
12 more than a technical or de minimis deviation from the NCP. . . .
13 As such, [the plaintiff had not] met its burden of demonstrating
14 that its incurred response costs were 'consistent' with the NCP,
15 and thus recoverable under CERCLA." Waste Mgmt. of Alameda County,
16 Inc. v. E. Bay Reg'l Park Dist., 135 F. Supp. 2d 1071, 1103 (N.D.
17 Cal. 2001).  City of Colton suggested, however, that a past failure
18 to comply with the procedural requirements of the National
19 Contingency Plan did not bar all possible future recovery.  City
20 of Colton, 614 F.3d at 1004 n.4, 1004-08.  The plaintiff in that
21 case effectively conceded that past costs had been incurred without
22 substantial compliance with the national contingency plan, but the
23 plaintiff sought a declaratory judgment entitling it to recovery

24  ───────────────

25 it relied on a Fifth Circuit case without citing the above Ninth
   Circuit authority; as such, Basic Management carries little
26 persuasive weight.

1  of future costs that would be incurred in compliance with the plan.

2  Id. at 1004.  The court held that CERCLA did not authorize such a

3  declaratory judgment in the absence of a showing of "liability for

4  past costs . . . under section 107."  Id. at 1008.  The court did

5  not reject, however, the plaintiff's underlying premise that future

6  costs could be consistent with the plan notwithstanding past

7  inconsistency.

8      Thus, the inquiry under CERCLA section 107(a)(4)(B) is whether

9  the particular costs for which the plaintiff seeks reimbursement

10 were incurred in connection with the national contingency plan, and

11 not whether the plaintiff has ever violated the plan.  For example,

12 a plaintiff who undertakes a remedial action without first

13 complying with the public participation requirements cannot recover

14 the costs of that action.  Waste Mgmt. of Alameda County, 135 F.

15 Supp. 2d at 1103.  It appears, however, that a party who initially

16 incurs costs without public participation can recognize the error,

17 seek meaningful participation regarding any work that remains, and

18 thereby recover the latter costs.  This approach serves CERCLA's

19 twin aims of providing an incentive for cleanup while ensuring that

20 the cleanup occurs in an effective (and cost-effective) manner.

21 To hold otherwise would mean that once a party had substantially

22 violated the national contingency plan, that party would have

23 little incentive to remediate the site.  Holding otherwise would

24 also disregard the statute's syntax, which looks to whether

25 particular costs complied with the national contingency plan.

26 ////

1        **2.   Reporting the 1983 Discovery of PCE Fumes**

2        Under 40 C.F.R. § 300.700(c)(5)(iv), one of the indicia of

3   "substantial compliance" with the national contingency plan is

4   compliance with 40 C.F.R. § 300.405.   Section 300.405 requires

5   reporting of "releases" of hazardous materials.   Specifically, it

6   provides that "A release may be discovered through: . . . (5)

7   Inventory or survey efforts or random or incidental observation

8   reported by government agencies or the public; . . . [or] (8) Other

9   sources," and "reports of [such] releases . . . shall, as

10  appropriate, be made to the [National Response Committee]."

11       As noted above in part II(D)(2), TEO has raised a triable

12  question as to whether AmeriPride discovered PCE in the soil in

13  1983 when excavation released PCE fumes.   TEO argues that

14  AmeriPride was required to report the presence of PCE at that time.

15  The court assumes that reporting was required without deciding the

16  issue.  Even under this assumption, the failure to report a release

17  does not preclude a finding of substantial compliance with the

18  National Contingency Plan.  NL Industries, Inc. v. Kaplan, 792 F.2d

19  896, 898-99 (9th Cir. 1986).   Because NL Industries squarely

20  confronted this issue, the court quotes the opinion at length:

21              [defendant] NL Industries contends that
            [plaintiff] Kaplan did not incur response
22          costs "consistent with the national
            contingency plan" since it failed to report
23          promptly the existence of a release of
            hazardous substances to the National Response
24          Center, as required by 40 C.F.R. § 300.63(b)
            (1985).    We have held, however, that
25          consistency with the national contingency plan
            does not necessitate strict compliance with
26          its provisions.  [Wickland Oil Terminals v.

> *Asarco, Inc*, 792 F.2d 887, 891-92 (9th Cir. 1986).] The apparent purpose of the requirement that releases be reported promptly to the National Response Center is to facilitate the development by a lead agency of a coordinated governmental response. Since we have held in *Wickland* that private parties may incur costs consistent with the national contingency plan without acting pursuant to a cleanup program approved by a lead agency, it would make little sense for us to bar private party recovery under section 107(a) of CERCLA on the basis of failure to comply with 40 C.F.R. § 300.63(b) (1985). Therefore, we hold that noncompliance with this section does not alone render the incurrence of response costs inconsistent with the national contingency plan.

*NL Industries*, 792 F.2d at 898-99. The court is not aware of any subsequent cases addressing the reporting requirement as it pertains to compliance with the national contingency plan.[15]

At oral argument, TEO conceded that *NL Industries* established that failure to report, without more, does not constitute a substantial violation of the national contingency plan. TEO argues that something "more" is present in this case, namely, harm resulting from the delay in reporting. In contrast, TEO argues that *NL Industries* rested on the factual conclusion that the failure to report was harmless in that case.

---

[15] All the cases TEO cites about reporting have to do with claims for failure to report under CERCLA section 103, and none have to do with the question of whether failure to report precludes recovery of costs under section 107. *United States v. Buckley*, 934 F.2d 84, 89 (6th Cir. 1991), *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003). *Tyson Foods* stands for the unobjectionable propositions that a party actual or constructive knowledge will trigger a duty to report, but that the duty only arises when there is knowledge of both a release and that the release occurred in a reportable quantity.

1    The court agrees that a failure to report, if it leads to a

2  delay in a response, can aggravate contamination.  Under CERCLA,

3  a party whose delay makes the problem worse can bear responsibility

4  for a share of the response costs.  <u>Bedford Affiliates v. Sills</u>,

5  156 F.3d 416, 422 (2d Cir. 1998), <u>overruled on other grounds by</u>

6  <u>W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.</u>, 559 F.3d 85, 90 (2d

7  Cir. 2009) (citing <u>Cooper Indus., Inc. v. Aviall Servs., Inc.</u>, 543

8  U.S. 157 (2004)).  TEO argues for a broader proposition, however:

9  by posturing the delay as a violation of the national contingency

10 plan, TEO argues that AmeriPride should be wholly barred from

11 recovery.

12    The court rejects TEO's broader argument as contrary to the

13 purposes of CERCLA.  Under TEO's interpretation, once a party had

14 failed to report a discharge leading to a delay in cleanup, that

15 party would be forever barred from recovering response costs.  This

16 would vastly diminish, if not wholly eliminate, the party's

17 incentive to clean the site.  It would also make a failure to

18 report unique among violations of the contingency plan.  As the

19 court explained above, <u>City of Colton</u> implies that other violations

20 of the national contingency plan can be corrected, at least

21 prospectively.  Under TEO's interpretation, a party who initially

22 fails to report cannot partially cure this failure by reporting at

23 a later date--indeed, AmeriPride did file a later report in this

24 case.

25    The court further notes that TEO's interpretation would

26 apparently be at odds with the purposes of CERCLA.  Under TEO's

1  position, once AmeriPride had failed to initially report a release,
2  AmeriPride would be forever barred from recovering response costs
3  under section 107.  This would make violation of reporting
4  requirements into, in some sense, a more extreme violation of
5  CERCLA than discharge of pollution itself.  Even a party
6  responsible for the majority of pollution can bring a section 107
7  claim against another party to recover the small fraction of costs
8  attributable to the second party.  TEO's interpretation would
9  consequently remove a key incentive for the non-reporting party to
10 remediate the site, thereby frustrating CERCLA's primary purpose.
11 Cases concerning other violations of the national contingency plan
12 have not imposed such forward looking consequences.  As discussed
13 above, City of Colton suggested that where a party has failed to
14 comply with the national contingency plan, the party could not
15 recover past costs, but that the door remained open for compliance
16 in future remedial efforts and thus future recovery.

17     Rejecting TEO's argument does not read the reporting
18 requirement out of the regulation, because a failure to report
19 still carries consequences.  CERCLA provides a separate cause of
20 action for failure to report discharges of hazardous chemicals,
21 CERCLA § 103, and the threat of such suits is an incentive to
22 report.  A failure to report, while itself insufficient to
23 demonstrate a substantial violation of the national contingency
24 plan, is one factor that may be evaluated together with other
25 violations in determining substantial compliance.  Washington State
26 Dept. of Transp. v. Washington Natural Gas Co., Pacificorp, 59 F.3d

1   793, 805 (9th Cir. 1995) (compliance evaluated based on the

2   "situation as a whole.").[16]  Finally, as the court explained above,

3   a failure to report may expose a party to liability contribution

4   under section 113(f).   Because of these numerous potential

5   consequences, the court's rejection of TEO's argument does not

6   eliminate the reporting requirement from the regulation.  In this

7   case, the report requirement remains an issue for trial because of

8   the contribution question.

9       In summary, there is a triable question as to whether

10  AmeriPride was aware of the PCE contamination in 1983.  Regardless

11  of whether AmeriPride was aware of PCE contamination in 1983,

12  AmeriPride's response costs were incurred in substantial compliance

13  with the national contingency plan.  TEO may raise the failure to

14  report in the context of its section 113(f) counterclaim.

15          **3.   Appropriateness of Response Costs**

16      TEO next argues that the particular remedial measures adopted

17  by AmeriPride violated the national contingency plan because they

18  were not "cost effective," 55 Fed. Reg. 8793.  The court rejects

19  TEO's argument and grants summary adjudication to AmeriPride on

20  this issue.

21      TEO first argues that rather than treating the contaminated

22  water, AmeriPride should have discharged the water into the

23  municipal sanitary sewer.  TEO's Opp'n to Pl.'s Mot. For Summ. J.,

24  13-14.   TEO asserts that this option would have been cheaper,

25  _____

26  [16] In this case, however, TEO has not provided evidence of any
    other general violations of the national contingency plan.

1  relying on the Warner expert declaration. (Dkt. 718). Warner
2  offers no evidence, however, regarding his cost calculations.
3  AmeriPride argues that discharging contaminated water to the
4  sanitary sewer would be more expensive than treating the water.
5  AmeriPride re-uses the treated water in laundry operations before
6  discharging the water to the sewer. Stott Rebuttal Decl. ¶ 8 (Dkt.
7  727-9). If AmeriPride did not first treat the contaminated water,
8  AmeriPride would be unable to use it for laundry. Id. AmeriPride
9  would therefore have to pay to discharge of both contaminated water
10 and laundry's "process water" into the sewer. Moreover, this
11 option would not obviate the expenses incurred in extracting and
12 testing the contaminated water. Id. AmeriPride submitted a
13 declaration indicating that as a result of these expenses, stopping
14 treatment of contaminated water at Operating Unit 2 would *increase*
15 expenses by $21,100 annually. Id. ¶ 9. In connection with the
16 present motion, TEO has not submitted any evidence to the contrary.
17 Instead, Warner's analysis of Operating Unit 2 ignores the costs
18 associated with disposing of contaminated water through the
19 sanitary sewer. Warner Decl. ¶ 49 (Dkt. 718).

20     TEO advances a broader argument regarding the facility's
21 "operating unit 3". For this unit, Warner argues that discharging
22 to the sanitary sewer would also have saved many up-front capital
23 costs in addition to saving annual treatment costs, but Warner does
24 not provide any evidence regarding annual costs of disposal to the
25 sanitary sewer. Id. The court assumes that a trier of fact could
26 credit Warner's conclusions regarding capital savings. AmeriPride

has provided evidence indicating, however, that these capital savings would be overwhelmed by increases in annual disposal costs, an issue on which TEO has not provided evidence.[17]   Stott Rebuttal Decl. ¶¶ 11-14 (Dkt. 727-9).   Accordingly, TEO has failed to raise a triable question as to whether discharging the contaminated water directly into the sanitary sewer would have been a cheaper treatment option.

TEO also asserts that AmeriPride seeks recovery for "other potentially unjustified costs enumerated in [expert] Jim Warner's declaration and report."   TEO's Opp'n to Pl.'s Mot. For Summ. J., 14.   Warner identifies only two such costs, which the court addresses despite TEO's failure to discuss these costs in its brief.   Warner states "I was not able to determine whether competitive bidding was used for construction work at the site. If not, it is possible that the costs could have been reduced." Warner Decl. ¶ 49 (Dkt. 718).   This is insufficient to raise a triable question.   Matsushita Elec. Indus., 475 U.S. at 585-86 ("metaphysical doubt" insufficient to defeat motion for summary judgment).

Warner also argues that, although the Regional Water Quality Control Board requires AmeriPride to monitor the plume of groundwater contamination on a quarterly basis, AmeriPride "should have been more aggressive in negotiating [with the Board for] a

---

[17] Warner assumed that the costs of water disposal and the operating costs of the treatment facility would be equivalent, without indicating that he had actually considered the issue.

37

1  semiannual or even annual monitoring program." Warner Decl. ¶ 49.

2  This does not raise a triable issue.   It appears to the court

3  wholly speculative as to whether such an aggressive posture would

4  have influenced the agency.  Warner argues that it is likely that

5  the Board would have been receptive because the local Board has

6  approved less frequent monitoring on analogous projects.   Id.

7  Since those questions turn on particular facts, an assertion of

8  similarity is less then convincing.  Moreover, it is unclear as to

9  whether less frequent monitoring, although cheaper, would have been

10 as effective.  By requiring a cost-effective response, the national

11 contingency plan does not mandate the cheapest possible response.

12 Instead, courts have held that more expensive options were cost-

13 effective when the added expense bought additional environmental

14 benefit.   Franklin County Convention Facilities Authority v.

15 American Premier Underwriters, Inc., 240 F.3d 534, 546 (6th Cir.

16 2001).  Thus, the court concludes that Warner's statement that the

17 Board has approved semiannual monitoring in other cases does not

18 raise a triable question as to the cost-effectiveness of quarterly

19 monitoring.

20      **4.   AmeriPride's Calculation of Response Costs**

21      Separate from TEO's arguments regarding compliance with the

22 national contingency plan, TEO challenges AmeriPride's calculation

23 of costs.   TEO first raises triable questions as to whether

24 AmeriPride's costs have been partially offset by recovery from

25 other sources.   TEO then argues AmeriPride cannot seek

26 reimbursement for funds paid in settlement to third parties.  The

1   court concludes that although these settlement costs are not
2   recoverable under CERCLA section 107, AmeriPride may pursue them
3   under section 113(f).

4               a.    Costs Offset by Other Sources

5        TEO argues that AmeriPride's costs are offset by the economic
6   benefit AmeriPride derives from re-using treated water and by funds
7   AmeriPride has received in settlement from third parties.

8        Taking the first issue, TEO argues that by re-using the
9   treated water, AmeriPride offsets the cost of purchasing water from
10  the city, but that AmeriPride has failed to include this savings
11  in its cost calculations.  TEO's Opp'n to Pl.'s Mot. For Summ. J.,
12  13-14. Warner Decl. ¶ 49 (Dkt. 718).  Although TEO presents this
13  argument as an aspect of cost-effectiveness, the argument merely
14  speaks to accounting, rather than to whether AmeriPride's course
15  of conduct was cost effective (and by extension, whether AmeriPride
16  complied with the national contingency plan).  Warner declares that
17  AmeriPride saved $28,632 in this manner.  AmeriPride has not
18  responded to this argument.  If the trier of fact credits Warner's
19  testimony, the consequence will be to reduce AmeriPride's recovery
20  by $28,632, not to wholly bar AmeriPride from recovery.

21       As to funds received in settlement, under CERCLA, a settlement
22  by one defendant "reduces the potential liability of the others by
23  the amount of the settlement."  42 U.S.C. § 9613(f)(2).  TEO
24  asserts that AmeriPride has received funds in settlements with
25  Chromalloy and Petrolane, although TEO does not quantify these
26  funds.  TEO's response to SUF ¶ 56.  AmeriPride agrees that it has

1  received these funds and that its claim must be reduced by this

2  amount.  Because the parties' briefing does not quantify these

3  funds, the court does not further address this issue now.

4           **b.   Money AmeriPride Paid in Settlement**

5      TEO also points to AmeriPride's settlement of claims brought

6  against it by Huhtamaki and California-American (Cal-Am).

7  AmeriPride paid $8.25 million in settlement to Huhtamaki and $2

8  million to Cal-Am, for a total of $10.25 million.  Dkt. 638 page

9  4 ("Huhtamaki Settlement"), Notice of Mot. and Joint Mot. for

10 Approval of Settlement, 2:02-cv-01479, Dkt. 100 at 2 ("Cal-Am

11 Settlement").  In these settlement agreements, AmeriPride further

12 agreed to dismiss appeals of certain Cleanup and Abatement Orders

13 issued by the Central Valley Regional Water Quality Control Board

14 and to comply with future orders issued by the Board regarding PCE.

15 Although the court concludes that AmeriPride may not seek

16 indemnification or contribution for these costs under section 107,

17 the court permits AmeriPride to pursue these costs under section

18 113(f).

19     The Supreme Court has explained that "[w]hen a party pays to

20 satisfy a settlement agreement or a court judgment, it does not

21 incur its own costs of response . . . [r]ather, it reimburses other

22 parties for costs that those parties incurred." <u>Atlantic Research</u>,

23 551 U.S. at 139.  The court reached this conclusion by examining

24 the relationship between CERCLA sections 107 and 113(f).  The two

25 sections have differing scopes.  Section 113(f) provides a cause

26 of action for "contribution" for damages paid to another party.

1 <u>Atlantic Research</u>, 551 U.S. at 139.  Section 107 allows recovery

2 of "response costs."  Another distinction between the two sections

3 is that section 113(f) has a shorter statute of limitation than

4 section 107.  The Court held that if "response costs" included

5 funds paid to a third party, a party could always circumvent

6 section 113(f)'s statute of limitations by repackaging the same

7 claim under section 107.  <u>Id.</u>

8      Here, the court agrees with TEO that the funds AmeriPride paid

9 in settlement were not "response costs."  AmeriPride argues to the

10 contrary, asserting that these payments were for the cost of

11 providing replacement water and therefore response costs.

12 AmeriPride argues that pursuant to the Regional Water Quality

13 Control Board Abatement Orders, AmeriPride had pre-existing legal

14 obligations to provide replacement water to Huhtamaki and Cal-Am,

15 and that the Board held that the settlements discharged these

16 obligations.  The settlement agreements demonstrate, however, that

17 rather than fulfilling these obligations directly, AmeriPride paid

18 funds in exchange for agreements from Cal-Am and Huhtamaki to

19 release AmeriPride from this obligation.  Cal-Am settlement at 5,

20 Huhtamaki Settlement at 3, 4, 8.  Because AmeriPride simply paid

21 funds to Huhtamaki and Cal-Am, rather than actually purchasing

22 replacement water, the court cannot view these payments as response

23 costs.

24      <u>Atlantic Research</u> did not hold that a party cannot seek

25 contribution for settlement payments; the Court merely held that

26 such claims must be brought under section 113(f) rather than

41

section 107.  Nothing appears to preclude AmeriPride from bringing a section 113(f) claim here.  Notably, it does not appear that the statute of limitations has expired.  Thus, TEO simply argues that AmeriPride should be prevented from recovering these costs because AmeriPride failed to cite the correct provision of the statute in its complaint.  The court rejects this "magic words" argument. AmeriPride may therefore seek to recover these costs under section 113(f).

Finally, TEO notes that the settlements restated AmeriPride's existing obligation to comply with Regional Water Quality Control Board orders regarding cleanup.  TEO argues that because the settlement restated these obligations, the costs associated with these obligations were transformed into non-recoverable settlement costs.  TEO misunderstands Atlantic Research.  Notwithstanding the settlement, costs paid in connection with remediation actually performed by AmeriPride remain recoverable.

**5.   Summary of Liability under Section 107**

TEO raised three arguments in response to AmeriPride's section 107 claim.  First, TEO argued that the claim was barred by AmeriPride's failure to report PCE contamination in 1983.  Assuming that AmeriPride was aware of the contamination at that time, any failure to report does not demonstrate that AmeriPride was not in substantial compliance with the national contingency plan, as explained by the Ninth Circuit in NL Industries, 792 F.2d 896. Second, TEO argues that AmeriPride's response costs were not cost-effective.  TEO has failed to raise a triable question regarding

1  cost-effectiveness.    Finally,    TEO    challenges    AmeriPride's

2  accounting  for  costs.    Triable  questions  exist  as  to  whether

3  AmeriPride's  recovery  must  be  offset  by  the  value  of  the  treated

4  water  and  by  amounts  AmeriPride  received  in  settlement  from  third

5  parties.    The  court  further  agrees  that  funds  AmeriPride  paid  to

6  Huhtamaki  and  Cal-Am  were  not  "response  costs"  recoverable  under

7  CERCLA  section  107,  but  AmeriPride  may  seek  to  recover  these  funds

8  under  section  113(f).

9      Thus,  AmeriPride  is  entitled  to  summary  judgment  regarding  the

10  threshold  question  of  TEO's  liability  under  section  107.    The  court

11  therefore  turns  to  the  questions  of  AmeriPride's  fault  in  the

12  matter.

13  **B.    Apportionment and Contribution**

14      CERCLA  provides  various  mechanisms  by  which  liability  may  be

15  distributed  among  potentially  responsible  parties.    Under  section

16  107,  where  the  *defendant*  can  show  that  it  is  liable  for  only  an

17  identifiable  portion  of  the  harm,  courts  will  apportion  liability

18  accordingly.    Burlington Northern,  129  S.Ct.  at  1882  n.9  (2009).

19  To  defeat  a  plaintiff-initiated  motion  for  summary  judgment,  the

20  defendant  only  needs  to  show  there  are  "genuine  issues  of  material

21  fact  regarding  a  reasonable  basis  for  apportionment  of  liability."

22  U.S. v. Alcan Aluminum Corp. (Alcan-PAS),  990  F.2d  711,  722  (2nd

23  Cir.  1993).    Even  when  apportionment  is  not  possible  under  the

24  strict  standards  of  section  107,  a  defendant  may  seek  contribution

25  under  section  113(f),  which  allows  for  consideration  of  additional

26  equitable  factors,  and  which  further  allows  a  defendant  to  seek

1  contribution from the section 107 plaintiff.  <u>Burlington Northern</u>,

2  129 S.Ct. at 1882 n.9.

3      In the instant motion, AmeriPride argues that it did not

4  contribute to the PCE contamination in any way, and that the court

5  should therefore ascribe 100% of the liability to TEO.  On this

6  basis, AmeriPride argues that the court should grant summary

7  judgment for AmeriPride's section 107 claim, dismiss TEO's section

8  113(f) counterclaim, and similarly dismiss TEO's state law

9  counterclaims.

10      The court rejects this argument because triable questions

11  exist as to whether AmeriPride contributed to the PCE

12  contamination.  TEO has provided evidence supporting four types of

13  culpable conduct.  First, TEO argues that AmeriPride conducted dry

14  cleaning using PCE during the years immediately following

15  AmeriPride's purchase of the facility, presumably spilling some

16  PCE.  Second, that AmeriPride discharged wastewater contaminated

17  with PCE into the soil.  Third, that AmeriPride's wastewater

18  discharge, even if it was not contaminated with PCE, "mobilized"

19  the PCE already in the soil and therefore aggravated the problem.

20  <u>See</u> <u>Carson Harbor I</u>, 270 F.3d at 877 ("movement of [existing]

21  contamination . . . result[ing] from human conduct is a

22  'disposal.'") (citing <u>Kaiser Aluminum & Chemical Corp. v. Catellus</u>

23  <u>Development Corp.</u>, 976 F.2d 1338, 1342 (9th Cir. 1992)).  Fourth,

24  AmeriPride may have discovered the contamination in 1983 or 1984,

25  in which case AmeriPride's delay in response may have allowed the

26  problem to become worse.

1    Thus, there are triable questions as to whether TEO was 100%

2   responsible.   This defeats the predicate underlying AmeriPride's

3   argument for summary judgment on these issues.

4   **C.    AmeriPride's Claim for Declaratory Judgment Regarding Future**

5         **Response Costs**

6    Finally, AmeriPride seeks summary judgment on its claim for

7   future response costs under CERCLA section 113(g)(2).   A predicate

8   to such a claim is success on a claim under section 107.   City of

9   Colton, 614 F.3d at 1008.   To the extent that the court has

10  determined that AmeriPride's existing response actions have

11  substantially complied with the national contingency plan, the

12  court determines that continuation of those actions will be

13  similarly compliant.   Because triable questions exist as to the

14  allocation of responsibility between AmeriPride and TEO, however,

15  the court cannot grant declaratory judgment holding TEO responsible

16  for those future costs.

17                        **IV.  CONCLUSION**

18    For the reasons stated above, the court orders as follows:

19

20  1.    AmeriPride's motion for summary judgment is GRANTED IN

21        PART. The court grants partial summary judgment pursuant

22        to Fed. R. Civ. P. 56(g).

23

24  2.    The amounts AmeriPride paid in settlement to Huhtamaki

25        and Cal-Am are not recoverable under CERCLA section 107.

26        AmeriPride may file an amended complaint seeking to

recover these costs under CERCLA section 113(f). Said complaint shall be filed no later than fourteen (14) days from the date of this order.

3.    AmeriPride's statement of costs may need to be reduced to account for funds received in settlements with other parties and for the economic value of the treated water.

4.    All of the remaining response costs claimed by AmeriPride are "necessary" and consistent with the national contingency plan.

5.    TEO is a potentially responsible party liable for AmeriPride's response costs pursuant to CERCLA section 107(a)(4)(B). The precise amount of this liability, and potential apportionment of liability between TEO and AmeriPride, remains to be determined.

6.    Triable questions remain as to whether AmeriPride "released" or "disposed of" PCE within the meaning of CERCLA.

7.    Similarly, triable questions remain regarding the equitable allocation of costs between the parties, pursuant to CERCLA section 113(f).

8.   Accordingly, the court denies AmeriPride's motion for
     summary judgment insofar as this motion pertains to
     allocation of liability on AmeriPride's CERCLA claims.
     The court similarly denies AmeriPride's motion for
     summary judgment as to TEO's counterclaims.

IT IS SO ORDERED.

DATED: May 12, 2011.


_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

47