UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AMERIPRIDE SERVICES, INC.,
A Delaware corporation,

        Plaintiff,

    v.

VALLEY INDUSTRIAL SERVICE,
INC., a former California
corporation, et al.,

        Defendants.
_____/
AND CONSOLIDATED ACTION AND
CROSS- AND COUNTER-CLAIMS.
_____/

NO. CIV. S-00-113 LKK/JFM

**PRETRIAL CONFERENCE ORDER**
**[TENTATIVE]**

Pursuant to court order, a Pretrial Conference was held in Chambers on October 3, 2011. PHILIP C. HUNSUCKER, LEE N. SMITH and MARC A. SHAPP appeared as counsel for plaintiff; FRED M. BLUM, ERIN K. POPPLER and RONALD S. BUSHNER appeared as counsel for defendants. After hearing, the court makes the following findings and orders:

This matter arises out of the contamination of the soil and groundwater at 7620 Wilbur Way in Sacramento, California. Plaintiff AmeriPride Services, Inc., the current owner and operator

1

1 │ of the site (an industrial laundry facility), brings claims against
2 │ Valley Industrial Services, Inc., and Texas Eastern Overseas, Inc.,
3 │ under the federal Comprehensive Environmental Response,
4 │ Compensation and Liability Act of 1980 ("CERCLA"), for cost
5 │ recovery, contribution, and declaratory relief.   Texas Eastern
6 │ Overseas, Inc., brings a counterclaim against AmeriPride for
7 │ contribution under CERCLA as well.

## I. JURISDICTION/VENUE

9 │     Jurisdiction is predicated upon 28 U.S.C. § 1331.   Venue is
10 │ predicated upon 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613 (b).

## II. JURY/NON-JURY

12 │     The parties agree that trial will be by the court and not by
13 │ a jury.

## III. UNDISPUTED FACTS

15 │     1.   AmeriPride is a Delaware corporation authorized to
16 │ do business in California.

17 │     2.   Defendant Valley Industrial Services, Inc. ("VIS,
18 │ Inc.") was incorporated in 1972 and was duly organized and
19 │ existed under the laws of the State of California.

20 │     3.   TEO is a dissolved Delaware corporation.

21 │     4.   TEO dissolved in 1992.

22 │     5.   TEO has capacity to be sued under 8 Delaware Code
23 │ Section 279.   The Delaware Chancery Court ordered appointment
24 │ of a receiver on November 30, 2009, as affirmed by the Delaware
25 │ Supreme Court on June 24, 2010.   TEO has no assets other than
26 │ potential rights under certain insurance policies.

1   6.   VIS, Inc. was a wholly owned subsidiary of Petrolane,
2   Inc. ("Petrolane").

3   7.   In 1972, all of the stock of VIS, Inc. was sold to
4   Petrolane which continued to operate the corporation as a
5   wholly-owned subsidiary.

6   8.   After Petrolane purchased VIS, Inc. and the Facility,
7   it was the sole owner of all the shares of stock of VIS, Inc.
8   during the time VIS, Inc. operated the Facility.

9   9.   In 1983, Petrolane sold the property and Facility to
10  Mission Linen.   Petrolane approved the sale to Mission Linen
11  and was a signatory to the sale agreement.   Petrolane received
12  the first installment of the purchase price for VIS, Inc. in
13  the amount of $1 million.

14  10.  VIS, Inc. merged into Automotive Repairs, Inc., a
15  California corporation, in 1990, and then Automotive Repairs,
16  Inc. merged into TEO, a Delaware corporation.

17  11.  TEO is the successor to VIS, Inc. by way of the
18  mergers discussed in Undisputed Fact 10.

19  12.  TEO admitted it is the successor by merger to VIS,
20  Inc.

21  13.  VIS, Inc. was merged into corporations which
22  eventually merged into TEO.

23  14.  By operation of the merger agreements between VIS,
24  Inc. and Automotive Repairs and Automotive Repairs and TEO, TEO
25  has expressly assumed VIS, Inc.'s liabilities.

26  15.  VIS, Inc. conducted industrial dry cleaning and

3

1  laundry washing operations at the property located at 7620
2  Wilbur Way in Sacramento, California (the "Facility") for a
3  period of 17 years.

4      16.   The Facility is a "facility" as that term is defined
5  by CERCLA Section 101(9), 42 U.S.C. § 9609(9).

6      17.   AmeriPride is the current owner and operator of the
7  Facility.

8      18.   AmeriPride conducts industrial laundry washing
9  operations at the Facility.

10     19.   In 1983, VIS, Inc. sold the Facility to Mission
11  Linen.

12     20.   Mission Linen then immediately sold the Facility to
13  Welch's Overall Cleaning Company, Inc. ("Welch's").

14     21.   Welch's operated the Facility until December 31,
15  1998, at which time Welch's was merged into AmeriPride, its
16  parent company.

17     22.   Dry cleaning operations at the Facility stopped prior
18  to 1983.

19     23.   Dry cleaning equipment was locked in a room at the
20  Facility until sometime after AmeriPride purchased the
21  Facility.

22     24.   PCE is a listed "Hazardous Substance" under CERCLA.
23  42 U.S.C. Section 9601(14) and 40 C.F.R. Section 302.4.

24     25.   Testing has revealed the presence of PCE in the soil
25  and groundwater at and near the Facility.

26     26.   PCE has been detected in the groundwater at the

4

1  Facility in concentrations as great as 11,000 parts per
2  billion.

3      27.   In 2001, Huhtamaki Foodservices, Inc.'s ("Huhtamaki")
4  production well Chinet #2 contained a concentration of 14 parts
5  per billion PCE.

6      28.   The RWQCB determined that the Facility was a source
7  of the PCE discovered in both of Huhtamaki's production wells.

8      29.   In 2001, PCE was detected in groundwater at a
9  concentration of 78 parts per billion in the Cal-Am Water Co.
10  Wilbur #1 municipal supply well in the vicinity of the
11  Facility.

12      30.   The RWQCB determined that the Facility was a source
13  of the PCE discovered in the Cal-Am Water Co. well.

14      31.   Cal-Am Water Co. discontinued use of the Wilbur #2
15  well, located approximately 500 feet south of the Site, in
16  December 2001 due to the proximity to the PCE plume.

17      32.   The level of PCE in the groundwater at the Facility
18  exceeds the federal and state mandated drinking water maximum
19  contaminant level ("MCL") of 5 parts per billion.

20      33.   The primary chemical of concern at the site is PCE.
21  PCE degradation products are also detected in site media,
22  including trichloroethene (TCE), cis- and
23  trans-1,2-dichloroethene (c- and t-1,2-DCE), 1,1-dichloroethene
24  (1,1-DCE), and vinyl chloride (VC). Degradation products of
25  PCE are also referred to herein as "daughter products" or
26  "daughter compounds."

1      34.  cis-1, 2 DCE, TCE and vinyl chloride can be created
2  when PCE degrades in the environment.

3      35.  Breakdown   products   of   PCE,   including   TCE,
4  cis-1,2-DCE,  and  1,1-DCE,  also  have  been  detected  in  the
5  groundwater at and near the Facility ("the Site").

6      36.  In groundwater, PCE has been detected at the highest
7  concentrations and is the most widespread chemical of concern
8  detected at the Site.

9      37.  In addition to PCE and its breakdown products, other
10  chemicals that are not listed as chemicals of concern in any
11  of the Cleanup and Abatement Orders listed in Undisputed Fact
12  83 have been detected in samples from Gore Sorbers, soil vapor,
13  soil or groundwater collected at the Site.

14      38.  In its undissolved form (a separate phase liquid),
15  PCE is denser than water and is referred to as a DNAPL.

16      39.  PCE is a volatile organic compound or "VOC."

17      40.  PCE is heavier than water.

18      41.  When dissolved in water, PCE is referred to as
19  aqueous phase PCE or "dissolved PCE."

20      42.  DNAPL   contamination   can   create   dissolved   PCE
21  contamination. Dissolved PCE contamination cannot create DNAPL
22  contamination.

23      43.  When DNAPL PCE is in equilibrium with water, the PCE
24  dissolves from the DNAPL PCE into the water until approximately
25  0.015% of the solution is PCE.  This is equivalent to a PCE
26  concentration of 150,000 parts per billion.

1      44.  The soils residing above the saturated zone are
2 referred to as the "vadose zone." The vadose zone extends from
3 the ground surface to approximately 70 to 75 feet below ground
4 surface.   Groundwater at the Site is approximately 70 to 75
5 feet below ground surface.

6      45.  When pure PCE is released into the subsurface, it
7 behaves as a "Dense Nonaqueous Phase Liquid" (DNAPL).

8      46.  PCE DNAPL tends to migrate downward in the subsurface
9 as long as sufficient DNAPL has been released to maintain a
10 driving force and the soil is permeable enough.   Low
11 permeability layers and the water table can both cause PCE to
12 migrate laterally instead of downward. If PCE is released to
13 the subsurface, it can spread to a point where it no longer
14 migrates due to the capacity of the soil/aquifer in the area
15 to hold the PCE in pore spaces.  PCE that has reached this
16 residual saturation state and is no longer capable of migrating
17 is referred to as "residual DNAPL." PCE that has not reached
18 residual saturation and is capable of further migration is
19 referred to as mobile DNAPL. Depending on site conditions and
20 the amount of PCE released, DNAPL PCE can remain stuck in the
21 vadose zone without reaching the water table, or alternatively
22 can migrate to and below the water table.

23      47.  Above the water table there is a certain amount of
24 soil moisture related to infiltration of water from above and
25 a certain amount is in the pore spaces, called "pore water."
26      48.  There is residual PCE in the vadose zone from spills

1   during dry cleaning operations during VIS, Inc.'s ownership of
2   the Facility.

3       49.   When soil vapor from residual DNAPL PCE hits the pore
4   water, the residual PCE may contaminate the pore water or the
5   water can infiltrate through the original contamination and
6   leach the chemicals.

7       50.   When the water comes in contact with the residual
8   PCE, or soil gas containing PCE, it can cause some of the PCE
9   to leach into the water.

10      51.   PCE that is released to the subsurface can partition
11  into three phases. PCE can sorb onto soil, exist in soil gas,
12  and dissolve in water. With the exception of soil vapor, these
13  same phases can occur below the water table.  PCE in the vadose
14  zone can migrate to groundwater as DNAPL, in the vapor phase,
15  and/or as a dissolved phase in groundwater.

16      52.   During the time VIS, Inc. owned and operated the
17  Facility, it used DNAPL PCE as a solvent for its dry cleaning
18  operations.

19      53.   PCE entered the environment during the VIS, Inc.
20  years of ownership and operation of the Facility.

21      54.   There were "releases within the meaning of Section
22  101(22) of CERCLA, 42 U.S.C. Section 9601(22), of Hazardous
23  Substances at the Site."

24      55.   During VIS, Inc.'s operation of the Facility, any
25  DNAPL PCE releases initially occurred to the ground.

26      56.   Releases of DNAPL PCE to the floor can reach the

8

1  environment thorough cracks in the concrete, the porosity of
2  paved surfaces and spaces from the way equipment is anchored
3  to the ground.

4      57.   At least one of the TEO releases listed on Table 8
5  of the Warner Expert Report (Dkt. 707-10 at 16) got PCE into
6  the subsurface.

7      58.   In 1980 or 1981, a pipe broke while a storage tank
8  for DNAPL PCE was being moved.

9      59.   An overfill of a PCE storage tank occurred in the
10 late 1970s when a delivery truck driver left the pump running
11 while filling the PCE storage tank causing a DNAPL PCE to spill
12 across the floor and into a nearby canal.

13     60.   A boil-over in the late 1970s occurred, resulting in
14 PCE being released.

15     61.   An approximately 20 gallon accidental overflow of PCE
16 occurred between 1976 and 1981 when the operators forgot to
17 turn off the pump.

18     62.   PCE releases from machine imbalances between 1979 and
19 1980 could have reached the subsurface.

20     63.   PCE is highly volatile and thus readily partitions
21 (evaporates) into aboveground air and subsurface soil vapor.

22     64.   Even if DNAPL PCE does not make its way all the way
23 to groundwater, there can be groundwater contamination as a
24 result of PCE vapors transported to the water table and water
25 that infiltrates through spill zones can carry chemicals down
26 to the water table.

1    65.  Dissolved PCE has been detected in AmeriPride's
2    wastewater.

3    66.  The wash aisle trench was extended after AmeriPride
4    purchased the Facility.

5    67.  During AmeriPride's ownership and operation of the
6    Facility, a wastewater sump overflowed a couple of times.

7    68.  The sump outside the Facility that handles waste
8    water at the Facility is constructed with approximately 6
9    inches of concrete.

10   69.  During AmeriPride's ownership and operation of the
11   Facility, pipes removed by AmeriPride leaked PCE-contaminated
12   wastewater into the soil and groundwater and this contamination
13   was a cause of the contamination on the Huhtamaki property.

14   70.  Releases of PCE and other hazardous substances to the
15   subsurface have occurred before and after AmeriPride's
16   acquisition of the Facility in June 1983, resulting in some
17   overlapping areas of contamination with the same chemicals.

18   71.  Both DNAPL PCE and wastewater with dissolved PCE have
19   been released to the subsurface.

20   72.  Wastewater releases from laundry operations since
21   1983 physically overlap some of the areas where PCE DNAPL may
22   have been previously released.

23   73.  AmeriPride and VIS, Inc. received and processed
24   laundry from customers that from time to time was contaminated
25   with PCE and other chemicals that are not listed as chemicals
26   of concern in any of the Cleanup and Abatement Orders listed

10

1 | in Undisputed Fact 83.

2 |     74.  During a remodel of the Facility in March 1997,
3 | AmeriPride's    environmental    consultant    performed    an
4 | investigation of the soil at the Facility and ultimately found
5 | evidence of PCE in the soil under the Facility.

6 |     75.  In 1997, AmeriPride reported the PCE contamination
7 | by telephone call to regulatory authorities, namely the
8 | Sacramento County Department of Environmental Management
9 | ("SCDEM").

10 |    76.  As directed by SCDEM, AmeriPride conducted additional
11 | soil sampling and installed monitoring wells from 1997 through
12 | 2002.

13 |     77.  During the course of the investigation, AmeriPride
14 | discovered that in addition to PCE in the soil beneath the
15 | buildings at the Facility, PCE, PCE breakdown products and
16 | other chemicals that are not listed as chemicals of concern in
17 | any of the Cleanup and Abatement Orders listed in Undisputed
18 | Fact 83 were present in the groundwater beneath the Facility.

19 |     78.  AmeriPride's investigation concluded that PCE
20 | typically used in dry cleaning operations was in the soil and
21 | groundwater at and near the Facility.

22 |     79.  In 2001, PCE also was detected in a production well
23 | at the neighboring Huhtamaki facility.

24 |     80.  Also in 2001, PCE was detected in a municipal well
25 | near the Facility (Wilbur #1).

26 |     81.  As a result of PCE detected in a municipal well near

1  the Facility (Wilbur #1) owned by Citizens Utilities Company
2  in 2001, at least one of these wells was consequently shut
3  down.

4      82.   The California Regional Water Quality Control Board,
5  Central Valley Region ("RWQCB") took regulatory control over
6  the site investigation in 2002.

7      83.   During the course of its oversight of the
8  investigation and remediation of the PCE at and near the
9  Facility, the RWQCB issued Cleanup and Abatement Orders ("CAO")
10  R5-2003-0059; R5-2005-0721; R5-2006-0530; R5-2007-0723; and
11  amended R5-2009-0702 to both AmeriPride and VIS, Inc.

12      84.   Each of the CAOs listed in Undisputed Fact 83, lists
13  VIS, Inc. as a "discharger."

14      85.   TEO's counsel, John Poulos, was copied on each of the
15  CAOs listed in Undisputed Fact 83 at the same time they were
16  transmitted to AmeriPride.

17      86.   Under the direction of the RWQCB, AmeriPride has
18  performed investigation and remediation of the PCE in soil and
19  groundwater at and near the Facility.

20      87.   TEO has not performed any work to address the PCE and
21  its breakdown products in the soil and groundwater at and near
22  the Facility.

23      88.   TEO admits it has not paid any money toward the
24  remediation of the DNAPL PCE released by VIS, Inc.

25      89.   A Soil Vapor Extraction ("SVE") system has been
26  operating at the Site since 2003.

90.   The cleanup of the Site is ongoing, as the work directed by the RWQCB has not been completed.   As such, additional response costs will be incurred.

91.   As a result of a settlement with AmeriPride, California-American Water Company ("Cal-Am Water Co.") was paid $2 million.

92.   As a result of a settlement with AmeriPride, Huhtamaki was paid $8,250,000.

93.   As a result of a settlement with Chromalloy, AmeriPride was paid $500,000.   As a result of its settlement with Petrolane, AmeriPride was paid $2.75 million.

94.   On July 2, 2007 this Court entered an order approving the three settlements agreements between Chromalloy and AmeriPride, Petrolane and AmeriPride, and Huhtamaki and AmeriPride settlement agreements as good faith settlements.

95.   The Court's July 2, 2007 order approved the settlements between Chromalloy and AmeriPride, AmeriPride and Petrolane and AmeriPride and Huhtamaki.   The order approving these settlements states, "Section 6 of the Uniform Comparative Fault Act ("UCFA"), 12 U.L.A. 147 (1996) in pertinent part, is hereby adopted as the federal common law in this case for the purpose of determining the legal effect of the settlement agreements."

96.   AmeriPride, as the current owner and operator of the Facility, has been required by the RWQCB, an agency of the State of California, to address the PCE and its breakdown

1  products in the soil and groundwater at and near the Facility.

2      97.   VIS, Inc. and AmeriPride were both issued a CAO by

3  the RWQCB due to PCE releases.

4      98.   Whether or not AmeriPride was required by the RWQCB's

5  CAO No. R5-2003-0059 to provide replacement water for Cal-Am

6  Water Co. due to PCE released from the Facility? (AmeriPride's

7  Position: TEO admitted this fact in its answer to AmeriPride's

8  4th Amended Complaint. (Dkt. 756  50 at 7; Dkt. 698-7  14, Ex.

9  H  2-5 at 7-8; Dkt. 735 at 23; Dkt. 715  73.) TEO's Position:

10 CAO No. R5-2003-0059 required AmeriPride and VIS, Inc. to

11 submit a work plan, not to provide Cal-Am with replacement

12 water.   The CAO left the remedy open to the parties to

13 determine.   ("By 20 June 2003 submit a work plan to provide an

14 interim alternate supply to replace in-kind the supplies lost

15 from Wilbur #1 and Wilbur #2, municipal water supply wells, and

16 Chinet #1 and Chinet #2 water supply wells for the Huhtamaki

17 facility, in coordination with the wells' owners/operators. The

18 interim water supply replacement shall be in effect during the

19 time required to develop a permanent alternate supply unless

20 a permanent alternate supply is provided in the short term. The

21 work plan shall include a schedule, detailed proposals and a

22 commitment by the Discharger to implement the work plan,

23 including any necessary agreements or permits. If-any proposed

24 interim action requires Department of Health Services approval

25 prior to implementation, the work plan shall demonstrate that

26 the action will comply with Department of Health Services

14

1   requirements and that the Discharger has discussed and
2   coordinated the proposal with Department of Health Services,
3   Cal Am and Huhtamaki personnel." (Pg 7, pp2).   AmeriPride
4   choose the remedy that it provided.   Not the Board.)   At the
5   pretrial conference hearing held on October 7, 2011, the court
6   determined that, based on the record, this fact is undisputed.
7   See Hr'g Tr., ECF No. 775, at 19.

8       99.   Whether or not despite this relatively low solubility
9   in water, the concentrations of dissolved PCE in water are
10  significant when compared to the maximum contaminant level or
11  "MCL" of 5 parts per billion? (AmeriPride's Position:   TEO
12  admitted this fact in its answer to AmeriPride's 4th Amended
13  Complaint. (Dkt. 756 12 at 3; Dkt. 715 16.)   TEO's Position:
14  The objective numbers are not in dispute, but AmeriPride's
15  characterizations are inaccurate and not appropriate.   The
16  meaning of "this relatively low solubility" is vague.   Further,
17  this is a generalization which cannot be extrapolated to apply
18  to all areas of the Site because Site conditions vary.)   At the
19  pretrial conference hearing held on October 7, 2011, the court
20  determined that, based on the record, this fact is undisputed.
21  See Hr'g Tr., ECF No. 775, at 26.

22      100. Whether or not DNAPL PCE may act as long-term sources
23  of groundwater contamination if they are in the vadose zone?
24  (AmeriPride's Position:   TEO already admitted this fact in its
25  answer to AmeriPride's 4th Amended Complaint.   (Dkt. 756 30
26  at 5; Warner Depo. at 135:15-24, 147:7-16.)   Mr. Warner, TEO's

1 | expert, testified the presence of DNAPL PCE in the vadose zone
2 | at this Site had been a source of PCE in groundwater as a
3 | result of leaching and vapor transport:

4 |     Q. Okay. If the - if the DNAPL didn't make its way all
5 |        the way to groundwater, why is there a groundwater
6 |        contamination?

7 |     A. Well, vapors can be transported to the water table and
8 |        can contaminate groundwater. That's pretty well
9 |        established. And water that infiltrates through spill
10 |        zones can carry chemicals down to the water table.

11 |     Q. Do you think that process is happening at the - at our
12 |        site?

13 |     A. Yes.

14 | (Warner Depo. 135:15-24, emphasis added.) TEO's Position:
15 | Whether or not this occurs depends on numerous site conditions,
16 | such as the amount of PCE released, the depth to groundwater,
17 | the soil conditions and the presence of a source of water.
18 | Simply because it may occur does not mean it is occurring at
19 | the Site.) At the pretrial conference hearing held on October
20 | 7, 2011, the court determined, and the parties agreed, that
21 | this fact is undisputed. See Hr'g Tr. ECF No. 795 at 27.

22 |     101. Whether, on at least one delivery, a Van Waters'
23 | employee while transferring PCE to the storage tank allowed PCE
24 | to be released to the soil and into the groundwater at the
25 | Site. The release(s) of PCE have resulted in contamination of
26 | the Environment, including the soil and groundwater at and

1    around the Site, with PCE?   (AmeriPride's Position:   TEO
2    admitted this fact in its answer to AmeriPride's 4th Amended
3    Complaint.  (Dkt. 756  20 at 3-4.  See also Dkt. 697  24.)  The
4    Court determined in its May 12, 2011 summary judgment order
5    that this release was undisputed and was not cleaned up.  (Dkt.
6    735 at 10.)   TEO's Position:   TEO admitted there was a PCE
7    spill.   TEO has not and does not admit that this PCE spill
8    resulted in PCE contamination of the soil and/or groundwater
9    at and around the Site.)   At the pretrial conference hearing
10   held on October 7, 2011, the court determined that, based on
11   the record, this fact is undisputed.   See Hr'g Tr., ECF No.
12   775, at 31.

13       102. Whether or not TEO is a "covered person" under
14   CERCLA Section 107(a)(2), 42 U.S.C. § 9607(a)(2)? (AmeriPride's
15   Position:   TEO already admitted this fact in its answer to
16   AmeriPride's 4th Amended Complaint.   (Dkt. 756   56 at 8.)
17   Furthermore,  the  Court's  May  12,  2011  order  ("Summary
18   Adjudication Order"), held that:  "TEO is a type of person
19   potentially subject to liability, as TEO owned the facility at
20   the time the PCE was disposed of. 42 U.S.C. §§ 9607(a)(2),
21   9601(21) (corporations are persons for purposes of CERCLA),
22   9601(29) ('disposal' includes 'spilling')." (Dkt. 735 at 25.)
23   TEO's Position:  This is duplicative of other disputed facts.)
24   At the pretrial conference hearing held on October 7, 2011, the
25   court determined, and the parties agreed, that the fact is
26   undisputed.   See Hr'g Tr., ECF No. 775, at 8.

1   103. Whether or not VIS, Inc. has no separate existence
2   from TEO, because TEO is a successor. (AmeriPride's Position:
3   TEO already has admitted this fact.  (Dkt. 735 at 9; Dkt. 756
4   3 at 2; Dkt. 715 30. See also Dkt. 677 at 4:8-10 and Dkt. 663
5   at 6:20-23.)  TEO's Position:  This is duplicative of other
6   disputed facts.)  At the pretrial conference hearing held on
7   October 7, 2011, the court determined, and the parties agreed,
8   that the fact is undisputed. See Hr'g Tr., ECF No. 775, at 9.

9   104. Whether or not VIS, Inc. was a "person who at the
10  time of disposal of any hazardous substances owned or operated
11  [a] facility at which such hazardous substances were disposed
12  of."  42 U.S.C. § 9607(a)(2)?  (AmeriPride's Position:   TEO
13  already admitted this fact in its answer to AmeriPride's 4th
14  Amended Complaint.  (Dkt. 756 58 at 8. See also Warner Expert
15  Report, Table 8, Dkt. 707-10 at 16; TEO Depo. at 71:16-25.)
16  TEO's Position:   At the time the CAO was issued, VIS, Inc.
17  had previously merged and had ceased to exist.)  At the
18  pretrial conference hearing held on October 7, 2011, the court
19  determined, and the parties agreed, that the fact is
20  undisputed. See Hr'g Tr., ECF No. 775, at 10.

21  105. Whether or not the RWQCB has a reputation as being
22  a tough regulator? (AmeriPride's Position:   This fact is
23  relevant to the Gore Factor used in CERCLA Section 113(f) for
24  "cooperation with regulators." Bell Petroleum Services, Inc.
25  v. Sequa Corp., 3 F. 3d 889, 899-900 (5th Cir.1993) and
26  Centerior  Service Co. v. Acme Scrap Iron & Metal Corp., 153

1   F. 3d 344, 354 (6th Cir. 1998). See also United States v.
2   Newmont USA Ltd., No. CV-05-020-JLQ, 2008 WL 4621566 at *58
3   (E.D. Wash. Oct. 17, 2008). The "Gore Factors" are: (1) the
4   parties' ability to demonstrate that their contribution to
5   discharge, release, or disposal of hazardous waste can be
6   distinguished; (2) amount of hazardous waste involved; (3)
7   degree of toxicity of hazardous waste; (3) degree of
8   involvement by parties in generation, transportation,
9   treatment, storage, or disposal of hazardous waste; (4) degree
10  of care exercised by parties with respect to hazardous waste
11  concerns, taking into account characteristics of such hazardous
12  waste; and, (5) the degree of cooperation by parties with
13  federal, state or local officials to prevent any harm to public
14  health or environment. Id. (emphasis added). TEO already
15  admitted this fact in its answer to AmeriPride's 4th Amended
16  Complaint. (Dkt. 756  39 at 6; Warner Depo. at 45:19-46:11.
17  See also Dkt. 756  39 at 6; April 29, 2011 Deposition of
18  Michael Kavanaugh ("Kavanaugh Depo.") at 34:1-12.) TEO's
19  Position: TEO objects on the basis of relevance. This fact
20  does not relate or correspond to an element of a relevant cause
21  of action, as required by the Status (Pretrial Scheduling)
22  Conference Order. Moreover, there is no evidence that the
23  Board is tougher or less tough than any other regulator.) At
24  the pretrial conference hearing held on October 7, 2011, the
25  court overruled defendant TEO's objection on the basis of
26  relevance and determined that this fact is undisputed. See

1 │ Hr'g Tr., ECF No. 775, at 24.

2 │ ### IV. DISPUTED FACTUAL ISSUES

3 │ a. **Facts Proposed by AmeriPride, But Disputed by TEO**

4 │ i. **Whether TEO and VIS, Inc. were "covered persons" under**

5 │ **CERCLA?**

6 │ 1. Whether or not TEO's predecessor, VIS, Inc., was the

7 │ operator and owner of the Facility during the release of DNAPL

8 │ PCE at the Facility? (AmeriPride's Position: TEO already

9 │ admitted this fact in its answer to AmeriPride's 4th Amended

10 │ Complaint. (Dkt. 756 57 at 8; Warner Expert Report, Table 8,

11 │ Dkt. 707-10 at 16.) In addition, TEO admits in testimony given

12 │ by its corporate designee: "I believe that a number of - of

13 │ the operations and some of the events and releases that have

14 │ been described by the witnesses and are recorded in some of the

15 │ documentation would suggest that PCE entered the environment

16 │ during the VIS years, yes." (TEO Depo. at 71:16-25.) TEO's

17 │ Position: This is duplicative of other disputed facts.)

18 │ ii. **What Response Costs Were Incurred by the Parties?**

19 │ 2. Whether or not AmeriPride incurred over $18 million

20 │ in response costs to address the PCE contamination caused by

21 │ VIS, Inc. at the Facility, including $474,730 in regulatory

22 │ oversight costs; $7,570,921 in investigation and remediation

23 │ costs; and $10.25 million to settle replacement water claims?

24 │ (AmeriPride's Position: This was admitted by TEO in the Warner

25 │ Expert Report at 40-41, Dkt. 707-1 at 52-53 and Table 12, Dkt.

26 │ 707-10 at 21. In addition, according to the Summary

1  Adjudication Order, "TEO does not dispute that these amounts
2  were spent." (Dkt. 735 at 23.) In TEO's Position in response
3  to this proposed fact, TEO does not dispute the fact itself.
4  Instead, TEO improperly uses a "disputed fact" to reargue two
5  motions it lost - the Summary Adjudication Motion and a motion
6  to reopen discovery to seek insurance information filed both
7  after the Summary Adjudication Order and after the discovery
8  cut off. The premise of TEO's erroneous argument is that TEO
9  deserves a credit for insurance payments, even though did not
10 request a credit in its opposition to AmeriPride's summary
11 judgment motion. The Summary Adjudication Order recognized
12 three credits: (1) A credit for water reuse: "TEO argues that
13 by re-using the treated water, AmeriPride offsets the cost of
14 purchasing water from the city, but that AmeriPride has failed
15 to include this savings in its cost calculations;" (Dkt. 735
16 at 39); and, (2) Two credits for settlements with Chromalloy
17 and Petrolane: "AmeriPride received settlement funds from
18 Chromalloy and Petrolane which should be deducted from these
19 amounts now sought." (Dkt. 715  56.) No offset by TEO for
20 insurance payments was sought and the Court did not give one.
21 Accordingly, the credits to be given have been decided.
22 AmeriPride makes a detailed argument why TEO is wrong in the
23 disputed evidentiary issues section of its separate pretrial
24 statement which should be incorporated by reference here, if
25 necessary. TEO's Position: At this point TEO does not dispute
26 these amounts were spent. TEO disputes whether or not these

1  amounts were actually spent by AmeriPride.   The evidence
2  establishes that AmeriPride received insurance proceeds for the
3  environmental investigation, remediation and litigation. Since
4  there is no collateral source rule under CERCLA these proceeds
5  should be deducted from any sums that AmeriPride alleges it
6  spent,   AmeriPride has presented no evidence that the money
7  that it claims was spent was not reimbursed through insurance
8  proceeds.   As to the settlement monies, TEO disputes whether
9  the monies paid were response costs or were otherwise compliant
10 with the NCP.)

11        3.   Whether or not AmeriPride has been required to incur
12 at least $7,570,921 on investigation and remediation through
13 August 2010?  (AmeriPride's Position:  TEO admitted this fact
14 in the Warner Expert Report at 40-41, Dkt. 707-1 at 52-53 and
15 Table 12, Dkt. 707-10 at 21.   In addition, according to the
16 Summary Adjudication Order, "TEO does not dispute that these
17 amounts were spent."  (Dkt. 735 at 23.)   In TEO's Position in
18 response to this proposed fact, TEO does not dispute the fact
19 itself.   Instead, TEO improperly uses a "disputed fact" to
20 reargue two motions it lost - the Summary Adjudication Motion
21 and a motion to reopen discovery to seek insurance information
22 filed both after the Summary Adjudication Order and after the
23 discovery cut off.  The premise of TEO's erroneous argument is
24 that TEO deserves a credit for insurance payments, even though
25 it did not request a credit in its opposition to AmeriPride's
26 summary judgment motion.   The Summary Adjudication Order

1   recognized three credits:   (1) A credit for water reuse:   "TEO
2   argues that by re-using the treated water, AmeriPride offsets
3   the cost of purchasing water from the city, but that AmeriPride
4   has failed to include this savings in its cost calculations;"
5   (Dkt. 735 at 39); and, (2) Two credits for settlements with
6   Chromalloy and Petrolane:   "AmeriPride received settlement
7   funds from Chromalloy and Petrolane which should be deducted
8   from these amounts now sought." (Dkt. 715  56.)   No offset by
9   TEO for insurance payments was sought and the Court did not
10  give one.   Accordingly, the credits to be given have been
11  decided. AmeriPride makes a detailed argument why TEO is wrong
12  in the disputed evidentiary issues section of its separate
13  pretrial statement which should be incorporated by reference
14  here, if necessary.   TEO's Position:   At this point TEO does
15  not dispute this amount was spent.  TEO disputes whether or not
16  this amount was actually spent by AmeriPride.   The evidence
17  establishes that AmeriPride received insurance proceeds for the
18  environmental investigation, remediation and litigation.  Since
19  there is no collateral source rule under CERCLA these proceeds
20  should be deducted from any sums that AmeriPride alleges it
21  spent,   AmeriPride has presented no evidence that the money
22  that it claims was spent was not reimbursed through insurance
23  proceeds.)

24       4.    Whether or not AmeriPride has been required to incur
25  at least $474,730 on regulatory oversight through September
26  2010?   (AmeriPride's Position:   TEO admits this in the Warner

23

1 | Expert Report at 40-41, Dkt. 707-1 at 52-53 and Table 12, Dkt.
2 | 707-10 at 21.    In addition, according to the Summary
3 | Adjudication Order, "TEO does not dispute that these amounts
4 | were spent." (Dkt. 735 at 23.)   In TEO's Position in response
5 | to this proposed fact, TEO does not dispute the fact itself.
6 | Instead, TEO improperly uses a "disputed fact" to reargue two
7 | motions it lost - the Summary Adjudication Motion and a motion
8 | to reopen discovery to seek insurance information filed both
9 | after the Summary Adjudication Order and after the discovery
10 | cut off.   The premise of TEO's erroneous argument is that TEO
11 | deserves a credit for insurance payments, even though did not
12 | request a credit in its opposition to AmeriPride's summary
13 | judgment motion.   The Summary Adjudication Order recognized
14 | three credits: (1)  A credit for water reuse:  "TEO argues that
15 | by re-using the treated water, AmeriPride offsets the cost of
16 | purchasing water from the city, but that AmeriPride has failed
17 | to include this savings in its cost calculations;" (Dkt. 735
18 | at 39); and, (2) Two credits for settlements with Chromalloy
19 | and Petrolane:   "AmeriPride received settlement funds from
20 | Chromalloy and Petrolane which should be deducted from these
21 | amounts now sought." (Dkt. 715   56.)   No offset by TEO for
22 | insurance payments was sought and the Court did not give one.
23 | Accordingly, the credits to be given have been decided.
24 | AmeriPride makes a detailed argument why TEO is wrong in the
25 | disputed evidentiary issues section of its separate pretrial
26 | statement which should be incorporated by reference here, if

1   necessary.   TEO's Position: At this point TEO does not dispute
2   this amount was spent.   TEO disputes whether or not this amount
3   was actually spent by AmeriPride. The evidence establishes that
4   AmeriPride received insurance proceeds for the environmental
5   investigation, remediation and litigation.   Since there is no
6   collateral source rule under CERCLA these proceeds should be
7   deducted from any sums that AmeriPride alleges it spent,
8   AmeriPride has presented no evidence that the money that it
9   claims was spent was not reimbursed through insurance
10  proceeds.)

11      5.   Whether or not AmeriPride's future response costs
12  would be substantial, probably over a million dollars?
13  (AmeriPride's Position:   This fact is relevant to AmeriPride's
14  declaratory relief claim.   TEO already admitted this fact in
15  its answer to AmeriPride's 4th Amended Complaint.   (Dkt. 756
16  47 at 7;  Warner Depo. at 20:4-10.)   TEO's Position:
17  AmeriPride's future costs are unknown and there is no guarantee
18  that they will be NCP compliant.  Further, TEO objects on the
19  basis of relevance.   This fact does not relate or correspond
20  to an element of a relevant cause of action, as required by the
21  Status (Pretrial Scheduling) Conference Order.   Furthermore,
22  given the receipt of insurance proceeds, there is no proof that
23  AmeriPride will incur these costs.)

24  **iii. Whether AmeriPride Made Payments for Replacement Water**
25          **to Cal-Am Water Co. and Huhtamaki?**

26      6.   Whether or not after the shutdown, these municipal

1   wells (Wilbur #1 and #2) and any related contamination claims
2   were acquired by Cal-Am Water Co.)?  (AmeriPride's Position:
3   Previously, in its opposition to AmeriPride's Motion for
4   Summary Judgment, TEO admitted this fact.   (Dkt. 715   49.)
5   Additional evidence supports this fact.  (Dkt. 698-7  16, Ex.
6   N at 1.)   TEO feigns misunderstanding of the word "acquire,"
7   but in the context of Cal-Am Water Co.'s claims it is clear
8   because  Cal-Am  Water  Co.  acquired  the  wells  listed  in
9   Undisputed Fact 81 as owned by Citizens Utilities Company.  The
10  claims were transferred with the wells to Cal-Am Water Co.
11  TEO's Position: The meaning of this sentence is not clear.  TEO
12  is  also  unaware  of  what  meaning  AmeriPride  ascribes  to
13  "acquired" and AmeriPride has provided no elaboration.)

14      7.   Whether or not AmeriPride and VIS, Inc. each were
15  required by the RWQCB's CAO No. R5-2003-0059 to provide
16  Huhtamaki with replacement water following extensive sampling
17  by AmeriPride?  (AmeriPride's Position: TEO admitted this fact
18  in its answer to AmeriPride's 4th Amended Complaint.  (Dkt. 756
19  50 at 7. See also Dkt. 698-7  14, Ex. H  2-5 at 7-8; Dkt. 735
20  at 23; Dkt. 715  66.)   TEO's Position:  CAO No. R5-2003-0059
21  required AmeriPride and VIS, Inc. to submit a work plan, not
22  to provide Huhtamaki with replacement water.  The CAO left the
23  remedy open to the parties to determine. ("By 20 June 2003
24  submit a work plan to provide an interim alternate supply to
25  replace in-kind the supplies lost from Wilbur #1 and Wilbur #2,
26  municipal water supply wells, and Chinet #1 and Chinet #2 water

1   supply wells for the Huhtamaki facility, in coordination with
2   the wells' owners/operators.      The interim water supply
3   replacement shall be in effect during the time required to
4   develop a permanent alternate supply unless a permanent
5   alternate supply is provided in the short term.  The work plan
6   shall include a schedule, detailed proposals and a commitment
7   by the Discharger to implement the work plan, including any
8   necessary agreements or permits. If-any proposed interim action
9   requires Department of Health Services approval prior to
10  implementation, the work plan shall demonstrate that the action
11  will comply with Department of Health Services requirements and
12  that the Discharger has discussed and coordinated the proposal
13  with Department of Health Services, Cal Am and Huhtamaki
14  personnel." (Pg 7, pp2). AmeriPride choose the remedy that it
15  provided.  Not the Board.)

16       8.   Whether or not AmeriPride was required by the RWQCB's
17  CAO No. R5-2005-0721 to provide in-kind replacement water for
18  Huhtamaki, Inc?   (AmeriPride's Position:    TEO admitted this
19  fact in its answer to AmeriPride's 4th Amended Complaint.
20  (Dkt. 756  50 at 7; Dkt. 698-7  14, Ex. I  2-4 at 11-12; Dkt.
21  735 at 23; Dkt. 715    66.)    TEO's Position:    CAO No.
22  R5-2005-0721 required AmeriPride to submit a work plan
23  outlining how to provide in kind water replacement to
24  Huhtamaki.   The CAO left the remedy open to the parties to
25  determine. ("By December 15 submit a detailed technical work
26  plan outlining how the Discharger will provide in kind

1 replacement water to Huhtamaki for the water supply lost due
2 to pollution and proper abandonment to the Chinet #1 and #2
3 water supply wells." (Pg 11, pp 2).   AmeriPride choose the
4 remedy that it provided.   Not the Board.)

5     9.   Whether   or   not   RWQCB   CAO   No.   R5-2007-0723
6 acknowledged that the RWQCB's requirement that AmeriPride
7 provide replacement water for Huhtamaki had been satisfied by
8 the   February 12, 2007   settlement   between   AmeriPride   and
9 Huhtamaki? (AmeriPride's Position: TEO admitted this fact in
10 its answer to AmeriPride's 4th Amended Complaint.   (Dkt. 756
11 50 at 7; Dkt. 698-7  14, Ex. K  58 at 10; Dkt. 735 at 23; Dkt.
12 715   69.)   TEO's Position:   The CAO does not state that
13 AmeriPride's settlement with Huhtamaki satisfied the RWQCB's
14 requirement that AmeriPride provide replacement water for
15 Huhtamaki.   ("On 12 February 2007, Huhtamaki and AmeriPride
16 signed a Settlement Agreement resolving issues with respect to
17 water replacement costs, water supply replacement, and the
18 method of replacement and the closure of the two Chinet Wells.
19 Therefore, requirements for water supply replacement for the
20 industrial supply wells Chinet #1 and Chinet #2 have been
21 removed from this Order. Closure of these wells is still a
22 requirement in this Order." CAO No. R5-2007-0723  58).)

23     10.   Whether or not AmeriPride paid $2,000,000 to Cal-Am
24 Water Co. to settle the water replacement claims Cal-Am Water
25 Co.  had against AmeriPride?   (AmeriPride's Position:   TEO
26 admitted this fact in its answer to AmeriPride's 4th Amended

28

1  Complaint. (Dkt. 756  54 at 7; Warner Expert Report at 40-41,
2  Dkt. 707-1 at 52-53 and Table 12, Dkt. 707-10 at 21.)
3  According to the Court's May 12, 2011 summary judgment order,
4  "TEO does not dispute that these amounts were spent." (Dkt.
5  735 at 23.) TEO's Position: TEO does not dispute this amount
6  was spent. TEO disputes whether this amount was actually spent
7  by AmeriPride. The evidence establishes that AmeriPride
8  received insurance proceeds for the environmental
9  investigation, remediation and litigation. Since there is no
10  collateral source rule under CERCLA, these proceeds should be
11  deducted from any sums that AmeriPride alleges it spent.
12  AmeriPride has presented no evidence that the money that it
13  claims was spent was not reimbursed through insurance proceeds.
14  Moreover, the agreement settled all claims that Cal-Am had
15  against AmeriPride, including the water replacement claims, and
16  claims for lost of business, diminution in value, and other
17  damages.)

18      11.  Whether or not RWQCB CAO No. R5-2007-0723 stated that
19  the RWQCB's requirement that AmeriPride provide replacement
20  water for Cal-Am Water Co. had been satisfied by the settlement
21  between AmeriPride and Cal-Am Water Co?  (AmeriPride's
22  Position:  TEO admitted this fact in its answer to AmeriPride's
23  4th Amended Complaint. (Dkt. 756  50 at 7; Dkt. 698-7  14, Ex.
24  K  37 at 6.  See also Dkt. 698-7  14, Ex. I  42 at 7; Dkt. 735
25  at 23; Dkt. 715  75.)  TEO's Position:  The CAO does not state
26  that AmeriPride's settlement with Cal-Am Water Co. satisfied

1 the RWQCB's requirement that AmeriPride provide replacement
2 water for Cal-Am Water Co. ("On 12 February 2007, Huhtamaki and
3 AmeriPride signed a Settlement Agreement resolving issues with
4 respect to water replacement costs, water supply replacement,
5 and the method of replacement and the closure of the two Chinet
6 Wells. Therefore, requirements for water supply replacement for
7 the industrial supply wells Chinet #1 and Chinet #2 have been
8 removed from this Order. Closure of these wells is still a
9 requirement in this Order." CAO No. R5-2007-0723  58).)

10        12.  Whether or not the RWQCB required AmeriPride to
11 provide replacement water to Huhtamaki and Cal-Am Water Co.
12 because of the impacts of DNAPL PCE released at the Facility
13 on the water wells owned by them?  (AmeriPride's Position:
14 Previously, in its opposition to AmeriPride's Motion for
15 Summary Judgment, TEO admitted this fact.  (Dkt.  715  61.)
16 Additional evidence supports this fact.  (Dkt. 698-7  14, Ex.
17 H  2-5 at 7-8, Ex. I  38-42 at 6-7, and Ex. J  2-7 at 14-15;
18 Dkt. 735 at 23.)  TEO's Position:  There is no valid evidence
19 supporting this fact.  The RWQCB Orders AmeriPride alleges
20 support this fact required AmeriPride to develop a work plan
21 for water supply replacement. At most the Orders required the
22 payment for interim water while a final resolution was agreed
23 upon.   There is no proof that AmeriPride made any of these
24 payments.   The final remedy was left entirely open to the
25 parties.)

26        13.  Whether or not the RWQCB CAO No.  R5-2006-0530

required the payment of monetary compensation to Huhtamaki, Inc. for replacement water? (AmeriPride's Position: TEO admitted this fact in its answer to AmeriPride's 4th Amended Complaint. Dkt. 756 50 at 7; Dkt. 698-7 14, Ex. J 2-3 at 14-15; Dkt. 715 67. See also Dkt. 735 at 23.) TEO's Position: There is no evidence supporting this fact. The RWQCB Order AmeriPride alleges support this fact required AmeriPride to develop a work plan for water supply replacement. At most the Orders required the payment for interim water while a final resolution was agreed upon. There is no proof that AmeriPride made any of these payments. The final remedy was left entirely open to the parties.

14. Whether or not AmeriPride paid $8,250,000 to Huhtamaki to settle the water replacement claims Huhtamaki had against AmeriPride? (AmeriPride's Position: TEO's expert, Mr. Warner, admitted this fact. Warner Expert Report at 40-41, Dkt. 707-1 at 52-53 and Table 12, Dkt. 707-10 at 21. In TEO's Position in response to this proposed fact, TEO does not dispute the fact itself. Instead, TEO improperly uses a "disputed fact" to reargue two motions it lost - the Summary Adjudication Motion and a motion to reopen discovery to seek insurance information filed both after the Summary Adjudication Order and after the discovery cut off. The premise of TEO's erroneous argument is that TEO deserves a credit for insurance payments, even though did not request a credit in its opposition to AmeriPride's summary judgment motion. The

1  Summary Adjudication Order recognized three credits: (1)  A
2  credit for water reuse:   "TEO argues that by re-using the
3  treated water, AmeriPride offsets the cost of purchasing water
4  from the city, but that AmeriPride has failed to include this
5  savings in its cost calculations;" (Dkt. 735 at 39); and, (2)
6  Two credits for settlements with Chromalloy and Petrolane:
7  "AmeriPride received settlement funds from Chromalloy and
8  Petrolane which should be deducted from these amounts now
9  sought." (Dkt. 715  56.)   No offset by TEO for insurance
10 payments was sought and the Court did not give one.
11 Accordingly, the credits to be given have been decided.
12 AmeriPride makes a detailed argument why TEO is wrong in the
13 disputed evidentiary issues section of its separate pretrial
14 statement which should be incorporated by reference here, if
15 necessary.   TEO's Position:   The court denied AmeriPride's
16 Motion on the settlement payments and reached no conclusions
17 on the ability of AmeriPride to recover these alleged payments.
18 TEO does not dispute this amount was spent.   TEO disputes
19 whether this amount was actually spent by AmeriPride, and
20 whether it settled only the water replacement claims Huhtamaki
21 had against AmeriPride.   The agreement settled other claims as
22 well.   On 12 February 2007, Huhtamaki and AmeriPride signed a
23 Settlement Agreement resolving all issues between them,
24 including claims for business lost and dimunition in value.)

25      15.   Whether or not AmeriPride paid a total of $10.25
26 million to settle the replacement water claims of Huhtamaki

1  ($8.25 million) and Cal-Am Water Co. ($2 million)?
2  (AmeriPride's Position: Mr. Warner, TEO's expert, admits this
3  fact. (Warner Expert Report at 40-41, Dkt. 707-1 at 52-53 and
4  Table 12, Dkt. 707-10 at 21.) In addition, according to the
5  Summary Adjudication Order, "TEO does not dispute that these
6  amounts were spent." (Dkt. 735 at 23.)     In TEO's Position
7  in response to this proposes fact, TEO's position does not a
8  dispute of the fact itself. Instead, TEO improperly uses a
9  "disputed fact" to reargue two motions it lost - the Summary
10 Adjudication Motion and a motion to reopen discovery to seek
11 insurance information filed both after the Summary Adjudication
12 motion and the discovery cut off.     The premise of TEO's
13 erroneous is that TEO deserves a credit for insurance payments,
14 even though did not request a credit in its opposition to
15 AmeriPride's summary judgment motion. The Summary Adjudication
16 Order recognized three credits: (1) A credit for water reuse:
17 "TEO argues that by re-using the treated water, AmeriPride
18 offsets the cost of purchasing water from the city, but that
19 AmeriPride has failed to include this savings in its cost
20 calculations;" (Dkt. 735 at 39); and, (2) Two credits for
21 settlements with Chromalloy and Petrolane:     "AmeriPride
22 received settlement funds from Chromalloy and Petrolane which
23 should be deducted from these amounts now sought." (Dkt. 715
24 56.)   No offset by TEO for insurance payments was sought and
25 the Court did not give one. Accordingly, the credits to be
26 given have been decided. AmeriPride makes a detailed argument

1  why TEO is wrong in the disputed evidentiary issues section of
2  its separate pretrial statement which should be incorporated
3  by reference here, if necessary.   TEO's Position:   The court
4  denied AmeriPride's Motion on the settlement payments and
5  reached no conclusions on the ability of AmeriPride to recover
6  these alleged payments.   TEO does not dispute this amount was
7  spent.   TEO disputes whether this amount was actually spent by
8  AmeriPride.   The evidence establishes that AmeriPride received
9  insurance proceeds for the environmental investigation,
10  remediation and litigation.   Since there is no collateral
11  source rule under CERCLA these proceeds should be deducted from
12  any sums that AmeriPride alleges it spent, AmeriPride has
13  presented no evidence that the money that it claims was spent
14  was not reimbursed through insurance proceeds.   Moreover, the
15  agreement settled all claims that plaintiffs had against
16  AmeriPride, including the water replacement claims, and claims
17  for lost of business, diminution in value and other damages.)

18  **iv.   Whether the Parties Cooperated with the Regulators?**

19     16.   Whether AmeriPride cooperated with the RWQCB in
20  ensuring that the contaminated soil and groundwater are
21  remediated to prevent migration of PCE to drinking water wells?
22  (AmeriPride's Position:   TEO has never denied this fact,
23  including in its response to AmeriPride's Statement of
24  Undisputed Facts in Support of its Motion for Summary Judgment
25  (Dkt. 715 at 19), and in its answer to AmeriPride's 4th Amended
26  Complaint (Dkt. 756  60 at 8).  (See also Dkt. 698-8  36-40,

1 | 51, 53; Dkt. 698-17  12, 22, 23, and 30; Dkt. 698-7  5 and 15;
2 | Dkt.  698-6   12-13.)  TEO's  Position:  TEO  never  admitted
3 | AmeriPride cooperated with the RWQCB.  This fact is disputed.)

4 |        17.   Whether  or  not  TEO  refused  to  participate  in  the
5 | investigation and remediation of the contamination caused by
6 | the DNAPL PCE released by VIS, Inc. at and from the Facility,
7 | including refusing to comply with the cleanup and abatement
8 | orders   issued   by   the   RWQCB?      (AmeriPride's   Position:
9 | Previously, TEO admitted this fact.   (Dkt. 103  84; Dkt. 125
10 | 84.)  TEO's answer to AmeriPride's third party complaint, filed
11 | on February 23, 2001 states: "TEO admits that it has not taken
12 | action to remove alleged contaminants from the Facility, to
13 | share in the cost of removal of alleged contaminants, or to
14 | remediate alleged contamination at and under the Facility
15 | because it is not obligated to do so." (Dkt. 125  84.)  It was
16 | not impossible for TEO to participate any more than it has been
17 | impossible for TEO to participate in this civil action.  Plus,
18 | TEO clearly has insurance and its insurers could have enabled
19 | TEO's participation, just as they are now doing in this civil
20 | action.   TEO's Position:   TEO did not refuse to participate in
21 | the investigation and remediating because it was physically and
22 | legally impossible for TEO to have done so.  Refusal assumes
23 | a conscious decision not to do something and since TEO did not
24 | exist it could not refuse to do anything.  It is undisputed TEO
25 | is a dissolved corporation and has been so since 1992.   TEO
26 | dissolved  over  ten  years  before  any  CAO  was  issued  or

1  remediation was undertaken.    Even after the Receiver was
2  appointed, it was impossible for TEO to participate.  The order
3  appointing the Receiver gave the Receiver very limited powers
4  that did not include complying with the CAO.    TEO was never
5  listed on any CAO.  As a result thereof, TEO did not refuse to
6  participate since it did not have an obligation to do.    In
7  addition, the theoretical existence of insurance does not
8  change the status of TEO.  The insurers are not a responsible
9  party under CERCLA nor were they, or could they, be named as
10 a discharger by the RWQCB.)

11     18.    Whether or not AmeriPride has paid for all the
12 investigation and remediation, all the regulatory oversight and
13 all the replacement water costs associated with the Site?
14 (AmeriPride's Position:  TEO admitted this in the Warner Expert
15 Report at 40-41, Dkt. 707-1 at 52-53 and Table 12, Dkt. 707-10
16 at 21.  According to the Summary Adjudication Order, "TEO does
17 not dispute that these amounts were spent."  (Dkt. 735 at 23.)
18 In TEO's Position in response to this proposed fact, TEO does
19 not dispute the fact itself.    Instead, TEO improperly uses a
20 "disputed fact" to reargue two motions it lost - the Summary
21 Adjudication Motion and a motion to reopen discovery to seek
22 insurance information filed both after the Summary Adjudication
23 Order and after the discovery cut off.  The premise of TEO's
24 erroneous argument is that TEO deserves a credit for insurance
25 payments, even though did not request a credit in its
26 opposition to AmeriPride's summary judgment motion.    The

1 Summary Adjudication Order recognized three credits: (1)   A
2 credit for water reuse:   "TEO argues that by re-using the
3 treated water, AmeriPride offsets the cost of purchasing water
4 from the city, but that AmeriPride has failed to include this
5 savings in its cost calculations;" (Dkt. 735 at 39); and, (2)
6 Two credits for settlements with Chromalloy and Petrolane:
7 "AmeriPride received settlement funds from Chromalloy and
8 Petrolane which should be deducted from these amounts now
9 sought." (Dkt. 715   56.)   No offset by TEO for insurance
10 payments was sought and the Court did not give one.
11 Accordingly, the credits to be given have been decided.
12 AmeriPride makes a detailed argument why TEO is wrong in the
13 disputed evidentiary issues section of its separate pretrial
14 statement which should be incorporated by reference here, if
15 necessary. TEO's Position: At this point TEO does not dispute
16 these costs were paid.   TEO disputes whether or not these
17 costs, and what amount of these costs, were actually paid by
18 AmeriPride.   The evidence establishes that AmeriPride received
19 insurance proceeds for the environmental investigation,
20 remediation and litigation.   Since there is no collateral
21 source rule under CERCLA these proceeds should be deducted from
22 any sums that AmeriPride alleges it spent,   AmeriPride has
23 presented no evidence that the money that it claims was spent
24 was not reimbursed through insurance proceeds.   AmeriPride
25 argues that its payments to remediate and investigate the Site
26 are relevant Gore factors.   Therefore, independent of the

1  relevance to the § 107 claim, whether the monies paid by
2  AmeriPride were its own or were from insurance proceeds is
3  relevant to the Gore factors.)

4  **v.   Whether PCE has the Following Properties?**

5      19.   Whether or not DNAPLs have been extensively studied
6  (USEPA, 1991, 1992a, and 1993) in the environmental field for
7  many years because they present significant challenges for
8  groundwater remediation to low concentrations like MCLs?
9  (AmeriPride's Position:   This fact is relevant to show the
10 relative difficulty of remediation the DNAPL PCE releases from
11 TEO's predessor, VIS, Inc.   Specifically, Gore Factor (3),
12 cited in AmeriPride's response to Disputed Fact 20 is:   "(3)
13 degree of toxicity of hazardous waste."   TEO already admitted
14 this fact in its answer to AmeriPride's 4th Amended Complaint.
15 (Dkt. 756  14 at 3; Warner Expert Report at 16, Dkt. 707-1 at
16 28.)   TEO's Position:   TEO objects on the basis of relevance.
17 This purported "fact" does not relate or correspond to an
18 element of a relevant cause of action, as required by the
19 Status (Pretrial Scheduling) Conference Order.)

20     20.   Whether or not DNAPL PCE is clear in color, making
21 it hard to see as DNAPL in the subsurface?   (AmeriPride's
22 Position: TEO admitted this fact in its answer to AmeriPride's
23 4th Amended Complaint.   (Dkt. 756  10 at 3; Warner Depo. at
24 150:4-8.)   TEO's Position:   TEO admitted that DNAPL PCE may be
25 clear, not that it is always clear in color.   The color of
26 DNAPL is dependant on site conditions.)

1      21.   Whether or not PCE is only slightly soluble in water?
2  (AmeriPride's Position:   TEO admitted this fact in its answer
3  to AmeriPride's 4th Amended Complaint.   (Dkt.  756   11 at 3;
4  Dkt.  715   15.)   TEO's Position:   The meaning of "slightly
5  soluble" is vague.   TEO is unaware of what AmeriPride means by
6  the term, therefore, the fact is in dispute.)

7      22.   Whether or not, at the Site, the vadose zone soil
8  vapors partitioning between groundwater and soil and so the
9  vapors  are  interacting  with  groundwater?      (AmeriPride's
10 Position:   TEO already admitted this fact in its answer to
11 AmeriPride's 4th Amended Complaint. (Dkt. 756  30 at 5; Warner
12 Depo. at 147:7-16.)   Mr. Warner, TEO's expert, testified the
13 vadose zone soil vapors were partitioning between groundwater
14 and soil and so the vapors are interacting with groundwater at
15 this Site. TEO's Position: Whether or not this occurs depends
16 on  numerous  site  conditions,  such  as  the  amount  of  PCE
17 released, the depth to groundwater, the soil conditions and the
18 presence of a source of water.  Since site conditions vary by
19 site  location,  a  generalization  cannot  be  made  that  this
20 process is occurring broadly at "the Site." At the Site, any
21 interactions between soil gas and PCE did not significantly
22 affect groundwater.)

23     23.   Whether or not, since the MCL for PCE is pretty low
24 at 5 parts per billion, it does not take very much PCE to cause
25 a big problem? (AmeriPride's Position:   TEO admitted this fact
26 in its answer to AmeriPride's 4th Amended Complaint.  (Dkt. 756

1   13 at 3; Warner Depo. at 152:8-15.)  These are the words of Mr.

2   Warner, TEO's expert.  TEO's Position:  The objective numbers

3   are not in dispute, but AmeriPride's characterizations are

4   inaccurate and not appropriate.  The meaning of "very much" and

5   "a big problem" is vague and unquantifiable.  TEO is unaware

6   of what AmeriPride means by the terms.  Further, this is a

7   generalization which cannot be extrapolated to apply to all

8   areas of the Site because Site conditions vary.  TEO expressly

9   denied this fact in its Answer to AmeriPride's 4th Amended

10  Complaint.)

11       24.  Whether or not PCE undergoes transformation by

12  chemical and biochemical reactions, leading to degradation to

13  less chlorinated compounds, including the breakdown VOCs TCE;

14  c-1,2-DCE;  t-1,2  DCE;  1,1,  DCE  and  vinyl  chloride?

15  (AmeriPride's Position:  TEO admitted this fact in its answer

16  to AmeriPride's 4th Amended Complaint.  (Dkt. 756  15 at 3.)

17  Paragraph 45 of AmeriPride's 4th Amended Complaint states:

18       45.  After the initial release of DNAPL PCE to the
    subsurface, PCE dissolves from DNAPL PCE to soil water and
19  groundwater, vaporizes into soil gas, and sorbs to soil
    surfaces. PCE also undergoes transformation by chemical and
20  biochemical  reactions,  leading  to  degradation  to  less
    chlorinated compounds, including the following breakdown VOCs:
21  TCE; c-1,2-DCE; t-1,2 DCE; 1,1, DCE and vinyl chloride. Thus,
    DNAPL PCE can serve as a long-term source of continuing
22  dissolved PCE and VOC contamination to the groundwater. This
    allegation is not disputed by TEO. (Dkt. 715  17.)
23  TEO's answer at Paragraph 15 states:

24       15.  Answering paragraph 45 of the FAC, specifically
    the last two sentences contained therein, TEO alleges that
25  whether or not DNAPL PCE can act as a long term source of
    contamination depends on numerous site conditions including the
26  amount of PCE released, and the amount of organic material in

1 the soil.  TEO admits the other allegations contained in said
  paragraph.
2

3 (Emphasis added.)  TEO's Position:  Whether or not this occurs
4 depends on numerous site conditions including the amount of PCE
5 released, and the amount of organic material in the soil.  For
6 instance, in aerobic conditions PCE does not readily degrade
7 and the Site is generally aerobic.)

8     25.  Whether or not, after the initial release of DNAPL
9 PCE to the subsurface, PCE dissolves from DNAPL PCE to soil
10 water and groundwater, vaporizes into soil gas, and sorbs to
11 soil surfaces?  (AmeriPride's Position:  TEO admitted this
12 fact in its answer to AmeriPride's 4th Amended Complaint.
13 (Dkt. 756  15 at 3.)  TEO's Position:  PCE generally does this,
14 subject to Site conditions.  Contrary to AmeriPride's
15 characterization, this process is not unique to DNAPLs.)

16     26.  Whether or not DNAPL PCE can serve as a long-term
17 source of continuing dissolved PCE and VOC contamination to the
18 groundwater?  (AmeriPride's Position:  This allegation was not
19 disputed by TEO in its opposition to AmeriPride's Summary
20 Judgment Motion.  (Dkt. 715  17.)  In addition, TEO's expert,
21 Mr. Warner, admitted this in his expert report.  (Dkt. 707-1
22 at 29.)  TEO's Position:  PCE does this.  Contrary to
23 AmeriPride's characterization, this process is not unique to
24 DNAPLs.  Further, whether or not PCE or DNAPL PCE can act as
25 a long term source of contamination depends on numerous site
26 conditions including the amount of PCE released, and the amount

1 │ of organic material in the soil.)

2 │     27.  Whether or not when DNAPLs like PCE migrate below the
3 │ water table and are not remediated, they tend to act as
4 │ long-term   sources   of   dissolved   PCE   in  groundwater?
5 │ (AmeriPride's Position:  TEO already admitted this fact in its
6 │ answer to AmeriPride's 4th Amended Complaint.  (Dkt. 756   14
7 │ at 3; Warner Expert Report at 17, Dkt. 707-1 at 29.)   TEO's
8 │ Position:  Whether or not this occurs depends on numerous site
9 │ conditions.)

10 │ **vi.   Whether there was any PCE Use by AmeriPride at the**
11 │      **Facility?**

12 │     28.  Whether   or   not   AmeriPride   or   its   corporate
13 │ predecessor, Welch's Overall, ever used PCE at the Facility?
14 │ (AmeriPride's Position:  TEO already admitted that AmeriPride
15 │ and its corporate predecessor never used PCE.  On April 25,
16 │ 2011, in the Corporate Deposition of TEO pursuant to Federal
17 │ Rule of Civil Procedure 30(b)(6)("TEO Depo.") at 71:10-15, TEO
18 │ admitted that use of PCE at the Facility ceased before 1983.
19 │ Other evidence supporting this fact is at Dkt. 698-7  9, Ex.
20 │ D at 76:8-77:19; Dkt. 698-7  10, Ex. E at 10:1-11, 51:5-13, and
21 │ 80:12-20; Dkt. 698-9  15-16; Dkt. 698-11 at 8, Ex. B at 3; Dkt.
22 │ 698-16, Ex. C.   TEO's Position:   The evidence does not
23 │ substantiate that there was no use of products containing VOCs.
24 │ TEO agreed only that dry cleaning at the Facility ceased before
25 │ 1983. This is not analogous to an agreement that AmeriPride or
26 │ its predecessor never used PCE at the Facility.   TEO's

1 | corporate designee was testifying concerning VIS, Inc.'s
2 | operations at the Site not AmeriPride's.)

3 |     29.   Whether or not there is any evidence of releases of
4 | DNAPL PCE by AmeriPride at the Facility?   (AmeriPride's
5 | Position: TEO, through its corporate designee, testified that
6 | dry cleaning stopped before AmeriPride's period of ownership
7 | started.   (TEO Depo. at 71:10-15.)   Furthermore, there is no
8 | evidence of DNAPL PCE releases by AmeriPride - by definition
9 | PCE in wastewater cannot be DNAPL PCE because of its very low
10 | soluabilty in water.  TEO's Position:  TEO agreed only that dry
11 | cleaning at the Facility ceased before 1983.   This is not
12 | analogous to an agreement that AmeriPride or its predecessor
13 | never used PCE at the Facility.   Further, the wastewater had
14 | concentrations of PCE in the DNAPL range.   It is undisputed
15 | that wastewater leaked during AmeriPride's ownership and
16 | operation of the Facility.)

17 | **vii. Whether Releases of PCE During VIS, Inc.'s Ownership of**
18 |        **the Facility Reached Groundwater?**

19 |     30.   Whether or not groundwater contamination as a
20 | result of PCE vapors transported to the water table and water
21 | that infiltrates through spill zones is carrying chemicals down
22 | to the water table at the Site? (AmeriPride's Position:   TEO
23 | admitted this fact in its answer to AmeriPride's 4th Amended
24 | Complaint.   (Dkt. 756  30 at 5; Warner Depo. at 135:15-24.)
25 | This fact is from Mr. Warner, TEO's expert's testimony.
26 | Additionally, testimony from TEO's own expert proves that

43

1 | residual DNAPL PCE caused groundwater contamination via
2 | leaching and vapor transport:

3 |     Q. Okay. If the - if the DNAPL didn't make its way all
4 |     the way to groundwater, why is there a groundwater
5 |     contamination?

6 |     A. Well, vapors can be transported to the water table and
7 |     can contaminate groundwater. That's pretty well
8 |     established. And water that infiltrates through spill
9 |     zones can carry chemicals down to the water table.

10 |     Q. Do you think that process is happening at the - at our
11 |     site?

12 |     A. Yes.

13 |     31. (Warner Depo. 135:15-24, emphasis added.) TEO's
14 | Position: The alleged fact does not make sense. All that
15 | TEO's expert stated was that it is possible that vapors can be
16 | transported to the water table and can contaminate groundwater.
17 | There is a dispute as to whether this process is actually
18 | occurring at the Site. Any effect that vapors have had on
19 | groundwater contamination at the Site is minor at worst.)

20 |     32. Whether or not the pipe that broke in 1980 or 1981
21 | while a storage tank for DNAPL PCE was being moved spilled 50
22 | to 100 gallons of DNAPL PCE on to the ground at the Facility?
23 | (AmeriPride's Position: TEO already admitted this fact. (Dkt.
24 | 735 at 10; Dkt. 715  21; Warner Expert Report, Table 8, Dkt.
25 | 707-10 at 16.) TEO's Position: TEO does not dispute that
26 | there was a release. However, the amount of the release is

1  disputed.)

2      33.   Whether or not the overfill of a PCE storage tank
3  occurred in the late 1970s when a delivery truck driver left
4  the pump running while filling the PCE storage tank causing a
5  DNAPL PCE to spill across the floor and into a nearby canal
6  caused at least some of this DNAPL PCE to seep into the
7  subsurface and reached groundwater?  (AmeriPride's Position:
8  TEO's expert admitted this fact.  (Warner Depo. at 110:4-15;
9  Dkt. 697 at  24.)  TEO's Position:  There is no evidence that
10 DNAPL PCE contaminated the soil subsurface and reached the
11 groundwater as a result of this overfills.   The evidence
12 establishes the opposite.)

13     34.  Whether or not VIS, Inc. exercised a high degree of
14 care in its use of PCE, taking into account the characteristics
15 of PCE?  (AmeriPride's Position:  Admissions by TEO prove this
16 fact.  (Dkt. 756  62 at 8; Warner Expert Report, Table 8, Dkt.
17 707-10 at 16; TEO Depo. at 71:16-25.)  TEO's Position:  There
18 is no evidence of the relevant standard of care during the
19 period VIS, Inc. operated the Facility, let alone that VIS,
20 Inc. failed to satisfy it.  Moreover, there is no obligation
21 to exercise a "high" degree of care, but only ordinary care.)

22     35.   Whether or not releases from the wastewater system
23 during VIS, Inc.'s ownership would have resulted in a material
24 contribution of PCE to the subsurface? (AmeriPride's Position:
25 This fact presents an alternative theory why, based on TEO's
26 own expert testimony, AmeriPride's allocated share must be

45

1   small.   AmeriPride's expert, Dr. Farr, disputes there were
2   material contributions from the wastewater during VIS, Inc.'s
3   ownership, but TEO's expert, Mr. Warner, claims this is so.
4   (Dkt. 756   28 at 5; Warner Depo. at 198:22-199:5.)   If Mr.
5   Warner were correct, then any wastewater releases from VIS,
6   Inc. would essentially balance out any alleged waste water
7   releases by AmeriPride, making them essentially irrelevant for
8   purposes of allocation. TEO's Position:   TEO objects to this
9   fact on the basis it is outside the context of AmeriPride's
10  expert Anne Farr's opinion.   In her reports, Dr. Farr gave no
11  opinions on this fact and it is improper for her to render such
12  opinions at this stage of the proceedings.     There is no
13  evidence regarding the amount of water that VIS, Inc. may have
14  used, or the concentrations of chemicals in the water or the
15  effect on the subsurface.)

16      36.   Whether  or  not  wastewater  releases  from  the
17  wastewater system at the Facility would have caused residual
18  DNAPL  from  DNAPL  PCE  releases  to  reach  groundwater  in
19  approximately 2-3 years, resulting in the DNAPL PCE releases
20  by VIS, Inc. listed in Table 8 to the Warner Expert Report
21  reaching groundwater prior to 1983? (AmeriPride's Position:
22  AmeriPride's expert, Dr. Farr, opined that releases of DNAPL
23  PCE  itself  reached  groundwater.     However,  TEO's  experts
24  disagree and claim that DNAPL PCE provides only "residual
25  DNAPL" at the Site.   This fact presents an alternative theory
26  why,  based  on  TEO's  own  expert  testimony,  AmeriPride's

1  allocated share must be small because, even if TEO's experts
2  are correct, according to calculations by TEO's expert, Ms.
3  Gates, wastewater released by VIS, Inc. would have driven the
4  PCE to groundwater before 1983 when AmeriPride began
5  operations. (See Dkt. 756  29 at 5; Gates Depo. at 131:6-132:4.
6  Dkt. 756  29 at 5.)  TEO's Position:  This is not a plain
7  concise statement, and its meaning is not clear.  If this fact
8  refers to VIS, Inc.'s period of operation, TEO objects to this
9  fact on the basis it is outside the context of AmeriPride's
10 expert Anne Farr's opinion.  In her reports, Dr. Farr gave no
11 opinions on this fact and it is improper for her to render such
12 opinions at this stage f the proceedings.    There is no
13 evidence regarding the amount of water that VIS may have used,
14 or the concentrations of chemicals in the water or the effect
15 on the subsurface.)

16 **viii.   What is TEO's Liability Under the CAOs Issued by**
17           **RWQCB?**

18     37.   Whether a person who is named as a "discharger," as
19 VIS, Inc. was under the CAO's listed in Undisputed Fact 83 of
20 the Undisputed Facts Section, above, must comply with them?
21 (AmeriPride's  Position:    TEO's  experts  testified  that
22 compliance is required.  (Kavanaugh Depo. at 32:19-22; Warner
23 Depo at 54:17-55:2 and 55:17-23.)  TEO's Position:   In the
24 case of VIS, Inc., it did not exist at the time any CAO listing
25 VIS, Inc. was issued.  It is undisputed VIS, Inc. was merged
26 with Automotive Repairs in 1990, which subsequently merged with

47

1   TEO in 1991.   As a result of the merger, VIS, Inc., as a
2   separate entity, ceased to exist.   The Board never named the
3   corporate successor.   Likewise, TEO was never named or listed
4   as a party in any of the CAOs listing VIS, Inc.   Nor did the
5   Water Board ever institute an enforcement action against TEO.
6   Further, it is undisputed TEO is a dissolved corporation.   TEO
7   dissolved over ten years before any CAO was issued or
8   remediation was undertaken.   TEO did not and does not have the
9   physical or legal capacity to comply with the CAOs.   As a
10  result thereof, TEO is not under an obligation to do so.)

11      38.   Whether or not each of the CAOs listed in Undisputed
12  Fact 83 requires action of the discharger, lists VIS, Inc. as
13  a discharger collectively, and everything required in the CAOs
14  is required of both parties?   (AmeriPride's Position:   TEO
15  admitted this in the TEO Depo. at 68:4-69:10.   TEO's Position:
16  In the case of VIS, Inc., it did not exist at the time any CAO
17  listing VIS, Inc. was issued.   It is undisputed VIS, Inc. was
18  merged with Automotive Repairs in 1990, which subsequently
19  merged with TEO in 1991. As a result of the merger, VIS, Inc.,
20  as a separate entity, ceased to exist.   The Board never named
21  the corporate successor.   Moreover, TEO was never named or
22  listed as a party in any of the CAOs listing VIS, Inc.   Nor did
23  the Water Board ever institute an enforcement action against
24  TEO.   Further, it is undisputed TEO is a dissolved corporation.
25  TEO dissolved over ten years before any CAO was issued or
26  remediation was undertaken.   TEO did not and does not have the

48

1 | physical or legal capacity to comply with the CAOs.   As a
2 | result thereof, TEO is not under an obligation to do so.)

3 |     39.   Whether or not serious consequences flow from failure
4 | to comply with  CAOs such as those listed in Undisputed Fact
5 | 83, including:

6 |     a.   Being subject to a "regulatory enforcement action,"
7 | including California Water Code Section 13267 letters and
8 | fines?   (AmeriPride's Position:   Mr. Warner, TEO's expert,
9 | admitted this at his deposition at 55:24-56:12.   Capacity is
10 | a legal conclusion, not a fact.   Importantly, capacity under
11 | the CAOs most likely would be determined under California law
12 | which provides that dissolution does not impair valid claims
13 | against the corporation which have not been paid or provided
14 | for in the liquidation proceedings.   Claims may be asserted
15 | against a dissolved corporation - whether they arise before or
16 | after dissolution - and the corporation remains liable to the
17 | extent of its undistributed assets, including any available
18 | insurance. Calif. Corps. Code. § 2011(a) and Penasquitos, Inc.
19 | v. Sup.Ct., 53 Cal. 3d 1180 (1991).   This rule is different
20 | from the capacity rule under Federal Rule of Civil Procedure
21 | 17(b) which looks to the law of the state of incorporation.
22 | Importantly:   (1) VIS's, Inc. and TEO each had insurance
23 | policies that eventually responded to provide TEO a defense in
24 | this civil action; (2) VIS, Inc. and TEO are insured on
25 | policies issued to Petrolane, Inc. by members of the ACE
26 | Insurance Group ("ACE"), the American International Group

1  ("AIG"), and Lloyds of London (collectively "TEO's Insurers");
2  (3) TEO's Insurers had notice of this civil action since, at
3  the latest, January 31, 2002 (Dkt. 660-5 at 2); (4) on
4  September 4, 2007, TEO acknowledged that claims had been
5  tendered to insurers, allowing them to enter an appearance for
6  TEO to prevent entry of default against TEO (Dkt. 649); (5) one
7  of TEO's insurers, ACE, informed this Court of its involvement
8  in the claims against VIS, Inc. and TEO on June 1, 2007, when
9  ACE's counsel, Berman & Aiwasian, filed a "Statement of
10  Position Re: Joint Motion for Judgment, Approval of Settlement
11  and Entry of Contribution Bar" (Dkt 622); (6) by no later than
12  October 2003, Berman & Aiwasian was representing ACE in
13  connection with the claims in this civil action (Dkt. 606-5 at
14  4); and, (7) on August 11, 2008, TEO's current counsel, the
15  Wilson Elser firm, attended a hearing on AmeriPride's Motion
16  to set Pretrial Conference and Trial Dates (see Dkt. 663; Dkt.
17  666). The Wilson Elser firm was hired by TEO's insurers. (See
18  Dkt. 672-1 at 3.)  TEO's Position:  The issue of insurance is
19  irrelevant. The insurers never were, or could they, be named
20  in any order related to the Site or in any litigation related
21  to the Site. The insurers never owed any duty to AmeriPride
22  to investigate or remediate the Site.  In the case of VIS,
23  Inc., it did not exist at the time any CAO listing VIS, Inc.
24  was issued.  It is undisputed VIS, Inc. was merged with
25  Automotive Repairs in 1990, which subsequently merged with TEO
26  in 1991. As a result of the merger, VIS, Inc., as a separate

1  entity, ceased to exist.  The Board never named the corporate
2  successor.  Moreover, TEO was never named or listed as a party
3  in any of the CAOs listing VIS, Inc.  Nor did the Water Board
4  ever institute an enforcement action against TEO.  Further, it
5  is undisputed TEO is a dissolved corporation.  TEO dissolved
6  over ten years before any CAO was issued or remediation was
7  undertaken.   TEO did not and does not have the physical or
8  legal capacity to comply with the CAOs.  As a result thereof,
9  TEO is not under an obligation to do so.)

10       b.   Being "subject to fines and ultimately it can be a
11  criminal offense"?

12  (AmeriPride's Position:  TEO's expert, Mr. Kavanaugh, admitted
13  this at his deposition at 32:23-33:2.  Capacity is a legal
14  conclusion, not a fact.  Importantly, capacity under the CAOs
15  most likely would be determined under California law which
16  provides that dissolution does not impair valid claims against
17  the corporation which have not been paid or provided for in the
18  liquidation proceedings.  Claims may be asserted against a
19  dissolved corporation - whether they arise before or after
20  dissolution - and the corporation remains liable to the extent
21  of its undistributed assets, including any available insurance.
22  Calif. Corps. Code. § 2011(a) and Penasquitos, Inc. v. Sup.Ct.,
23  53 Cal. 3d 1180 (1991).   This rule is different from the
24  capacity rule under Federal Rule of Civil Procedure 17(b) which
25  looks to the law of the state of incorporation.  Importantly:
26  (1) VIS's, Inc. and TEO each had insurance policies that

1  eventually responded to provide TEO a defense in this civil
2  action; (2) VIS, Inc. and TEO are insured on policies issued
3  to Petrolane, Inc. by members of the ACE Insurance Group
4  ("ACE"), the American International Group ("AIG"), and Lloyds
5  of London (collectively "TEO's Insurers"); (3) TEO's Insurers
6  had notice of this civil action since, at the latest, January
7  31, 2002 (Dkt. 660-5 at 2); (4) on September 4, 2007, TEO
8  acknowledged that claims had been tendered to insurers,
9  allowing them to enter an appearance for TEO to prevent entry
10 of default against TEO (Dkt. 649); (5) one of TEO's insurers,
11 ACE, informed this Court of its involvement in the claims
12 against VIS, Inc. and TEO on June 1, 2007, when ACE's counsel,
13 Berman & Aiwasian, filed a "Statement of Position Re: Joint
14 Motion for Judgment, Approval of Settlement and Entry of
15 Contribution Bar" (Dkt 622); (6) by no later than October 2003,
16 Berman & Aiwasian was representing ACE in connection with the
17 claims in this civil action (Dkt. 606-5 at 4); and, (7) on
18 August 11, 2008, TEO's current counsel, the Wilson Elser firm,
19 attended a hearing on AmeriPride's Motion to set Pretrial
20 Conference and Trial Dates (see Dkt. 663; Dkt. 666).   The
21 Wilson Elser firm was hired by TEO's insurers. (See Dkt. 672-1
22 at 3.)  TEO's Position:  The issue of insurance is irrelevant.
23 The insurers never were, or could they, be named in any order
24 related to the Site or in any litigation related to the Site.
25 The insurers never owed any duty to AmeriPride to investigate
26 or remediate the Site.   In the case of VIS, Inc., it did not

1  exist at the time any CAO listing VIS, Inc. was issued.  It is
2  undisputed VIS, Inc. was merged with Automotive Repairs in
3  1990, which subsequently merged with TEO in 1991.  As a result
4  of the merger, VIS, Inc., as a separate entity, ceased to
5  exist.    The  Board  never  named  the  corporate  successor.
6  Moreover, TEO was never named or listed in any of the CAOs
7  listing VIS, Inc.  Further, it is undisputed TEO is a dissolved
8  corporation.  TEO dissolved over ten years before any CAO was
9  issued or remediation was undertaken.  TEO did not and does not
10 have the physical or legal capacity to comply with the CAOs.
11 As a result thereof, TEO is not under an obligation to do so.)

12     40.  Whether or not TEO, as successor to VIS, Inc., is
13 liable under each of the CAOs listed in Undisputed Fact 83?
14 (AmeriPride's Position:   In its opposition to AmeriPride's
15 summary judgment motion, TEO admitted this fact.  (Dkt. 715
16 25-31.)   In addition, there is other evidence that supports
17 this fact.  (Dkt. 698-7  14, Ex. H at 1, Ex. I at 1, Ex. J at
18 1, Ex. K at 1, and Ex. L at 1; Dkt. 697  6; Dkt. 125 at
19 1:24-26; Dkt. 735 at 9, n. 5.)  Capacity is a legal conclusion,
20 not a fact.  Importantly, capacity under the CAOs most likely
21 would be determined under California law which provides that
22 dissolution  does  not  impair  valid  claims  against  the
23 corporation which have not been paid or provided for in the
24 liquidation proceedings.  Claims may be asserted against a
25 dissolved corporation - whether they arise before or after
26 dissolution - and the corporation remains liable to the extent

53

1 | of its undistributed assets, including any available insurance.
2 | Calif. Corps. Code. § 2011(a) and Penasquitos, Inc. v. Sup.Ct.,
3 | 53 Cal. 3d 1180 (1991). This rule is different from the
4 | capacity rule under Federal Rule of Civil Procedure 17(b) which
5 | looks to the law of the state of incorporation. Importantly:
6 | (1) VIS's, Inc. and TEO each had insurance policies that
7 | eventually responded to provide TEO a defense in this civil
8 | action; (2) VIS, Inc. and TEO are insured on policies issued
9 | to Petrolane, Inc. by members of the ACE Insurance Group
10 | ("ACE"), the American International Group ("AIG"), and Lloyds
11 | of London (collectively "TEO's Insurers"); (3) TEO's Insurers
12 | had notice of this civil action since, at the latest, January
13 | 31, 2002 (Dkt. 660-5 at 2); (4) on September 4, 2007, TEO
14 | acknowledged that claims had been tendered to insurers,
15 | allowing them to enter an appearance for TEO to prevent entry
16 | of default against TEO (Dkt. 649); (5) one of TEO's insurers,
17 | ACE, informed this Court of its involvement in the claims
18 | against VIS, Inc. and TEO on June 1, 2007, when ACE's counsel,
19 | Berman & Aiwasian, filed a "Statement of Position Re: Joint
20 | Motion for Judgment, Approval of Settlement and Entry of
21 | Contribution Bar" (Dkt 622); (6) by no later than October 2003,
22 | Berman & Aiwasian was representing ACE in connection with the
23 | claims in this civil action (Dkt. 606-5 at 4); and, (7) on
24 | August 11, 2008, TEO's current counsel, the Wilson Elser firm,
25 | attended a hearing on AmeriPride's Motion to set Pretrial
26 | Conference and Trial Dates (see Dkt. 663; Dkt. 666). The

1   Wilson Elser firm was hired by TEO's insurers. (See Dkt. 672-1
2   at 3.)   TEO's Position:  The issue of insurance is irrelevant.
3   The insurers never were, or could they, be named in any order
4   related to the Site or in any litigation related to the Site.
5   The insurers never owed any duty to AmeriPride to investigate
6   or remediate the Site.   In the case of VIS, Inc., it did not
7   exist at the time any CAO listing VIS, Inc. was issued.  It is
8   undisputed VIS, Inc. was merged with Automotive Repairs in
9   1990, which subsequently merged with TEO in 1991.   Since VIS
10  was not subject to the CAO, its successor cannot be.  Moreover,
11  TEO was never named or listed in any of the CAOs listing VIS,
12  Inc.  Further, it is undisputed TEO is a dissolved corporation.
13  TEO dissolved over ten years before any CAO was issued or
14  remediation was undertaken.   TEO did not and does not have the
15  physical or legal capacity to comply with the CAOs.   Pursuant
16  to 8 Del. Code § 279 the receiver has authority to pursue and
17  act only with respect to available insurance coverage and to
18  defend in the action.   As a result thereof, TEO is not under
19  an obligation to do so.)
20  ix.   Whether the Distribution of PCE Contamination at the Site
21        Consistent With DNAPL PCE as the Only or Primary Source?
22        41.   Whether or not "residual phase" for DNAPL PCE means
23  that you have pure chemical contaminant like DNAPL PCE, for
24  example, in the subsurface that's acting as a continuous
25  source? (AmeriPride's Position: This fact is relevant to show
26  the relative difficulty of remediation the DNAPL PCE releases

1   from TEO's predecessor, VIS, Inc.  Specifically, Gore Factor (3),
2   cited in AmeriPride's response to Disputed Fact 20 is:  "(3)
3   degree of toxicity of hazardous waste."  TEO admitted this fact
4   in its answer to AmeriPride's 4th Amended Complaint.  (Dkt. 756
5   14 at 3; Warner Depo. at 31:11-16.)  TEO's Position: TEO
6   objects on the basis of relevance.  This purported "fact" does
7   not relate or correspond to an element of a relevant cause of
8   action, as required by the Status (Pretrial Scheduling)
9   Conference Order.  Moreover, whether and what effect DNAPL PCE
10  has is subject to a myriad of site specific conditions.)

11      42.  Whether or not "continuous source" means if you have
12  pure PCE DNAPL in the subsurface, it will it will keep
13  contributing mass to the subsurface environment? (AmeriPride's
14  Position:     This fact is relevant to show the relative
15  difficulty of remediation the DNAPL PCE releases from TEO's
16  predecessor, VIS, Inc.  Specifically, Gore Factor (3), cited in
17  AmeriPride's response to Disputed Fact 20 is:  "(3) degree of
18  toxicity of hazardous waste."  TEO admitted this fact in its
19  answer to AmeriPride's 4th Amended Complaint.  (Dkt. 756  14
20  at 3; Warner Depo. at 31:17-21.)  TEO's Position: TEO objects
21  on the basis of relevance.  This purported "fact" does not
22  relate or correspond to an element of a relevant cause of
23  action, as required by the Status (Pretrial Scheduling)
24  Conference Order.  Moreover, whether and what effect DNAPLE PCE
25  hse is subject to a myriad of site specific conditions.)

26      43.  Whether or not PCE vapor plumes can cover really

56

1   large areas, hundreds of feet in cases, oftentimes with
2   significantly high concentrations around the vadose zone
3   release areas and detectable concentrations pretty good
4   distances away? (AmeriPride's Position: TEO admitted this
5   fact in its answer to AmeriPride's 4th Amended Complaint.
6   (Dkt. 756 30 at 5; Warner Depo. at 177:1-4 and 177:9-22.) Mr.
7   Warner, TEO's expert, testified this process is happening at
8   this Site. TEO's Position: This is a hypothetical issue,
9   which depends on the conditions actually represent at a site
10  and has no relevancy to this Site. Further the terms
11  "significantly high concentrations" and "pretty good distances"
12  are vague.)

13      44. Whether or not the soil vapors from residual DNAPL
14  go different directions from the groundwater? (AmeriPride's
15  Position: This fact is relevant to show the relative
16  difficulty of remediation the DNAPL PCE releases from TEO's
17  predessor, VIS, Inc. Specifically, Gore Factor (3), cited in
18  AmeriPride's response to Disputed Fact 20 is: "(3) degree of
19  toxicity of hazardous waste." Mr. Warner, TEO's expert,
20  testified that this process is happening at this Site. TEO
21  admitted this fact in its answer to AmeriPride's 4th Amended
22  Complaint. (Dkt. 756 30 at 5; Warner Depo. at 176:6-8.)
23  TEO's Position: The meaning of this fact is unclear and vague,
24  however, TEO does not dispute soil vapor can move in different
25  directions.)

26      45. Whether or not typically there will be a vapor plume

57

1  that's sort of concentric around source areas and then a
2  groundwater plume that might be below that that heads off in
3  one direction? (AmeriPride's Position:  This fact is relevant
4  to show the relative difficulty of remediation the DNAPL PCE
5  releases from TEO's predecessor, VIS, Inc.  Specifically, Gore
6  Factor (3), cited in AmeriPride's response to Disputed Fact 20
7  is:  "(3) degree of toxicity of hazardous waste."  Mr. Warner,
8  TEO's expert, testified that this process is happening at this
9  Site.  TEO admitted this fact in its answer to AmeriPride's 4th
10  Amended Complaint.  (Dkt. 756  30 at 5; Warner Depo. at
11  176:9-25.)  TEO's Position:  The meaning of this fact is
12  unclear and vague, however, TEO does not dispute soil vapor can
13  move in different directions.)

14       46.  Whether or not, where there is a cover on the surface
15  of a site there is a capping effect where there's not as much
16  vapors going out to the atmosphere; the vapors spread out more
17  generally in the subsurface?  (AmeriPride's Position:  This
18  fact is relevant to show the relative difficulty of remediation
19  the DNAPL PCE releases from TEO's predecessor, VIS, Inc.
20  Specifically, Gore Factor (3), cited in AmeriPride's response
21  to Disputed Fact 20 is:  "(3) degree of toxicity of hazardous
22  waste."  Mr. Warner, TEO's expert, testified that this process
23  is happening at this Site.  TEO admitted this fact in its
24  answer to AmeriPride's 4th Amended Complaint.  (Dkt. 756  30
25  at 5; Warner Depo. at 179:16-22.)  TEO's Position:  This is a
26  hypothetical issue, which depends on the conditions actually

1  present at a site.)

2      47.   Whether or not at the Site is there a big cap where
3  the Site is paved for a long way that would tend to make the
4  vapor plume bigger than if there was no cap at the Site?
5  (AmeriPride's Position:   This fact is relevant to show the
6  relative difficulty of remediation the DNAPL PCE releases from
7  TEO's predecessor, VIS, Inc.   Specifically, Gore Factor (3),
8  cited in AmeriPride's response to Disputed Fact 20 is:   "(3)
9  degree of toxicity of hazardous waste."   Mr. Warner, TEO's
10  expert, testified that there is a big cap at this Site.   TEO
11  admitted this fact in its answer to AmeriPride's 4th Amended
12  Complaint.  (Dkt. 756  30 at 5; Warner Depo. at 179:23-180:7.)
13  TEO's Position:   This is a hypothetical issue, which depends
14  on the conditions actually present at a site.)

15      48.   Whether or not the DNAPL PCE releases by TEO's
16  corporate predecessor, VIS, Inc., will contribute mass in the
17  vapor phase as the vapors move out and away from the DNAPL PCE?
18      (AmeriPride's Position: TEO admitted this fact in its answer
19  to AmeriPride's 4th Amended Complaint.  (Dkt. 756  14 at 3;
20  Warner Depo. at 31:22-32:3.)   TEO's Position:   AmeriPride
21  misconstrues the expert testimony it cites to support this
22  proposition.   Jim Warner testified generally regarding the
23  definitions of continuous source and residual PCE.  He did not
24  connect this process to any releases by VIS, Inc.  Moreover,
25  any contribution by DNAPL PCE is entirely dependent on site
26  specific conditions.)

1      49.   Whether or not as PCE vapors move away from an area,
2   there will be a redistribution of chemicals where more will
3   move into the vapor phase?   (AmeriPride's Position:     TEO
4   admitted this fact in its answer to AmeriPride's 4th Amended
5   Complaint.   (Dkt. 756  14 at 3; Warner Depo. at 31:22-32:3.)
6   TEO's Position:   AmeriPride misconstrues the expert testimony
7   it cites to support this proposition.   Jim Warner testified
8   generally regarding the definitions of continuous source and
9   residual PCE.   He did not connect this process to any releases
10  by VIS, Inc.    Moreover, any contribution by DNAPL PCE is
11  entirely dependent on site specific conditions.)

12      50.   Whether or not the distribution of PCE in groundwater
13  at the Site is consistent with the only or primary source of
14  contamination being DNAPL PCE released from dry cleaning
15  operations at the Facility?   (AmeriPride's Position:     The
16  highest   concentrations   of   PCE   are   present   in   shallow
17  groundwater immediately underlying and downgradient of the
18  highest concentrations of PCE present in the vadose zone.
19  Lower concentrations of PCE also are present in groundwater to
20  the west of the dry cleaning operations and are consistent with
21  the reported disposal of waste sludges by VIS, Inc. as part of
22  dry cleaning operations.   (Declaration of Anne Farr ("Farr
23  Decl.")  38, Dkt. 698-5  38 at 9-10.)   TEO's Position:   As
24  reiterated throughout its Opposition to AmeriPride's Motion for
25  Summary Judgment, TEO's position is that DNAPL spills are not
26  the only or the primary source of contamination at the Site.

1   Mr. Warner looked to the failure to find significant DNAPL in
2   the soil, and the presence of chemicals that are unique to
3   AmeriPride's waste water as proof that the primary source of
4   the groundwater contamination was released due to the
5   operations of Ameripride. Moreover, AmeriPride has stipulated
6   that their release of PCE contaminated wastewater caused
7   contamination at the Huhtamaki property.)

8       51. Whether or not, absent the presence of these low
9   concentrations of PCE to the west of the dry cleaning
10  operations, the Site still would have required the same
11  magnitude of investigation and remediation consistent with the
12  only or primary source of contamination being DNAPL PCE
13  released from dry cleaning operations at the Facility?
14  (AmeriPride's Position:  The highest concentrations of PCE are
15  present in shallow groundwater immediately underlying and
16  downgradient of the highest concentrations of PCE present in
17  the vadose zone.  Lower concentrations of PCE also are present
18  in groundwater to the west of the dry cleaning operations and
19  are consistent with the reported disposal of waste sludges by
20  VIS, Inc. as part of dry cleaning operations.  (Declaration of
21  Anne Farr ("Farr Decl.")  38, Dkt. 698-5  38 at 9-10.)  TEO's
22  Position:  This fact is not supported by the evidence and
23  attempts to make a generalization about the condition of the
24  Site, when in actuality conditions at the Site vary.  As
25  reiterated throughout its Opposition to AmeriPride's Motion for
26  Summary Judgment, TEO's position is that DNAPL spills are not

1   the only or the primary source of contamination at the Site.

2   Mr. Warner looked to the failure to find significant DNAPL in

3   the soil, and the presence of chemicals that are unique to

4   AmeriPride's waste water as proof that the primary source of

5   the groundwater contamination was released due to the

6   operations of AmeriPride. Moreover, AmeriPride has stipulated

7   that their release of PCE contaminated wastewater caused

8   contamination at the Huhtamaki property.)

9       52. Whether or not releases of PCE in wastewater by

10  AmeriPride would require remediation? (AmeriPride's Position:

11  AmeriPride's expert, Dr. Anne Farr, has performed calculations

12  that demonstrate that the vast majority of the dissolved PCE

13  in the groundwater at the Site is the result of PCE dissolving

14  into the groundwater from the DNAPL PCE present in the

15  subsurface from releases of DNAPL PCE during the period of dry

16  cleaning operations at the Facility. Accordingly, Dr. Farr

17  opines that it is very unlikely that the investigation and

18  remediation would have been required if not for the DNAPL PCE

19  releases. (Farr Decl. 2, 37, 39 and 40, Ex. A at 1, 14, Dkt.

20  698-5 2, 37, 39 and 40, Ex. A at 16, 29.) TEO's Position:

21  Dr. Farr's calculations are unreliable and are contradicted by

22  objective data. Further, AmeriPride's wastewater added PCE to

23  the soil and moved the PCE already in the soil, which is a

24  release. AmeriPride has stipulated that wastewater released

25  from it broken pipe has contaminated Huhtamaki's property.)

26      53. Whether or not the potential PCE contribution from

1   AmeriPride's industrial wastewater releases is exceedingly

2   small, even in a worst case scenario? (AmeriPride's Position:

3   According to AmeriPride's expert, Dr. Anne Farr, the reasonable

4   maximum and worst case estimates of total mass of PCE that may

5   have been released to the subsurface from VIS, Inc.'s

6   industrial laundry operations and AmeriPride's industrial

7   laundry operations can be compared to the total mass of PCE

8   removed from the Site. Dr. Farr calculates that: (a) The

9   reasonable maximum contribution of PCE from AmeriPride's

10  wastewater operations to the Site contamination is less than

11  0.3% (5.7 kilograms/1,852 kilograms) of the total PCE released

12  at the Site. (Id. at 15, Dkt. 729-2 at 21, as corrected in

13  Farr Depo. at 66:14-68:13.); (b) VIS's reasonable maximum

14  contribution of PCE from wastewater operations to the Site

15  contamination is less than 0.3% (5.2 kilograms/1,852 kilograms)

16  of the total PCE released at the Site; (c) The worst case

17  contribution of PCE from AmeriPride's industrial laundering

18  operation is less than 1.8% (33.9 kilograms/1,852 kilograms)

19  of the total PCE released at the Site; and, (d) VIS's worst

20  case contribution of PCE from wastewater releases is less than

21  4.1% (76.7 kilograms/1,852 kilograms) of the total PCE at the

22  Site. (Farr Expert Rebuttal Report at 15, Dkt. 729-2 at 21,

23  as corrected in Anne Farr's April 29, 2011 deposition ("Farr

24  Depo.") at 66:14-68:13.) TEO's Position: This is not a plain

25  concise factual statement. Further, it ignores facts

26  concerning the levels of contamination in AmeriPride's

1   wastewater and relies on the unreliable opinion of Dr. Farr.

2   As reiterated throughout its Opposition to AmeriPride's Motion

3   for Summary Judgment, DNAPL spills are not the only or the

4   primary source of contamination at the Site and VIS, Inc. was

5   not the only source of DNAPLs.  They were also in AmeriPride's

6   wastewater.    Mr. Warner  looked  to  the  failure  to  find

7   significant DNAPL in the soil, and the presence of chemicals

8   that are unique to AmeriPride's wastewater as proof that the

9   primary source of the groundwater contamination is released

10  from the operations of Ameripride.)   Moreover, AmeriPride has

11  stipulated that their release of PCE contaminated wastewater

12  caused contamination at the Huhtamaki property.)

13       **b. Facts Proposed by TEO, But Disputed by AmeriPride**

14       54.   Whether or not, in November 2009, the Delaware Court

15  of Chancery appointed a receiver pursuant to 8 Del. C. § 279

16  of and for TEO with authority to pursue and act only with

17  respect to available insurance coverage and to defend in the

18  action?   (TEO's Position:   It is undisputed the receiver was

19  appointed of and for TEO under 8 Del. C. § 279.   The Court's

20  Memorandum Opinion appointing the receiver states:  "By its own

21  terms, § 279 limits the power of an appointed receiver.  "Such

22  receivers may 'take charge of the corporation's property, and

23  . . . collect the debts and property due and belonging to the

24  corporation' for the purpose of prosecuting and defending

25  lawsuits."  Order p. 5 quoting § 279.)   It is undisputed that

26  TEO has no property other than potential rights under certain

insurance policies.  AmeriPride's Position:  This is not what
the order says.  The order appointing the receiver states in
pertinent part:  "Receiver has no obligation to pay for the
defense of TEO or for any judgment against TEO in the Federal
Action, and Receiver shall not control the defense of TEO or
any judgment or settlement of claims made against TEO in the
Federal Action, but rather, the counsel defending TEO shall
control the defense of TEO and any judgment or settlement of
claims made against TEO in the Federal Action."  The order
appointing the receiver does not give the receiver the
authority to defend this civil action.  Instead, the order
squarely places these burdens on counsel representing TEO and
TEO's insurers who hired counsel for TEO.  The language of this
order was negotiated and approved by Delaware counsel for TEO
who also was paid by TEO's insurers.)

55.  Whether or not a unity of interest and ownership
between Petrolane and VIS, Inc. existed such that any
individuality and separateness between Petrolane and VIS, Inc.
ceased, and VIS, Inc. was the alter ego of Petrolane up to and
including 1990?  (TEO's Position:  AmeriPride alleged this fact
in its Second Amended Complaint.  It is irrelevant the fact was
not alleged in AmeriPride's Fourth Amended Complaint.  Since
AmeriPride accepted settlement monies based on a Court approved
agreement, AmeriPride is estopped from denying the relationship
between VIS and Petrolane.  Further, ample evidence supports
this factual issue.  Among other things, the two entities had

1  interlocking boards, Petrolane controlled the operations of

2  VIS, and Petrolane directly received the sales proceeds for

3  VIS.   AmeriPride's Position:  AmeriPride is not bound by the

4  allegations of its Second Amended Complaint.   The evidence

5  developed during discovery does not prove this alleged fact.

6  AmeriPride's operative complaint, the 4th Amended Complaint has

7  no such allegation.   In fact, there is no operative complaint

8  filed by the parties that supports this claim.   AmeriPride's

9  4th Amended Complaint makes no such claim.   Moreover, when the

10 Court approved the settlement agreements between Chromalloy and

11 AmeriPride,  Petrolane and AmeriPride,  and  Huhtamaki  and

12 AmeriPride in 2007, the Court made clear that neither VIS, Inc.

13 nor TEO were parties to the settlement agreements, and the

14 Court expressly did not dismiss AmeriPride's claims against

15 VIS, Inc. and TEO. (Dkt 638 at 2, n. 1 and 8.))

16     56.   Whether or not the unity of interests Petrolane and

17 VIS shared included overlapping officers, directors, and board

18 members, shared pension plans, shared payroll, and assignment

19 of liabilities? (TEO's Position: AmeriPride alleged this fact

20 in its Second Amended Complaint.  It is irrelevant the fact was

21 not alleged in AmeriPride's Fourth Amended Complaint.   Since

22 AmeriPride accepted settlement monies based on a Court approved

23 agreement, AmeriPride is estopped from denying the relationship

24 between VIS and Petrolane.   Further, ample evidence supports

25 this factual issue.   Among other things, the two entities had

26 interlocking boards, Petrolane controlled the operations of

1 VIS, and Petrolane directly received the sales proceeds for
2 VIS.  AmeriPride's Position:  AmeriPride is not bound by the
3 allegations of its Second Amended Complaint.  The evidence
4 developed during discovery does not prove this alleged fact.
5 AmeriPride's operative complaint, the 4th Amended Complaint has
6 no such allegation.  In fact, there is no operative complaint
7 filed by the parties that supports this claim.  AmeriPride's
8 4th Amended Complaint makes no such claim.  In fact, there is
9 no operative complaint filed by the parties that supports this
10 claim. AmeriPride's 4th Amended Complaint makes no such claim.
11 The evidence does not support this claim.)

12     57.  Whether or not VIS, Inc. employees were clear that
13 Petrolane was the owner of and controlled the Facility? (TEO's
14 Position:  Irrespective of whether Petrolane held legal title
15 as the owner of the Facility, the evidence establishes that
16 Petrolane's conduct and control over the Facility gave VIS,
17 Inc.'s employees the impression that Petrolane owned and
18 controlled the Facility. AmeriPride's Position:  AmeriPride
19 is aware of no evidence that Petrolane ever owned the Facility
20 and this purported fact is not relevant to any issues in this
21 case.   The alleged fact is irrelevant and, as explained in
22 TEO's Position, speculative at best.)

23     58.  Whether or not Petrolane received $2.6 million in
24 accounts receivable of VIS, Inc. as a result of the sale of
25 VIS, Inc.? (TEO's Position:  The fact is supported by evidence
26 and relevant to establishing a unity of interests between

1  Petrolane and VIS, Inc. AmeriPride's Position:  This alleged
2  fact may prove that a shareholder who sells assets gets paid
3  for those assets, but it does not establish a "unity of
4  interest."  This fact is not relevant to any issue in the
5  case.)

6      59.  Whether or not, when the RWQCB issued Cleanup and
7  Abatement Orders naming VIS, Inc. as a Discharger, TEO was and
8  had been a dissolved corporation for over a decade?  (TEO's
9  Position:  It is undisputed TEO dissolved in 1992.  It is also
10 undisputed that the RWQCB took regulatory control over the site
11 investigation in 2002.  It is further undisputed that RWQCB did
12 not issue a Cleanup and Abatement Order until 2003, which is
13 over a decade since TEO dissolved in 1992.  AmeriPride's
14 Position:  Argument.  AmeriPride will agree that: "TEO
15 dissolved under Delaware law in 1992."  (See Dkt. 677 at 9.)
16 In Undisputed Fact 5, the parties already agreed that a
17 receiver was appointed under 8 Del. Code Section 279 - this
18 occurred on November 30, 2009 in the Delaware Chancery Court
19 (Dkt. 682 at 1), where the order was not stayed pending appeal
20 to the Delaware Supreme Court where it was affirmed on June 24,
21 2010.  (Dkt. 689 at 2.))

22     60.  Whether or not, after its dissolution, TEO did not
23 and does not have the legal or physical capacity to respond to
24 any of the RWQCB Cleanup and Abatement Orders?  (TEO's
25 Position:  TEO dissolved over ten years before any CAO was
26 issued or remediation was undertaken.  TEO did not and does not

1 have the physical or legal capacity to comply with the CAOs.
2 Pursuant to 8 Del. Code § 279 the receiver has authority to
3 pursue and act only with respect to available insurance
4 coverage and to defend in the action.  That is the entirety of
5 its powers and they do not include the ability to respond to
6 the CAO.  As a result thereof, TEO is not under an obligation
7 to do so.  The issue of insurance is irrelevant.  The insurers
8 never were, or could they, be named in any order related to the
9 Site or in any litigation related to the Site.  The insurers
10 never owed any duty to AmeriPride to investigate or remediate
11 the Site. AmeriPride's Position:  This is a legal conclusion,
12 not a fact.  Importantly, capacity under the CAOs most likely
13 would be determined under California law which provides that
14 dissolution does not impair valid claims against the
15 corporation which have not been paid or provided for in the
16 liquidation proceedings.  Claims may be asserted against a
17 dissolved corporation - whether they arise before or after
18 dissolution - and the corporation remains liable to the extent
19 of its undistributed assets, including any available insurance.
20 Calif. Corps. Code. § 2011(a) and Penasquitos, Inc. v. Sup.Ct.,
21 53 Cal. 3d 1180 (1991).  This rule is different from the
22 capacity rule under Federal Rule of Civil Procedure 17(b) which
23 looks to the law of the state of incorporation.  Importantly:
24 (1) VIS's, Inc. and TEO each had insurance policies that
25 eventually responded to provide TEO a defense in this civil
26 action; (2) VIS, Inc. and TEO are insured on policies issued

1  to Petrolane, Inc. by members of the ACE Insurance Group
2  ("ACE"), the American International Group ("AIG"), and Lloyds
3  of London (collectively "TEO's Insurers"); (3) TEO's Insurers
4  had notice of this civil action since, at the latest, January
5  31, 2002 (Dkt. 660-5 at 2); (4) on September 4, 2007, TEO
6  acknowledged that claims had been tendered to insurers,
7  allowing them to enter an appearance for TEO to prevent entry
8  of default against TEO (Dkt. 649); (5) one of TEO's insurers,
9  ACE, informed this Court of its involvement in the claims
10 against VIS, Inc. and TEO on June 1, 2007, when ACE's counsel,
11 Berman & Aiwasian, filed a "Statement of Position Re: Joint
12 Motion for Judgment, Approval of Settlement and Entry of
13 Contribution Bar" (Dkt 622); (6) by no later than October 2003,
14 Berman & Aiwasian was representing ACE in connection with the
15 claims in this civil action (Dkt. 606-5 at 4); and, (7) on
16 August 11, 2008, TEO's current counsel, the Wilson Elser firm,
17 attended a hearing on AmeriPride's Motion to set Pretrial
18 Conference and Trial Dates (see Dkt. 663; Dkt. 666). The
19 Wilson Elser firm was hired by TEO's insurers. (See Dkt. 672-1
20 at 3.))

21     61.  Whether or not, without a driving force, DNAPL could
22 not have reached below the top tier of soil? (TEO's Position:
23 DNAPL PCE of the type and amount spilled by VIS, Inc. move
24 slowly through the soil absent something to push it deeper.
25 Due to the amount of DNAPL PCE allegedly released and the large
26 surface that it would have covered, the DNAPLs would have only

1  slightly  penetrated  the  subsurface.   Given  that  it  is

2  approximately 70 feet to groundwater, it required the water

3  from AmeriPride's wastewater system to drive the contamination

4  from  the  DNAPLs  to  groundwater.   AmeriPride's  Position:

5  Undisputed Fact 46 is more accurate.  Language disputed because

6  the DNAPL itself has a driving force and "top tier of soil" is

7  vague and it is undisputed that vapors from residual DNAPL in

8  the vadose zone can cause groundwater contamination, even when

9  groundwater is a long way - 70 to 75 feet or more - below

10 ground surface.   In fact, TEO's expert, Mr. Warner admits

11 releases have DNAPL PCE during VIS Inc.'s operations at the

12 Facility have resulted in groundwater contamination.)

13      62.   Whether or not during VIS, Inc.'s operation of the

14 Facility, there was not a sufficient volume of DNAPL released

15 at the surface in any one instance or in aggregate to maintain

16 a  driving  downward  force  and  cause  the  DNAPL  to  reach

17 groundwater?   (TEO's Position:   DNAPL PCE of the type and

18 amount spilled by VIS, Inc. moves slowly through the soil

19 absent something to push it deeper.  Due to the amount of DNAPL

20 PCE allegedly released and the large surface that it would have

21 covered, the DNAPLs would have only slightly penetrated the

22 subsurface.   Given  that  it  is  approximately  70  feet  to

23 groundwater, it required the water from AmeriPride's wastewater

24 system  to  drive  the  contamination  from  the  DNAPLs  to

25 groundwater.  AmeriPride's Position:   Disputed because the

26 DNAPL itself has a driving force which AmeriPride's expert, Dr.

1  Farr, opined was sufficient to cause it to reach groundwater.
2  In addition, TEO's expert, Mr. Warner admits releases of DNAPL
3  PCE during VIS, Inc.'s operations at the Facility have resulted
4  in groundwater contamination.)

5      63.   Whether or not the distribution of PCE in soil vapor
6  and soil is associated with both former dry cleaning areas and
7  the   footprint   of   the   wastewater   conveyance   and   treatment
8  system, including some overlapping areas where the former dry
9  cleaning operations and the wastewater trench/pipelines are
10  near one another?   (TEO's Position:   This is the subject of a
11  dispute between experts.   AmeriPride's Position: Agree there
12  is a dispute between experts).

13      64.   Whether or not other VOCs and petroleum hydrocarbons
14  have been detected at significant concentrations relative to
15  PCE in soil vapor and soil in association with the wastewater
16  conveyance and treatment system?   (TEO's Position:   This is the
17  subject of a dispute between experts.   AmeriPride's Position:
18  Agree there is a dispute between experts).

19      65.   Whether releases of both DNAPL PCE and wastewater
20  with dissolve PCE have occurred in overlapping areas within and
21  near the washroom, and in combination have resulted in the PCE
22  plume at the site?   (TEO's Position:   This is the subject of
23  a dispute between experts.   AmeriPride's Position: Agree there
24  is a dispute between experts).

25      66.   Whether the soil vapor and soil data demonstrate that
26  the   highest   concentrations   of   PCE   in   the   vadose   zone   are

1  associated with both the former dry cleaning areas and the

2  wastewater trench, with overlapping areas of contamination

3  resulting from releases from both types of sources and their

4  adjacent positions to one another? (TEO's Position: This is

5  the subject of a dispute between experts. AmeriPride's

6  Position: Agree there is a dispute between experts).

7      67. Whether or not the following parties to the

8  consolidated actions AmeriPride Services, Inc v. Valley

9  Industrial Services, Inc. and Huhtamaki Foodservice, Inc. v.

10  AmeriPride Services, Inc. entered various settlement

11  agreements: (1) AmeriPride, as plaintiff in the AmeriPride

12  action and as a defendant in the Huhtamaki action; (2) Mission

13  Linen Supply; (2) Chromalloy American Corporation

14  ("Chromalloy"), DHM Enterprises, Inc., George Backovich and

15  Bruce Pennell (the "DHM Parties"); (4) Petrolane Incorporated,

16  UGI Corporation, AmeriGas Inc., AmeriGas Propane, Inc.,

17  AmeriGas Propane LP, AmeriGas Partners, L.P., and Texas Eastern

18  Corporation (collectively "Petrolane"); and (5) Huhtamaki as

19  plaintiff in the Huhtamaki action? (TEO's Position: This is

20  an accurate summary of the parties involved. AmeriPride's

21  Position: Disputed because not all of these parties "entered

22  various settlement agreements," which is what the alleged fact

23  says.)

24      68. Whether or not the Chromalloy/AmeriPride settlement

25  agreement provided that AmeriPride was to be paid $500,000 over

26  three years and AmeriPride's right to payment was subject to

1  a right of offset with respect to certain claims against
2  Chromalloy and included a mutual release of all claims by and
3  among AmeriPride, Chromalloy and DHM Parties, as well as
4  dismissal with prejudice of claims by and among Chromalloy and
5  AmeriPride? (TEO's Position:  This is a verbatim quote of the
6  settlement terms stated in this Court's July 2, 2007 Order
7  approving the settlement.)  AmeriPride's Position:  Disputed
8  as incomplete and misleading for use as an undisputed fact.
9  AmeriPride will agree to an undisputed fact that it settled
10 with Chromalloy on the terms set forth in their settlement
11 agreement, a copy of which already has been provided to the
12 Court.  (See Dkt. 717-12.))

13      69.  Whether or not the Petrolane/AmeriPride settlement
14 required the Petrolane Defendants to pay AmeriPride $2.75
15 million in return for which AmeriPride has agreed to release
16 the Petrolane Defendants from liability.  The Petrolane and
17 AmeriPride settlement includes indemnities by AmeriPride in
18 favor of the Petrolane Defendants?  (TEO's Position:  This is
19 a verbatim quote of the settlement terms stated in this Court's
20 July 2, 2007 Order approving the settlement.)  AmeriPride's
21 Position:  Irrelevant and disputed as incomplete and misleading
22 for use as an undisputed fact.  AmeriPride will agree to an
23 undisputed fact that it settled with Petrolane on the terms set
24 forth in their settlement agreement, a copy of which already
25 has been provided to the Court.  (See Dkt. 717-13.))

26      70.  Whether or not the Huhtamaki/AmeriPride settlement

74

1  provided that AmeriPride will pay Huhtamaki $8.25 million, that
2  AmeriPride will dismiss its appeal of an extant Cleanup and
3  Abatement Order issued by the RWQCB, and that AmeriPride will
4  comply with future RWQCB orders related to PCE emanating from
5  the AmeriPride property.   Huhtamaki has agreed to provide
6  AmeriPride with access to the Huhtamaki property as necessary
7  for AmeriPride to comply with the RWQCB orders.   Each of the
8  parties to the Huhtamaki and AmeriPride settlement provided the
9  other with a release of liability and promises to dismiss the
10 claims in the Huhtamaki action claims with prejudice?   (TEO's
11 Position:   This issue was raised by TEO in its opposition to
12 AmeriPride's summary judgment motion.   Resolution of the issue
13 was deferred by the Court when it denied the summary judgment
14 motion on the settlement dollars.   This is a verbatim quote of
15 the settlement terms stated in this Court's July 2, 2007 Order
16 approving the settlement.   AmeriPride's Position:   Irrelevant
17 and disputed as incomplete and misleading for use as an
18 undisputed fact.   In opposition to AmeriPride's summary
19 judgment motion, TEO claimed that these payments could only be
20 recovered under CERCLA Section 113(f) because they settled
21 Huhtamaki's CERCLA Section 107 claims against AmeriPride and
22 the Court agreed.   (Dkt. 735 at 40.)   Now, TEO wants to argue
23 these settlements were for something else.   AmeriPride will
24 agree to an undisputed fact that it settled with Huhtamaki on
25 the terms set forth in their settlement agreement, a copy of
26 which already has been provided to the Court.   (See Dkt.

1  717-11.))

2      71.  Whether or not Huhtamaki's claims against AmeriPride

3  include damages for damage to their property and business as

4  well as diminution in value?  (TEO's Position:  This issue was

5  raised by TEO in its opposition to AmeriPride's summary

6  judgment motion.  Resolution of the issue was deferred by the

7  Court when it denied the summary judgment motion on the

8  settlement dollars.  This fact is supported by the causes of

9  action alleged in Huhtamaki's Complaint.  AmeriPride's

10 Position:    Irrelevant   and   disputed   as   incomplete   and

11 misleading.  In opposition to AmeriPride's summary judgment

12 motion, TEO claimed that these payments could only be recovered

13 under CERCLA Section 113(f) because they settled Huhtamaki's

14 CERCLA Section 107 claims against AmeriPride and the Court

15 agreed.  (Dkt. 735 at 40.)  Now, TEO wants to argue these

16 settlements were for something else.  AmeriPride will agree to

17 an undisputed fact that lists all of Huhtamaki's claims against

18 AmeriPride, including Huhtamaki's claim against AmeriPride

19 under CERCLA Section 107 which provided the basis for the

20 Court's ruling on summary adjudication that the settlement

21 payment to Huhtamaki could be recovered against TEO under

22 CERCLA Section 113(f).)

23     72.  Whether or not the monies that Huhtamaki and Cal-Am

24 Water Co. received did not reimburse them for response costs

25 paid in compliance with the national contingency plan?  (TEO's

26 Position:    Payment   of   monies   for   which   a   party   seeks

1  contribution under § 113(f) is required to be spent consistent
2  with the national contingency plan (the "NCP").   The payment
3  of the monies to Huhtamaki was not consistent with the NCP.)
4    AmeriPride's Position:   Disputed because water replacement
5  costs are response costs and because a settlement of a CERCLA
6  Section 107 claim does not require proof of compliance with the
7  National Contingency Plan, 42 C.F.R. Part 300.   In addition,
8  Huhtamaki had a claim against AmeriPride under CERCLA Section
9  107 which provided the basis for the Court's ruling on summary
10 adjudication that the settlement payment to Huhtamaki could be
11 recovered against TEO under CERCLA Section 113(f).)

12      73.   Whether or not anything in the settlement agreement
13 between Cal-Am Water Co., AmeriPride, and Petrolane limited
14 AmeriPride's right to seek reimbursement of all or any portion
15 of the settlement payment from any of its insurers in the
16 future?  (TEO's Position:  This issue was raised by TEO in its
17 opposition to AmeriPride's summary judgment motion. Resolution
18 of the issue was deferred by the Court when it denied the
19 summary judgment motion on the settlement dollars.   This fact
20 is a recitation of what the parties' settlement agreement
21 states.   AmeriPride's Position:   Irrelevant and disputed as
22 incomplete and misleading for use as an undisputed fact.   In
23 opposition to AmeriPride's summary judgment motion, TEO claimed
24 that these payments could only be recovered under CERCLA
25 Section 113(f) because they settled Huhtamaki's CERCLA Section
26 107 claims against AmeriPride and the Court agreed.  (Dkt. 735

1 at 40.)   Now, TEO wants to argue these settlements were for
2 something else.   AmeriPride will agree to an undisputed fact
3 that it settled with Huhtamaki on the terms set forth in their
4 settlement agreement.)

5     74.   Whether or not AmeriPride has/ had insurance coverage
6 for the Facility which provided AmeriPride with coverage in
7 this litigation, other litigation and response to the CAOs?
8 (TEO's Position:   Irrespective of whether AmeriPride had
9 insurance that covered claims made by AmeriPride in this
10 litigation, AmeriPride received monies to pay for claims
11 against AmeriPride, and for site remediation and investigation
12 costs related to the Site contamination.   Despite not having
13 paid them in full, AmeriPride now seeks to recover these total
14 amounts from TEO.   This fact is relevant because these monies
15 received by AmeriPride will be a set off against the future
16 costs AmeriPride seeks to recover.   AmeriPride's Position:
17 Disputed.   AmeriPride had liability policies that do not
18 provide coverage for claims made by AmeriPride in this
19 litigation.   AmeriPride makes a detailed argument why TEO is
20 wrong in the disputed evidentiary issues section of its
21 separate pretrial statement which should be incorporated by
22 reference here, if necessary.)

23     75.   Whether or not AmeriPride, since the discovery of the
24 contamination at the site, made a claim for PCE contamination
25 to its insurance carriers?   (TEO's Position:   AmeriPride
26 received insurance monies to pay for claims brought against

1  AmeriPride, and for site remediation and investigation costs
2  related to the Site contamination.   Despite not having paid
3  them in full, AmeriPride now seeks to recover these total
4  amounts from TEO.   The monies AmeriPride has received should
5  act as set offs, an issue the Court's order left.   This fact
6  is relevant to AmeriPride's future costs under its section 107
7  claim and its declaratory relied claim. AmeriPride's Position:
8  Disputed as irrelevant and untimely. The Court entered summary
9  adjudication on the amounts incurred to settle CERCLA Section
10 107 claims against AmeriPride by Cal-Am Water Co. and
11 Huhtamaki.   (Dkt. 735.)   In opposing AmeriPride's motion for
12 summary judgment, in the Declaration of Emily M. Weissenberger
13 in Support of Texas Eastern Overseas, Inc.'s Opposition to
14 Plaintiff AmeriPride Services Inc.'s Motion for Summary
15 Judgment (Dkt. 717), TEO provided evidence of credits required
16 for AmeriPride's settlements with Cal-Am Water Co. and
17 Huhtamaki.      (Dkt.    715    56;   Dkt.    716    42.)     The
18 AmeriPride-Chromalloy settlement was Exhibit L to Ms.
19 Weissenberger's   declaration.     (Dkt.   717-12.)      The
20 AmeriPride-Petrolane settlement was Exhibit M to Ms.
21 Weissenberger's declaration.   (Dkt. 717-12.)   No request for
22 a credit for any payment by AmeriPride's insurance was made.
23 None of the declarations filed by TEO made the claim "that, for
24 specified reasons, it cannot present facts essential to justify
25 its opposition" as required by Fed. R. Civ. P. 56(d).   (See
26 Dkt. 717.)   A proposed finding of fact is not a discovery tool.

1  The Court issued an order to TEO denying discovery on this
2  issue for lack of diligence in the face of the Court's
3  Scheduling Order. (Dkt. 765.) AmeriPride makes a detailed
4  argument why TEO is wrong in the disputed evidentiary issues
5  section of its separate pretrial statement which should be
6  incorporated by reference here, if necessary.)

7      76. Whether or not AmeriPride received money from its
8  insurance carriers as a result of the claim made? (TEO's
9  Position:   AmeriPride received insurance monies to pay for
10 claims brought against AmeriPride, and for site remediation and
11 investigation costs related to the Site contamination. Despite
12 not having paid them in full, AmeriPride now seeks to recover
13 these total amounts from TEO.   The monies AmeriPride has
14 received should act as set offs, an issue the Court's order
15 left. This fact is relevant to AmeriPride's future costs under
16 its section 107 claim and its declaratory relied claim.
17 AmeriPride's Position:   Disputed as irrelevant and untimely.
18 The Court entered summary adjudication on the amounts incurred
19 to settle CERCLA Section 107 claims against AmeriPride by
20 Cal-Am Water Co. and Huhtamaki.   (Dkt. 735.)   In opposing
21 AmeriPride's motion for summary judgment, in the Declaration
22 of Emily M. Weissenberger in Support of Texas Eastern Overseas,
23 Inc.'s Opposition to Plaintiff AmeriprideAmeriPride Services
24 Inc.'s Motion For Summary Judgment (Dkt. 717), TEO provided
25 evidence of credits required for AmeriPride's settlements with
26 Cal-Am Water Co. and Huhtamaki.   (Dkt. 715  56; Dkt. 716  42.)

1  The AmeriPride-Chromalloy settlement was Exhibit L to Ms.
2  Weissenberger's declaration. (Dkt. 717-12.) The
3  AmeriPride-Petrolane settlement was Exhibit M to Ms.
4  Weissenberger's declaration. (Dkt. 717-12.) No request for
5  a credit for any payment by AmeriPride's insurance was made.
6  None of the declarations filed by TEO made the claim "that, for
7  specified reasons, it cannot present facts essential to justify
8  its opposition" as required by Fed. R. Civ. P. 56(d). (See
9  Dkt. 717.) A proposed finding of fact is not a discovery tool.
10 The Court issued an order to TEO denying discovery on this
11 issue for lack of diligence in the face of the Court's
12 Scheduling Order. (Dkt. 765.) AmeriPride makes a detailed
13 argument why TEO is wrong in the disputed evidentiary issues
14 section of its separate pretrial statement which should be
15 incorporated by reference here, if necessary.)

16     77. Whether or not, when the Facility was sold to
17 AmeriPride, AmeriPride was aware there were environmental
18 concerns related to the site? (TEO's Position: There is
19 evidence to support this fact. AmeriPride's Position:
20 Disputed. There is no evidence to support this alleged fact.)

21     78. Whether or not AmeriPride contributed to the soil,
22 soil gas, and groundwater contamination at the site? (TEO's
23 Position: This fact is not in dispute. Per the parties' July
24 12, 2011 Stipulation, AmeriPride is prohibited from presenting
25 any evidence which denies it contributed to the soil and
26 groundwater contamination. AmeriPride's Position: Cumulative.

1  AmeriPride has complied fully with the terms of the stipulation
2  in agreeing to Undisputed Fact 69.)

3      79.   Whether or not the pipes removed by AmeriPride leaked
4  PCE-contaminated wastewater into the soil and groundwater and
5  this contamination was a cause of the contamination on the
6  Huhtamaki property?   (TEO's Position:   Per the parties' July
7  12, 2011, the fact finder is instructed to find that this fact
8  is   established.        AmeriPride's   Position:     Cumulative.
9  AmeriPride has complied fully with the terms of the stipulation
10  in agreeing to Undisputed Fact 69.)

11     80.   Whether or not, between 1983 and 1985, AmeriPride's
12  employees  or  agents  detected  the  odor  of  PCE  during  the
13  excavation  of  the  wash  aisle  trench?   (TEO's  Position:   In
14  AmeriPride's  March  1,  2011  Response  to  TEO's  Request  for
15  Admissions, AmeriPride admitted that the wash trench excavation
16  occurred during its operation of the Facility, and admitted the
17  following facts related to this excavation:

18     REQUEST FOR ADMISSION NO. 29:

19     Admit  that  YOU  detected  PCE  odors  emanating  from
20  subsurface soil surrounding the wash trench excavation referred
21  to in Request No. 28.

22     RESPONSE TO REQUEST NO. 29:

23     Denied. AmeriPride admits that a trench at the Facility
24  was extended after AmeriPride purchased the Facility. The odor
25  of PCE was detected during the excavation.

26     REQUEST FOR ADMISSION NO. 30:

1    Admit that one or more of YOUR employees or agents became
2    sick as a result of the PCE odors emanating from the wash
3    trench excavation referred to in Request No. 28.

4        RESPONSE TO REQUEST NO. 30:

5        Denied. AmeriPride admits that a trench at the Facility
6    was extended after AmeriPride purchased the Facility. The odor
7    of PCE was detected during the excavation. People in the office
8    claimed the odor was giving them a headache, so they were sent
9    home early.

10       Subsequently, without leave of court, AmeriPride
11   improperly filed Amended Responses denying these facts.
12   Federal Rule of Civil Procedure Rule 36(b) requires a party to
13   move the court for an Order allowing it to amend or withdraw
14   its admissions. AmeriPride failed to do so, and the motion
15   cut-off date is now passed. Accordingly, AmeriPride is
16   precluded from introducing any and all evidence, references to
17   evidence, testimony, or argument inconsistent with its initial
18   admissions regarding the wash trench excavation; and court
19   should deem the matter admitted and conclusively established.
20   In AmeriPride's lengthy recitation of the alleged facts what
21   is missing is an explanation as to why it admitted the fact in
22   the first instance. All the evidence it relies upon was
23   available to it at the time. The only thing that is different
24   is AmeriPride's understanding of the impact of the admission.
25   AmeriPride should not be allowed to withdraw an admission
26   simply because it discovered its admission had significance.

1 TEO has relied on the admission and would be significantly
2 prejudiced by AmeriPride's gamesmanship. AmeriPride's
3 Position: Disputed. The evidence does not support this
4 alleged fact. TEO's expert, Jim Warner, testified that this
5 event must have taken place prior to AmeriPride's taking
6 ownership of the Facility in 1983. (Warner Depo. at 129:7-22.)
7 AmeriPride initially admitted this fact in its March 1, 2011
8 initial responses to TEO's requests for admissions. This
9 admission was based on the first deposition of Mr. Smith.
10 However, Mr. Smith testified differently on refreshed
11 recollection in a second deposition:

12     Q.  MR. KAPLAN:     Was the expansion in connection with
13         the Community acquisition before the facility was
14         purchased by American Linen ?

15     THE WITNESS:    Yes.

16 (Robert Smith May 3, 2006 Depo. at 14:11-19.)   John Dankoff
17 testified to the same effect.   (Dankoff May 3, 2006 Depo. at
18 9:16-10:18;  34:1-14.)    Mr. Smith's testimony as a whole,
19 coupled with Mr. Dankoff's testimony, makes clear that the wash
20 water trench expansion at the Facility that is the subject of
21 TEO's Requests for Admissions 28-30 and 33 took place during
22 VIS, Inc.'s ownership and operation of the Facility, not
23 AmeriPride's.   On April 22, 2011, AmeriPride amended its
24 responses to reflect Mr. Smith's testimony at his second
25 deposition.   TEO had both depositions of Mr. Smith.   In
26 addition, AmeriPride served amended interrogatory responses

setting forth the facts upon which AmeriPride denied TEO's Requests for Admissions 28-30 and 33. Based on the state of the evidence and TEO's expert's own understanding of the evidence, AmeriPride requests that it be relieved from the admission pursuant to Fed. R. Civ. P. 36(b). According to Rule 16(e), "Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b). The Court has not issued a final pretrial conference order, so it is not limited by Fed. R. Civ. P. 16(e). AmeriPride maintains that allowing this request would not prejudice TEO in maintaining or defending the action on the merits. AmeriPride asked TEO to agree, but TEO refused. AmeriPride's separate pretrial statement requests that the Court provide relief from the admissions based on a lack of prejudice to TEO as demonstrated, in part, by TEO's Position stated above.)

81. Whether or not, between1983 and 1985, AmeriPride's employees detected the odor of PCE during the excavation of the wash aisle trench caused AmeriPride's employees or agents to get headaches and leave the Facility? (TEO's Position: In AmeriPride's March 1, 2011 Response to TEO's Request for Admissions, AmeriPride admitted that the wash trench excavation occurred during its operation of the Facility, and admitted the following facts related to this excavation:

1    REQUEST FOR ADMISSION NO. 29:

2    Admit that YOU detected PCE odors emanating from
3    subsurface soil surrounding the wash trench excavation referred
4    to in Request No. 28.

5    RESPONSE TO REQUEST NO. 29:

6    Denied. AmeriPride admits that a trench at the Facility
7    was extended after AmeriPride purchased the Facility. The odor
8    of PCE was detected during the excavation.

9    REQUEST FOR ADMISSION NO. 30:

10   Admit that one or more of YOUR employees or agents became
11   sick as a result of the PCE odors emanating from the wash
12   trench excavation referred to in Request No. 28.

13   RESPONSE TO REQUEST NO. 30:

14   Denied. AmeriPride admits that a trench at the Facility
15   was extended after AmeriPride purchased the Facility. The odor
16   of PCE was detected during the excavation. People in the office
17   claimed the odor was giving them a headache, so they were sent
18   home early.

19   Subsequently, without leave of court, AmeriPride
20   improperly filed Amended Responses denying these facts.
21   Federal Rule of Civil Procedure Rule 36(b) requires a party to
22   move the court for an Order allowing it to amend or withdraw
23   its admissions. AmeriPride failed to do so, and the motion
24   cut-off date is now passed. Accordingly, AmeriPride should be
25   precluded from introducing any and all evidence, references to
26   evidence, testimony, or argument inconsistent with its initial

1  admissions regarding the wash trench excavation; and court
2  should deem the matter admitted and conclusively established.
3  In AmeriPride's lengthy recitation of the alleged facts what
4  is missing is an explanation as to why it admitted the fact in
5  the first instance.   All the evidence it relies upon was
6  available to it at the time.   The only thing that is different
7  is AmeriPride's understanding of the impact of the admission.
8  AmeriPride should not be allowed to withdraw an admission
9  simply because it discovered its admission had significance.
10 TEO has relied on the admission and would be significantly
11 prejudiced  by  AmeriPride's  gamesmanship.     AmeriPride's
12 Position:   The evidence does not support this alleged fact.
13 TEO's expert, Jim Warner, testified that this event must have
14 taken place prior to AmeriPride's taking ownership of the
15 Facility in 1983.    (Warner Depo. at 129:7-22.)    AmeriPride
16 initially admitted this fact in its March 1, 2011 initial
17 responses to TEO's requests for admissions.   This admission was
18 based on the first deposition of Mr. Smith.   However, Mr. Smith
19 testified differently on refreshed recollection in a second
20 deposition:

21      Q.   MR. KAPLAN:     Was the expansion in connection with
22      the  Community  acquisition  before  the  facility  was
23      purchased by American Linen ?
24      THE WITNESS:    Yes.
25 (Robert Smith May 3, 2006 Depo. at 14:11-19.)   John Dankoff
26 testified to the same effect.   (Dankoff May 3, 2006 Depo. at

9:16-10:18;  34:1-14.)    Mr. Smith's testimony as a whole, coupled with Mr. Dankoff's testimony, makes clear that the wash water trench expansion at the Facility that is the subject of TEO's Requests for Admissions 28-30 and 33 took place during VIS, Inc.'s ownership and operation of the Facility, not AmeriPride's.    On April 22, 2011, AmeriPride amended its responses to reflect Mr. Smith's testimony at his second deposition.    TEO had both depositions of Mr. Smith.    In addition, AmeriPride served amended interrogatory responses setting forth the facts upon which AmeriPride denied TEO's Requests for Admissions 28-30 and 33.   Based on the state of the evidence and TEO's expert's own understanding of the evidence, AmeriPride requests that it be relieved from the admission pursuant to Fed. R. Civ. P. 36(b).  According to Rule 16(e), "Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits."  Fed. R. Civ. P. 36(b).   The Court has not issued a final pretrial conference order, so it is not limited by Fed. R. Civ. P. 16(e).  AmeriPride maintains that allowing this request would not prejudice TEO in maintaining or defending the action on the merits.   AmeriPride asked TEO to agree, but TEO refused.   AmeriPride's separate pretrial statement requests that the Court provide relief from the admissions based on a lack of prejudice to TEO as demonstrated,

1   in part, by TEO's Position stated above.)

2       82.   Whether or not, between 1983 and 1985, AmeriPride did
3   not report the discovery of PCE fumes at the Facility to any
4   authorities?   (TEO's Position:   Per the court's summary
5   adjudication order, it is undisputed that when the trench was
6   expanded, the PCE fumes that were discovered were not reported
7   to any authorities.   Instead, the only action that was taken
8   was to replace concrete over the soil and contain the fumes.
9   (Dkt.   735,   p.   16).   Further,   the   evidence   establishes
10  AmeriPride did not report PCE contamination to the regulatory
11  authorities until 1997. AmeriPride's Position:   Disputed.   The
12  evidence does not support this alleged fact.)

13      83.   Whether or not, between 1983 and 1985, the only
14  action AmeriPride took to contain the fumes was to replace the
15  concrete over the soil?   (TEO's Position:   Per the court's
16  summary adjudication order, it is undisputed that when the
17  trench was expanded, the PCE fumes discovered were not reported
18  to any authorities.   Instead, the only action that was taken
19  was to replace concrete over the soil and contain the fumes.
20  (Dkt.   735,   p.   16).   AmeriPride's Position:   Disputed.   The
21  evidence does not support this alleged fact.)

22      84.   Whether or not AmeriPride discharged wastewater into
23  the soil during its ownership and operation of the Facility?
24  (TEO's Position:   Per the parties' July 12, 2011 Stipulation,
25  this   fact   is   not   in   dispute.   AmeriPride's   Position:
26  Cumulative.   AmeriPride has complied fully with the terms of

1   the stipulation in agreeing to Undisputed Fact 69.)

2       85.  Whether or not during AmeriPride's ownership and
3   operation, in 1983 or 1984, a pipe connecting the washing
4   machines to a sewer or sump pump and/or tank broke at the
5   Facility?  (TEO's Position: Ray De Los Santos testified in his
6   deposition that this pipe broke and was leaking.  AmeriPride's
7   Position:  Disputed.  The evidence does not support this
8   alleged fact.  Mr. Delosantos testified to much less certainty
9   that is implied by the alleged fact:

10      Q. The ten inch pipe - how long before you left them?

11      A. Six months. Something like that. Something like that.
12  I'm not too sure. I know it was broke, you know, but I didn't
13  keep track of that.  I didn't order  it to get fixed, so I
14  couldn't tell you.

15  (Delossantos Depo. 50:3-8, emphasis added.)

16      86.  Whether or not the sump at the site leaked?  (TEO's
17  Position:  There is only one sump at the Site.  The testimony
18  of Anne Farr supports this fact.  Further, the parties have
19  previously agreed that the wastewater sump overflowed "a
20  couple" of times.  (Dkt. 735 p. 19).  AmeriPride's Position:
21  Disputed.  Vague.  Assuming this draft fact refers to the sump
22  outside the facility that handles waste water at the Facility,
23  this draft fact is the subject of disputed expert testimony.
24  An over flow, as claimed in TEO's Position is quite different
25  from a leak.)

26      87.  Whether or not the pipes, sump, and wastewater

90

1  systems at the site leaked PCE and other chemicals?   (TEO's
2  Position:    In addition to the parties' July 12, 2011
3  Stipulation establishing that the removed pipes leaked PCE
4  contaminated wastewater, the evidence establishes the sump and
5  other pipes at the site leaked.   Jim Warner and Anne Gates
6  testified that, as supported by several studies, wastewater
7  systems generally leak.   Warner also testified the most likely
8  source of contaminants other than PCE breakdown products would
9  be leaking wastewater.   AmeriPride's Position:   Cumulative.
10 AmeriPride has complied fully with the terms of the stipulation
11 by agreeing to Undisputed Fact 69.)

12     88.   Whether or not AmeriPride received laundry that was
13 contaminated with PCE?  TEO's Position: The parties agreed to
14 this fact, it is not in dispute.   (Dkt. 735 p. 20).   It is
15 undisputed that PCE has been detected in AmeriPride's
16 wastewater.   Other chemicals have also been detected in the
17 wastewater.   The wastewater systems and pipes leaked during
18 AmeriPride's ownership and operation of the Facility.   It is
19 undisputed AmeriPride leaked PCE-contaminated wastewater into
20 the soil. (AmeriPride's Position:  This fact is duplicative of
21 Undisputed Fact 73 which states:   "AmeriPride and VIS, Inc.
22 received and processed laundry from customers that from time
23 to time was contaminated with PCE and other chemicals that are
24 not listed as chemicals of concern in any of the Cleanup and
25 Abatement Orders listed in Undisputed Fact 83.")

26     89.   Whether or not AmeriPride's operations at the Site

91

1 added PCE and other contaminants into the environment? (TEO's
2 Position: It is undisputed that dissolved PCE has been
3 detected in AmeriPride's wastewater and that shop towels that
4 AmeriPride laundered contained PCE. Other chemicals have also
5 been detected in the wastewater. The wastewater systems and
6 pipes leaked during AmeriPride's ownership and operation of the
7 Facility. It is undisputed AmeriPride leaked PCE-contaminated
8 wastewater into the soil. Further, the evidence does not
9 substantiate that there was no use of products containing VOCs
10 during AmeriPride's ownership and operation of the Facility.
11 AmeriPride's Position: This alleged fact is duplicative of
12 Undisputed Fact 37, 68 and 72. Undisputed Fact 37 states: "In
13 addition to PCE and its breakdown products and other chemicals
14 that are not listed as chemicals of concern in any of the
15 Cleanup and Abatement Orders listed in Undisputed Fact 83 have
16 been detected in samples from Gore Sorbers, soil vapor, soil
17 or groundwater collected at the Site." Undisputed Fact 69
18 states: "During AmeriPride's ownership and operation of the
19 Facility, pipes removed by AmeriPride leaked PCE-contaminated
20 wastewater into the soil and groundwater and this contamination
21 was a cause of the contamination on the Huhtamaki property."
22 Undisputed Fact 77 states: "During the course of the
23 investigation, AmeriPride discovered that in addition to PCE
24 in the soil beneath the buildings at the Facility, PCE, PCE
25 breakdown products and other chemicals that are not listed as
26 chemicals of concern in any of the Cleanup and Abatement Orders

1  listed in Undisputed Fact 83 were present in the groundwater
2  beneath the Facility.")

3       90.  Whether  or  not  the  wastewater  discharged  by
4  AmeriPride, regardless of whether it contained PCE, mobilized
5  the PCE already in the soil, driving it deeper into the soil,
6  causing it to reach the groundwater, and aggravating the
7  contamination problem at the Site? (TEO's Position:  The type
8  and amount of PCE spilled by VIS, Inc. moved through the soil
9  slowly absent a driving force. Wastewater is a driving force
10 that could have mobilized the PCE in the soil and caused it to
11 travel deeper into the soil and to reach the groundwater.
12 AmeriPride's Position:  Disputed.  This is the subject of an
13 expert dispute.  Any type of water, including rain water or
14 wastewater, can be a driving force that can cause the type of
15 residual DNAPL PCE caused by VIS, Inc.'s DNAPL PCE releases to
16 migrate to groundwater.)

17      91.  Whether or not AmeriPride's failure to report the PCE
18 contamination it discovered during the wash aisle trench
19 excavation and extension increased the size and cost of
20 remediation needed at the Site? (TEO's Position: AmeriPride's
21 failure to report allowed the plume to spread, thereby
22 increasing the contamination. AmeriPride's Position: Disputed
23 and assumes other facts.  This is the subject of an expert
24 dispute.)

25      92.  Whether or not AmeriPride's costs, including its
26 section 113(f) costs have been offset by other sources?  (TEO's

93

1  Position:  AmeriPride offset its cost of purchasing water from
2  the city by $28,632 through its practice of re-using treated
3  water.  AmeriPride has failed to reduce this saved amount from
4  its total cost calculations.  A portion of the section 113(f)
5  costs claimed by AmeriPride must be off set by the settlements
6  it  entered  with  Petrolane  and  Chromalloy.   AmeriPride's
7  Position:  Disputed as a result of the use of the vague terms
8  "AmeriPride's costs, including its section 113(f) costs" and
9  "other sources" in the proposed fact.  Pursuant to the Summary
10  Adjudication Order, TEO is entitled to a credit against its
11  response costs claim under CERCLA Section 107 for OU2 water
12  reuse of $28,632 (Dkt. 735 at 46; Dkt. 707-1 at 61).  Pursuant
13  to the Summary Adjudication Order, TEO is entitled to a credit
14  for payments made to settle the CERCLA Section 107 claims of
15  Petrolane and Chromally totaling $3,250,000 (Dkt. 735 at 46;
16  Dkt. 707-10).)

17      93.  Whether or not the Huhtamaki settlement impacts
18  AmeriPride's recovery? (TEO's Position:  The Court's July 2,
19  2007 order approving the settlements between Chromalloy and
20  AmeriPride,  AmeriPride  and  Petrolane  and  AmeriPride  and
21  Huhtamaki adopted Section 6 of the Uniform Comparative Fault
22  Act ("UCFA") as the federal common law in this case for the
23  purpose of determining the legal effect of the settlement
24  agreements.  Accordingly, TEO's liability, as the non-settling
25  defendant,  must  be  reduced  by  the  equitable  share  of  the
26  settling  party's  obligation,  regardless  of  the  actual

1  settlement amount.   As the owner of property, Huhtamki was
2  responsible for the contamination on their property and must
3  share some responsibility for the contamination.    Since
4  AmeriPride settled with the party, AmeriPride must bear that
5  party's share.   AmeriPride's Position: As phrased, this is not
6  really a fact issue.   Nevertheless, there is no evidence
7  Huhtamaki caused any of the PCE contamination that resulted
8  from the Facility. Accordingly, Huhtamaki could have a share
9  of no more than zero percent.)

10        94.  Whether or not the Cal-Am settlement impacts
11  AmeriPride's recovery? (TEO's Position:  The Court's July 2,
12  2007 order approving the settlements between Chromalloy and
13  AmeriPride, AmeriPride and Petrolane and AmeriPride and
14  Huhtamaki adopted Section 6 of the Uniform Comparative Fault
15  Act ("UCFA") as the federal common law in this case for the
16  purpose of determining the legal effect of the settlement
17  agreements. Accordingly, TEO's liability, as the non-settling
18  defendant, must be reduced by the equitable share of the
19  settling party's obligation, regardless of the actual
20  settlement amount.   As the owner of property Cal-Am was
21  responsible for the contamination on their property and must
22  share some responsibility for the contamination.    Since
23  AmeriPride settled with the party, AmeriPride must bear that
24  party's share. AmeriPride's Position: As phrased, this is not
25  really a fact issue. Nevertheless, there is no evidence Cal-Am
26  Water Co. caused any of the PCE contamination that resulted

1  from the Facility.  Accordingly, Cal-Am Water Co. cannot have
2  a share of more then zero percent.)

3      95.  Whether or not the Petrolane settlement impacts
4  AmeriPride's recovery? (TEO's Position:  The Court's July 2,
5  2007 order approving the settlements between Chromalloy and
6  AmeriPride, AmeriPride and Petrolane and AmeriPride and
7  Huhtamaki adopted Section 6 of the Uniform Comparative Fault
8  Act ("UCFA") as the federal common law in this case for the
9  purpose of determining the legal effect of the settlement
10  agreements. Accordingly, TEO's liability, as the non-settling
11  defendant, must be reduced by the equitable share of the
12  settling party's obligation, regardless of the actual
13  settlement amount.  Petrolane, and its related companies, are
14  allegedly the alter ego of VIS, Inc. and are responsibility for
15  the majority of the blame for the releases. · AmeriPride's
16  Position:   As phrased, this is not really a fact issue.
17  Nevertheless, there is no evidence Petrolane itself caused any
18  of the PCE contamination that resulted from VIS, Inc. DNAPL PCE
19  releases.   Furthermore, AmeriPride does not presently claim
20  that Petrolane was the alter ego of VIS, Inc.  Nevertheless,
21  AmeriPride has agreed that Petrolane's settlement payment
22  should be a credit against AmeriPride's claim against TEO under
23  Section 113(f) of CERCLA.)

24      96.  Whether or not the Chromalloy settlement impacts
25  AmeriPride's recovery? (TEO's Position:  The Court's July 2,
26  2007 order approving the settlements between Chromalloy and

1 AmeriPride, AmeriPride and Petrolane and AmeriPride and
2 Huhtamaki adopted Section 6 of the Uniform Comparative Fault
3 Act ("UCFA") as the federal common law in this case for the
4 purpose of determining the legal effect of the settlement
5 agreements. Accordingly, TEO's liability, as the non-settling
6 defendant, must be reduced by the equitable share of the
7 settling party's obligation, regardless of the actual
8 settlement amount. According to AmeriPride, Chromalloy
9 contributed to the contamination at their property and should
10 be partially responsible for the response costs. AmeriPride's
11 Position:   As phrased, this is not really a fact issue.
12 Nevertheless, there is no evidence Chromalloy itself caused any
13 of the PCE contamination that resulted from the Facility.
14 Nevertheless, AmeriPride has agreed that Chromalloy's
15 settlement payment should be a credit against AmeriPride's
16 claim against TEO under Section 113(f) of CERCLA.)

17       97.  Whether or not the costs under §107 can be
18 apportioned?  TEO's Position:   The contamination allegedly
19 caused by VIS, Inc. would have only effected the top thirteen
20 feet of the subsurface but for the conduct of AmeriPride.
21 AmeriPride should be responsible for all contamination below
22 thirteen feet. AmeirPride's Position: "Apportionment" is not
23 the same thing as allocation under CERCLA.   "[A]pportionment
24 ... looks to whether defendants may avoid joint and several
25 liability by establishing a fixed amount of damage for which
26 they are liable," while contribution actions allow jointly and

1 severally liable PRPs to recover from each other on the basis
2 of equitable considerations." Burlington Northern and Santa
3 Fe. Ry. Co. v. United States, 129 S.Ct. 1870, 1883 (2009).
4 Whether harm can be apportioned under CERCLA Section 107 is a
5 legal issue in the first instance. U.S. v. Hercules, Inc., 247
6 F. 3d 706, 178 (8th Cir. 2001) ("The preliminary issue of
7 whether the harm to the environment is capable of apportionment
8 among two or more causes is a question of law.").
9 Apportionment is an affirmative defense to a CERLCA Section 107
10 claim, so the burden of proof is on TEO. Id. at 1881. ("Not
11 all harms are capable of apportionment, however, and CERCLA
12 defendants seeking to avoid joint and several liability bear
13 the burden of proving that a reasonable basis for apportionment
14 exists."). If TEO wanted to assert an apportionment defense
15 to AmeriPride's CERCLA Section 107 claim, the time to have done
16 that was before the law and motion cut-off date in the Court's
17 Scheduling Order. This TEO failed to do. According to the
18 Court's Scheduling Order:

19     The parties should keep in mind that the purpose of law
       and motion is to narrow and refine the legal issues
20     raised by the case, and to dispose of by pretrial motion
       those issues that are susceptible to resolution without
21     trial. To accomplish that purpose, the parties need to
       identify and fully research the issues presented by the
22     case, and then examine those issues in light of the
       evidence gleaned through discovery. If it appears to
23     counsel after examining the legal issues and facts that
       an issue can be resolved by pretrial motion, counsel are
24     to file the appropriate motion by the law and motion
       cutoff set forth supra.
25
   (Dkt. 695 at 3-4.) The law and motion cut off was February 2,
26

98

1  2011.  (Dkt. 695 at 2.) TEO did not file a summary judgment
2  motion on apportionment.  Moreover, it failed to raise
3  apportionment as a defense to AmeriPride's summary judgment
4  motion as to CERCLA Section 107.  As the Court stated, TEO
5  raised three arguments:

6      TEO raised three arguments in response to AmeriPride's
       section 107 claim. First, TEO argued that the claim was
7      barred by AmeriPride's failure to report PCE
       contamination in 1983.  Assuming that AmeriPride was
8      aware of the contamination at that time, any failure to
       report does not demonstrate that AmeriPride was not in
9      substantial compliance with the national contingency
       plan, as explained by the Ninth Circuit in NL Industries,
10     792 F.2d 896.  Second, TEO argues that AmeriPride's
       response costs were not costeffective.  TEO has failed
11     to raise a triable question regarding cost-effectiveness.
       Finally, TEO challenges AmeriPride's accounting for
12     costs. Triable questions exist as to whether AmeriPride's
       recovery must be offset by the value of the treated water
13     and by amounts AmeriPride received in settlement from
       third parties.  The court further agrees that funds
14     AmeriPride paid to Huhtamaki and Cal-Am were not
       "response costs" recoverable under CERCLA section 107,
15     but AmeriPride may seek to recover these funds under
       section 113(f).
16
       Thus, AmeriPride is entitled to summary judgment
17     regarding the threshold question of TEO's liability under
       section 107.
18

19  (Dkt. 735 at 42-43.)  Apportionment of harm was not one of the
20  three arguments.  In the Summary Adjudication Order, the Court
21  held that AmeriPride had established all the elements of its
22  CERCLA Section 107 claim.  (Dkt. 735 at 42-43.)

23      TEO cannot prove that a reasonable basis for apportionment
24  exists.  "Apportionment is proper only when the evidence
25  supports the divisibility of the damages jointly caused by the
26  PRPs."  Burlington Northern and Santa Fe Ry. Co., 129 S. Ct.

99

1  at 1882, n. 9.   Even if TEO had not failed to raise an
2  apportionment defense prior to the law and motion cut-off and
3  in defense of AmeriPride's summary judgment motion, none of
4  TEO's experts opined that DNAPL PCE is not present more than
5  thirteen feet below ground surface.   Additionally, testimony
6  from TEO's own expert proves that "apportionment" of harm is
7  not possible in this case because residual DNAPL PCE caused
8  groundwater contamination via leaching and vapor transport:

9      Q. Okay. If the -  if the DNAPL didn't make its way all
10     the way to groundwater, why is there a groundwater
11     contamination?

12     A. Well, vapors can be transported to the water table and
13     can   contaminate   groundwater.   That's   pretty   well
14     established.   And water that infiltrates through spill
15     zones can carry chemicals down to the water table.

16     Q. Do you think that process is happening at the -  at our
17     site?

18     A. Yes.

19  (Warner Depo. 135:15-24, emphasis added.)  TEO admitted in its
20  Third-Party Complaint that the PCE from the tank overfill was
21  released to the soil and into the groundwater at the Site.
22  (Dkt. 697  24.)   Thus, even if TEO's claim that the DNAPL PCE
23  released by it did not itself reach groundwater, the residual
24  DNAPL PCE caused groundwater contamination, so the Site is not
25  divisible - capable of apportionment on the basis TEO claims.
26  ////

100

## V.   NON-DISCOVERY MOTIONS TO THE COURT AND RESOLUTION

a. 4/5/2000--Defendant Texas Eastern Corp. filed a motion to dismiss plaintiff's entire complaint for lack of personal jurisdiction (denied).   In the alternative, defendants moved to dismiss AmeriPride's first claim for failure to state a claim under CERCLA (denied).

b. 9/25/2000--Plaintiff filed a motion to amend their second amended complaint (granted).

c. 2/3/2003--Defendant Mission Linen Supply filed a motion for partial summary judgment on the issue of ownership (stipulated that Mission would remain a party to the action and Mission would be dismissed in two related cases; AmeriPride could later amend complaint to include allegations concerning damages incurred in other two cases for which Mission could be held liable).

d. 8/26/2005--Plaintiff filed a motion to consolidate cases (consolidated for discovery purposes only); (decision deferred pending state court hearing regarding CA Regional Water Quality Control Board's Clean-up and Abatement Order); (motion granted, subject to reconsideration).

e. 4/17/2006--Plaintiff AmeriPride and Defendant Chromally American Corp. filed an ex parte motion for extension for filing of their motion for approval of settlement (granted).

f. 4/27/2006--Plaintiff Huhtamaki Foodservice, Inc. filed a motion to shorten time for the motion for protective order by Huhtamaki Foodservice, Inc. (denied w/o prejudice).

1      g. 4/27/2006-Plaintiff Huhtamaki Foodservice, Inc. filed

2 a motion for protective order (denied).

3      h. 5/15/2006--Parties Texas Eastern Corp., Petrolane,

4 Inc., AmeriPride Services, Inc., Amerigas Propane, Inc., UGI

5 Corporation, Amerigas Partners filed a joint motion for

6 approval of settlement and contribution bar (termed, to be

7 renoticed).

8      i. 5/22/2006-Chromally American Corp. filed an ex parte

9 motion to shorten time for notice of motion for approval of

10 settlement and entry of contribution bar order (granted) or,

11 alternatively, allowing motion to be set for hearing (granted).

12      j. 5/22/2006--Defendant Chromally American Corp. filed a

13 joint motion for approval of settlement and entry of

14 contribution bar order (termed, to be renoticed).

15      k. 5/23/2006--Defendant Chromally American Corp. filed an

16 ex parte motion for an order allowing service of motion for

17 approval of settlement and entry of contribution bar order, on

18 non-parties (granted).

19      l. 7/6-7/2006--Plaintiff Huhtamaki Foodservice, Inc. filed

20 Daubert motions to preclude the admission of the opinion

21 testimony of: Mr. John Minney; Mark A. Bryant; Dr. Jessica R.

22 Greene; Peter Mesard (terminated).

23      m. 7/7/2006--Plaintiff Huhtamaki Foodservice, Inc. filed

24 a motion for sanctions against AmeriPride (granted).

25      n. 7/7/2006--Plaintiff Huhtamaki Foodservice, Inc. filed

26

1  two motions for summary judgment against AmeriPride: one on
2  tort causes of action, and one on cost recovery under federal
3  and state law (terminated).

4      o. 7/7/2006--Plaintiff/Defendant AmeriPride Services, Inc.
5  filed a motion for partial summary judgment against Huhtamaki
6  (terminated).

7      p. 7/7/2006--Plaintiff/Defendant AmeriPride Services, Inc.
8  filed a motion for judgment on the pleadings or for partial
9  summary judgment re: Huhtamaki's punitive damage claims
10 (terminated).

11      q. 7/7/2006--Plaintiff/Defendant AmeriPride Services, Inc.
12 filed a motion for summary judgment re: Mission Linen Supply's
13 contractual liability (denied).

14      r. 7/20/2006--Plaintiff/Defendant AmeriPride Services,
15 Inc. filed a motion to strike motion Huhtamaki Foodservice,
16 Inc.'s facts or, in the alternative, for a continuance of the
17 hearing date and time to respond, and motion to shorten time
18 for hearing re: motion to strike (denied).

19      s. 7/26/2006--Defendant Mission Linen Supply filed a
20 motion for summary judgment re: "owner/control" issue
21 (granted); and filed a motion for summary judgment for
22 contractual indemnification (granted).

23      t. 8/2/2006--Plaintiff Huhtamaki Foodservice, Inc.
24 ////
25 ////
26 ////

filed motions to strike declarations of Jeffrey Hicks and Jeff Thuma, and motions to shorten time for their motions to strike (granted).

u. 8/17/2006---Plaintiff/Defendant AmeriPride Services, Inc. filed a motion for reconsideration (denied), and a motion for a certificate of appealability (granted).

v. 12/8/2006--Plaintiff/Defendant AmeriPride Services, Inc. filed a motion for leave to supplement the record (denied).

w. 12/11/2006--Plaintiff Huhtamaki Foodservice, Inc. filed a motion to strike documents and preclude expert testimony of Delta Environmental Consultants, Inc. and/or Jeffrey Thuma (granted).

x. 4/27/2006--Plaintiff Huhtamaki Foodservice, Inc. filed a joint motion for entry of judgment, approval of settlement, and entry of contribution bar (granted); and a joint motion for order allowing service of such motion on non-parties (granted).

y. 6/1/2007--Non-party California-American Water Company filed a motion to request to consideration of late-filed motion.

z. 6/19/2008--Plaintiff/Defendant AmeriPride filed a motion to set the pretrial conference and trial date.

aa. 9/26/2008--Defendant Texas Eastern Overseas, Inc. filed a motion for summary judgment for lack of capacity to be sued (granted).

bb. 1/7/2011--Plaintiff/Defendant AmeriPride filed a

1 motion for summary judgment (granted in part, denied in part).

2      cc. 5/23/2011--Defendant Texas Eastern Overseas, Inc.

3 filed a motion to exclude opinion testimony of plaintiff's

4 expert.   dd.

5      dd. 5/23/2011--Defendant Texas Eastern Overseas, Inc.

6 filed a motion for sanctions against AmeriPride (resolved).

7           **VI.   DISPUTED EVIDENTIARY ISSUES**

8      a.   Plain, concise summary of any reasonably anticipated

9 disputes concerning admissibility of live and deposition

10 testimony and a statement whether each such dispute should be

11 resolved by motion in limine, briefed in the trial brief, or

12 addressed in some other manner.

13           i.   Anticipated Dispute about whether TEO cannot

14 prove AmeriPride's share as required by CERCLA Section 113(f).

15      AmeriPride asserts that TEO cannot prove AmeriPride's

16 share because TEO's experts gave no opinion or deposition

17 testimony on the percentage amount of AmeriPride's share:

18      TEO's expert, Jim Warner, claims that PCE from

19 AmeriPride's wastewater system had a "material contribution"

20 to the PCE contamination at the Site, but Mr. Warner does not

21 have an opinion on a percentage.   (Warner Depo. at

22 193:6-194:2.)   Despite clear testimony, TEO disputes this.

23 (Dkt. 756   33 at 5.)   In his deposition, TEO's expert, Jim

24 Warner, testified that he could not assign mass to each of the

25 parties because it was a "combined contribution."

26 Specifically, Jim Warner testified:

1     Q.   What part should be assigned to AmeriPride?

2     A.   What do you mean?

3     Q.   Well, you say in part it should be assigned to

4     AmeriPride.  What part?  How much?

5     A.   How much?

6     Q.   Yeah.

7     A.   I - I don't think we have the data to assign the mass

8     to  each  of  the  parties.   It's  been  a  combined

9     contribution."

10 (Warner Depo. at 194:12-20, emphasis added.);

11     According to Jim Warner, TEO's expert, he does not have

12 the data to assign accurate mass to wastewater releases versus

13 PCE releases.  Specifically, Jim Warner testified:

14     Q.   I get the what, which is what you're describing now,

15     what happened and what releases there were, blah, blah,

16     and all that stuff.   That's the what to me.  What I'm

17     asking is the how much question.  How much?  When you say

18     significant, I want to know how much.

19     A.   I don't think - we don't have the data to assign

20     accurate mass to wastewater releases versus PCE releases.

21     The other part of this is the PCE releases that are

22     related to dry cleaning as a transport mechanism of

23     wastewater are moving through and leaching the PCE and

24     carrying it down to the water table.  So even for PCE that

25     was related to dry cleaning, the wastewater has acted as

26     an agent for moving the PCE down to the water table.

1        Q.   Well, let's say you didn't have any DNAPL PCE in the

2        - in the subsurface at the site.  Okay?  And you only had

3        the wastewater.   What kind of a cleanup would we be

4        looking at here?

5        A.   I can't answer that question because the PCE is there.

6    And the PCE is from a combination of sources.  Can't subtract

7    those two out."

8    (Warner Depo. at 196:20-197:16, emphasis added.).

9        According to TEO's expert, Jim Warner, the amount of

10   wastewater   that   got   out   during   either   VIS,   Inc.'s   or

11   AmeriPride's operations is uncertain.   "We don't have data to

12   quantify that other than to say that it's significant based on

13   the limited data we have from soil for non-dry-cleaning-related

14   chemicals and the soil vapor data and the groundwater data."

15   (Warner Depo. at 93:18-94:1.);

16       TEO's expert, Jim Warner, does not know the amount of

17   exfiltration from the wastewater system.   (Id. at 94:10-95:1.);

18       TEO's expert, Jim Warner, did not perform a calculation

19   of   the   total   amount   of   PCE   actually   released   from   the

20   wastewater system at the facility.   (Id. at 100:17-21.);

21       TEO's expert, Jim Warner, did not perform a calculation

22   of the exfiltration from any sump at the facility.   (Id. at

23   100:22-24.);

24       TEO's expert, Jim Warner, does not have a number for the

25   total amount of PCE that would have been released in the

26   ////

1 wastewater    itself    through    exfiltration.         (Id.    at
2 100:25-101:3.);

3      Assuming the calculations by TEO's expert, Anne Gates, are
4 correct  (and  they  are  not),  even  the  maximum  amount  she
5 calculates for PCEs released from the wastewater system during
6 AmeriPride's period of ownership is approximately 10 percent
7 of the total pounds of PCE pulled out of just a part of the
8 site with the soil vapor extraction system in Operable Unit 1.
9 (Gates Depo. at 173:22-174:4.)    Anne Gates admits that her
10 "estimate does not account for the amount of PCE released
11 during spills from the wastewater system, nor does it account
12 for other spills of PCE from non-wastewater operations" which
13 include releases listed in Table 8 from Warner's report [Dkt.
14 707-10 at 16].   (Gates Depo. at 174:9-24.)   Accordingly, PCE
15 released in wastewater does not explain the PCE contamination
16 at the Site.

17      As  of  the  end  of  December  2010,  4,074  pounds  (or
18 approximately 1,852 kilograms) of PCE had been removed from the
19 subsurface at the Site.   (Farr Expert Rebuttal Report at 15,
20 Dkt. 729-2 at 21, as corrected in Dr. Farr's April 29, 2011
21 deposition ("Farr Depo.") at 66:14-68:13.)   According to Dr.
22 Farr, the reasonable maximum and worst case estimates of total
23 mass of PCE that may have been released to the subsurface from
24 VIS,  Inc.'s  industrial  laundry  operations  and  AmeriPride's
25 industrial laundry operations can be compared to the total mass
26 of PCE removed from the Site to date because:

1       (a)   The estimated mass of PCE which was discharged in the
2   wastewater  was  calculated  using  three  different  assumptions
3   regarding  the  average  PCE  concentrations  prior  to  November
4   1990, as follows:

5           (1)   assuming a time-weighted average concentration
6   of 283 parts per billion measured for the period from November
7   1990 through April 2010;

8           (2)   assuming   a   time-weighted   average   PCE
9   concentration of 406 parts per billion measured for the period
10  from November 1990 through January 1998; and,

11          (3)   assuming a conservatively high concentration of
12  6,000  parts  per  billion,  consistent  with  the  maximum
13  concentration  of  PCE  ever  detected  in  wastewater  at  the
14  Facility during Plaintiff's ownership.   (Id. at 12, Dkt. 729-2
15  at 18.);

16      (b)   Even  if  one  were  to  assume  a  reasonable  maximum
17  leakage rate for the wastewater conveyance system of 1 % of the
18  total flow volume, consistent with systems with known sewer
19  defects, then the resulting reasonable maximum total mass of
20  dissolved PCE that could have been released to the subsurface
21  due to wastewater releases during the period from mid June 1983
22  through April 2010 is approximately 5.1 to 5.7 kilograms
23  (consistent with average concentrations of PCE detected in
24  wastewater), with a worst case estimate of 34 kilograms
25  (consistent with assuming a concentration of 6,000 µg/l of PCE
26  ////

1  in wastewater prior to November 1990.  Id. at 14, Dkt. 729-2

2  at 20.);

3       (c)  Similarly,  for  operations  of  the industrial

4  laundering prior to June 1983, a reasonable maximum total mass

5  of PCE that could have been released to the subsurface is

6  approximately 3.6 to 5.2 kilograms (consistent with average

7  concentrations of PCE detected in wastewater), with a worst

8  case estimate of 77 kilograms (consistent with assuming a

9  concentration of 6,000 parts per billion of PCE in wastewater

10 prior to November 1990).  (Id.);

11      (d)  The  reasonable  maximum  contribution  of  PCE from

12 AmeriPride's wastewater operations to the Site contamination

13 is less than 0.3% (5.7 kilograms/1,852 kilograms) of the total

14 PCE released at the Site.  (Id. at 15, Dkt. 729-2 at 21, as

15 corrected in Farr Depo. at 66:14-68:13.);

16      (e)  Similarly,  VIS,  Inc.'s  reasonable maximum

17 contribution of PCE from wastewater operations to the Site

18 contamination is less than 0.3% (5.2 kilograms/1,852 kilograms)

19 of the total PCE released at the Site.  (Id.); and,

20      (f)  Alternatively, the worst case contribution of PCE

21 from AmeriPride's industrial laundering operation is less than

22 1.8% (33.9 kilograms/1,852 kilograms) of the total PCE released

23 at the Site and VIS, Inc.'s worst case contribution of PCE from

24 wastewater releases is less than 4.1% (76.7 kilograms/1,852

25 kilograms) of the total PCE at the Site.  (Id.)

26 ////

1      AmeriPride thinks this disputed evidentiary issue probably

2 is best handled through a motion in limine.

3         ii.   Anticipated dispute as to whether or not TEO can

4 claim a credit for additional amounts not previously raised in

5 opposition to AmeriPride's motion for summary judgment.

6      AmeriPride anticipates that there will be a dispute as to

7 whether or not TEO can claim a credit for amounts TEO failed

8 to raise in opposition to AmeriPride's motion for summary

9 judgment.  As discussed more fully below, the Court has already

10 ruled on what credits will be applied.  A credit for insurance

11 payments is not a credit mentioned n the Summary Adjudication

12 Order because TEO did not raise it in response to AmeriPride's

13 summary judgment motion.   However, TEO now claims insurance

14 payments were made to AmeriPride for which it deserves a credit

15 against AmeriPride's CERCLA Section 113(f) claims for payment

16 of the Cal-Am Water Co. and Huhtamaki settlements totaling

17 $10.25 million.  (See Disputed Facts 18 and 19.)   The Summary

18 Adjudication Order decided TEO was entitled to credits for

19 payments made by AmeriPride to settle CERCLA Section 107 claims

20 against AmeriPride by Cal-Am Water Co. and Huhtamaki.  (Dkt.

21 735.)  In opposing AmeriPride's motion for summary judgment,

22 TEO only sought three credits.  First, TEO sought through the

23 declaration of its expert, Jim Warner, a credit for "reused

24 treated groundwater from the OU2 treatment system in laundry

25 operations."  (Dkt. 718   49.)   This credit is specifically

26 addressed in the Summary Adjudication Order.  (Dkt. 735 at 39.)

1    Next, in the Declaration of Emily M. Weissenberger in Support
2    of Texas Eastern Overseas, Inc.'s Opposition to Plaintiff
3    AmeriPride Services Inc.'s Motion for Summary Judgment (Dkt.
4    717), TEO provided evidence of two other credits, namely:  (1)
5    A payment to AmeriPride as a result of a settlement between
6    AmeriPride and Chromalloy; and, (2) A payment made to
7    AmeriPride as a result of a settlement between AmeriPride and
8    Petrolane.   (Dkt. 715  56. )   The AmeriPride-Chromalloy
9    settlement was Exhibit L to Ms. Weissenberger's declaration.
10   (Dkt. 717-12.)  The AmeriPride-Petrolane settlement was Exhibit
11   M to Ms. Weissenberger's declaration.  (Dkt. 717-12.)   The
12   Court discusses these next two credits in the Summary
13   Adjudication Order:

14       As to funds received in settlement, under CERCLA, a
         settlement by one defendant "reduces the potential
15       liability of the others by the amount of the settlement."
         42 U.S.C. § 9613(f)(2).  TEO asserts that AmeriPride has
16       received funds in settlements with Chromalloy and
         Petrolane, although TEO does not quantify these funds.
17       TEO's response to SUF 56.  AmeriPride agrees that it has
         received these funds and that its claim must be reduced
18       by this amount.  Because the parties' briefing does not
         quantify these funds, the court does not further address
19       this issue now.

20   (Dkt. 735 at 39.)

21       No request for a credit for any payment by AmeriPride's
22   insurance was made by TEO.  TEO did not oppose AmeriPride's
23   motion for summary judgment on the basis of any proof of
24   insurance payments consistent with the requirements of Fed. R.
25   Civ. P. 56, L.R. 260 and the Court's Scheduling Order (Dkt.
26   695).

1   Neither did TEO oppose the motion for summary judgment on the
2   basis of a need for discovery on insurance payments as required
3   by Fed. R. Civ. P. 56(d) and L.R. 260(b).   None of the
4   declarations filed by TEO in opposition to AmeriPride's motion
5   for summary judgment made the claim "that, for specified
6   reasons, it cannot present facts essential to justify its
7   opposition" as required by Fed. R. Civ. P. 56(d).   (See Dkt.
8   717.)   L.R. 260(b) requires that:   "If a need for discovery is
9   asserted as a basis for denial of the motion, the party
10  opposing the motion shall provide a specification of the
11  particular facts on which discovery is to be had or the issues
12  on which discovery is necessary."   L.R. 260(b) (emphasis
13  added).   TEO did not specify insurance payments as a fact on
14  which discovery was to be had or was necessary.

15      The Court's Scheduling Order states:   "Where the parties
16  bring motions for summary judgment, the court will deem facts
17  which are apparently undisputed as undisputed under Fed. R.
18  Civ. P. 56(d), unless specifically reserved and that party
19  tenders evidence to support the reservation."   (Dkt. 695 at 4,
20  emphasis added.)   TEO did not tender evidence to support the
21  reservation of a credit for an insurance payment.   The Summary
22  Adjudication Order reserved only the three credits requested
23  by TEO in its opposition papers:   "AmeriPride's statement of
24  costs may need to be reduced to account for funds received in
25  settlements with other parties [Chromalloy and Petrolane] and
26  ////

1  for the economic value of the treated water." (Dkt. 735 at 46,
2  emphasis added.)

3      After issuance of the Summary Adjudication Order (Dkt.
4  735) and after the discovery and motion cut off dates in the
5  Court's scheduling order (Dkt. 695) TEO filed a motion seeking
6  to pursue discovery of insurance payments to AmeriPride.  (Dkt.
7  736)  The Court issued an order denying such discovery.  (Dkt.
8  765.)

9      The Summary Adjudication Order decided the credits to be
10 considered and those credits did not include insurance
11 payments.  Despite the Court's Summary Adjudication Order,
12 proof of payment by AmeriPride (AM016337-AM016356 and
13 AM016332-AM016336) of the Cal-Am Water Co. and the Huhtamaki
14 settlement amounts and despite admissions by TEO and its expert
15 Jim Warner, TEO persists in renewing its denials that
16 AmeriPride has incurred these costs.

17     AmeriPride thinks this disputed evidentiary issue probably
18 is best handled through a motion in limine.

19          iii. Anticipated dispute on the admissibility of
20 certain opinion testimony by TEO's various experts on the
21 grounds that the reports did not meet the disclosure
22 requirements of the Federal Rules of Civil Procedure and the
23 Court's Scheduling Order.

24     AmeriPride anticipates that it will object to the
25 admissibility of certain opinion testimony by TEO's various
26 experts on the grounds that the opinions were not submitted in

1  accordance with the Federal Rules of Civil Procedure and the
2  Court's Scheduling Order (Dkt. 695) and, therefore, the
3  evidence is inadmissible.  Specifically, TEO failed to file
4  with the Court any list of rebuttal experts or expert rebuttal
5  reports, as required by the Court's Scheduling Order.  (Dkt.
6  695 at 5.)  As such, AmeriPride asserts that the Court should
7  not admit any expert rebuttal opinions offered by TEO's experts
8  into evidence.  In the Joint Pretrial Statement filed on
9  September 19, 2011, the parties stipulated that:  "Neither
10  party will object to the other party's expert's rebuttal
11  opinions or supplemental opinions given prior to the expert's
12  deposition on the basis that such opinions should have been
13  disclosed in the other party's initial expert witness
14  disclosures."  Because Jim Warner was disclosed properly as an
15  initial expert for TEO in accordance with the requirements set
16  forth in the Court's Scheduling Order, this anticipated
17  evidentiary dispute does not extend to Mr. Warner's opinions.
18  However, the Court should disregard entirely the rebuttal
19  opinions of Anne Gates, Michael Kavanaugh, and Harvey
20  Kreitenberg.
21      In addition, as to TEO's rebuttal expert, Harvey
22  Kreitenberg, TEO has also failed to follow the disclosure
23  requirements of Fed.R. Civ. P. 26(a)(2)(B)(iv), (v), and (vi).
24  TEO did not disclose (1) a list of Mr. Kreitenberg's
25  publications authored in the previous 10 years, (2) a list of
26  any of the cases in which, during the previous 4 years, Mr.

1  Kreitenberg testified as an expert at trial or by deposition,
2  or (3) a statement of the compensation to be paid to Mr.
3  Kreitenberg for the study and testimony in the case.

4      AmeriPride thinks this disputed evidentiary issue probably
5  is best handled through a motion in limine.

6          iv.   Anticipated renewal of TEO's Daubert motion to
7  exclude opinion testimony of AmeriPride's expert.

8      TEO's Daubert v. Merrell Dow Pharmaceuticals, Inc., 509
9  U.S. 579 (1995) ("Daubert") motion to exclude opinion testimony
10 of AmeriPride's expert, Anne M. Farr, Ph.D. (Dkt. 740 to Dkt.
11 743-3) was denied by the Court, subject to the Court's further
12 determinations as to the relevance and reliability of the
13 challenged testimony at trial (Dkt. 765).   It is anticipated
14 that TEO will renew its objections to Dr. Farr's expert
15 opinions at trial.

16          v.   Anticipated dispute on the admissibility of
17 certain opinion testimony by TEO's expert, Anne Gates, on the
18 grounds that the opinions are not relevant and reliable in
19 accordance with the requirements of Daubert.

20     Certain opinions of Anne Gates fail to meet the
21 requirements for expert testimony under Federal Rule of
22 Evidence ("FRE") 702, and of relevance and reliability as
23 originally set forth in Daubert. FRE 702 provides that "a
24 witness qualified as an expert by knowledge, skill, experience,
25 training, or education, may testify" to "specific, technical
26 or other specialized knowledge" if "(1) the testimony is based

116

1   on sufficient facts or data; (2) the testimony is the product
2   of reliable principles and methods, and (3) the witness has
3   applied the principles and methods reliably to the facts of the
4   case."    The trial court must assess the relevance and
5   reliability of scientific evidence by considering "whether (1)
6   the reasoning or methodology underlying the testimony is
7   scientifically valid (the reliability prong); and (2) whether
8   the reasoning or methodology properly can be applied to the
9   facts in issue (the relevancy prong)."   Abarca v. Franklin
10  Cnty. Water Dist., 761 F. Supp. 2d 1007, 1021 (E.D. Cal. 2011).

11      Anne Gates opined that a soil resistivity test performed
12  at the AmeriPride facility provides evidence that there was
13  exfiltration from the sump.  (Rebuttal Report of Anne Gates at
14  7.)  But, Anne Gates's opinion is directly contradicted by the
15  opinions of another of TEO's experts, Harvey Kreitenberg.   In
16  his Declaration in Support of TEO's Opposition to Plaintiff's
17  Motion for Summary Judgment, Mr. Kreitenberg stated
18  unequivocally that "soil resistivity testing is not a
19  recognized method utilized to verify a liquid waste piping
20  system's integrity."  (Dkt. 719  8 at 4.)   Mr. Kreitenberg
21  repeated this statement in his expert report dated April 13,
22  2011, and confirmed the opinion that soil resistivity testing
23  is not a reliable method for determining the integrity of any
24  underground object or structure, including sumps.   (See
25  Deposition of Harvey Kreitenberg (April 28, 2011) 37:8-42:7.)
26  ////

1    The self-contradictory admissions of TEO's experts cannot meet
2    the reliability prong, and so must be stricken.

3        Similar to TEO's Daubert motion, this issue is probably
4    best handled after Ms. Gates' testimony, if her opinions are
5    not stricken as a result of the anticipated evidentiary dispute
6    about TEO's failure to follow disclosure requirements for
7    expert reports discussed in Section 5.a.iii., above.

8                vi.  Anticipated dispute on the whether or not
9    AmeriPride should be precluded from relief from its response
10   to TEO's Request for Admission.

11       TEO claims that between 1983 and 1985, AmeriPride's
12   employees or agents detected the odor of PCE during the
13   excavation of the wash aisle trench.  However, TEO's expert,
14   Jim Warner, testified that this event must have taken place
15   prior to AmeriPride's taking ownership of the Facility in 1983.
16   Warner Depo. at 129:7-22.)  AmeriPride initially admitted this
17   fact in its March 1, 2011 initial responses to TEO's requests
18   for admissions.  This admission was based on the first
19   deposition of Mr. Smith.  However, Mr. Smith testified
20   differently on refreshed recollection in a second deposition:
21       Q.  MR. KAPLAN:     Was the expansion in connection with
22           the  Community  acquisition  before  the  facility  was
23           purchased by American Linen ?
24       THE WITNESS:    Yes.
25   (Robert Smith May 3, 2006 Depo. at 14:11-19).   John Dankoff
26   testified to the same effect.  (Dankoff May 3, 2006 Depo. at

1  9:16-10:18; 34:1-14.)   Mr. Smith's testimony as a whole,
2  coupled with Mr. Dankoff's testimony, makes clear that the wash
3  water trench expansion at the Facility that is the subject of
4  TEO's Requests for Admissions 28-30 and 33 took place during
5  VIS, Inc.'s ownership and operation of the Facility, not
6  AmeriPride's.

7       On April 22, 2011, AmeriPride amended its responses to
8  reflect Mr. Smith's testimony at his second deposition.   TEO
9  had both depositions of Mr. Smith.   In addition, AmeriPride
10 served amended interrogatory responses setting forth the facts
11 upon which AmeriPride denied TEO's Requests for Admissions
12 28-30 and 33.   Based on the state of the evidence and TEO's
13 expert's own understanding of the evidence, AmeriPride requests
14 that it be relieved from the admission pursuant to Fed. R. Civ.
15 P. 36(b).   According to Rule 16(e), "Subject to Rule 16(e), the
16 court may permit withdrawal or amendment if it would promote
17 the presentation of the merits of the action and if the court
18 is not persuaded that it would prejudice the requesting party
19 in maintaining or defending the action on the merits."   Fed.
20 R. Civ. P. 36(b).   The Court has not issued a final pretrial
21 conference order, so it is not limited by Fed. R. Civ. P.
22 16(e).   AmeriPride maintains that allowing this request would
23 not prejudice TEO in maintaining or defending the action on the
24 merits.   AmeriPride asked TEO to agree, but TEO refused.

25      AmeriPride thinks this disputed evidentiary issue probably
26 is best handled through a motion in limine.

1    vii. AmeriPride awaits the Court's direction on how

2  best to handle these issues.

3    Based on the Court's ruling denying TEO's Daubert motion

4  (Dkt. 765), AmeriPride infers that the Court may be inclined

5  to decide such issues at the final pretrial conference or

6  during the trial.  However, AmeriPride is prepared to file

7  motions should the Court choose to resolve these issues in that

8  manner.

9    b.   Plain, concise summary of any reasonably anticipated

10 disputes concerning physical and demonstrative evidence and a

11 statement whether each such dispute should be resolved by

12 motion in limine, briefed in the trial brief, or addressed in

13 some other manner.

14   AmeriPride anticipates that it will object to the use by

15 TEO of certain photographs taken during the April 23, 2011

16 inspection of the Facility ("inspection photographs").   In a

17 letter dated August 10, 2011, TEO provided to AmeriPride a

18 compact disc containing inspection photographs.  Representing

19 TEO during the inspection of the Facility were TEO's counsel,

20 Ron Bushner and Fred Blum, and TEO's experts, Jim Warner, Anne

21 Gates, and Dr. Michael Kavanaugh.   Pursuant to the Court's

22 Scheduling Order, "Experts will not be permitted to testify at

23 the trial as to any information gathered or evaluated, or

24 opinion formed, after the deposition taken subsequent to

25 designation." (Dkt. 695 at 5.) However, none of TEO's experts

26 included any mention of the inspection photographs in their

reports, and as Anne Gates made clear during her deposition, she did not review the photographs before her deposition: "[P]art of this [inspection] was Fred [Blum] took a bunch of photos.  So I think my idea was at some point I'd get a copy of the photos and I could annotate the photos with the relative information." (Gates Depo. 69:11-15.)  Therefore, although the inspection photographs may represent "information gathered" prior to the depositions of TEO's experts, it is clear that any evaluation or any opinions formed with respect to the inspection photographs by TEO's experts occurred after their depositions were taken.  As such, TEO's experts may not testify as to the inspection photographs at trial.  AmeriPride believes this dispute would be best handled by a motion in limine.

c.   Plain, concise summary of any reasonably anticipated disputes concerning the use of special technology at trial, including computer animation, video discs, and other high technology and a statement whether each such dispute should be resolved by motion in limine, briefed in the trial brief, or addressed in some other manner.

AmeriPride expects to present its case using electronic means and trial software known as Trial Director.  This technology allows for a much quicker trial presentation.  In addition, AmeriPride plans to use PowerPoint for its opening statement and closing argument.  AmeriPride and TEO are discussing the possible sharing of trial presentation hardware and software and a person to run the technology during trial.

1  AmeriPride does not expect any disputes concerning the use of
2  special technology.

3      a.   Anticipated disputes concerning admissibility of live
4  and deposition  testimony.

5      i.   Anticipated disputes regarding AmeriPride's expert
6  Anne  Farr's testimony.

7          1.   TEO's renewed Daubert motion.

8      The Court's July 19, 2011 Order stated: "With respect to
9  the Daubert motion, the court may make further determinations
10 as to the relevance and reliability of the challenged testimony
11 at trial."  (Dkt 765.)  Accordingly, at the trial, TEO requests
12 that the Court reconsider the arguments raised in its Daubert
13 motion challenging the testimony of AmeriPride's expert Dr.
14 Anne Farr.   (Dkt. 740-44, 755, 762-65.)

15     Since the matter has been fully briefed, TEO defers to the
16 Court as to when and how this dispute should be resolved.

17         2.   Farr's testimony must be limited to opinions
18 previously offered in written reports or deposition.

19     TEO anticipates AmeriPride will offer Dr. Farr to testify
20 regarding sources of VIS's PCE contamination at the Site about
21 which she did not previously render opinions.  The Court should
22 prohibit Dr. Farr from offering any such testimony.    The
23 Court's Pretrial Scheduling Order is clear: "Experts will not
24 be permitted to testify at the trial as to any information
25 gathered or evaluated, or opinion formed, after deposition
26 taken subsequent to designation."  (Dkt. 695, p.5.)

1        Dr. Farr previously provided opinions about four main
2  occasions when PCE was spilled during VIS's operation of the
3  Facility:   (1) a pipe breaking in 1980 or 1981while a storage
4  tank for DNAPL PCE was being moved; (2) an overfill of a PCE
5  storage tank in the late 1970s when a delivery truck driver
6  left the pump running while filling the PCE storage tank
7  causing DNAPL to spill across the floor and into a nearby
8  canal; (3) a boil-over in the late 1970s resulting in PCE being
9  released;  and  (4)  an  approximately  20  gallon  accidental
10  overflow of PCE between 1976 and 1981 when operators forgot to
11  turn off the pump.   (Dkt. 755-1.)

12        Beyond these occasions, Dr. Farr has not previously
13  rendered any opinions in written reports or deposition
14  regarding VIS's contribution to PCE at the Site. However, TEO
15  anticipates Dr. Farr may testify at trial that additional
16  sources  of  PCE  contamination  are  attributable  to  VIS.
17  Specifically, that the wastewater system during VIS's operation
18  resulted in a material contribution of PCE to the subsurface.
19  (Dkt. 770, p. 31.)   Dr. Farr never offered an opinion on this
20  issue.   The only time the issue was addressed is in Dr. Farr's
21  Supplemental Rebuttal Expert Report, in which she asserted that
22  TEO's expert, Anne Gates, must conclude "release of wastewater
23  during VIS, Inc.'s operation of the Facility resulted in the
24  migration of PCE through the vadose zone and into groundwater
25  prior to AmeriPride purchasing the Facility."   (Dkt. 731, p.
26  ////

1  11.)   Dr. Farr's opinion is not that VIS's wastewater is a
2  source, but that Anne Gates' opinion must be that it is.

3      Were Dr. Farr to offer such an opinion at trial concerning
4  the wastewater system or any new source, it would be for the
5  first time.   This is not permitted.   (Dkt. 695, p. 5.)
6  Accordingly, Dr. Farr must be precluded from testifying about
7  the wastewater source or any other source of VIS' possible
8  contamination other than those to which she previously
9  testified.

10      This anticipated dispute should be resolved through a
11  motion in limine.

12      ii.   Anticipated dispute regarding the relevance of Mark
13  Bryant's testimony.

14      The Court already has ruled that the response costs
15  AmeriPride incurred under its section 107 action are compliant
16  with the NCP.   The only NCP issue that remains relates to those
17  costs claimed under section 113.   TEO anticipates AmeriPride
18  will attempt to offer Mark Bryant to provide an expert opinion
19  as to whether AmeriPride's claimed section 113 costs complied
20  with the NCP.   However, AmeriPride did not designate Mr. Bryant
21  to testify regarding NCP Compliance for any costs relevant to
22  the section 113 claim.   He should be prohibited from doing so
23  at trial.

24      This anticipated dispute should be resolved through a
25  motion in limine.

26  ////

124

1       iii. Anticipated  dispute  regarding  testimony  of  John

2   Poulos and Bruce Telles.

3       Based  on  a  review  of  AmeriPride's  Appendix  1,  TEO

4   anticipates  AmeriPride  will  attempt  to  call  attorneys  John

5   Poulos  and  Bruce  Telles  to  testify.   Mr. Poulos  at  one  time

6   appeared  for  TEO  as  counsel  of  record.   Mr.  Telles  is  an

7   attorney that represents some of TEO's potential insurers.

8       AmeriPride  can  present  no  evidentiary  need  that  would

9   justify  requiring  either  of  these  witnesses  taking  the  stand.

10  Lawyers representing litigants "should not be called as witness

11  in trials involving those litigations if such testimony can be

12  avoided  consonant  with  the  end  of  obtaining  justice."   Ramey

13  v.  Dist.  141,  Intern.  Ass'n  of  Machinists  and  Aerospace

14  Workers,  378  F.3d  269,  282  (2004).   Courts  agree  that  an

15  attorney's  testimony  should  be  the  last  resort  and  certainly

16  only  allowed  if  there  is  no  other  way  to  get  the  facts  sought.

17  Tavy v. American Red Cross in Greater N.Y., 618 N.Y.S. 2d 25

18  (N.Y. App. Div. 1994).

19      Before  either  of  these  attorney  witnesses  is  allowed  to

20  testify,  AmeriPride  should  be  required  to  explain  the

21  significance  of  the  matters  to  which  each  might  testify,  the

22  weight  the  witness'  testimony  has  in  resolving  these  matters,

23  and  the  availability  of  other  witnesses  or  documentary  evidence

24  by  which  these  matters  could  be  independently  established.

25      This  anticipated  dispute  should  be  resolved  through  a

26  motion in limine.

1       iv.  Anticipated dispute regarding standard of care
2 testimony.

3       TEO anticipates that AmeriPride will attempt to introduce
4 testimony regarding VIS' alleged failure to abide by the
5 standard of care in its operation at the Site.  Disputed Fact
6 No. ("DF") 42 (Dkt. 770, p. 31.)  AmeriPride has not retained
7 an expert to provide an opinion on this issue, and no such
8 opinion has been disclosed.  Accordingly, the standard of care
9 is not at issue and, at trial, AmeriPride must be precluded
10 from offering any testimony on this issue.  (Dkt. 695, pp.
11 5-6.)

12       This anticipated dispute should be resolved through a
13 motion in limine.

14       v.  Anticipated dispute regarding testimony related to
15 TEO's insurance coverage.

16       AmeriPride argues that TEO could have participated in
17 remediation and investigation at the Site because "TEO clearly
18 has insurance and its insurers could have enabled TEO's
19 participation . . . ."  (Dkt. 770, p. 24.)  TEO anticipates
20 AmeriPride will attempt to offer testimony at trial regarding
21 TEO's insurance coverage.  AmeriPride should be prevented from
22 offering any such testimony because the fact does not relate
23 or correspond to an element of any relevant cause of action.
24 (Dkt. 695, p. 7.)  Namely, TEO's insurance is irrelevant to the
25 issue of whether TEO had the legal or physical capacity or
26 obligation to participate in Site remediation or to respond to

the CAOs issued by the RWQCB. TEO's insurers are not responsible parties under CERCLA nor were they, or could they, be named as dischargers by the RWQCB. AmeriPride has provided no legal support for its position that such a duty should be imposed on insurers.

This anticipated dispute should be resolved through a motion in limine.

b. Anticipated disputes concerning physical and demonstrative evidence.

i. Anticipated dispute concerning AmeriPride's Response to TEO's Request for Admissions.

TEO anticipates that AmeriPride will attempt to introduce evidence inconsistent with its Federal Rules of Civil Procedure Rule 36 admissions regarding a water trench excavation at the Site between 1983 and 1985. Should AmeriPride attempt to present such inconsistent evidence, TEO will move the Court to exclude it on the grounds that it is inadmissible under Fed. R. Civ. P. Rule 36(b).

In AmeriPride's March 1, 2011 Response to TEO's Request for Admissions, AmeriPride admitted that a wash trench excavation occurred during its operation of the Facility, and admitted the following facts related to this excavation:

REQUEST FOR ADMISSION NO. 28:

Admit that YOU undertook a wash trench excavation at the FACILITY between 1983 and 1985.

////

1    RESPONSE TO REQUEST NO. 28:

2        AmeriPride objects to the term "wash trench excavation"

3    as vague and ambiguous.  Subject to and without waiving this

4    objection, AmeriPride responds as follows:

5        Admitted, that the wash aisle trench was extended between

6    1983 and 1985.

7    REQUEST FOR ADMISSION NO. 29:

8        Admit  that  YOU  detected  PCE  odors  emanating  from

9    subsurface soil surrounding the wash trench excavation referred

10   to in Request No. 28.

11   RESPONSE TO REQUEST NO. 29:

12       Denied. AmeriPride admits that a trench at the Facility

13   was extended after AmeriPride purchased the Facility. The odor

14   of PCE was detected during the excavation.

15   REQUEST FOR ADMISSION NO. 30:

16       Admit that one or more of YOUR employees or agents became

17   sick as a result of the PCE odors emanating from the wash

18   trench excavation referred to in Request No. 28.

19   RESPONSE TO REQUEST NO. 30:

20       Denied. AmeriPride admits that a trench at the Facility

21   was extended after AmeriPride purchased the Facility. The odor

22   of PCE was detected during the excavation. People in the office

23   claimed the odor was giving them a headache, so they were sent

24   home early.

25       A little over a month later, without leave of court,

26   AmeriPride improperly filed Amended Responses denying these

128

1   facts.    The Federal Rules do not allow for the unilateral
2   withdrawal  or  modification  of  responses  to  requests  for
3   admissions.    The Federal Rules of Civil Procedure Rule 36(b)
4   requires a party to move the court for an order allowing it to
5   amend or withdraw its admissions. AmeriPride failed to do so,
6   and the motion cut-off date is now passed.    Accordingly,
7   AmeriPride  is  precluded  from  introducing  any  evidence,
8   references to evidence, testimony, or argument inconsistent
9   with  its  initial  admissions  regarding  the  wash  trench
10  excavation; and the Court should deem the matter admitted and
11  conclusively established.

12      In AmeriPride's lengthy recitation of the alleged facts
13  it now cites to justify a denial of these admissions, the
14  crucial fact missing is an explanation as to why AmeriPride
15  made these admissions in the first instance.    All of the
16  evidence upon which AmeriPride relies post hoc was available
17  to it at the time it made its initial responses.    The only
18  thing that is different is AmeriPride's understanding of the
19  impact of the admissions.

20      Once TEO, in its Opposition to AmeriPride's Motion for
21  Summary Judgment, argued that based on the trenching activities
22  AmeriPride should have notified the regulators immediately in
23  1983 rather than 1997, AmeriPride realized the significance of
24  its admissions regarding the wastewater trench. Shortly after,
25  without  leave  of  court,  AmeriPride  attempted  to  amend  its
26  responses to deny Responses No. 29-30 above. AmeriPride should

1   not be allowed to withdraw an admission simply because it
2   discovered its admission had significance. TEO has relied on
3   the admission and would be significantly prejudiced by
4   AmeriPride's gamesmanship.

5       This anticipated dispute should be resolved through a
6   motion in limine.

7       ii. Anticipated dispute regarding the responsive
8   documents AmeriPride refused to produce on the basis of
9   privilege.

10      TEO intends to file a motion to compel production of
11  documents withheld by AmeriPride as privileged from its recent
12  production of documents.  While TEO is aware that the motion
13  cut-off date has passed, the documents were just produced by
14  AmeriPride, such that TEO could not have brought the motion
15  earlier.

16      These documents include environmental audits conducted by
17  the general manager of AmeriPride's facilities.  These audits
18  are dated as early as 1989 and were discussed in Bernard
19  Berry's deposition as a series of questions regarding the
20  various types of potential pollution issues at each facility.
21  (Berry Deposition at 160:12-15).  The withheld documents also
22  include a memorandum compiling the information from these
23  audits.  AmeriPride raised objections based primarily on the
24  attorney-client/work product privilege.

25      Because AmeriPride prepared these documents in the
26  ordinary course of business on a quarterly basis since the late

130

1  1980s and the documents clearly were not prepared in
2  anticipation of litigation, they are not protected by the work
3  product doctrine. F. R. CIV. P. 26(b) (3). Further, because
4  these documents would have been created in substantially
5  similar form even if no litigation was anticipated to ensure
6  compliance with the law, they are not work product documents.
7  Lewis v. Wells Fargo & Co., 266 F.R.D. 433, 440 (N.D. Cal.
8  2010).

9      Neither are AmeriPride's claims of attorney client
10 privilege applicable to the documents at issue. The attorney
11 client privilege protects from disclosure communications from
12 a client to his attorney made in confidence and concerning
13 legal advice. U.S. v. Tedder, 801 F. 2d 1437, 1441 (4th Cir.
14 1986) (emphasis added) citing In re Special Grand Jury No.
15 81-1, 676 F. 2d 1005, 1008-09 (4th Cir. 1982). However, the
16 mere relationship of attorney client does not warrant a
17 presumption of confidentiality. Id. For example, no attorney
18 client privilege was found where FLSA audits had been conducted
19 without sufficient information that the audits were to seek
20 advice from counsel. Deel v. Bank of America, 227 F.R.D. 456,
21 461 (W.D. Va. 2005). See also Lewis, 266 F.R.D. at 445
22 (checklists prepared by managers were not privileged because
23 they were not aware that the information was being requested
24 in order to obtain legal advice).

25     The environmental audits withheld by AmeriPride are
26 nothing more than a questionnaire that includes topics such as:

1  an employees' right to know; hazardous materials on site; noise
2  levels; underground storage tanks; plant wastes and other
3  topics.  Nowhere is there any indication that this information
4  is being sought to solicit legal advice.  In fact, the audits
5  do not even inform the employee that the legal department for
6  the company prepared this form.  Additionally, any memorandum
7  prepared based on information provided in these audits is not
8  privileged and should not be withheld because the facts relayed
9  are not privileged.

10  The information is crucial to this litigation because it
11  will establish that AmeriPride was aware of the potential for
12  environmental contamination as early as the 1980s at each of
13  its laundry facilities.  At minimum, the court should conduct
14  an in camera review of the documents withheld as privileged.

15  iii. Foundational issues related to the admissibility of
16  evidence.

17  The parties will meet and confer to discuss how to handle
18  any potential foundational issues regarding the admission of
19  evidence.  Preliminary discussions have already commenced and
20  it is not anticipated that any significant difficulties will
21  arise.

22  c.   Anticipated disputes concerning the use of special
23  technology.

24  TEO does not anticipate any disputes concerning the use
25  of special trial technology.  TEO and AmeriPride are discussing
26  ////

1 | sharing trial presentation software and a trial software
2 | technician.

3 | The parties are to bring on their motions within thirty
4 | (30) days, fifteen (15) days to respond, seven (7) days to
5 | close. The matter will be heard on December 16, 2011 at 10:00
6 | a.m.

7 | **VII. SPECIAL FACTUAL INFORMATION**

8 | Not applicable.

9 | **VIII. RELIEF SOUGHT**

10 | AmeriPride seeks the following relief:

11 | 1. Consistent with the Court's May 12, 2011 summary
12 | judgment order (Dkt. 735), that the Court issue a judgment:

13 | a. For past response costs under CERCLA Section 107,
14 | award AmeriPride $7,777,625.92, consisting of:

15 | i. $7,331,528.25 for NCP-compliant investigation
16 | and remediation costs AmeriPride paid through August 31,
17 | 2010 (Dkt. 735 at 23);

18 | ii. $474,729.67 for oversight paid by AmeriPride
19 | to the RWQCB through September 13, 2010 (Dkt. 735 at 23);
20 | and,

21 | iii. Less a credit for OU2 water reuse of $28,632
22 | (Dkt. 745 at 46; Dkt. 707-1 at 61).

23 | b. Awarding AmeriPride $10.25 million dollars under
24 | CERCLA Section 113(f) for replacement water paid by
25 | AmeriPride (Dkt. 735 at 46; Dkt. 735 at 23), less a credit

26 |

1  for settlements paid by Chromalloy and Petrolane of
2  $3,250,000 (Dkt. 735 at 46; Dkt. 707-10).

3       2.    That the Court issue a declaratory judgment
4  awarding to AmeriPride all or a portion of the response
5  costs that it incurred since the dates identified in
6  Paragraph 1.a., above, according to proof and that will be
7  incurred in the future, consistent with the Court's Summary
8  Adjudication Order (Dkt. 735) under CERCLA Section
9  113(g)(2), except for that portion that TEO proves is not
10 its allocated share (as determined at trial).   (CERCLA §
11 113(g)(2), 42 U.S.C. § 9613(g)(2); Dkt. 735 at 45);

12      3.    That the Court award AmeriPride prejudgment
13 interest on all response costs incurred and any other
14 interest according to law.   CERCLA § 107(a)(4); 42 U.S.C.§
15 9607(a)(4).

16      4.    That the Court award AmeriPride such other damages
17 as may be provided by law in an amount according to proof.

18      5.    For retention of jurisdiction by the Court over
19 this matter until such time as AmeriPride has completed the
20 remediation of the Hazardous Substances (including DNAPL
21 PCE) at the Site.

22      6.    For costs of suit; and;

23      7.    Such other relief as the Court deems just and
24 proper.

25      TEO seeks the following relief:
26 ////

                        134

1       1.    Contribution for AmeriPride's share under CERCLA §

2   113(f), 42 U.S.C. § 9613(f);

3       2.    Costs of suit; and

4       3.    Such other relief as the Court deems just and

5   proper.

## IX.  POINTS OF LAW

7       The elements, standards, and burdens of proof for

8   claims under CERCLA.

9    a.Statement of the Legal Theory or Theories of Recovery or

10                          of Defense

11       i.    CERCLA Sections 107 and 113(g)(2)

12       The claims at issue for trial are CERCLA claims, all to

13   be decided under federal law.  The Court already has addressed

14   these claims in its Summary Adjudication Order  (Dkt. 735).

15   AmeriPride  believes  the  Court  has  correctly  stated  the

16   applicable law in its Summary Adjudication Order relative to

17   CERCLA Sections 107 and 113(g)(2) at Dkt. 735 at 4-8, 25-35,

18   and 45.

19             ii.   CERCLA Section 113(f)

20       As  to  allocation  between  AmeriPride  and  TEO,  CERCLA

21   Section  113(f)  provides  the  applicable  standard.    CERCLA

22   Section 113(f)(1) provides "In resolving contribution claims,

23   the court may allocate response costs among liable parties

24   using  such  equitable  factors  as  the  court  determines  are

25   appropriate."  42 U.S.C. § 9613(f)(1).  "This language gives

26   district courts discretion to decide what factors ought to be

1  considered, as well as the duty to allocate costs according to

2  those factors." Boeing Co. v. Cascade Corp., 207 F. 3d 1177,

3  1187 (9th Cir. 2000).

4      Among the factors courts often consider are the so-called

5  "Gore factors." Bell Petroleum Services, Inc. v. Sequa Corp.,

6  3 F. 3d 889, 899-900 (5th Cir.1993) and Centerior Service Co.

7  v. Acme Scrap Iron & Metal Corp., 153 F. 3d 344, 354 (6th Cir.

8  1998).   See also United States v. Newmont USA Ltd.,   No.

9  CV-05-020-JLQ, 2008 WL 4621566 at *58 (E.D. Wash. Oct. 17,

10  2008).   The "Gore Factors" are:   (1) the parties' ability to

11  demonstrate that their contribution to discharge, release, or

12  disposal of hazardous waste can be distinguished; (2) amount

13  of  hazardous  waste  involved;  (3)  degree  of  toxicity  of

14  hazardous  waste;  (3)  degree  of  involvement  by  parties  in

15  generation, transportation, treatment, storage, or disposal of

16  hazardous waste; (4) degree of care exercised by parties with

17  respect  to  hazardous  waste  concerns,  taking  into  account

18  characteristics of such hazardous waste; and, (5) the degree

19  of  cooperation  by  parties  with  federal,  state  or  local

20  officials to prevent any harm to public health or environment.

21  Id.

22      Applying the Gore Factors, TEO should be allocated 100

23  percent  or  nearly  100  percent  of  the  response  costs  and

24  settlements paid by AmeriPride as demonstrated in the chart

25  below.   The "Gore factors" are listed in the left-hand column

26  ////

1  of the chart that follows.  Applying the "Gore factors" to the

2  present case, none favor TEO:

3      "GORE FACTOR"

4  (1)   the ability of the parties to demonstrate that their

5  contribution to a discharge, release or disposal of a hazardous

6  waste can be distinguished.

7      APPLICATION

8      Dry cleaning ceased at the Facility before AmeriPride took

9  ownership.   (Undisputed Fact 22.)   AmeriPride did not use

10  undissolved PCE or "DNAPL PCE" at the Facility.   (Disputed

11  Facts 35 and 36.  AmeriPride asserts this fact already has been

12  admitted by TEO for the reasons stated following Disputed Facts

13  35 and 36.)   TEO admits VIS, Inc. used DNAPL PCE for its dry

14  cleaning operations.  (Undisputed Fact 52.)   TEO admits DNAPL

15  PCE was released at the Facility during VIS, Inc.'s ownership

16  and operations and entered the environment.   (Undisputed Facts

17  53-61.)   TEO cannot distinguish any other contribution to the

18  of PCE at the Facility from the contamination resulting from

19  DNAPL PCE releases at the Facility by TEO's predecessor, VIS,

20  Inc.   (Undisputed Facts 70-73.   See also Section (5) a.i

21  [Anticipated Dispute about whether TEO can prove its share as

22  required by CERCLA Section 113(f).].)

23      "GORE FACTOR"

24      (2)   the amount of the hazardous waste involved.

25      APPLICATION

26  ////

1   The primary chemical of concern at the Site is PCE.
2   (Undisputed Fact 33.)  The vast majority of the dissolved PCE
3   in the groundwater at the Site is the result of PCE dissolving
4   into the groundwater from the DNAPL PCE present in the
5   subsurface from releases of DNAPL PCE during the period of dry
6   cleaning operations at the Facility.   Accordingly, Dr. Farr
7   opines that it is very unlikely that the investigation and
8   remediation would have been required if not for the DNAPL PCE
9   releases.   (Disputed Fact 60.  AmeriPride asserts this fact
10  already has been admitted by TEO for the reasons stated
11  following Disputed Fact 60.)   The potential PCE contribution
12  from AmeriPride's industrial wastewater releases is exceedingly
13  small, even in a worst case scenario.   (Disputed Fact 61.
14  AmeriPride asserts this fact already has been admitted by TEO
15  for the reasons stated following Disputed Fact 61.)

16       "GORE FACTOR"

17       (3)   the degree of toxicity of the hazardous waste
18  involved.

19       APPLICATION

20       The degree of toxicity of the hazardous waste factor does
21  not apply as all the chemicals of concern are either PCE or its
22  breakdown products.   (Undisputed Facts 33-35.)

23       "GORE FACTOR"

24       (4)   the degree of involvement by the parties in the
25  generation, transportation, treatment, storage, or disposal of
26  the hazardous waste.

1    APPLICATION

2    TEO's predecessor, VIS, Inc., was the operator and owner

3    of the Facility during the releases of DNAPL PCE at the

4    Facility.  (Undisputed Fact 52-62.)

5    "GORE FACTOR"

6    (5)  the degree of care exercised by the parties with

7    respect to the hazardous waste concerned, taking into account

8    the characteristics of such hazardous waste.

9    APPLICATION

10   While VIS, Inc. accidentally released DNAPL PCE at the

11   Facility (Undisputed Facts 58-62), TEO cannot demonstrate that

12   VIS, Inc. exercised a high degree of care with DNAPLPCE, taking

13   into account the characteristics of PCE.  (Disputed Fact  42.

14   AmeriPride asserts this fact already has been admitted by TEO

15   for the reasons stated following Disputed Fact 42.)

16   "GORE FACTOR"

17   (6)  the degree of cooperation by the parties with

18   Federal, State, or local officials to prevent any harm to the

19   public health or the environment.

20   APPLICATION

21   AmeriPride has complied with the RWQCB's orders from the

22   outset, whereas neither VIS, Inc. nor TEO participated in the

23   investigation and remediation of the contamination caused by

24   the DNAPL PCE released by VIS, Inc. at and from the Facility.

25   (Undisputed Facts 86-88.)  In fact, TEO admitted it refused to

26   cooperate with the RWQCB.  (Disputed Fact 22.    AmeriPride

139

1    asserts this fact already has been admitted by TEO for the
2    reasons stated following Disputed Fact 22.) AmeriPride has paid
3    for all the investigation, remediation, regulatory oversight
4    (Disputed Facts 5-7, 23 which  AmeriPride asserts this fact
5    already  has  been  admitted  by  TEO  for  the  reasons  stated
6    following Disputed Facts 5-7 and 23) and all the replacement
7    water costs.   (Undisputed Facts 91-92; Disputed Facts 9-19.
8    AmeriPride asserts this fact already has been admitted by TEO
9    for the reasons stated following Disputed Facts 9-19.)

10        Fault also has been used by a number of courts as a basis
11   for allocation under CERCLA Section 113(f).   Kalamazoo River
12   Study Group v. Rockwell International Corporation, 274 F. 3d
13   1043, 1046-48 (6th Cir. 2001); PMC, Inc. v. Sherwin-Williams
14   Co., 151 F. 3d 610, 616 (7th Cir.1998); Envtl. Transp. Sys.,
15   Inc. v. ENSCO, Inc., 969 F. 2d 503, 512 (7th Cir.1992); Gopher
16   Oil Co., Inc. v. Union Oil Co. of California, 955 F. 2d 519,
17   526-27 (8th Cir. 1992); Appleton Papers Inc. v. George A.
18   Whiting Paper Co., No. 08-C-16, 2009 WL 5064049 at *25 (E.D.
19   Wis. Dec. 16, 2009); Norfolk S. Ry. Co. v. Gee Co., No. 98 C
20   1619, 2002 WL 31163777 at *33-34 (N.D. Ill. Sept. 30, 2002);
21   Am. Color & Chem. Corp. v. Tenneco Polymers, Inc., 918 F. Supp.
22   945, 959-60 (D.S.C. 1995); and United States v Stringfellow,
23   No. CV 83-2501 JMI, 1993 WL 565393 at *110-12 (C.D. Cal. Nov.
24   30, 1993).  TEO's predecessor, VIS, Inc., had releases of DNAPL
25   PCE which sank all the way to the groundwater (disputed by
26   TEO's expert) and also which partitioned into soil vapor and

1   reached groundwater (not disputed by TEO's expert).  TEO claims
2   AmeriPride had the same sort of wastewater releases as VIS,
3   Inc. that drove DNAPL PCE released by VIS, Inc. to the
4   groundwater.

5                       iii.Burden of Proof

6        The party alleging a CERCLA Section 113(f) claims bears
7   the burden of proof proving share.  Minyard Enterprises, Inc.
8   v. Southeastern Chemical & Solvent Co., 184 F. 3d 373, 385 (4th
9   Cir. 1999).  Thus, as to AmeriPride's response costs claimed
10  under CERCLA Section 107 for which the Court has already ruled
11  TEO is liable, TEO bears the burden of proving AmeriPride's
12  share.    As   for   AmeriPride's   settlements   under   CERCLA,
13  AmeriPride bears the burden of proving TEO's share.

14    b.Points of Law (Substantive or Procedural) that Are or May
15            Reasonably Be Expected to Be in Controversy

16       Points of law (substantive or procedural) that are or may
17  reasonably be expected to be in controversy, citing the
18  pertinent statutes, ordinances, regulations, cases, and other
19  authorities relied upon follows:

20       1.   AmeriPride expects that TEO will dispute the
21  following determinations in the  Court's May 12, 2011 Summary
22  Adjudication Order (Dkt. 735):

23       a.   The Court held:  "AmeriPride's response costs were
24  incurred in substantial compliance with the national
25  contingency plan."  (Dkt. 735 at 35.)
26  ////

                              141

1    b.    "TEO has failed to raise a triable question as to
2  whether discharging the contaminated water directly into the
3  sanitary sewer would have been a cheaper treatment option."
4  (Dkt. 735 at 37.)

5    c.    "Warner states 'I was not able to determine whether
6  competitive bidding was used for construction work at the site.
7  If not, it is possible that the costs could have been reduced.'
8  Warner Decl.  49 (Dkt. 718).  This is insufficient to raise a
9  triable question.  Matsushita Elec. Indus. Co. v. Zenith Radio
10  Corp., 475 U.S. 574, 585-86 (1986)  ('metaphysical doubt'
11  insufficient to defeat motion for summary judgment)."  (Id.)

12    d.    "Warner also argues that, although the Regional Water
13  Quality Control Board requires AmeriPride to monitor the plume
14  of groundwater contamination on a quarterly basis, AmeriPride
15  'should have been more aggressive in negotiating [with the
16  Board for] a semiannual or even annual monitoring program.'
17  Warner Decl.  49.  This does not raise a triable issue.  It
18  appears to the court wholly speculative as to whether such an
19  aggressive posture would have influenced the agency."  (Id. at
20  37-38.)

21    e.    "TEO argued that the claim was barred by AmeriPride's
22  failure to report PCE contamination in 1983.  Assuming that
23  AmeriPride was aware of the contamination at that time, any
24  failure to report does not demonstrate that AmeriPride was not
25  in substantial compliance with the national contingency plan,
26  ////

                              142

1 | as explained by the Ninth Circuit in NL Industries, 792 F. 2d
2 | 896."  (Id. at 42.)

3 |     The parties shall also brief those matters set forth in
4 | court on October 7, 2011 during the examination of purported
5 | disputed and undisputed facts.

6 |     ANY  CAUSES  OF  ACTION  OR  AFFIRMATIVE  DEFENSES  NOT
7 | EXPLICITLY ASSERTED IN THE PRETRIAL ORDER UNDER POINTS OF LAW
8 | AT THE TIME IT BECOMES FINAL ARE DISMISSED, AND DEEMED WAIVED.

9 |                    X.   ABANDONED ISSUES

10 |     A statement of all issues raised by the pleadings that
11 | have been abandoned, including, for example, claims for relief
12 | and affirmative defenses is below:

13 |     1.   Only CERCLA claims remain and the Court found TEO
14 | liable under CERCLA in the Summary Adjudication Order.  Dkt.
15 | 735.  In addition, TEO admits all the necessary elements of
16 | AmeriPride's CERCLA claims.  TEO's Answer, Dkt. 756  56, 66,
17 | 67, and 71-74.  Accordingly, TEO should abandon its First
18 | Defense (Failure To State A Cause Of Action).

19 |     2.   On July 18, 2011, AmeriPride agreed to withdraw its
20 | state law claims, namely the Third, Fourth, Fifth, Sixth,
21 | Seventh, Eighth, Ninth, Tenth and Eleventh Claims for Relief
22 | in its Fourth Amended Complaint (Dkt. 750).

23 |     3.   In light of AmeriPride's July 18, 2011 withdrawal of
24 | its state law claims, during the meet and confer for the joint
25 | pretrial statement, counsel for TEO has informed counsel for
26 | AmeriPride that TEO will withdraw affirmative defenses that are

1  not applicable to CERCLA Section 107 or CERCLA Section 113(f).
2  TEO has not done so yet.

3     4.    There is no evidence that AmeriPride's CERCLA claims
4  are barred by the applicable statute of limitations.
5  Accordingly, TEO should abandon its Thirteenth Defense (Statute
6  of Limitations).

7     5.    Affirmative defenses are often pleaded in an answer
8  to a complaint as a precaution in order to avoid an inadvertent
9  waiver.    However, after discovery has been completed,
10  affirmative defenses are reassessed. The following affirmative
11  defenses should be abandoned by TEO for the following reasons:

12     a.    There is no evidence that natural gas releases caused
13  any response costs.   Accordingly, TEO should abandon its
14  Thirtieth Defense (Natural Gas Exclusion).

15     b.    There is no evidence that TEO is an innocent
16  landowner. Further, TEO admits its predecessor, VIS, Inc., was
17  the operator and owner of the Facility during the release of
18  DNAPL PCE at the Facility.   (Dkt. 756  57.)   Accordingly, TEO
19  should abandon its Forty-Second Defense (Innocent Landowner).

20     c.    TEO has also asserted an affirmative defense of
21  failure to comply with the NCP (Twenty-Second Defense).   TEO's
22  Twenty-Second Defense overlaps with its Forty-Sixth Defense
23  (Failure to Give Notice).   Accordingly, TEO should abandon its
24  Forty-Sixth Defense (Failure to Give Notice).

25  ////

26  ////

144

1  d.   There is no evidence that TEO had a state permitted
2  release.   Accordingly, TEO should abandon its Fifty-Fourth
3  Defense (State Permitted Release).

4  e.   There is no evidence that TEO had a federally
5  permitted release. Accordingly, TEO should abandon its
6  Fifty-Fifth Defense (Federally Permitted Release).

7  6.   In addition to the defenses asserted in its Answer
8  to AmeriPride's Fourth Amended Complaint, TEO also has
9  non-CERCLA claims in its operative counterclaims against
10  AmeriPride (Dkt. 125), filed on February 23, 2001.   However,
11  the only viable claim for relief TEO has is its CERCLA Section
12  113(f) claim for the reasons discussed below:

13  a.   In California, the right to contribution accrues at
14  the time of payment.   Cal. Civ. Proc. Code § 875(c) ("Such
15  right of contribution may be enforced only after one tortfeasor
16  has, by payment, discharged the joint judgment or has paid more
17  than his pro rata share thereof.   It shall be limited to the
18  excess so paid over the pro rata share of the person so paying
19  and in no event shall any tortfeasor be compelled to make
20  contribution beyond his own pro rata share of the entire
21  judgment.")   See also California v. Randtron, 69 F. Supp. 2d
22  1264, 1273 n. 8 (E.D. Cal. 1999) ("Under California law, '[t]he
23  right of contribution accrues at the time of payment.'"), and
24  Jackson v. Lacy, 37 Cal. App. 2d 551, 559 (Cal. Ct. App. 1940)
25  ("It is elementary that a party acquires a right of
26  contribution as soon as he pays more than his share but not

145

1    until then".)    Similarly, the right to equitable indemnity
2    flows from payment of a joint legal obligation on another's
3    behalf.  Cal. Civ. Code § 1432.  See also Expressions at Rancho
4    Niguel Ass'n v. Ahmanson Developments, Inc., 86 Cal. App. 4th
5    1135, 1139 (Cal. Ct. App. 2001) ("The right to indemnity flows
6    from payment of a joint legal obligation on another's
7    behalf."), and Union Pac. Corp. v. Wengert, 79 Cal. App. 4th
8    1444, 1447-48 (Cal. Ct. App. 2000).

9        b.    TEO has made no payment.    (Undisputed Facts 87-88.)
10   TEO has not paid any money for investigation or clean up, for
11   RWQCB oversight costs, or for replacement water as a result of
12   the DNAPL PCE released by VIS, Inc.    (Id.)   Accordingly, TEO
13   should abandon its Second Counterclaim (Contribution under HSAA
14   Section 25363(e)); Third Counterclaim (Comparative Equitable
15   Indemnity); and, Fourth Counterclaim (Equitable Apportionment
16   and Contribution).    TEO's counsel informed counsel for
17   AmeriPride during the meet and confer process for the joint
18   pretrial statement that TEO planned to abandon these claims.
19   TEO has not yet done so.

20       The following is a statement of the issues raised by TEO's
21   pleadings that have been abandoned.  However, TEO abandons
22   these affirmative defenses based solely on the definitions
23   under CERCLA.  TEO does not abandon its right to raise issues,
24   both factual and legal, subsumed by any of the following
25   affirmative defenses:
26   ////

1      i.   Failure to State a Cause of Action;

2      ii.  Uncertainty;

3      iii. Assumption of Risk;

4      iv.  Independent, Intervening and/or Superseding Cause;

5      v.   Cause in Fact;

6      vi.  Proximate Cause/Substantial Factor;

7      vii. AmeriPride's Negligence;

8      viii.    Conformance   with   Statute,   Regulation,   and
9 Industry Standards;

10     ix.  Estoppel;

11     x.   Release or Waiver; Mitigation of Damages;

12     xi.  Statutes of Limitation;

13     xii. Laches;

14     xiii.   De Minimis Effect;

15     xiv. Failure  to  Join  Necessary  and/or  Indispensible
16 Parties;

17     xv.  CERCLA Section 107(b) Defense and Health and Safety
18 Code Section 25323.5, Based on Act of God;

19     xvi. CERCLA  Section  107(b)(4)  Defense  and  Health  and
20 Safety Code Section 25323.5, Based on Combination of an Act of
21 God, an Act of War and/or Actions of a Third-Party;

22     xvii.   Unclean Hands;

23     xviii.  No Contribution;

24     xix. Petroleum Exclusion;

25     xx.  Natural Gas Exclusion;

26     xxi. Violation of Regulatory Standards;

1       xxii.    Imputation of Fault to AmeriPride;

2       xxiii.   Other Defendants and Third Parties;

3       xxiv.    Due Care;

4       xxv. Speculative Damages;

5       xxvi.    Preemption;

6       xxvii.   Innocent Landowner;

7       xxviii.  Standing;

8       xxix.    Primary Jurisdiction;

9       xxx. Failure to Perform Conditions Precedent or Exhaust

10 Remedies;

11       xxxi.    Failure to Give Notice;

12       xxxii.   Lack of Legal Duty;

13       xxxiii.  Justified Conduct;

14       xxxiv.   Unjust Enrichment;

15       xxxv.    Offset;

16       xxxvi.   United States and California Constitutions;

17       xxxvii.  Actions Pursuant to Local, State or Federal

18 Authority; State Permitted Release;

19       xxxviii. Federally Permitted Release;

20       xxxix.   Additional Defenses; and

21       xl.  Incorporation of Cross-Claim.

22     The defendant will dismiss, without prejudice, the state

23 law based claims.

24                   **XI.  WITNESSES**

25     Plaintiff anticipates calling the following witnesses:

26     See attachment "A".

1   Defendant anticipates calling the following witnesses:

2   See attachment "B".

3   The parties agree to the following stipulations:

4   AmeriPride and TEO have agreed to the following
5   stipulations:

6   a.   Stipulation pursuant to the court's order entered on
7   July 8, 2011:

8   "The court will instruct the jury and/or the fact finder
9   will find that the removed pipes leaked PCE-contaminated
10  wastewater into the into the soil and groundwater and that this
11  was a cause of the contamination on the Huhtamaki property.
12  AmeriPride will be prohibited from presenting any evidence
13  which denies that AmeriPride contributed to the soil and
14  groundwater contamination.   However, the parties agree that
15  there is a dispute about the amount of contamination caused by
16  releases of wastewater during both VIS, Inc.'s and AmeriPride's
17  operation of the Facility that must be resolved by the trier
18  of fact."   This stipulation as been entered as an order of the
19  Court.   (Dkt. 763).   The fact to be entered pursuant to the
20  stipulation and order is Undisputed Fact 69.

21  b.Stipulation on Use of Deposition Testimony at Trial:

22  In order to facilitate a more efficient trial, the parties
23  have stipulated that:

24  1.   Deposition testimony given in this civil action,
25  including any civil action with which this civil action has
26  ////

149

 1 | been consolidated, may be used at trial in lieu of calling a
 2 | live witness;

 3 |     2.   The parties will provide notice of their intent to
 4 | call a witness by deposition no later than 30 days after the
 5 | final pretrial conference;

 6 |     3.   Designation of deposition testimony will be as
 7 | follows:

 8 |     a.   The party proposing to call a witness by deposition
 9 | shall designate those portions of the deposition testimony
10 | within 15 days after giving notice of intent to call the
11 | witness by deposition;

12 |     b.   The other party shall provide counter designations
13 | of deposition testimony, along with any objections to the
14 | designated deposition testimony15 days later;

15 |     c.   Any objections to the counter designated deposition
16 | testimony shall be served and filed 7 days thereafter; and,

17 |     d.   Written responses to any objections shall be filled
18 | 7 days thereafter;

19 |     4.   The designation of any party of its intent to utilize
20 | the deposition testimony of a witness shall not prohibit the
21 | any party from calling that witness to testify live at trial,
22 | provided the live testimony is not cumulative; and,

23 |     5.   The deposition testimony designated by the parties
24 | shall be read into the record at trial, unless the Court
25 | decides to accept the testimony as a written submission.
26 | ////

1       c.    **Stipulation on Use of Demonstrative Evidence at**

2            **Trial:**

3      In order to facilitate a more efficient trial, the parties

4        have stipulated that:

5      1.    Demonstrative exhibits do not need to be listed on

6  the list of trial exhibits;

7      2.    Any demonstrative exhibits a party plans to use at

8  trial will be submitted to the other party by no later than 30

9  days before the first scheduled trial date; and,

10     3.    Objections to any demonstrative exhibits shall be

11  submitted to the Court no later than 7 days before the first

12  scheduled trial date.

13      d.    **Stipulation on Objections to Rebuttal Expert Reports:**

14           **In order to facilitate a more efficient trial, the**

15           **parties have stipulated that:**

16     1.    Neither party will object to the other party's

17  expert's rebuttal opinions or supplemental opinions given prior

18  to the expert's deposition on the basis that such opinions

19  should have been disclosed in the other party's initial expert

20  witness disclosures; and,

21     2.    The stipulation in paragraph d.1. does not apply to

22  objections to expert testimony based on any other alleged lack

23  of compliance with Fed. R. Evid. 702.

24      Each party may call a witness designated by the other.

25     A.    No other witnesses will be permitted to testify

26  unless:

1   (1) The party offering the witness demonstrates that
2 the witness is for the purpose of rebutting evidence which
3 could not be reasonably anticipated at the Pretrial Conference,
4 or

5   (2) The witness was discovered after the Pretrial
6 Conference and the proffering party makes the showing required
7 in "B" below.

8  B. Upon the post-Pretrial discovery of witnesses, the
9 attorney shall promptly inform the court and opposing parties
10 of the existence of the unlisted witnesses so that the court
11 may consider at trial whether the witnesses shall be permitted
12 to testify.  The evidence will not be permitted unless:

13   (1) The witnesses could not reasonably have been
14 discovered prior to Pretrial;

15   (2) The court and opposing counsel were promptly
16 notified upon discovery of the witnesses;

17   (3) If time permitted, counsel proffered the
18 witnesses for deposition;

19   (4) If time did not permit, a reasonable summary of
20 the witnesses' testimony was provided opposing counsel.

21     **XII. EXHIBITS, SCHEDULES AND SUMMARIES**

22  Plaintiff contemplates the following by way of exhibits:
23  See attachment "C".

24  Defendant contemplates the following by way of exhibits:
25  See attachment "D".

26 ////

1      The parties agreed to a stipulation regarding
2  demonstrative exhibits.

3      **a.  Stipulation on Use of Demonstrative Evidence at**
4         **Trial:**

5      In order to facilitate a more efficient trial, the parties
6  have stipulated that:

7      1.  Demonstrative exhibits do not need to be listed on
8  the list of trial exhibits;

9      2.  Any demonstrative exhibits a party plans to use at
10  trial will be submitted to the other party by no later than 30
11  days before the first scheduled trial date; and,

12      3.  Objections to any demonstrative exhibits shall be
13  submitted to the Court no later than 7 days before the first
14  scheduled trial date.

15      A.  No other exhibits will be permitted to be introduced
16  unless:

17      (1)  The party proffering the exhibit demonstrates
18  that the exhibit is for the purpose of rebutting evidence which
19  could not be reasonably anticipated at the Pretrial Conference,
20  or

21      (2)  The exhibit was discovered after the Pretrial
22  Conference and the proffering party makes the showing required
23  in paragraph "B," below.

24      B.  Upon the post-Pretrial discovery of exhibits, the
25  attorneys shall promptly inform the court and opposing counsel
26  of the existence of such exhibits so that the court may

1  consider at trial their admissibility.   The exhibits will not
2  be received unless the proffering party demonstrates:

3          (1)   The exhibits could not reasonably have been
4  discovered prior to Pretrial;

5          (2)   The court and counsel were promptly informed of
6  their existence;

7          (3)   Counsel forwarded a copy of the exhibit(s) (if
8  physically possible) to opposing counsel.   If the exhibit(s)
9  may not be copied, the proffering counsel must show that he has
10 made the exhibit(s) reasonably available for inspection by
11 opposing counsel.

12       As to each exhibit, each party is ordered to exchange
13 copies of the exhibit not later than fourteen (14) days from
14 the date of this Pretrial Order.   Each party is then granted
15 fourteen (14) days to file with the court and serve on opposing
16 counsel any objections to said exhibits.   In making said
17 objections, the party is to set forth the grounds for the
18 objection.   As to each exhibit which is not objected to, it
19 shall be marked and received into evidence and will require no
20 further foundation.   Each exhibit which is objected to will be
21 marked for identification only.

22       In addition to electronically filing said objections, if
23 any, the objections must be submitted by email, as an
24 attachment in Word or WordPerfect format, to:
25 arivas@caed.uscourts.gov.

26 ////

154

1   The attorney for each party is directed to appear before
2   and present an original and one (1) copy of said exhibit to Ana
3   Rivas, Deputy Courtroom Clerk, not later than 10:30 a.m. on the
4   date set for trial.   All exhibits shall be submitted to the
5   court in binders.   Plaintiff's exhibits shall be listed
6   numerically.   Defendant's exhibits shall be listed
7   alphabetically.   The parties shall use the standard exhibit
8   stickers provided by the court:  pink for plaintiff and blue
9   for defendant.

10                 **XIII.   DISCOVERY DOCUMENTS**
11      <u>See</u> plaintiff's attachment "E".
12      <u>See</u> defendant's attachment "F".

13               **XIV.   FURTHER DISCOVERY OR MOTIONS**
14      Both parties anticipate the motions in limine which the
15   court has heretofore set.  TEO also anticipates filing a
16   motion to compel the production of documents.

17                    **XV.   STIPULATIONS**
18      AmeriPride and TEO have agreed to the following
19   stipulations:

20      **a.   Stipulation pursuant to the court's order entered**
21              **on July 8, 2011:**

22      "The court will instruct the jury and/or the fact
23   finder will find that the removed pipes leaked PCE-contaminated
24   wastewater into the into the soil and groundwater and that this
25   was a cause of the contamination on the Huhtamaki property.
26   AmeriPride will be prohibited from presenting any evidence

155

1   which denies that AmeriPride contributed to the soil and
2   groundwater contamination.    However, the parties agree that
3   there is a dispute about the amount of contamination caused by
4   releases of wastewater during both VIS, Inc.'s and AmeriPride's
5   operation of the Facility that must be resolved by the trier
6   of fact."  This stipulation as been entered as an order of the
7   Court.   (Dkt. 763).   The fact to be entered pursuant to the
8   stipulation and order is Undisputed Fact 69.

9        b.   **Stipulation on Use of Deposition Testimony at**
10          **Trial:**

11      In order to facilitate a more efficient trial, the
12  parties have stipulated that:

13      1.   Deposition testimony given in this civil action,
14  including any civil action with which this civil action has
15  been consolidated, may be used at trial in lieu of calling a
16  live witness;

17      2.   The parties will provide notice of their intent to
18  call a witness by deposition no later than 30 days after the
19  final pretrial conference;

20      3.   Designation of deposition testimony will be as
21  follows:

22      a.   The party proposing to call a witness by
23  deposition shall designate those portions of the deposition
24  testimony within 15 days after giving notice of intent to
25  call the witness by deposition;

26

1   b.   The other party shall provide counter designations
2   of deposition testimony, along with any objections to the
3   designated deposition testimony15 days later;

4   c.   Any objections to the counter designated
5   deposition testimony shall be served and filed 7 days
6   thereafter; and,

7   d.   Written responses to any objections shall be
8   filled 7 days thereafter;

9   4.   The designation of any party of its intent to
10  utilize the deposition testimony of a witness shall not
11  prohibit the any party from calling that witness to testify
12  live at trial, provided the live testimony is not
13  cumulative; and,

14  5.   The deposition testimony designated by the parties
15  shall be read into the record at trial, unless the Court
16  decides to accept the testimony as a written submission.

17  c.   **Stipulation on Use of Demonstrative Evidence at**
18       **Trial:**

19  In order to facilitate a more efficient trial, the
20  parties have stipulated that:

21  1.   Demonstrative exhibits do not need to be listed on
22  the list of trial exhibits;

23  2.   Any demonstrative exhibits a party plans to use at
24  trial will be submitted to the other party by no later than
25  30 days before the first scheduled trial date; and,

26

1      3.    Objections to any demonstrative exhibits shall be

2  submitted to the Court no later than 7 days before the first

3  scheduled trial date.

4      d.    **Stipulation on Objections to Rebuttal Expert**

5          **Reports:**

6      In order to facilitate a more efficient trial, the

7  parties have stipulated that:

8      1.    Neither party will object to the other party's

9  expert's rebuttal opinions or supplemental opinions given

10  prior to the expert's deposition on the basis that such

11  opinions should have been disclosed in the other party's

12  initial expert witness disclosures; and,

13      2.    The stipulation in paragraph d.1. does not apply

14  to objections to expert testimony based on any other alleged

15  lack of compliance with Fed. R. Evid. 702.

16                 **XVI.   AMENDMENTS/DISMISSALS**

17      a.    AmeriPride agreed to withdraw its state law claims.

18      b.    TEO will dismiss its third-party complaint against

19  Univar USA, Inc.  AmeriPride notes that TEO has not yet

20  dismissed this complaint and that time to serve it has already

21  passed and the defendant agrees.

22               **XVII.   FURTHER TRIAL PREPARATION**

23      A.    Counsel are directed to Local Rule 285 regarding

24  the contents of and the time for filing trial briefs.

25  ////

26

1      B.   The parties shall file and serve Proposed Findings

2 of Fact and Conclusions of Law not later than fifteen (15)

3 days prior to the first date of trial.

4      C.   It is the duty of counsel to ensure that any

5 deposition which is to be used at trial has been filed with

6 the Clerk of the Court.  Counsel are cautioned that a

7 failure to discharge this duty may result in the court

8 precluding use of the deposition or imposition of such other

9 sanctions as the court deems appropriate.

10      D.   The parties are ordered to file with the court and

11 exchange between themselves not later than one (1) week

12 before the trial a statement designating portions of

13 depositions intended to be offered or read into evidence

14 (except for portions to be used only for impeachment or

15 rebuttal).

16      E.   The parties are ordered to file with the court and

17 exchange between themselves not later than one (1) week

18 before trial the portions of answers to interrogatories

19 which the respective parties intend to offer or read into

20 evidence at the trial (except portions to be used only for

21 impeachment or rebuttal).

22      F.   The court has extensive audiovisual equipment

23 available.  Any counsel contemplating its use shall contact

24 the court's Telecommunications Manager, Andre Carrier, at

25 ////

26

1 | (916) 930-4223, at least two weeks in advance of trial to
2 | receive the appropriate training.

### XVIII.   SETTLEMENT NEGOTIATIONS

4 | The parties have been engaging in settlement
5 | negotiations with Mr. Timothy Gallagher.  The court will now
6 | appoint Mr. Gallager as a special master for settlement
7 | purposes.

### XIX.   TRIAL EXHIBITS

9 | The parties agree that no special handling of trial
10 | exhibits will be required.

### XX.   SEPARATE TRIAL OF ISSUES

12 | Not required.

### XXI.   IMPARTIAL EXPERTS/LIMITATION OF EXPERTS

14 | None.

### XXII.   ATTORNEYS' FEES

16 | None.

### XXIII.   MISCELLANEOUS

18 | AmeriPride will put together a glossary of relevant terms
19 | and TEO will approve them prior to trial.

### XXIV.   ESTIMATE OF TRIAL TIME/TRIAL DATE

21 | Court trial is set for January 18, 2012, at 10:30 a.m. in
22 | Courtroom No. 4.  The parties represent in good faith that the
23 | trial will take approximately five to ten (5-10) days.
24 | ////
25 | ////
26 |

1    Counsel are to call Ana Rivas, Courtroom Deputy, at (916)

2    930-4133, one week prior to trial to ascertain status of trial

3    date.

4    **XXV.   PARTIES' STATEMENT OF ALL NON-DISCOVERY MOTIONS**

5    **TENDERED TO THE COURT**

6    Pursuant to the Court's Scheduling Order (Dkt. 695),

7    the parties agree that the following non discovery motions

8    were tendered to the Court and were resolved as indicated

9    below:

10   **a.   Motion to Approve Settlement Between AmeriPride**

11   **and Cal-Am Water Co.**

12   In a related matter, California-American Water Company

13   v. AmeriPride Services, Inc., No. 02-1479 (the "Cal-Am

14   Action"), on August 16, 2005, the Court granted a motion

15   approving a settlement between Cal-Am Water Company and

16   AmeriPride.  By that settlement, AmeriPride paid Cal-Am Water

17   Company $2 million.

18   **b.   Motion to Consolidate (Dkt. 175-4)**

19   A motion to consolidate was filed this action with

20   Huhtamaki Foodservice, Inc v. AmeriPride Services, Inc. (the

21   "Huhtamaki Action").  (Dkt. 175-4.)  The motion was granted on

22   November 3, 2005.  (Dkt. 185.)

23   **c.   Joint Motion for Good Faith Settlement (Dkt. 615)**

24   The joint motion for good faith settlement filed by:  (i)

25   AmeriPride; (ii) Mission Linen Supply ("Mission Linen") as a

26

1 | defendant in the AmeriPride Action; (iii) Chromalloy American
2 | Corporation ("Chromalloy American"), DHM Enterprises, Inc.
3 | ("DHM"), George Backovich and Bruce Pennell (the "DHM Parties")
4 | as defendants, cross claimants and cross-defendants in the
5 | AmeriPride Action; (iv) Petrolane Incorporated, UGI
6 | Corporation, AmeriGas Inc., AmeriGas Propane, Inc., AmeriGas
7 | Propane LP, AmeriGas Partners, L.P, and Texas Eastern
8 | Corporation (collectively "Petrolane"), defendants in the
9 | AmeriPride Action; and (v) Huhtamaki Foodservice Inc.
10 | ("Huhtamaki"), the plaintiff in the Huhtamaki Action is at Dkt.
11 | 615. By this motion, AmeriPride and all of the defendants,
12 | except TEO, sought approval of good faith settlements. This
13 | motion was granted by the Court by its order dated July 2,
14 | 2007. (Dkt. 638.) This order approved three settlements: (i)
15 | A settlement by which AmeriPride paid Huhtamaki, Inc. $8.25
16 | million; (ii) A settlement by which Petrolane paid AmeriPride
17 | $2.75 million; and, (ii) A settlement by which Chromalloy
18 | American paid AmeriPride $500,000.

19 |    **d.   TEO's Summary Judgment Motion (Dkt. 669)**

20 |    Styled as a motion to dismiss for lack of capacity, the
21 | Court treated this motion as a summary judgment motion by TEO.
22 | TEO's motion, AmeriPride's opposition and TEO's reply papers
23 | are at Dkt. 669 to Dkt. 676. This motion was resolved by the
24 | Court's order dated November 24, 2008 by which the Court
25 | granted TEO's motion, but allowed AmeriPride to seek

26 |

162

1   appointment of a receiver in the Delaware Courts.  (Dkt. 677.)
2   Ultimately, the Delaware Chancery Court appointed a receiver
3   and its decision was affirmed by the Delaware Supreme Court.
4   (See Dkt. 690.)

5           e.    AmeriPride's Summary Judgment Motion (Dkt. 698)

6           AmeriPride's summary judgment motion under CERCLA, TEO's
7   Opposition and AmeriPride's reply papers are at Dkt. 698 to
8   Dkt. 702, Dkt. 714 to Dkt. 722, and Dkt. 727 to Dkt. 727-10.
9   This motion was resolved by the Court's Summary Adjudication
10  Order (Dkt. 735).

11          f.    TEO's Daubert Motion (Dkt. 740)

12          TEO's Daubert motion, AmeriPride's Opposition and TEO's
13  reply papers are at Dkt. 740 to Dkt. 744, Dkt. 755 to Dkt.
14  755-44, and Dkt. 762 to Dkt. 762-5.  This motion was denied,
15  subject to the Court's further determinations as to the
16  relevance and reliability of the challenged testimony at trial.
17  (Dkt. 765).

18                  **XXVI.   CLAIMS OF PRIVILEGE**

19          AmeriPride  claims  privilege  against  disclosure,  of
20  information contained in the attorneys' fee invoices produced
21  in support of AmeriPride's claims against TEO, but the validity
22  of the claim has not yet been determined.  AmeriPride claims
23  privilege for the individual entries in the invoices, but not
24  the amounts paid, on the basis of the attorney-client privilege
25  and the attorney work product doctrine.  AmeriPride claims

26

1 privilege against disclosure of information contained in
2 written communications between AmeriPride employees and
3 in-house counsel as well as communications between outside
4 counsel and AmeriPride, as disclosed on AmeriPride's final
5 privilege log, served to TEO on August 26, 2011, along with
6 prior privilege logs referenced in AmeriPride's final privilege
7 log.  TEO has objected to some of these privilege claims, but
8 the validity of these privilege claims has not been challenged
9 by motion filed by TEO or determined by the Court.

10    Based on a review of AmeriPride's Appendix 1, TEO
11 anticipates AmeriPride will attempt to call attorneys John
12 Poulos and Bruce Telles to testify.  Mr. Poulos at one time
13 appeared for TEO as counsel of record.  Mr. Telles is an
14 attorney that represents some of TEO's potential insurers.  As
15 discussed above, before either of these attorney witnesses is
16 allowed to testify, AmeriPride should be required to explain
17 the significance of the matters to which each might testify,
18 the weight the witness' testimony has in resolving these
19 matters and the availability of other witnesses or documentary
20 evidence by which these matters could be independently
21 established.

22    AmeriPride has withheld documents claiming privilege based
23 primarily on the attorney-client/work product privilege.
24 However, these documents include environmental audits conducted
25 by the general manager of AmeriPride's facilities.  These

26

1   audits are dated as early as 1989 and were discussed in Bernard
2   Berry's deposition as a series of questions regarding the
3   various types of potential pollution issues at each facility.
4   (Berry Deposition at 160:12-15). The withheld documents also
5   include a memorandum compiling the information from these
6   audits. This information is crucial to this litigation because
7   it will establish that AmeriPride was aware of the potential
8   for environmental contamination as early as the 1980s at each
9   of its laundry facilities. Additionally, any memorandum
10  prepared with the information provided in these audits should
11  not be withheld because the facts relayed are not privileged.
12  At minimum, the court should conduct an in camera review of the
13  documents withheld as privileged.

## XXVII.   OBJECTIONS TO PRETRIAL ORDER

15      Each party is granted fourteen (14) days from the
16  effective date of this Pretrial Order [Tentative] to object to
17  or augment same. Each party is also granted seven (7) days
18  thereafter to respond to the other party's objections. If no
19  objections or additions are made, the Tentative Pretrial Order
20  will become final without further order of the court.

21      The parties are reminded that pursuant to Federal Rule of
22  Civil Procedure 16(e), this order shall control the subsequent
23  course of this action and shall be modified only to prevent
24  manifest injustice.

25  ////

26

1

## XXVI.  <u>OTHER</u>

2        All time limits and dates that refer to the Pretrial Order

3 refer to the date this Pretrial Order [Tentative] is filed and

4 not the date an amended order, if any, is filed.

5        IT IS SO ORDERED.

6        DATED: October 26, 2011.

7

8

9

10                                    LAWRENCE K. KARLTON
                                    SENIOR JUDGE
11                                    UNITED STATES DISTRICT COURT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# **Appendix 1**

*AmeriPride Services Inc. v. Valley Industrial Services, Inc.*, Case No. 00-113
LKK/JFM

List of prospective witnesses offered by Plaintiff AmeriPride Services Inc.

PLAINTIFF AMERIPRIDE SERVICES INC.'S PRETRIAL STATEMENT – APPENDIX 1

## Appendix 1

*AmeriPride Services Inc. v. Valley Industrial Services, Inc.*, Case No. 00-113 LKK/JFM

List of prospective witnesses offered by Plaintiff AmeriPride Services Inc.:

| |
|---|
| **Mark A. Bryant, P.E., D.WRE**<br>**(Expert Witness)**<br>Shannon & Wilson Inc.<br>400 N. 34th Street<br>Seattle, WA 98103 |
| **James Burlingame**<br>AmeriPride Services Inc.<br>650 Industrial Boulevard<br>Minneapolis, MN 55413 |
| **John D. Dankoff, Jr.**<br>7584 Saint Luke Way<br>Sacramento, CA 95823 |
| **Gaynor Dawson, P.E., BCEE**<br>**(Texas Eastern Overseas, Inc.'s**<br>**Rule 30(b)(6) Designee)**<br>64209 East Grover<br>West Richland, WA 99353 |
| **Rogerio Delossantos**<br>12531 Rising Road<br>Wilton, CA 95693 |
| **Anne M. Farr, PH.D.**<br>**(Expert Witness)**<br>Farr Associates<br>6016 Princeton Reach Way<br>Granite Bay, CA 95746 |
| **Timothy Flowers**<br>543 Ward Avenue<br>Patterson, CA 95363 |
| **Anne Wooster Gates, P.E.**<br>**(Expert Witness)**<br>ENVIRON International Corporation<br>Marketplace Tower<br>6001 Shellmound Street, Suite 700<br>Emeryville, CA 94608 |
| **Russell Greaver**<br>2235 Serena Avenue<br>Fresno, CA 93720 |

2

| |
|---|
| **Steven Haskell**<br>Berkes Crane Robinson & Seal LLP<br>515 S. Figueroa Street, Suite 1500<br>Los Angeles, CA 90071 |
| **Michael Kavanaugh, Ph.D., P.E.**<br>**(Expert Witness)**<br>Geosyntec Consultants<br>1111 Broadway, 6th Floor<br>Oakland, CA 94607 |
| **Harvey Kreitenberg**<br>245 South Hudson Avenue<br>Los Angeles, CA 90004 |
| **Durin Linderholm**<br>California Regional Water Quality<br>Control Board, Central Valley Region<br>11020 Sun Center Drive, Suite 200<br>Rancho Cordova, CA 95670 |
| **Joseph E. Peter**<br>URS Corporation<br>100South Fifth Street, Suite 1500<br>Minneapolis, MN 55402 |
| **John Poulos**<br>Pillsbury Winthrop Shaw Pittman LLP<br>2600 Capitol Avenue, Suite 300<br>Sacramento, CA 95816 |
| **Robert Steven Smelosky**<br>7256 Lamer Way<br>Sacramento, CA 95828 |
| **Lee N. Smith**<br>Stoel Rives LLP<br>500 Capital Mall, Suite 1600<br>Sacramento, CA 95814 |
| **Robert J. Smith**<br>6780 Trudy Way<br>Sacramento, CA 95831 |
| **Catherine J. Stott**<br>Burns & McDonnell<br>8201 Norman Center Drive, Suite 300<br>Bloomington, MN 55437 |
| **Jesse F. Taylor**<br>902 Del Paso Boulevard, Space 140<br>Sacramento, CA 95815 |

3

| |
|---|
| **Bruce Telles** |
| The Aiwasian Law Firm |
| 725 S. Figueroa Street |
| Los Angeles, CA 90017 |
| **Jeffrey J. Thuma, P.G.** |
| Burns & McDonnell |
| 8201 Norman Center Drive, Suite 300 |
| Bloomington, MN 55437 |
| **Jim Warner, P.G.** |
| **(Expert Witness)** |
| Environmental Resource Management |
| 1277 Treat Boulevard, Suite 500 |
| Walnut Creek, CA 94597 |

4

## Addendum 1

*AmeriPride Service, Inc. v. Valley Industrial Services, Inc., Case No. 00-113 LKK/JFM*

List of Prospective witnesses to be offered by TEO

## Addendum 1

*AmeriPride Service, Inc. v. Valley Industrial Services, Inc., Case No. 00-113 LKK/JFM*

List of Prospective witnesses to be offered by TEO [1]

| Name | Address |
| --- | --- |
| Armstrong, Raymond | 8450 Gerber Rd. |
|  | Sacramento, CA 95828 |
| Berry, B. P., Jr. | 1337 Bethune Way |
|  | The Villages, FL 32162-2243 |
| Burke, Wayne | 184 Par Lane |
|  | Bakersfield, CA 93308 |
| Burlingame, James | AmeriPride Services Inc. |
|  | 650 Industrial Boulevard |
|  | Minneapolis, MN 55413 |
| Butcher, George | 5610 N. Augusta St. |
|  | Fresno, CA 93710 |
| Dankoff, John D., Jr. | 7584 Saint Luke Way |
|  | Sacramento, CA 95823 |
| Dawson, Gaynor | (Texas Eastern Overseas, Inc.'s Rule 30(b)(6) |
|  | Designee) |
|  | 64209 East Grover |
|  | West Richland, WA 99353 |
| Delossantos, Rogerio | 12531 Rising Road |
|  | Wilton, CA 95693 |
| Flowers, Timothy | 543 Ward Ave. |
|  | Patterson, CA 95363 |
| Gates, Ann Wooster Gates | (Expert Witness) |
|  | ENVIRON International Corporation |
|  | Marketplace Tower |
|  | 6001 Shellmound Street, Suite 700 |
|  | Emeryville, CA 94608 |
| Greaver, Russell | 2235 Serena Avenue |
|  | Fresno, CA 93720 |
| Helps, Sandra | 702 E. Montecito St. |
|  | Santa Barbara, CA 93103 |
| Kavanaugh, Michael | (Expert Witness) |
|  | Geosyntec Consultants |
|  | 1111 Broadway, 6th Floor |
|  | Oakland, CA 94607 |
| Kritenberg, Harvey | (Expert Witness) |
|  | 245 South Hudson Avenue |

---

[1] TEO reserves the right to call any person listed on AmeriPride's witness list filed on September 19, 2011

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 1
747125.1

| Name | Address |
|---|---|
| | Los Angeles, CA 90004 |
| Landon, Cass | 808 Coyote Rd.<br>Santa Barbara, CA 93108 |
| Logan, Henry | 831 State St. Apt. 2<br>Santa Barbara, CA 93101 |
| Smelosky, Robert Steven | 7256 Lamer Way<br>Sacramento, CA 95828 |
| Smith, Robert J. | 6780 Trudy Way<br>Sacramento, CA 95831 |
| Taylor, Jesse F. | 902 Del Paso Boulevard, Space 140<br>Sacramento, CA 95815 |
| Thuma, Jeffrey J. | Burns & McDonnell<br>8201 Norman Center Drive, Suite 300<br>Bloomington, MN 55437 |
| Warner, Jim | (Expert Witness)<br>Environmental Resource Management<br>1277 Treat Boulevard, Suite 500<br>Walnut Creek, CA 94597 |
| Wadsworth, Michael | 8450 Gerber Rd.<br>Sacramento, CA 95828 |
| Custodian of Records for the Sacramento Environmental Management District | 10590 Armstrong Avenue<br>Mather, CA 95655 |
| Custodian of Records for the Central Valley Regional Water Quality Control Board | 1001 I Street<br>Sacramento, CA 95814 |
| Custodian of Records for the U.S. Environmental Protection Agency | 1200 Pennsylvania Avenue, NW (2822T)<br>Washington, DC 20460 |
| Custodian of Records for the Sacramento County Sanitation District | 10060 Goethe Road<br>Sacramento, CA 95827 |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 1
747125.1

# Appendix 2

*AmeriPride Services Inc. v. Valley Industrial Services, Inc.*, Case No.
00-113 LKK/JFM

List of documents and other exhibits Plaintiff AmeriPride Services Inc.
expects to offer at trial.

## Appendix 2

*AmeriPride Services Inc. v. Valley Industrial Services, Inc.*, Case No. 00-113 LKK/JFM

List of documents and other exhibits Plaintiff AmeriPride Services Inc. expects to offer at trial:

| Exhibit Number | Description of document or other exhibit |
|---|---|
| 1 | Affidavit of Durin Linderholm |
| 2 | RWQCB's May 7, 2003 Transmittal of Adopted Resolution No. R5-2003-0057; Resolution No. R5-2003-0058; and Cleanup and Abatement Order R5-2003-0059 issued to AmeriPride Services, Inc., and Valley Industrial Services, Inc., 7620 Wilbur Way, Sacramento County and cover letter thereto |
| 3 | RWQCB's December 21, 2005 Cleanup and Abatement Order R5-2005-0721 issued to AmeriPride Services, Inc., and Valley Industrial Services, Inc., 7620 Wilbur Way, Sacramento County and cover letter thereto |
| 4 | RWQCB's September 8, 2006 Cleanup and Abatement Order R5-2006-0530 issued to AmeriPride Services, Inc., and Valley Industrial Services, Inc., 7620 Wilbur Way, Sacramento County and cover letter thereto |
| 5 | RWQCB's September 24, 2007 Cleanup and Abatement Order R5-2007-0723 issued to AmeriPride Services, Inc., and Valley Industrial Services, Inc., 7620 Wilbur Way, Sacramento County and cover letter thereto |
| 6 | RWQCB's April 30, 2009 Amended Cleanup and Abatement Order R5-2009-0702 issued to AmeriPride Services, Inc., and Valley Industrial Services, Inc., 7620 Wilbur Way, Sacramento County and cover letter thereto |
| 7 | Letter from Susan Timm of the RWQCB dated February 28, 2003 to Ms. Rojean Rada, AmeriPride Services, Inc. with the subject "Response to Technical Comments on Draft Cleanup and Abatement Order, AmeriPride Services, Inc., 7620 Wilbur Way, Sacramento County" |
| 8 | Letter from Susan Timm of the RWQCB dated July 25, 2006 to Ms. Rojean Rada, AmeriPride Services, Inc. with the subject "Remedial Investigation/Feasibility Study Report: Downgradient Ground Water (Operable Unit 3), AmeriPride Services, Inc., 7620 Wilbur Way, Sacramento County" |
| 9 | Settlement Agreement between California-American Water Company, AmeriPride Services, Inc., and Petrolane, Inc. |
| 10 | Bank statement dated September 30, 2005 showing payment made by AmeriPride to California-American Water Company for settlement in the amount of $2,000,000.00, determined as undisputed by the Court (Dkt. 735 at 23) |
| 11 | Settlement Agreement and Mutual Release between AmeriPride Services Inc. and Huhtamaki Foodservices, Inc. |
| 12 | Bank statement dated February 28, 2007 showing payment made by AmeriPride to Huhtamaki Foodservices, Inc. for settlement in the amount of $8,250,000.00, determined as undisputed by the Court (Dkt. 735 at 23) |
| 13 | Table summarizing consultant and other costs paid for investigation/remediation through, as submitted to the Court on January 7, 2011 |

2

| 14 | Declaration of Joseph E. Peter in Support of AmeriPride Services Inc.'s Motion for Summary Judgment (Dkt. 698-17 to 698-52), including:<br>(a) Invoices reflecting consultant and other costs of $7,331,528.25 paid for investigation/remediation through August 2010, as submitted to the Court on January 7, 2011 (Dkt. 698-18 to 698-51) and determined as undisputed (Dkt. 735 at 23); and<br>(b) Invoices reflecting costs of $474,729.67 paid for regulatory oversight through September 2010, as submitted to the Court on January 7, 2011 (Dkt. 698-52) and determined as undisputed by the Court (Dkt. at 23) |
|----|----|
| 15 | Invoices reflecting consultant and other costs of $446,656.84 paid for investigation/remediation since August 2010 |
| 16 | Invoices reflecting costs of $16,604.52 paid for regulatory oversight since January 2011 |
| 17 | Invoices reflecting costs paid for legal services rendered |
| 18 | Declaration of Anne M. Farr in Support of AmeriPride Services Inc.'s Motion for Summary Judgment (Dkt. 698-5) |
| 19 | Notice of Errata re Declaration of Anne M. Farr in Support of AmeriPride Services Inc.'s Motion for Summary Judgment (Dkt. 709) |
| 20 | Declaration of Catherine J. Stott in Support of AmeriPride Services Inc.'s Motion for Summary Judgment (Dkt. 698-6) |
| 21 | Declaration of Mark A. Bryant in Support of AmeriPride Services Inc.'s Motion for Summary Judgment (Dkt. 698-8) |
| 22 | Declaration of Jeffrey J. Thuma in Support of AmeriPride Services Inc.'s Motion for Summary Judgment (Dkt. 698-9 to 698-16) |
| 23 | December 22, 2010 Expert Report of Mark A. Bryant, P.E. (Dkt. 706-1) |
| 24 | December 28, 2010 Expert Report of Anne M. Farr, Ph.D. (Dkt. 706-2) |
| 25 | February 1, 2011 Expert Report of Jim Warner, P.G. (Dkt. 707 to 707-60) |
| 26 | Declaration of Jim Warner in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 718 to 718-2) |
| 27 | Harvey Kreitenberg's Declaration in Support of Texas Eastern Overseas' Opposition to Plaintiff's Motion for Summary Judgment (Dkt. 719 to 719-2) |
| 28 | Rebuttal Declaration of Anne M. Farr Ph.D. in Support of AmeriPride Services Inc.'s Reply Brief in Support of its Motion for Summary Judgment (Dkt. 727-7) |
| 29 | Rebuttal Declaration of Mark A. Bryant in Support of AmeriPride Services Inc.'s Reply Brief in Support of its Motion for Summary Judgment (Dkt. 727-8) |
| 30 | Rebuttal Declaration of Catherine J. Stott in Support of AmeriPride Services Inc.'s Reply Brief in Support of its Motion for Summary Judgment (Dkt. 727-9) |
| 31 | April 15, 2011 Rebuttal Expert Report of Mark Bryant, P.E. (Dkt. 729-1) |
| 32 | April 15, 2011 Rebuttal Expert Report of Anne M. Farr, Ph.D. (Dkt. 729-2 to 729-5) |
| 33 | April 27, 2011 Supplemental Rebuttal Expert Report of Anne M. Farr, Ph.D. (Dkt. 731) |
| 34 | April 13, 2011 Rebuttal Expert Report of Harvey Kreitenberg |
| 35 | April 14, 2011 Rebuttal Expert Report of Michael Kavanaugh, Ph.D., P.E. |
| 36 | April 15, 2011 Rebuttal Expert Report of Jim Warner, P.G. |
| 37 | April 15, 2011 Rebuttal Expert Report of Anne Gates, P.E. |

3

| 38 | April 7, 2006 Expert Report of Mark A. Bryant (Dkt. 221-1) |
| 39 | Declaration of Anne M. Farr Ph.D. in Support of AmeriPride Services Inc.'s Opposition to Texas Eastern Overseas, Inc.'s *Daubert* Motion to Exclude Opinion Testimony of Dr. Anne Farr (Dkt. 755-1 to 755-39) |
| 40 | Brian L. Zagon, *Letter to Ronald Bushner re: AmeriPride Services Inc. v. Valley Industrial Services, Inc.* (August 10, 2010) regarding prejudgment interest |
| 41 | Texas Eastern Overseas, Inc.'s Third-Party Complaint (Dkt. 697) |
| 42 | AmeriPride Services Inc.'s Fourth Amended Complaint (Dkt. 750) |
| 43 | Texas Eastern Overseas, Inc.'s Answer to AmeriPride Services, Inc.'s Fourth Amended Complaint (Dkt. 756) |
| 44 | McDonnell, Kimberley A., *Letter to Lee N. Smith re: Valley Industrial Services, Inc.*, January 31, 2002 |
| 45 | Century Indemnity company and ACE Property and Casualty Insurance Company's Statement of Position re: Joint Motion for Judgment, Approval of Settlement and Entry of Contribution Bar (Dkt. 622) |
| 46 | AAA Engineering & Drafting Co., *Foundation Plan* |
| 47 | AAA Engineering & Drafting Co., *Plumbing Site Plan* |
| 48 | All-Service Remediation, *Summary of Field Notes*, October 19, 2005 |
| 49 | American Linen Supply Company, *Proposed Layout*, February 25, 1992 |
| 50 | AmeriPride Services Inc., *Floor Plan* |
| 51 | AmeriPride Services Inc., *Demolition Plan* |
| 52 | AmeriPride Services Inc., *Building Addition Site Plan* |
| 53 | AmeriPride Uniform Services, *Sump System*, October 24, 1997 |
| 54 | AmeriPride Uniform Services, *Industrial Sewer Use Permit Application*, March 20, 1998 |
| 55 | AmeriPride Uniform Services, *Hazardous Materials Disclosure Information*, May 28, 1998 |
| 56 | AmeriPride Uniform Services, *Sacramento County Consolidated Contingency Plan*, July 30, 2001 |
| 57 | AmeriPride Uniform Services, *Sacramento County Hazardous Materials Plan*, September 17, 2002 |
| 58 | AmeriPride Uniform Services, *Compliance Report Form for Quarterly Monitoring Results, Sample Collected January 6, 2004*, February 9, 2004 |
| 59 | AmeriPride Uniform Services, *Compliance Report Form for Quarterly Monitoring Results, Sample collected July 14, 2004*, July 23, 2004 |
| 60 | AmeriPride Uniform Services, *Compliance Report Form for Quarterly Monitoring Results, Sample collected July 14, 2004*, August 5, 2004 |
| 61 | Anlab Analytical Laboratory, *Valley Industries Grab Sampling Results for July 11, 1995*, January 30, 1995 |
| 62 | ASTM E1739-95 (reapproved 2010), *Standard Guide for Risk-Based Corrective Action Applied at Petroleum Release Sites* |
| 63 | ATSDR, *Toxicological Profile for Tetrachloroethylene*, September 1997 |
| 64 | BSK Analytical Laboratories, *Wastewater Sampling Results for November 5, 1990*, November 26, 1990 |

| 65 | BSK Analytical Laboratories, *Wastewater Sampling Results for December 2, 1991*, December 19, 1991 |
|----|---|
| 66 | BSK Analytical Laboratories, *Results for Wilbur Way Sampling*, May 3, 1998 |
| 67 | BSK Analytical Laboratories, *Results for Wilbur Way Sampling*, September 9, 2000 |
| 68 | BSK Analytical Laboratories, *Analytical Results for Sampling at Wilbur Way # 2 Conducted on September 25, 2000*, October 19, 2000 |
| 69 | Burns & McDonnell Engineering Company, Inc., *Injury and Illness Prevention Plan & Site Health and Safety Plan*, October 2009 |
| 70 | Burns & McDonnell Engineering Company, Inc., *2009 Annual Groundwater Monitoring Report*, January 29, 2010 |
| 71 | Burns & McDonnell Engineering Company, Inc., *2009 Annual Remediation Monitoring Report*, January 29, 2010 |
| 72 | Burns & McDonnell Engineering Company, Inc., *Bench Scale Test Report*, March 1, 2010 |
| 73 | Burns & McDonnell Engineering Company, Inc., *2010 Remedial Action Plan/Remedial Design:  Phase II for Operable Unit 3*, April 30, 2010 |
| 74 | Burns & McDonnell Engineering Company, Inc., *First Quarter 2010 Remediation Monitoring Report*, April 30, 2010 |
| 75 | Burns & McDonnell Engineering Company, Inc., *First Quarter 2010 Quarterly Groundwater Monitoring Report*, April 30, 2010 |
| 76 | Burns & McDonnell Engineering Company, Inc., *Toxicity Identification Evaluation Study Plan*, May 7, 2010 |
| 77 | Burns & McDonnell Engineering Company, Inc., *Quarterly Groundwater monitoring Report 2nd Quarter 2010*, July 2010 |
| 78 | Burns & McDonnell Engineering Company, Inc., *Potassium Permanganate Injection Pilot Test Work Plan*, August 2010 |
| 79 | Burns & McDonnell Engineering Company, Inc., *Quarterly Groundwater Monitoring Report 3rd Quarter 2010*, October 2010 |
| 80 | Burns & McDonnell Engineering Company, Inc., *Wastewater Discharge Permit Renewal Application*, November 12, 2010 |
| 81 | Burns & McDonnell Engineering Company, Inc., *Draft AmeriPride Plant Wastewater Effluent Sample Results – Outfall 01*, November 18, 2010 |
| 82 | Burns & McDonnell Engineering Company, Inc., *Table 3:  Groundwater Quality Parameters (200-2010:  D.O., ORP, Temp, pH, Sp. Cond)* |
| 83 | Burns & McDonnell Engineering Company, Inc., *Table 2:  Groundwater Analytical Results (2000-2010)* |
| 84 | Burns & McDonnell Engineering Company, Inc., *Draft Summary of Soil Analytical Data* |
| 85 | Burns & McDonnell Engineering Company, Inc., *Draft Summary of Soil Gas Sampling Results at Individual SVE Points* |
| 86 | Burns & McDonnell Engineering Company, Inc., *Draft Summary of Off-Site Soil Gas Sampling Results* |
| 87 | Burns & McDonnell Engineering Company, Inc., *Draft Summary of Soil Gas Sampling Results* |

5

| 88 | Burns & McDonnell Engineering Company, Inc., *2010 Annual Groundwater Monitoring Report*, February 1, 2011 |
| 89 | Burns & McDonnell Engineering Company, Inc., *2010 Annual Remediation Monitoring Report*, February 1, 2011 |
| 90 | California Regional Water Quality Control Board, Central Valley Region, *Exectuvie Officer's Report*, December 3, 2004 |
| 91 | California Regional Water Quality Control Board, Central Valley Region, *Notice of Public Hearing*, March 23, 2007 |
| 92 | California Regional Water Quality Control Board, Central Valley Region, *Public Notice of Public Comment Period and Public Meeting for the Draft Remedial Action Work Plan/Remedial Design: OU3*, April 3, 2007 |
| 93 | California Regional Water Quality Control Board, Central Valley Region, *Minutes of the 486th Regular Meeting*, June 21/22, 2007 |
| 94 | California Regional Water Quality Control Board, Central Valley Region, *Monitoring and Reporting Program No. R5-2007-0827*, Novebmer 5, 2007 |
| 95 | California Regional Water Quality Control Board, Central Valley Region, *Comments on Huhtamaki Well Abandonment Report*, April 4, 2008 |
| 96 | California State Water Resources Control Board, *Resolution No. 92-49 (As Amended on April 21, 1994 and October 2, 1996): Policies and procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code Section 13304* |
| 97 | Cline, Zerkle & Agee Engineers & Architects, *Foundation & Framing Plan for Laundry Building for Valley Industrial Laundry, Sacramento Co, California*, April 1, 1965 |
| 98 | Cline, Zerkle & Agee Engineers & Architects, *Laundry Building for Valley Industrial Laundry, Sacramento Co, California: Foundation & Framing Plan*, April 1, 1965 |
| 99 | Cline, Zerkle & Agee Engineers & Architects, *Laundry Building for Valley Industrial Laundry, Sacramento Co, California: Plumbing Plan*, April 1, 1965 |
| 100 | Correspondence to and from regulators regarding AmeriPride Services, Inc., as reviewed by Mark A. Bryant |
| 101 | County of Sacramento, *Wastewater Sampling Results for Valley Laundry Grab Sampling on May 13, 1992*, July 2 1992 |
| 102 | County of Sacramento, Water Quality Division, Industrial Waste Section, *Valley Laundry Sampling Results for August 7, 1992* |
| 103 | County of Sacramento, Water Quality Division, Industrial Waste Section, *Site Inspection Report*, August 7, 1992 |
| 104 | DelSarto, Glen, *Email to SWRCB re: Transmittal of AmeriPride Sewer Sampling Data*, November 4, 2002 |
| 105 | Delta Environmental Consultants, Inc., *Hand Auger Soil Sampling Results and Work Plan for Two Soil Borings*, April 14, 1997 |
| 106 | Delta Environmental Consultants, Inc., *Fax Transmittal to Sacramento County Transmitting Sparger Technology Analytical Results for 4/07 Soil Sampling*, April 24, 1997 |
| 107 | Delta Environmental Consultants, Inc., *Revised Work Plan for Soil Boring/Monitoring Well Installation*, June 24, 1997 |
| 108 | Delta Environmental Consultants, Inc., *Soil Sampling Results*, July 8, 1997 |

| 109 | Delta Environmental Consultants, Inc., *Groundwater Monitoring Well Installation Report*, September 12, 1997 |
| 110 | Delta Environmental Consultants, Inc., *Phase I Environmental Assessment*, January 9, 1998 |
| 111 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Motnitoring Report, First Quarter 1998*, April 23, 1998 |
| 112 | Delta Environmental Consultants, Inc., *Work Plan for Monitoring Well Installation and Drainage Swell Sampling*, April 30, 1998 |
| 113 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report, Second Quarter 1998*, August 31, 1998 |
| 114 | Delta Environmental Consultants, Inc., *Additional Hydrogeological Assessment Results and Third Quarter 1998 Groundwater Monitoring Results Report*, February 10, 1999 |
| 115 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Fourth Quarter 1998*, March 24, 1999 |
| 116 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – First Quarter 1998*, May 24, 1999 |
| 117 | Delta Environmental Consultants, Inc., *Phased Approach Workplan*, June 7, 1999 |
| 118 | Delta Environmental Consultants, Inc., *Location Map - Geo-Sorber Modules*, August 9, 1999 |
| 119 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report - Second Quarter 1998*, September 21, 1999 |
| 120 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Third Quarter 1998*, November 19, 1999 |
| 121 | Delta Environmental Consultants, Inc., *Results of Gore-Sorber Survey and Addendum to Phased Approach Work Plan*, November 29, 1999 |
| 122 | Delta Environmental Consultants, Inc., *Clarification to SCEMD Work Plan Approval Letter Dated December 3, 1999*, January 10, 2000 |
| 123 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Fourth Quarter 1999*, April 11, 2000 |
| 124 | Delta Environmental Consultants, Inc., *Revised Gore-Sorber Screening Survey Maps*, April 14, 2000 |
| 125 | Delta Environmental Consultants, Inc., *Phase Approach Work Plan – Addendum III*, April 14, 2000 |
| 126 | Delta Environmental Consultants, Inc., *Site Map*, April 14, 2000, entered as Exhibit 3 to the October 24, 2005 Deposition of Robert J. Smith |
| 127 | Delta Environmental Consultants, Inc., *Phased Approach Work Plan – Addendum II*, June 12, 2000 |
| 128 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Second Quarter 2000*, October 17, 2000 |
| 129 | Delta Environmental Consultants, Inc., *Phased Approach Work Plan – Addendum IV*, February 19, 2001 |
| 130 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Second Quarter 2001*, August 3, 2001 |
| 131 | Delta Environmental Consultants, Inc., *Summary of Soil Management Activities*, September 12, 2001 |

**PLAINTIFF AMERIPRIDE SERVICES INC.'S PRETRIAL STATEMENT – APPENDIX 2**

| 132 | Delta Environmental Consultants, Inc., *Site Investigation Report*, January 24, 2002 |
| 133 | Delta Environmental Consultants, Inc., *Work Plan for Additional Monitoring Wells*, February 8, 2002 |
| 134 | Delta Environmental Consultants, Inc., *Amended Work Plan for Additional Monitoring Wells*, March 6, 2002 |
| 135 | Delta Environmental Consultants, Inc., *Project Status Report*, April 3, 2002 |
| 136 | Delta Environmental Consultants, Inc., *Investigation on Zimmer Property*, April 10, 2002 |
| 137 | Delta Environmental Consultants, Inc., *Investigation on Zimmer Property*, April 25, 2002 |
| 138 | Delta Environmental Consultants, Inc., *Work Plan for Investigation on Zimmer Property*, May 24, 2002 |
| 139 | Delta Environmental Consultants, Inc., *Draft Remedial Investigation/Feasibility Study Report*, May 31, 2002 |
| 140 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Second Quarter 2002*, August 16, 2002 |
| 141 | Delta Environmental Consultants, Inc., *Reply to Comments on Remediation Investigation/Feasibility Report*, August 28, 2002 |
| 142 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Third Quarter 2002*, November 22, 2002 |
| 143 | Delta Environmental Consultants, *Draft Remedial Action Work Plan: Soil Vapor Extraction System*, September 26, 2002 |
| 144 | Delta Environmental Consultants, Inc., *Remediation Action Work Plan for Operable Unit 1: Soil Vapor Extraction System*, February 27, 2003 |
| 145 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring Report – Fourth Quarter 2002*, April 14, 2003 |
| 146 | Delta Environmental Consultants, Inc., *Letter to RWQCB re: Draft CAO Comments*, April 16, 2003 |
| 147 | Delta Environmental Consultants, Inc., *Remedial Characterization/Feasibility Study Report: Groundwater*, June 20, 2003 |
| 148 | Delta Environmental Consultants, Inc., *Revised Work Plan for Date Gap Investigation*, July 16, 2003 |
| 149 | Delta Environmental Consultants, Inc., *Zimmer Investigation Analytical Results*, August 4, 2003 |
| 150 | Delta Environmental Consultants, Inc., *Revised Work Plan for Data Gap Investigation*, October 13, 2003 |
| 151 | Delta Environmental Consultants, Inc., *Groundwater Remedial Action Plan Pilot Testing Work Plan*, November 17, 2003 |
| 152 | Delta Environmental Consultants, Inc., *Baseline Health Risk Assessment*, January 30, 2004 |
| 153 | Delta Environmental Consultants, Inc., *Compliance Source Test Report: Soil Vapor Extraction System*, February 5, 2004 |
| 154 | Delta Environmental Consultants, Inc., *Compliance Source Test Report : Soil Vapor Extraction System, First Quarter 2004*, April 29, 2004 |

8

| 155 | Delta Environmental Consultants, Inc., *Soil Remediation Monitoring and Reporting Program: Soil Vapor Extraction System, First Quarter 2004*, April 29, 2004 |
| 156 | Delta Environmental Consultants, Inc., *Compliance Source Test Report: Soil Vapor Extraction System, Second Quarter 2004*, July 29 2004 |
| 157 | Delta Environmental Consultants, Inc., *Soil Gas Sampling Work Plan*, August 13, 2004 |
| 158 | Delta Environmental Consultants, Inc., *Remedial Action Work Plan for Operable Unit 2, Revision 1: Source Area Groundwater Extraction System*, August 16, 2004 |
| 159 | Delta Environmental Consultants, Inc., *Remedial Investigation/Feasibility Study Report: Downgradient Groundwater*, October 15, 2004 |
| 160 | Delta Environmental Consultants, Inc., *Supplemental Baseline Health Risk Assessment Report*, October 27, 2004 |
| 161 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring: Third Quarter 2004*, October 27, 2004 |
| 162 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring: Fourth Quarter 2004*, January 24, 2005 |
| 163 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring, Fourth Quarter 2004*, January 31, 2005 |
| 164 | Delta Environmental Consultants, Inc., *Soil Remediation Monitoring and Reporting Program: Soil Vapor Extraction System*, April 29, 2005 |
| 165 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring: First Quarter 2005*, April 29, 2005 |
| 166 | Delta Environmental Consultants, Inc., *Compliance Source Test Report: Soil Vapor Extraction System, First Quarter 2005*, April 29, 2005 |
| 167 | Delta Environmental Consultants, Inc., *Wastewater Discharge Permit Applications*, May 4, 2005 |
| 168 | Delta Environmental Consultants, Inc., *Compliance Source Test Report: Soil Vapor Extraction System, Second quarter 2005*, July 29, 2005 |
| 169 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring: Third Quarter 2005*, October 31, 2005 |
| 170 | Delta Environmental Consultants, Inc., *Compliance Source Test Report: Soil Vapor Extraction System, Third Quarter 2005*, October 31, 2005 |
| 171 | Delta Environmental Consultants, Inc., *Interim Corrective Action Plan (Revised)*, November 14, 2005 |
| 172 | Delta Environmental Consultants, Inc., *Remediation Monitoring and Reporting Program: Groundwater Extraction and Treatment System*, December 13, 2005 |
| 173 | Delta Environmental Consultants, Inc., *Proposed Water Supply Well Replace Work Plan*, December 15, 2005 |
| 174 | Delta Environmental Consultants, *Remedial Investigation/Feasibility Study Report: Downgradient Groundwater (Operable Unit 3)*, January 19, 2006 |
| 175 | Delta Environmental Consultants, Inc., *Quarterly Groundwater Monitoring: Fourth Quarter 2005*, January 31, 2006 |
| 176 | Delta Environmental Consultants, Inc., *Compliance Source Test: Soil Vapor Extraction System, Fourth Quarter 2005*, January 31, 2006 |
| 177 | Delta Environmental Consultants, Inc., *Soil Remediation Monitoring and Reporting Program: Soil Vapor Extraction System, Fourth Quarter 2005*, January 31, 2006 |

9

| 178 | Delta Environmental Consultants, *Final Water Supply Well Replacement Work Plan*, February 15, 2006 |
| 179 | Delta Environmental Consultants, Inc., *Letter from J. Thuma to R. Rada concerning invoicing summarn and status report*, February 23, 2006 |
| 180 | Delta Environmental Consultants, Inc., *Remedial Investigation/Feasibility Study Report: Downgradient Groundwater (Operable Unit 3)*, May 19, 2006 |
| 181 | Delta Environmental Consultants, *Off-Site Soil Gas Sampling*, June 30, 2006 |
| 182 | Delta Environmental Consultants, Inc., *Operable Unit 3: Well Installation and Aquifer Test Work Plan*, August 18, 2006 |
| 183 | Delta Environmental Consultants, *Supplemental Off-site Soil Gas Health Risk Assessment Report*, December 1, 2006 |
| 184 | Delta Environmental Consultants, Inc., *Remedial Action Work Plan for Operable Unit 3: Downgradient Groundwater Extraction System*, December 7, 2006 |
| 185 | Delta Consultants, *Technical Disposal Alternatives Report: Operable Unit 3, Downgradient Groundwater Extraction System*, January 2, 2007 |
| 186 | Delta Environmental Consultants, Inc., *Remediation Monitoring Report: Operable Units 1 and 2, Fourth Quarter 2006*, January 31, 2007 |
| 187 | Delta Environmental Consultants, Inc., *Limited Soil Monitoring Net Work Plan*, October 16, 2007 |
| 188 | Delta Consultants, *Addendum to the Limited Soil Monitoring Network Plan*, December 4, 2007 |
| 189 | Delta Environmental Consultants, Inc., *2007 Annual Remediation Monitoring Report*, January 31, 2008 |
| 190 | Delta Consultants, *Revised Soil Vapor Monitoring Point Installation and Monitoring Results*, July 1, 2008 |
| 191 | Delta Consultants, *Evaluation of Downgradient Capture Zone: Operable Unit 3, Downgradient Groundwater Extraction System*, October 31, 2008 |
| 192 | Delta Consultants, *Remedial Action Plan/Remedial Design: Phase II for Operable Unit 3*, December 31, 2008 |
| 193 | Delta Consultants, *Work Plan for Installation of Monitoring Wels*, January 16, 2009 |
| 194 | Delta Consultants, *2008 Annual Groundwater Monitoring*, January 30, 2009 |
| 195 | Delta Consultants, *2008 Annual Remediation Monitoring*, January 30, 2009 |
| 196 | Delta Consultants, *Class III Site Health and Safety Plan (revised)*, March 4, 2009 |
| 197 | Delta Consultants, *In-situ Bench Scale Testing Work Plan*, April 1, 2009 |
| 198 | Department of the Air Force, *Accreditation of the Remedial Action Cost Engineering Requirements (RACER)*, July 11, 2001 |
| 199 | Diagram, entered as Exhibit 1 to the October 11, 2005 Deposition of Rogerio Delossantos |
| 200 | Delta Environmental Consultants, Inc., *Site Map*, May 20, 2002, entered as Exhibit 2 to the October 11, 2005 Deposition of Rogerio Delossantos |
| 201 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on January 25, 1993*, February 10, 1993 |
| 202 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on April 7, 1993*, April 18, 1993 |

10

| 203 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on July 13, 1993*, July 30, 1993 |
|-----|-----------------------------------------------------------------------------------------------------------------------------|
| 204 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on October 5, 1993*, October 19, 1993 |
| 205 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on January 12, 1994*, January 28, 1994 |
| 206 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on April 12, 1994*, May 3, 1994 |
| 207 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on July 19, 1994*, July 29, 1994 |
| 208 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on October 19, 1994*, October 21, 1994 |
| 209 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on January 30, 1996*, February 19, 1996 |
| 210 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on April 3, 1996*, April 22, 1996 |
| 211 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on July 16, 1996*, August 5, 1996 |
| 212 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on October 8, 1996*, October 11, 1996 |
| 213 | FGL Environmental, *Wastewater Sampling Results for Valley Industrial Services Effluent Grab on January 7, 1997*, January 16, 1997 |
| 214 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on April 7, 1997*, May 6, 1997 |
| 215 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on July 1997*, July 28, 1997 |
| 216 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on October 7, 1997*, October 21, 1997 |
| 217 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on January 6, 1998*, January 20, 1998 |
| 218 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on April 14, 1998*, April 30, 1998 |
| 219 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on July 14, 1998*, July 31, 1998 |
| 220 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on October 13, 1998*, November 5, 1998 |
| 221 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on January 13, 1999*, February 2, 1999 |
| 222 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on April 13, 1999*, May 5, 1999 |
| 223 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on July 20, 1999*, August 5, 1999 |
| 224 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on October 5, 1999*, November 1, 1999 |
| 225 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on January 18, 2000*, February 2, 2000 |

11

| 226 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on April 4, 2000*, April 25, 2000 |
| 227 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on July 11, 2000*, July 27, 2000 |
| 228 | FGL Environmental, *Analytical Results for Wastewater Monitoring Effluent Sampling Conducted on July 10, 2000*, August 4, 2000 |
| 229 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on October 2, 2000*, October 27, 2000 |
| 230 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on January 8, 2001*, February 7, 2001 |
| 231 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on April 3, 2001*, April 27, 2001 |
| 232 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on July 10, 2001*, August 2, 2001 |
| 233 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on October 8, 2001*, October 31, 2001 |
| 234 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on January 9, 2001*, January 25, 2001 |
| 235 | FGL Environmental, *Wastewater Sampling Results for AmeriPride Effluent Grab on July 11, 2002*, July 2002 |
| 236 | GeoTrans, Inc., *Letter to Susan Timm re: Huhtamaki Well Abandonment – Rsults Tasks 1, 2, and 3 for Chinet #1 and Chinet #2*, September 28, 2007 |
| 237 | Hageman-Schank, Inc., *Removal of Two Underground Fuel Storage Tanks*, June 5, 1986 |
| 238 | Iris Environmental, *Proposed Water Supply Well Replacement Work Plan*, December 15, 2005 |
| 239 | Iris Environmental, *Final Water Supply Well Replacement Work Plan*, February 15, 2005 |
| 240 | Johnson, Craig, *Field Notes from October 19, 24 and 26 associated with OU2 GWET System Installation*, October 2005 |
| 241 | JR Associates, *Geophysical Investigation at the AmeriPride Site*, March 28, 2006 |
| 242 | Kiff Analytical LLC, *October 2010 Groundwater Monitoring Analytical Results*, October 27, 2010 |
| 243 | MBT Environmental Laboratories, *Wastewater Sampling Results Collected by Sacramento County Regional Sanitation District for Valley Industrial Services on November 3, 1994*, December 1, 1994 |
| 244 | MBT Environmental Laboratories, *3ʳᵈ Sump Sampling Results for Valley Industrial Services on January 17, 1995*, January 30, 1995 |
| 245 | MBT Environmental Laboratories, *Valley Industrial Services Sump 5' Sampling Results for August 17, 1995*, August 30, 1995 |
| 246 | MBT Environmental Laboratories, *Valley Industrial Services Sump 4' Sampling Results for October 18, 1995*, November 2, 1995 |
| 247 | Pipe Pros, Inc., *Report*, February 11, 2006 |
| 248 | RWQCB, *Comments on Remediation Investigation/Feasibility Report*, July 31, 2002 |

12

| 249 | Sacramento County, *Letter to Valley Industrial Services re: Credit for Evaporation Losses*, December 5, 1986 |
|-----|----------------------------------------------------------------------------------------------|
| 250 | Sacramento County, *Valley Industrial Site Inspection*, August 7, 1991 |
| 251 | Sacramento County, *Site Inspection*, December 17, 1991 |
| 252 | Sacramento County, *Industrial Pretreatment Inspection Report*, December 23, 1992 |
| 253 | Sacramento County, *Inspection Report*, June 3, 1992 |
| 254 | Sacramento County, *Inspection Report*, December 2, 1993 |
| 255 | Sacramento County, *Valley Industries Inspection Report*, June 14, 1994 |
| 256 | Sacramento County, *Inspection Report*, October 5, 1994 |
| 257 | Sacramento Regional County Sanitation District, *Annual Site Inspection for Valley Industrial Services*, December 17, 1991 |
| 258 | Sacramento Regional County Sanitation District, *Inspection Report*, June 1998 |
| 259 | Sacramento Regional County Sanitation District, *Wastewater Discharge Permit ILN005*, September 1, 2009 |
| 260 | Sacramento County Wastewater Treatment Plant Control Laboratory, *Industrial Pretreatment Inspection Report for Valley Industrial Services*, December 23, 1992 |
| 261 | Stott, Catherine J., *Email to mark Bryant re: Health and Safety Plans*, April 6, 2006 |
| 262 | SWRCB, *Letter to Welch's Overall Cleaning Co. re: Unused Underground Storage Tanks*, July 8, 1986 |
| 263 | Valley Industrial Services, *Industrial Sewer Use Permit Application*, December 11, 1984 |
| 264 | Valley Industrial Services, *Application for Permit to Operate Underground Storage Tank*, January 7, 1986 |
| 265 | Valley Industrial Services, *Letter to Water Quality Division re: Metered Water Consumption*, December 10, 1986 |
| 266 | Valley Industrial Services, *Wastewater Sampling Results for November 5, 1990*, December 13, 1990 |
| 267 | Valley Industrial Services, *Hazardous Materials Disclosure Information*, May 18, 1993 |
| 268 | Valley Industrial Services, *Hazardous Materials Disclosure Information*, May 17, 1994 |
| 269 | Valley Industrial Services, *Inspection Report*, June 3, 1993 |
| 270 | Valley Industrial Services, *Inspection Report*, December 2, 1993 |
| 271 | Valley Industrial Services, *Sludge Discharge Prevention and Control Plan*, June 1994 |
| 272 | Valley Industrial Services, *Hazardous Materials Disclosure Information*, May 18, 1995 |
| 273 | Valley Industrial Services, *Hazardous Materials Disclosure Information*, June 27, 1996 |
| 274 | Valley Industrial Services, *Hazardous Materials Disclosure Information*, June 25, 1997 |
| 275 | Valley Industrial Services, *Hazardous Materials Disclosure Information*, June 11, 1999 |
| 276 | W.L. Gore & Associates, Inc., *Gore-Sorber Screening Survey – Final Report*, September 21, 1999 |

13

| 277 | W.L. Gore & Associates, Inc., *Gore-Sorber Screening Survey – Final Report*, September 21, 1999 |
|-----|-------------------------------------------------------------------------------------------------|
| 278 | Mark L. Brusseau, et al, *Analysis of Soil Vapor Extraction Data to Evaluate Mass-Transfer Constraints and Estimate Source-Zone Mass Flux*, Ground Water Monitoring and Remediation, Vol. 30, No. 3: 57-64 (Summer 2010) |
| 279 | Robert M. Cohen & James W. Mercer, U.S. Envtl. Prot. Agency ("US EPA") DNAPL Site Evaluation (1993) |
| 280 | Ronald W. Falta, et al., *Density Driven Flow of Gas in the Unsaturated Zone Due to the Evaporation of Volatile Organic Compounds*, Water Resources Research, Vol. 25 No. 10: 2159-2169 (October 1989) |
| 281 | Stan Feenstra, et al., *A Method for Assessing Residual NAPL Based on Organic Chemical Concentrations in Soil Samples*, GWMR 128-136 (Spring 1991) |
| 282 | C.W. Fetter, Contaminant Hydrogeology (1993) |
| 283 | R. Allan Freeze & John A. Cherry, Groundwater (1979) |
| 284 | Hughes, et al., *Transport of trichlroethylene vapours in the unsaturated zone:  A field experiment*, Subsurface Contamination by Immiscible Fluids 81-88, at 83 (1992) |
| 285 | W. A. Jury et al, 1983, *Behavior Assessment Model for Organics in Soil I. Model Description*, Journal of Environmental Quality, Vol. 12: 558-564 |
| 286 | W.A. Jury et al, *Behavior Assessment Model for Trace Organics in Soil II. Chemical Classification and Parameter Sensitivity*, Journal of Environ. Quality, Vol. 13, No. 4: 567-572 (Part II) |
| 287 | W.A. Jury et al, *Behavior Assessment Model for Trace Organics in Soil III. Application of Screening Model*, Journal Environ. Quality, Vol. 13, No. 4: 573-579 (Part III) |
| 288 | W.A. Jury et al, *Behavior Assessment Model for Trace Organics in Soil IV. Review of Experimental Evidence*, Journal Environ Quality, Vol. 13, No. 4: 580-586 (Part IV) |
| 289 | Irving Langmuir, *The Constitution and Fundamental Properties of Solids and Liquids, Part I. Solids*, Journal of the American Chemical Society, 38 (11): 2221-2295 (1916) |
| 290 | Los Angeles RWQCB & DTSC, *Advisory – Active Soil Gas Investigations* (January 13, 2003) |
| 291 | W.R. Mabey, et al., *Aquatic Fate Processes Data for Organic Priority Pollutants*, US EPA Report No. 440/4-81-014 (1982) |
| 292 | Carl A. Mendoza, et al., *Transport of trichloroethylene vapours in the unsaturated zone:  Numerical anlaysis of a field experiment*, Proceedings:  Conference on Subsurface Contamination by Immiscible Fluids 221-227 (1992) |
| 293 | Carl A. Mendoza & Emil O. Frind, *Advective-Dispersive Transport of Dense Organic Vapors in the Unsaturated Zone 1.  Model Development*, Water Resources Research, Vol. 26, No. 3: 379-387, (March 1990) |
| 294 | Carl A. Mendoza & Emil O. Frind, *Advective-Dispersive Transport of Dense Organic Vapors in the Unsaturated Zone 2.  Sensitivity Analysis*, Water Resources Research, Vol. 26, No. 3: 388-398 (March 1990) |
| 295 | James W. Mercer & Robert M. Cohen, *A Review of Immiscible Fluids in the Subsurface:  Properties, Models, Characterization and Remediation*, Journal of Contaminant Hydrology, 6:107-163 (1990) |

14

| 296 | Roger L. Olsen & Andy Davis, *Predicting the Fate and Transport of Organic Compounds in Groundwater Part 1*, HMC 39-63 (May/June 1990) |
|-----|---|
| 297 | James F. Pankow & John A. Cherry, Dense Chlorinated Solvents and other DNAPLs in Groundwater (1996) |
| 298 | Barbara Ruffino & Mariachiara Zanetti, *Adsorption Study of Several Hydrophobic Organic Contaminants on an Aquifer Material*, American Journal of Environmental Sciences 5 (4): 507-515 (2009) |
| 299 | Hyeyoung Sophia Seo & John E. McCray, *Interfacial Tension of Chlorinated Aliphatic DNAPL Mixtures as a Function of Organic Phase Composition*, Environ. Sci. Tech., 36:1292-1298 (2002) |
| 300 | Rene P. Schwarzenbach & John Westall, *Transport of Nonpolar Organic Compounds from Surface Water to Groundwater. Laboratory Sorption Studies*, Environmental Science & Technology, Vol 15, No. 11 (November 1981) |
| 301 | Friedrich Schwille, Dense Chlorinated Solvents in Porous and Fractured Media, Model Experiments, Appendix I, 130 (James F. Pankow trans. 1988) |
| 302 | U.C. Davis, Final Draft Report, Intermedia Transfer Factor for Contaminants Found at Hazardous Waste Sites, Tetrachloroethylene (PCE) (December 1994) |
| 303 | U.C. Irvine, Orange County Sanitation District, & Brown and Caldwell, *Quantifying Sub-Surface Discharges from Individual Sewer Defects*, Water Environmental Foundation (2006) |
| 304 | US EPA, *Assessment and Delineation of DNAPL Source Zones at hazardous Waste Sites*, Ground-Water Issue (September 2009) |
| 305 | US EPA, Chemical Summary for Perchloroethylene, EPA 749-F-94-020a (August 1994) |
| 306 | US EPA, Estimating Potential for DNAPL Occurrence at Superfund Sites (January 1992) |
| 307 | US EPA, Exfiltration in Sewer Systems, EPA/600/R-01/034 (December 2000) |
| 308 | US EPA, Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA, EPA/540/G-89/004 (October 1988) |
| 309 | US EPA, Guidance on Remedial Actions for Contaminated Ground Water at Superfund Sites, EPA/540/G-88/003 (December 1988) |
| 310 | US EPA, Soil Screening Guidance:  User's Guide (July 1996) |
| 311 | US EPA, Soil Screening Guidance:  User's Guide (November 2010) |
| 312 | US EPA, Soil Screening Guidance:  Technical Background Document, EPA/540/R95/128 (May 1996) |
| 313 | US EPA, *Soil Sampling and Analysis for Volatile Organic Compounds*, Ground-Water Issue (February 1991) |
| 314 | US EPA, Superfund Public Health Evaluation Manual 25, Worksheet 3-1, Appendix C (October 1986) |
| 315 | US EPA, Superfund Remedial Design and Remedial Action Guidance (1986) |
| 316 | US EPA, User's Guide for Evaluating Subsurface Vapor Intrusion into Buildings (2004) |
| 317 | US EPA Region 9 Technical Guidelines for Accurately Determining Volatile Organic Compound (VOC) Concentrations in Soil and Solid Matrices, R9QA/05.2 5, 9 (December 2005) |

| 318 | John L. Wilson and Stephen H. Conrad, *Is Physical Displacement of Residual Hydrocarbons a Realistic Possibility in Aquifer Restoration?*, Proceedings of the NWWA/API Conference on Petroleum Hydrocarbons and Organic chemicals in Groundwater, 274-298 (1984) |
| 319 | Worley Parsons Komex, *Video of Sewer Inspection*, February 11, 2006 |

**Addendum 2**

*AmeriPride Service, Inc. v. Valley Industrial Services, Inc., Case No. 00-113 LKK/JFM*

List of documents and other exhibits TEO expects to offer at trial

**Addendum 2**

*AmeriPride Service, Inc. v. Valley Industrial Services, Inc., Case No. 00-113 LKK/JFM*

List of documents and other exhibits TEO expects to offer at trial [1]

| Exhibit | Description |
|---|---|
| A | Third Amended Complaint |
| B | James Burlingame Phone Logs, 31 March 1997and 2 April 1997 |
| C | Letter Re: Ameripride Company Wscs Discharge Request, 10 August 2010 |
| D | "ASTM and the National Clay Pipe Institute 100 Years of Teamwork and Achievement." Standardization News, Volume 32, No. 8. August. |
| E | California Department of Transportation (DOT). 2009. Highway Design Manual. November 2. Pp. 850-17 |
| F | Delta Environmental Consultants (Delta). 1991. Letter to Sacramento County DEH, Phased Work Approach Plan. |
| G | Fair, G.M., J.C. Geyer, and J.C. Morris. 1956. "Quantities of Water and Waste Water." Water Supply and Waste-Water Disposal. John Wiley and Sons, Inc., New York. 1956. Pp. 134-135. |
| H | Freeman, K. and S. Harader. 1992. Field Notes Regarding an Inspection of Valley Industrial. August 7. |
| I | Harris, R.J. and J. Tasello. "Sewer Leak Detection — Electro-Scan Adds a New Dimension, Case Study: City of Redding, California". No date. |
| J | Ingram, William T. "Sanitary Engineering." Standard Handbook for Civil Engineers. Ed. F.S. Merritt. McGraw-Hill Book Company, New York. 1968. Pp. 22-1 et seq. |
| K | Makar, Jon and Nathalie Chagnon. 1999. "Inspecting Systems for Leaks, Pits and Corrosion." Journal of American Water Works Association, Volume 91, No. 7. July. |
| L | Sacramento Regional County Sanitation District (SRCSD). 1981-2010. Sewer Use Billing Records (August 1981 — April 2010). |

---

[1] TEO reserves the right to use any and all documents previously listed in AmeriPride's exhibit list filed on September 19, 2011 as docket number 771-2.

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| M | USEPA. 2004. User's Guide for Evaluating Subsurface Vapor Intrusion into Buildings. Office of Emergency and Remedial Response. February. http://www.epa.gov/oswerlriskassessment/airmodel/pdf/2004_0222_3phase_user s_guide.pdf. |
| N | Burns &. McDonnell Engineering Company, Inc., 2010. 2010 Remedial Action Plan/Remedial Design: Phase II for Operable Unit 3, AmeriPride Service, Inc., 7620 Wilbur Way, Sacramento, California, Local Remediation Program Site Number C207. 30 April. |
| O | California Department of Public Health, located at http://www.cdph.ca.gov/certlic/drinkingwater/pages/chemicalcontaminants.aspx |
| P | California Regional Water Quality Control Board, Central Valley Region, 2009. Amended Cleanup and Abatement Order No. R5-2009-0702 for AmeriPride Service, Inc. and Valley Industrial Services, Inc., 7620 Wilbur Way, Sacramento, Sacramento County. April 30. |
| Q | California Regional Water Quality Control Board, San Francisco Bay Region, 2007. Screening for Environmental Concerns at Sites with Contaminated Soil and Groundwater Interim Final. November. |
| R | Delta, 1998. Phase I Environmental Assessment, AmeriPride Uniform Services, 7620 Wilbur Way, Sacramento, California. |
| S | Linn, Bill, 1997. Dry-cleaning: History, Processes and Practices, Dry-cleaning Solvent Cleanup Program, Florida Department of Environmental Protection. May. |
| T | Monahan, Michael A, Richard J. Denney, Jr., and Donna R. Black, 1993. California Environmental Law Handbook, Seventh Edition. March. |
| U | Sullivan, Thomas F.P., 1997. Environmental Law Handbook. Fourteenth Edition. |
| V | U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry, 1997. Toxicological Profile for Tetrachloroethylene. September. |
| W | U.S. Environmental Protection Agency, Office of Compliance, 1995. EPA Office of Compliance Sector Notebook Project, Profile of the Dry Cleaning Industry. September. |
| X | Barker, J.F., G.C. Patrick, and D. Major. 1987. *Natural Attenuation of Aromatic Hydrocarbons in a Shallow Sand Aquifer,* Groundwater Monitoring and Remediation: 7(1): 64-71. |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| Y | Burlingame, James. 1986: *Letter Re: Unused Underground Storage Tanks.* 17 July 1986. |
| Z | Burns & McDonnell. 2010a. *First Quarter 2010 Quarterly Groundwater Monitoring Report. 30 April 2010.* |
| 2A | Cogley and Wechsler. 1979. *Draft Final Report: Occurrence and Treatability of Priority Pollutants in Industrial Laundry Wastewaters.* Industrial Environmental Research Laboratory, Office of Research and Development, USEPA, Cincinnati, Ohio. 7 January 1979. |
| 2B | Davis; Andy and Olsen, Roger L. 1990. *Predicting the Fate and Transport of Organic Compounds in Groundwater, Part* 2: HMC, p. 18-37. July/August 1990. |
| 2C | Delta. 1997. *Hand Auger Soil Sample Results and Work Plan for Two Soil Borings.* 14 April 1997. |
| 2D | Delta. 2002a. *Site Investigation Report.* 24 January 2002. |
| 2E | Delta. 2002b. *Remedial Investigation/Feasibility Study Report.* 31 May 2002. |
| 2F | Delta. 2004a. *Draft Remedial Investigation/Feasibility Study Report: Downgradient Ground Water.* 15 October 2004. |
| 2G | Delta. 2004b. *Supplemental Baseline Health Risk Assessment Report.* 27 October 2004. |
| 2H | Delta. 2006. *Remedial Investigation/Feasibility Study Report: Downgradient Groundwater (OU3).* 19 May 2006. |
| 2I | Delta. 2007. *Technical Disposal Alternatives Report: Operable Unit 3 Downgradient Ground Water Extraction System.* 2 January 2007. |
| 2J | Delta. 2008. *Remedial Action Plan/Remedial Design: Phase II for Operable Unit 3.* 31 December 2008. |
| 2K | Department of Toxic Substances Control (DTSC). 1994. *Letter Re: Acknowledgement of Operation as a Commercial Laundry.* 20 December 1994. |
| 2L | Fetter, C.W. 1988. Applied Hydrogeology: Merrill Publishing, Columbus, OH, 592 pp. |
| 2M | Freeze, Alan R. and Cherry, John A. 1979. Groundwater. Prentice Hall. 604 pp. |
| 2N | Hageman-Schank. *1986. Letter to Valley Industrial Services Re: Removal of Two Underground Fuel Storage Tanks.* 5 June 1986. |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---------|-------------|
| 2O | Mesard, Peter M. 2006. *Expert Report Regarding the Distribution of Perchloroethylene in Groundwater in the Vicinity of the AmeriPride Site, Sacramento, California.* 6 April 2006. |
| 2P | Noonan, D.C. and J.T. Curtis. 1990. *Groundwater Remediation and Petroleum: A guide for Underground Storage Tanks,* Lewis Pub., Chelsea, MI, 142 pp. |
| 2Q | Olsen, Roger L. and Davis, Andy. 1990. *Predicting the Fate and Transport of Organic Compounds in Groundwater, Part* 1: HMC, p. 39-64. May/June 1990. |
| 2R | Rifai, H., R. C. Borden, J. T. Wilson, and C. H. Ward. *1995. Intrinsic Bioattenuation for Subsurface Restoration,* Intrinsic Bioremediation, Battelle Press, Columbus, OH, pp. 1-30, 1995. |
| 2S | RWQCB. 1992. *(Izzo, V. J.) Dry Cleaners - A Major Source of PCE in Ground Water.* 27 March 1992. |
| 2T | SCEMD. 1986. *Consolidated Application for Authority to Remove Underground Storage Tanks.* 28 May 1986. |
| 2U | SCEMD. 1993. *Compliance Inspection Report.* 6 December 1993. |
| 2V | SRCSD. 1984. *Industrial Sewer Use Permit Application.* 4 December 1984. |
| 2W | SRCSD. 1986. *Industrial Sewer Use Permit Application.* 25 August 1986. |
| 2X | SRCSD. 1993. *Laboratory Data.* |
| 2Y | SRCSD. 1995. *Industrial Sewer Use Permit Application.* 28 April 1995. |
| 2Z | SRCSD. 2001. *Inspection Report Permit No. ILNOO5.* 18 October 2001. |
| 3A | SRCSD. 2003. *Industrial Sewer Use Permit Application.* 18 July 2003. |
| 3B | SRCSD. 2005. *Industrial Sewer Use Permit Application.* 20 April 2005. |
| 3C | SCRSD. *2010. Analytical Table for Ameripride Wastewater Discharge Samples (1988 to April 2010).* |
| 3D | Suflita, J.M.. 1989. *Microbial Ecology and Pollutant Biodegradation in Subsurface Ecosystems, Seminar Publication: Transport and Fate of Contaminants in the Subsurface.* EPA/625/4-89/019. September. |
| 3E | Testa, S.M. and D.L. Winegardner.1991. *Restoration of Petroleum-Contaminated Aquifers,* Lewis Pub., Boca Raton, FL, 269 pp. |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| 3F | United States District Court. 2000. *Third Amended Complaint, Ameripride Services, Inc. v. Valley Industrial Services, Inc.* 13 December 2000. |
| 3G | USEPA. 1988. *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA;* EPA/540/G-89/004, OSWER 9355.3-01. October 1988. |
| 3H | USEPA. 1989. *Results of the Evaluation of Groundwater Impacts of Sewer Exfiltration.* February 1989. |
| 3I | USEPA 1991. *Dense Nonaqueous Phase Liquids;* EPA/540/4-91-002 (Scott Hulling and James Weaver). |
| 3J | USEPA 1992a. *Estimating Potential for Occurrence of DNAPL at Superfund Sites;* 9355.4-07FS. |
| 3K | USEPA. 1992b. *CERCLA/Superfund Orientation Manual;* EPA/542/R-92/005. October 1992. |
| 3L | USEPA 1993. *DNAPL Site Evaluation;* EPA/600/R-93/022 (Robert Cohen and James Mercer). |
| 3M | USEPA. 1994. *National Oil and Hazardous Substances Pollution Contingency Plan.* 40 CFR Part 300. 15 September 1994. |
| 3N | USEPA. 1998. *Technical Protocol for Evaluating Natural Attenuation of Chlorinated Solvents in Ground Water. EPA/600/R-98/128.* September 1998. |
| 3O | USEPA. 2000a. *Technical Development Document for the Final Action Regarding. Pretreatment Standards for the Industrial Laundries Point Source Category.* March 2000. |
| 3P | USEPA. 2000b. *Exfiltration in Sewer Systems (Amick, Robert S. and Burgess, Edward H.).* December 2000. |
| 3Q | USEPA Region 9. 2002. *Preliminary Remediation Goals (PRGs) InterCalc Tables: Phys-Chem Data.*http://www.epa.gov/region09/waste/sfund/prg/index.htm. 1 October 2002. Accessed 14 January 2005. |
| 3R | USEPA, Solid Waste and Emergency Response. 2004. *How to Evaluate Alternative Cleanup Technologies for Underground Storage Tank Sites: A Guide for Corrective Action Plan Reviewers,* Chapter IX: Monitored Natural Attenuation. EPA 510-R-04-002, www.epa.gov/oust/pubs/tums.htm. |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---------|-------------|
| 3S | USEPA Regions 3, 6, and 9. 2010. *Regional Screening Level (RSL) Chemical-specific Parameters Supporting Table May 2010.* http://www.epa.gov/region9/superfund/prg/params_sl_table_run_MAY2010.xls. Accessed 31 August 2010. |
| 3T | Vogel, T.M., C.S. Criddle and P.L. McCarty. 1987. 'Transformations of Halogenated Aliphatic Compounds," Environ. Sci. Technol. 21 (8), 722-736. |
| 3U | Rebuttal Report of Anne Gates.[2] |
| 3V | May 4, 2005, AmeriPride Wastewater Discharge Permit Application. |
| 3W | AmeriPride Line and Apparel Services Laundering Process Flow Schematic. |
| 3X | Photographs Taken at Inspection of AmeriPride Site By Defendant. |
| 3Y | AmeriPride Phase Approach Work Plan Dated June 7, 1999. |
| 3Z | Photographs of the AmeriPride Site, Attached as Exhibit 68-75 to Deposition of Anne Gates. |
| 4A | DNAPL Site Evaluation by Robert M. Cohen and James W. Mercer (February 1983). |
| 4B | Study of Potential for Groundwater Contamination From Past Drycleaner Operations in Santa Clara County, By Timothy K.G. Mohr. |
| 4C | Geophysical Investigation at the AmeriPride Site, By J.R. Associates (March 28, 2006). |
| 4D | Behavior Assessment Model for Trace Organics in Soil: I, J. Environ. Qual. Vol. 12, No. 4, 1983. |
| 4E | Behavior Assessment Model for Trace Organics in Soil: II, J. Environ. Qual. Vol. 13, No. 4, 1984. |
| 4F | Behavior Assessment Model for Trace Organics in Soil: IV, J. Environ. Qual. Vol. 13, No. 4, 1984. |
| 4G | Behavior Assessment Model for Trace Organics in Soil; III, J. Environ. Qual. Vol. 13, No. 4, 1984. |
| 4H | Limited Validation of Jury Infinite Source and Jury Finite Source Models (Eq, 1995). |

---

[2] TEO objects to the introduction of any expert report. However, to the extent that any are admitted all should be.

| Exhibit | Description |
|---------|-------------|
| 4I | Letter to Petrolane, dated February 22, 1983. |
| 4J | Letter from Henry W. Logan to Petrolane, dated February 24, 1983 |
| 4K | Purchase Agreement, Dated March 1983 between Mission Industries and Valley Industrial Services. |
| 4L | Letter from Mission Industries to Petrolane, dated February 24, 1983. |
| 4M | Letter from Petrolane to Mission Industries, dated June 9, 1983. |
| 4N | Inter-branch correspondence of American Linens Supply Company, dated November 29, 1983 for J. Norman Hove. |
| 4O | June 8, 1983 check made payable to Petrolane, Inc. for $17 million. |
| 4P | May, 1994 Hazardous Materials Disclosure Form of AmeriPride. |
| 4Q | Delta letter to Sacramento County regarding August Soil Sample results and work plan, dated April 14, 1997. |
| 4R | Notice to Comply directed to AmeriPride from County of Sacramento, dated March 28, 2000. |
| 4S | Facility Inspection Notes of County of Sacramento Environmental Management Department, Hazardous Materials Division, dated March 28, 2000. |
| 4T | Hazardous Waste Manifests generated by AmeriPride. |
| 4U | AmeriPride Consolidated Contingency Plan, dated May 22, 2000. |
| 4V | Handwritten closing notes of J. P. Barry, Jr. for purchase of sites. |
| 4W | Notice to Comply issued by County of Sacramento, Environmental Management Department, on October 30, 2003 to AmeriPride. |
| 4X | Hazardous Materials Plan of AmeriPride, dated August 8, 2003. |
| 4Y | Notice to Comply, dated July 8, 2004 by County of Sacramento, Environmental Management Department. |
| 4Z | Letter of Frank Woods, dated July 11, 1995 to CALEPA. |
| 5A | Notice to Comply to the Huhtamaki/ Chinet Company, dated February 20, 1996 from County of Sacramento, Environmental Management Department. |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---------|-------------|
| 5B | Estimating Potential for Currents of DNAPL at Superfund Sites, United States Environmental Protection Agency, January 1992. |
| 5C | 2010 Annual Groundwater Monitoring Report, AmeriPride Services, Inc., February 11, 2011, prepared by Burns & McDonnell Engineering Company, Inc. |
| 5D | 2010 Annual Remediation Monitoring Report, AmeriPride Services, Inc., February 1, 2001, prepared by Burns & McDonnell Engineering Company, Inc. |
| 5E | Phase One Environmental Assessment, for AmeriPride Services, Inc., prepared by Delta Environmental Consultants, June 9, 1998. |
| 5F | Delta letter to Gary Tackett, results of Soil Survey and Addendum to Phased Approached Work Plan, dated January 17, 2000. |
| 5G | Site Report, prepared for AmeriPride Services, by Delta Environmental Consultants, January 24, 2002. |
| 5H | Health Risk Assessment Work Plan, prepared for AmeriPride Services by Delta, May 30, 2003. |
| 5I | June 4, 2004 letter from Delta to Susan Trim, regarding draft Remedial Action Work Plan for Operable Unit 2, June 4, 2004 |
| 5J | Remedial Investigation/Feasibility Study Report: Downgradient Groundwater (operable unit 3), prepared for California Regional Quality Control Board by Delta Environmental, January 19, 2006. |
| 5K | Letter from Delta to Gary Tackett, regarding Groundwater Monitoring Well Installation Results Report, September 12, 2007. |
| 5L | Letter from Delta to Jim Burlingame, Quarterly Groundwater Monitoring Report Second Quarter 1998, August 31, 1998. |
| 5M | Letter from Delta to Jim Burlingame, Additional Hydrogeologic Assessment Results and Third Quarter 1998 Groundwater Monitoring Results Report, February 10, 1999. |
| 5N | Letter from Delta to Jim Burlingame, Quality Groundwater Monitoring Report, First Quarter, 1999, May 24, 1999. |
| 5O | Letter from Delta to Jim Burlingame, Quarterly Groundwater Monitoring Report, Second Quarter, 1999, September 21, 1999. |
| 5P | Letter from Delta to Rogean E. Rada, Quarterly Groundwater Monitoring Report, Third Quarter, 1999, November, 1999. |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---------|-------------|
| 5Q | Letter from Delta Rogean E. Rada, Quarterly Groundwater Monitoring Report, First Quarter, 2000, July 10, 2000. |
| 5R | Letter from Delta Rogean E. Rada, Quarterly Groundwater Monitoring Report, Second Quarter, 2000, October 17, 2000. |
| 5S | Letter from Delta Rogean E. Rada, Quarterly Groundwater Monitoring Report – Second Quarter 2002, August 16, 2002. |
| 5T | December, 1993 – Sacramento Sanitation District of Special Report. |
| 5U | Mediation Monitoring Reporting Program: Groundwater Extraction and Treatment System Operable Unit 2, dated December 13, 2005. |
| 5V | Remedial Investigation/Feasibility Study Report: Down Grading and Groundwater, Operable Unit 3, dated January 19, 2006. |
| 5W | Letter dated September 12, 1997 from Delta to Gary Tackett re Groundwater Monitoring Well Installation Results Report. |
| 5X | Letter from Delta to Jim Burlingame dated April 23, 1998 re Quarterly Groundwater Monitoring Report, First Quarter 1998. |
| 5Y | Letter from Delta to Jim Burlingame dated August 31, 1998 re Quarterly Groundwater Monitoring Report, Second Quarter 1998. |
| 5Z | Letter from Delta to Jim Burlingame dated February 10, 1999 re Additional Hydro-geologic Assessment Results and Third Quarter 1998 Groundwater Monitoring Results Report. |
| 6A | Letter from Delta to Jim Burlingame dated May 24, 1998 re Quarterly Groundwater Monitoring Report, First Quarter 1999. |
| 6B | Letter from Delta to Jim Burlingame dated September 21, 1999 re Quarterly Groundwater Monitoring Report, Second Quarter 1999. |
| 6C | Letter from Delta to Rojean E. Roda dated November 19, 1999 re Quarterly Groundwater Monitoring Report, Third Quarter 1999. |
| 6D | Letter from Delta to Rojean E. Roda dated July 10, 2000 re Quarterly Groundwater Monitoring Report, First Quarter 2000. |
| 6E | Letter from Delta to Rojean E. Roda dated October 17, 2000 re Quarterly Groundwater Monitoring Report, Second Quarter 2000. |
| 6F | Letter from Delta to Rojean R. Roda dated August 16, 2002 re Quarterly Groundwater Monitoring Report, Second Quarter 2002. |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---------|-------------|
| 6G | Letter from delta to Gary Tackett dated January 17, 2000 re Results of Gore/Sorber Survey and Addendum Faced Approached Work Plan. |
| 6H | Site Investigation Report by Ameripride Services dated January 24, 2002. |
| 6I | Baseline Health Risk Assessment Work Plan by Delta dated May 30, 2003. |
| 6J | Remedial Action Work Plan for Operable Unit 2 dated June 4, 2004. |
| 6K | Soil Monitoring and Reporting Program: Soil Vapor Extraction, Second Quarter 2005 dated July 22, 2005. |
| 6L | Solar Mediation Monitoring and Reporting Program Coil: Soil Vapor Extractions System Third Quarter 2005 dated October 31, 2005. |
| 6M | Industrious Sewer Use Permit Application to SRCSD, dated December 4, 1984. |
| 6N | Mailing Envelope and Environmental News dated December 15, 1990. |
| 6O | Letter from Delta to Rojean E. Rada dated November 22, 2002 re Quarterly Groundwater Monitoring Report, Third Quarter 2002. |
| 6P | Letter from Delta to Rojean E. Rada dated April 14, 2003 re Quarterly Groundwater Monitoring Report, Fourth Quarter, 2002. |
| 6Q | Letter from Delta to Susan Timm dated October 27, 2004 re Supplemental Baseline Health Risk Assessment Report. |
| 6R | Letter from Delta to Susan Timm dated August 18, 2003 re Summary of Monitoring Well Installation, Second Quarter 2003 Groundwater Monitoring. |
| 6S | Quarterly Groundwater Monitoring Report: First Quarter 2005, dated April 29, 2005. |
| 6T | Solar Mediation Monitoring and Reporting Program: Soil Vapor Extraction System First Quarter 2004, dated April 29, 2004 |
| 6U | Letter from Delta from Susan Timm dated February 18, 2004 re Summary of Fourth Quarter 2003 Groundwater Monitoring. |
| 6V | Quarterly Groundwater Monitoring and Monitoring and Well Installation Report: First Quarter 2004 dated April 29, 2004. |
| 6W | Quarterly Groundwater Monitoring and Monitoring and Well Installation Report: First Quarter 2004 dated April 29, 2004. |

| Exhibit | Description |
|---------|-------------|
| 6X | Delta Letter to Rojean E. Rada dated August 16, 2002 re Quarterly Groundwater Monitoring Report, Second Quarter 2002. |
| 6Y | Delta Letter to Susan Timm dated February 18, 2004 re Summary of Fourth Quarter 2003 Groundwater Monitoring. |
| 6Z | Quarterly Groundwater Monitoring and Monitoring Well Installation Report: First Quarter 2004, dated April 29, 2004. |
| 7A | Soil Mediation Monitoring and Reporting Program: Soil Vapor Extraction System Fourth Quarter 2005, dated January 31, 2006. |
| 7B | Compliance Source Test Reports: Soil Vapor Extraction System Fourth Quarter 2005, dated January 31, 2006. |
| 7C | Soil Mediation Monitoring and Reporting Program: Soil Vapor Extraction System Fourth Quarter 2005, dated January 21, 2006. |
| 7D | Compliance Source Test Report: Soil Vapor Extraction System Fourth Quarter 2005, dated January 31, 2006. |
| 7E | Delta Report Concerning Work Done at Site, Water Supply Well Replacement Work Plan Huhtamaki Facility Sacramento, California, dated January 15, 2006. |
| 7F | Draft Remedial Investigation/Feasibility Study Report: Downgrading Groundwater (Operable Unit 3), dated January 19, 2006. |
| 7G | 2010 Annual Remediation Monitoring Report (Burns & McDonnell, 1 February 2011) |
| 7H | 2007 Annual Remediation Monitoring Report: Operable Units 1 and 2 (Delta, 31 January 2008) |
| 7I | Remediation Monitoring Report: Operable Units 1 and 2, Fourth Quarter 2006 (Delta, 31 January 2007) |
| 7J | July 17, 1986 Letter from James Burlingame to the California State Water Resources Control Board |
| 7K | June 7, 1999 Letter from Delta to Barry Marcus regarding phased approach work plan |
| 7L | August 9, 1999 Letter from Delta to Barry Marcus regarding location map - Gore Sober Modules |
| 7M | September 4, 1998 Daily Field Report |

| Exhibit | Description |
|---|---|
| 7N | May 28, 1986 Application to remove underground storage tanks |
| 7O | February 8, 1984 Letter from Bernard Berry to Cass Landon of Mission Industries |
| 7P | AmeriPride's adjustment sheet of amounts due from mission acquisition |
| 7Q | AmeriPride's adjustment sheet of amounts due to mission or Petrolane |
| 7R | AmeriPride's adjustment sheet of further amounts due from Petrolane |
| 7S | AmeriPride's adjustment sheet of amounts owed to mission or Petrolane |
| 7T | September 13, 1995 Sacramento Regional County Sanitation District Inspection Report |
| 7U | July 9, 1997 Sacramento Regional County Sanitation District Inspection Report |
| 7V | Application for discharge consideration |
| 7W | November 13, 1996 Letter from Sacramento County to Wayne Burke regarding district file review |
| 7X | June 21, 1996 Sacramento Regional County Sanitation District Inspection Report |
| 7Y | November 14, 1991 Inter branch correspondence from Jim Burlingame regarding permit by rule testing |
| 7Z | May 23, 1988 Memo regarding the 10 commandments of Due Diligence |
| 8A | Valley Industrial Services Policy Manual |
| 8B | August 15, 1983 Inter-office communication from Mark Olson regarding sale issues |
| 8C | April 10, 1994 Letter from Petrolane to Bernard Berry regarding accounts receivable |
| 8D | Petrolane Collection Letters |
| 8E | April 18, 1989 Memo from Bernard Berry regarding environmental audits |
| 8F | January 1, 1995 Memo from Wayne Burke regarding company policy on hazardous waste |
| 8G | County of Sacramento Environmental Management District Notice to Comply |

| Exhibit | Description |
|---|---|
| 8H | Sacramento Regional County Sanitation District Process Description |
| 8I | February 19, 2001 Letter from Delta to Barry Marcus regarding the phased approach work plan - addendum IV |
| 8J | Baseline Health Risk Assessment Work Plan |
| 8K | May 31, 2002 Letter from Delta to Susan Timm regarding the draft remedial investigation/ feasibility study report |
| 8L | Compliance source test plan: soil vapor extraction system |
| 8M | December 15, 2000 Letter from AmeriPride to Joe Griffith regarding clarification for disposal of drill cutting and trenching |
| 8N | April 25, 2000 Letter from the California Regional Water Quality Control Board regarding proposed cleanup and abatement order |
| 8O | May 6, 2002 Letter from the California Regional Water Quality Control Board regarding proposed cleanup and abatement order |
| 8P | September 13, 2002 Letter from Delta to Susan Timm regarding hydraulic Investigation and Schedule for SVE System Installation |
| 8Q | October 17, 2000 Letter from Delta to Rojean Rada regarding quarterly ground water monitory report |
| 8R | November 17, 2003 Letter from Delta to Susan Timm regarding ground water remedial action plan pilot testing work plan |
| 8S | October 31, 2003 Letter from the California Regional Water Quality Control Board regarding the revised work plan for data gap investigation |
| 8T | October 13, 2003 Letter from Delta to Susan Timm regarding revised work plan for data gap investigation |
| 8U | October 2, 2003 Letter from the California Regional Water Quality Control Board regarding revised work plan for data gap investigation |
| 8V | February 28, 2003 Letter from the California Regional Water Quality Control Board regarding response to technical comments on draft cleanup and abatement order |
| 8W | April 25, 2003 Letter from the California Regional Water Quality Control Board regarding comments on draft remedial action work plan |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| 8X | September 30, 2004 Letter from Delta to the Sacramento Metropolitan Air Quality Management District regarding compliance source test plan |
| 8Y | Quarterly Ground Water Monitoring Second quarter 2004 |
| 8Z | February 18, 2004 Letter from Delta to Susan Timm regarding the summary of fourth quarter 2003 ground water monitoring |
| 9A | July 18, 2003 Letter from Delta to Susan Timm regarding the revised work plan for data gap investigation |
| 9B | November 19, 1999 Letter from Delta to Rojean Rada regarding quarterly ground water monitoring report |
| 9C | January 10, 2000 Letter from Delta to Barry Marcus regarding clarification to SCEMD work plan approval letter |
| 9D | February 8, 2002 Letter from Delta to Barry Marcus regarding work plan for additional monitoring wells |
| 9E | June 30, 2002 Letter from the California Regional Water Quality Control Board regarding work plan for data gaps investigation |
| 9F | January 24, 2003 Letter from the California Regional Water Quality Control Board regarding draft monitoring and reporting program |
| 9G | February 10, 2003 Letter from Delta to Susan Timm regarding comments on draft monitoring and reporting program |
| 9H | August 3, 2001 Letter from Delta to Rojean Rada regarding quarterly ground water monitoring report |
| 9I | Soil Remediation Monitoring and Reporting Program: Soil Vapor Extraction System, Second Quarter 2004 |
| 9J | Compliance source test plan: soil vapor extraction system, second quarter 2004 |
| 9K | Quarterly Ground Water Monitoring and monitoring well installation report: first quarter 2004 |
| 9L | Soil Remediation Monitoring and Reporting Program: Soil Vapor Extraction System, First Quarter 2004 |
| 9M | Compliance Source Test Report: Soil Vapor Extraction System, First Quarter 2004 |
| 9N | Site Investigation Reports |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| 9O | April 14, 2003 Letter from Delta to Rojean Rada regarding quarterly ground water monitoring report |
| 9P | November 22, 2002 Letter from Delta to Rojean Rada regarding quarterly ground water monitoring report |
| 9Q | Compliance Source Test Report: Soil Vapor Extraction System dated 2/5/04 |
| 9R | Hazardous Substance Storage Statement |
| 9S | Application for permit to operate underground storage tank P19-180-8 |
| 9T | June 30, 1993 Memo from Wayne Burke regarding perchloroethylene Dry Cleaning |
| 9U | April 4, 1997 Memo from Wayne Burke regarding George Butcher |
| 9V | Settlement Agreement between Amerigas Defendants and AmeriPride Services, Inc. |
| 9W | March 18, 2005 Letter from the California Regional Water Quality Control Board regarding remedial investigation/ feasibility study report |
| 9X | April 15, 2005 Letter from Delta to Susan Timm regarding the response to regional board RI/FS comments and proposed schedule |
| 9Y | Gore Sorber Screening Survey |
| 9Z | Industrial Sewer Use Permit Applications |
| 10A | April 14, 2000 Letter from Delta to Barry Marcus regarding the revised gore-sorber screening survey maps |
| 10B | August 12, 2005 Letter from the California Regional Water Quality Control Board regarding response to AmeriPride's letters regarding remediation investigation/feasibility study |
| 10C | Soil Remediation Monitoring and reporting program: soil vapor extraction system, third quarter 2005 |
| 10D | December 7, 2001 Letter from the County of Sacramento regarding PCE in groundwater |
| 10E | February 24, 2005 Correspondence from Jim Burlingame to Joe Peter regarding the sanitary sewer |

-16-

| Exhibit | Description |
|---|---|
| 10F | Officers of Petrolane and Valley Industrial Services |
| 10G | Directors of Petrolane and Valley Industrial Services |
| 10H | Field Notes prepared by Craig Johnson |
| 10I | Remedial Investigation/ Feasibility Study Report: Downgradient Ground Water (OU3) |
| 10J | Wastewater discharge permit |
| 10K | March 22, 2004 Notice of violation |
| 10L | March 22, 2004 Administrative complaint |
| 10M | Inspection Report Permit ILN005 |
| 10N | Emergency Response Plan |
| 10O | October 30, 2003 Summary of Violations for Hazardous Materials |
| 10P | March 19, 2008 Summary of Violations |
| 10Q | July 7, 1987 Memo regarding perchloroethylene test |
| 10R | Staff Report |
| 10S | February 22, 1993 Letter from Cass Landon to Petrolane |
| 10T | Sacramento List of A/R Agency |
| 10U | October 30, 2002 Letter to the State Water Resource Control Board regarding Cleanup and Abatement Order, Additional Parties |
| 10V | Remedial Investigation/ Feasibility Study |
| 10W | Employee Contracts |
| 10X | September 12, 1994 Letter from Delta to Gary Tackett regarding the groundwater monitoring well installation results report |
| 10Y | Chemical Waste Profile |
| 10Z | Procedure for receiving a plant inspection |
| 11A | TRSA Environmental News |

-17-

| Exhibit | Description |
|---|---|
| 11B | HISA White Paper on Perchloroethylene |
| 11C | Oil Remediation Monitoring and Reporting Program Soil Vapor Extraction System Second Quarter 2005 |
| 11D | Remediation Monitoring Report: Operable Units 1 and 2 First Quarter 2007 |
| 11E | Preliminary Petition for Writ of Administrative Mandamus |
| 11F | October 30, 2002 Letter to the State Water Resource Control Board regarding Cleanup and Abatement Order, Enforcement Issues |
| 11G | Inspection Report Permit 55 |
| 11H | Hazard Communication Training Certification |
| 11I | May 24, 1988 Letter from Winston tires to Valley Industrial Services |
| 11J | Emergency Response Plan |
| 11K | June 19, 1987 Memo from the Institute of Industrial Launderers |
| 11L | Sacramento Regional County Sanitation District Process Description |
| 11M | February 10, 1993 Sludge Sample |
| 11N | December 18, 1992 Memo from Wayne Burke regarding accepting hazardous waste |
| 11O | April 25, 2003, Public Hearing Transcript |
| 11P | Proposed Initial Geoprobe Soil Sampling Point Summaries |
| 11Q | July 8, 1997 Letter from Delta to Barry Marcus regarding soil sampling results |
| 11R | February 10, 1999 Letter from Delta to Jim Burlingame regarding the additional hydrogeologic assessment results and third quarter 1998 ground water monitoring results |
| 11S | December 3, 1999 Letter from the County of Sacramento to Rojean Rada regarding local remediation program |
| 11T | November 29, 1999 Letter from Delta to Barry Marcus regarding the Results of the Gore-Sorber Survey |
| 11U | July 31, 1997 Memo from Delta Erik regarding concrete floor |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| 11V | Memo to Mr. B from Wayne Burke regarding ground water samples |
| 11W | Chart with breakdown of PCE and its daughter products |
| 11X | Phase I Environmental Assessment |
| 11Y | Site Investigation Report |
| 11Z | October 16, 1997 Sacramento Regional Sanitation District Inspection Report |
| 12A | Sludge Sample tested by Ensec on 1/19/88 |
| 12B | Instruction Manual for processing shop towels |
| 12C | Petrolane Incorporation Employee Retirement Benefit Plans |
| 12D | VIS Procedures Reports |
| 12E | June 8, 1993 check from Mission Industries for purchase of Valley Industrial Services |
| 12F | November 4, 1981 Interoffice Communication to Ivan Nichols with Valley Industrial Services |
| 12G | March 8, 1999 Letter from County of Sacramento to Jim Burlingame regarding the local remediation program |
| 12H | June 5, 1986 Letter from Hageman-Schank, Inc. regarding the underground storage tanks |
| 12I | July 8, 1997 Letter from Delta to Barry Marcus regarding soil sampling results |
| 12J | AmeriPride's Material Safety Data Sheets |
| 12K | October 31, 1983 inter branch correspondence from Norman Hove regarding accounts receivable agency |
| 12L | November 29, 1983 inter branch correspondence from Norman Hove regarding accounts receivable aging |
| 12M | Ameripride Hazardous Waste Inventory Documents |
| 12N | November 2, 1993 Memo from Delta Oilfield Services, Inc. regarding transport of Valley Industrial |
| 12O | February 13, 1997 Sacramento Regional County Sanitation District Inspection Report |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| 12P | AmeriPride's Uniform Service Process Flow Diagram |
| 12Q | AmeriPride's Amended Cross-Claim against Defendant Petrolane |
| 12R | Complaint for Permanent Injunction and civil penalties against Chromalloy |
| 12S | Notice of entry of final judgment against Chromalloy |
| 12T | July 13, 2000 Letter from Delta to Barry Marcus regarding the phased approach work plan - addendum III |
| 12U | AmeriPride's First Amended Complaint |
| 12V | November 14, 1991 Inter Branch Correspondence from James Burlingame regarding Permit by Rule Testing |
| 12W | December 22, 1992 Memo from James Burlingame regarding washing of solvent laden shop towels |
| 12X | December 7, 1992 Letter from Pellerin Milnor Corporation |
| 12Y | Dry-clean coalition "Reported Leaks, Spills and Discharges at Florida Dry-cleaning Sites" |
| 12Z | Memo regarding Amounts due to Petrolane from Mission |
| 13A | Memo regarding amounts to Mission from Petrolane |
| 13B | Memo regarding amounts assigned to Mission for collection |
| 13C | Drawings of AmeriPride's Plant |
| 13D | November 1, 2000 Field Notes |
| 13E | May 7, 2001 Letter from Panda Industrial to AmeriPride Services, Inc. |
| 13F | June 12, 2000 Letter from Delta to Barry Marcus regarding the phased approach work plan - addendum II |
| 13G | Soil Remediation Monitoring and Reporting Program Soil Vapor Extraction System, First Quarter 2004 |
| 13H | Soil Remediation and Reporting Program Soil vapor Extraction System First Quarter 2005 |
| 13I | Soil Remediation Monitoring and Reporting Program Soil Vapor Extraction System, Second Quarter 2005 |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| 13J | Soil Remediation Monitoring and Reporting Program Soil Vapor Extraction System Third Quarter 2005 |
| 13K | Dry Cleaners - A Major Source of PCE in Ground Water |
| 13L | Soil Remediation Monitoring and Reporting Program Soil Vapor Extraction System Fourth Quarter 2005 |
| 13M | Remedial Investigation/Feasibility Report Downgradient Water (OU3) |
| 13N | Table 1 to Expert Rebuttal Report of Anne Gates |
| 13O | Table 2 to Expert Rebuttal Report of Anne Gates |
| 13P | Table 3 to Expert Rebuttal Report of Anne Gates |
| 13Q | Table 4 to Expert Rebuttal Report of Anne Gates |
| 13R | Appendix A to Expert Rebuttal Report of Anne Gates |
| 13S | Jim Warner's Expert Report |
| 13T | Jim Warner's Rebuttal Report |
| 13U | Rebuttal Report of Harvey Kreitenberg |
| 13V | Rebuttal Report of Michael Kavanaugh |
| 13W | Environmental Audits |
| 13X | Memo from Bernard Berry to All Plant Managers, with attachments |
| 13Y | Figure 1 to Report of Jim Warner |
| 13Z | Figure 2 to Report of Jim Warner |
| 14A | Figure 3 to Report of Jim Warner |
| 14B | Figure 4 to Report of Jim Warner |
| 14C | Figure 5 to Report of Jim Warner |
| 14D | Figure 6 to Report of Jim Warner |
| 14E | Figure 7 to Report of Jim Warner |
| 14F | Figure 8 to Report of Jim Warner |
| 14G | Figure 9 to Report of Jim Warner |
| 14H | Figure 10 to Report of Jim Warner |
| 14I | Figure 11 to Report of Jim Warner |
| 14J | Figure 12 to Report of Jim Warner |
| 14K | Figure 13 to Report of Jim Warner |
| 14L | Figure 14 to Report of Jim Warner |
| 14M | Figure 15 to Report of Jim Warner |
| 14N | Figure 16 to Report of Jim Warner |
| 14O | Figure 17 to Report of Jim Warner |
| 14P | Figure 18 to Report of Jim Warner |
| 14Q | Figure 19 to Report of Jim Warner |
| 14R | Figure 20 to Report of Jim Warner |
| 14S | Figure 21 to Report of Jim Warner |
| 14T | Figure 22 to Report of Jim Warner |
| 14U | Figure 23 to Report of Jim Warner |
| 14V | Figure 24 to Report of Jim Warner |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

| Exhibit | Description |
|---|---|
| 14W | Figure 25 to Report of Jim Warner |
| 14X | Figure 26 to Report of Jim Warner |
| 14Y | Figure 27 to Report of Jim Warner |
| 14Z | Table 2 to Report of Jim Warner |
| 15A | Table 3 to Report of Jim Warner |
| 15B | Table 4 to Report of Jim Warner |
| 15C | Table 5 to Report of Jim Warner |
| 15D | Table 6 to Report of Jim Warner |
| 15E | Table 7 to Report of Jim Warner |
| 15F | Table 11 to Report of Jim Warner |
| 15G | Table 13 to Report of Jim Warner |
| 15H | Table 15 to Report of Jim Warner |
| 15I | Table 16 to Report of Jim Warner |
| 15J | Figure 4 to Rebuttal Report of Jim Warner |
| 15K | Figure 5 to Rebuttal Report of Jim Warner |
| 15L | Land Disposal Restriction Forms |
| 15M | Site Investigation Photographs |
| 15N | AmeriPride Hazardous Chemical Inventory |
| 15O | AmeriPride Hazmat Chemical Inventory Form |
| 15P | Transportation of Materials from Ameripride by Safety Kleen |
| 15Q | Well Boring Logs |

Texas Eastern Overseas, Inc.'s Pretrial Conference Statement – Addendum 2
749161.1

# Appendix 3

*AmeriPride Services Inc. v. Valley Industrial Services, Inc.*, Case No. 00-113 LKK/JFM

List of portions of depositions, answers to interrogatories, and responses to requests for admission that AmeriPride Services Inc. expects to offer at trial.

## Appendix 3

*AmeriPride Services Inc. v. Valley Industrial Services, Inc.*, Case No. 00-113 LKK/JFM

List of portions of depositions, answers to interrogatories, and responses to requests for admission that AmeriPride Services Inc. expects to offer at trial[1]:

| Evidence expected to be offered at trial | Portion |
|---|---|
| April 25, 2011 Corporate Deposition of TEO pursuant to Federal Rule of Civil Procedure 30(b)(6) | 7:16-23; 8:20-10-4; 12:5-13:3; 13:18-13:25; 14:15-15:18; 58:4-69:10; 71:10-25 |
| March 1, 2006 Deposition of Jeffrey J. Thuma, P.G. | 8:11-11:14; 76:8-77:19 |
| October 11, 2005 Deposition of Rogerio Delossantos | 4:11-5:15; 9:20-10:18; 11:18-12-18; 28:7-29:11; 29:16-30:25; 50:3-8; 51:5-13; 54:14-56:25; 80:12-20 |
| April 29, 2011 Deposition of Michael Kavanaugh, Ph.D., P.E. | 32:19-33:2; 34:1-12 |
| April 27, 2011 Deposition of Jim Warner, P.G. | 20:4-10; 31:11-32:3; 45:19-46:11; 54:17-55:2; 55:17-56:12; 93:18-94:1; 94:10-95:1; 100:17-101:3; 102:24-103:15;104:7-18; 110:4-15; 112:18-113:3; 116:12-117:24; 118:15-19; 129:7-22; 135:15-24; 147:7-16; 150:4-8; 152:8-15; 176:6-25; 177:1-4; 177:9-22; 179:16-180:7; 194:6-194:2; 194:12-20; 196:20-197:16; 198:22-199:5 |
| April 28, 2011 Deposition of Ann Wooster Gates, P.E. | 69:11-15; 131:6-132:4; 173:22-174:4; 174:9-24 |
| April 28, 2011 Deposition of Harvey Kreitenberg | 6:8-7:18; 8:7-22; 13:17-14:12; 37:8-42:7 |
| October 25, 2005 Deposition of Robert J. Smith | 5:1-13; 8:3-9:6; 24:21-26:13; 61:1-12; 61:25-62:20 |
| May 3, 2006 Deposition of Robert J. Smith | 4:1-12; 11:14-12:1; 14:11-19 |
| August 8, 2005 Deposition of Jesse F. Taylor | 4:1-11; 8:4-8; 67:1-68:18; 69:4-10; 75:15-22 |
| August 9, 2005 Deposition of Timothy Flowers | 4:1-11; 7:4-8:15; 63:6-64:22; 65:13-66:7 |
| May 3, 2006 Deposition of John D. Dankoff, Jr. | 4:1-12; 4:20-23; 5:17-20; 7:9-8:7; 9:9-15; 9:16-11:5; 34:1-14 |
| October 24, 2005 Deposition of Robert Steven Smelosky | 5:1-13; 6:14-23; 8:12-25; 9:10-22; 10:5-23; 21:6-13; 21:22-22:4; 23:16-24:5; 25:18-27:15 |
| TEO's Amended Responses to Requests for Admissions (Set One), February 14, 2011 | Nos. 91 and 92 |

---

[1] The parties have stipulated in Section (14)b. of the parties' Joint Pretrial Statement filed on September 19, 2011 to a deposition designation process which may result in additions to this list.

2

## **Addendum 3**

*AmeriPride Service, Inc. v. Valley Industrial Services, Inc., Case No. 00-113 LKK/JFM*

List of Discovery TEO expects to offer at trial

## Addendum 3

*AmeriPride Service, Inc. v. Valley Industrial Services, Inc., Case No. 00-113 LKK/JFM*

List of Discovery TEO expects to offer at trial[1]

| Evidence expected to be offered at trial | Portion |
|---|---|
| Plaintiff AmeriPride Services Inc.'s Responses to TEO's First Set of Interrogatories | Interrogatory Response to Request for Admission No. 12, 19, 22, 29, 30, 40 Interrogatory Reponses No. 3, 6, 11, 15 |
| Plaintiff Ameripride Services Inc.'s Responses to TEO's Requests for Admissions, Set One | Response to Request for Admission No. 1, 2, 3, 4, 7, 8, 9, 12, 21, 24, 28, 29, 30, 33, 40 |
| Defendant Ameripride Services Inc.'s Responses to Huhtamaki's First Set of Interrogatories | Interrogatory Response No. 8, 15 |
| Plaintiff/Defendant/Counter-Claimant Ameripride Services Inc.'s Responses to Huhtamaki's Second Request for Admissions | Response to Request for Admission No. 5, 6, 27, 30, 33, 37, 51 |
| Plaintiff Ameripride Services Inc.'s Responses to Chromalloy's Interrogatories, Set One | Interrogatory Response No. 7, 18 |
| Plaintiff Ameripride Services Inc.'s Supplemental Responses to Chromalloy's Interrogatories, Set One | Interrogatory Response No. 10, 15 |
| Defendant and Cross-Claimant Ameripride Services Inc.'s Responses to California-American Water Company's Request for Admissions, Set One. | Response to Request for Admission No. 1 |
| Plaintiff Ameripride Services Inc.'s Responses to Petrolane's Interrogatories, Set One | Interrogatory Response No. 32, 34 |

---

[1] TEO will be designating deposition transcript excerpts in accordance with the stipulation reached by the parties.