UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

```
AMERIPRIDE SERVICES, INC.,
A Delaware corporation,
                                        NO. CIV. S-00-113 LKK/JFM
          Plaintiff,

     v.

VALLEY INDUSTRIAL SERVICE, INC.,
a former California corporation,        O R D E R
et al.,

          Defendants.
                                    /
AND CONSOLIDATED ACTION AND
CROSS- AND COUNTER-CLAIMS.
                                    /
```

Pending before the court is resolution of the trial of this case. As the court has stated at various times during the course of trial, both the facts and the law are difficult.

Nonetheless, to begin with the obvious, the court adopts the undisputed facts contained in the pretrial order. See Final Pretrial Conf. Order, ECF No. 854. Unfortunately, those are about the only obvious matters which can be resolved after trial.

1

The court is faced with a trial which the parties have tendered as one requiring resolution of contested expert opinion testimony.  The experts who have testified are well qualified and appear to be reasonable people, who have come to contradictory results.  The court wishes to be clear as to its opinion that this is not a case involving hired guns who will say anything someone pays them to say.

The testimony of the experts are not opinions in fields of exact science, but rather applied science.  That fact helps account for at least some of the divergent opinions that have been received by the court.  The reason for those divergent opinions, however, lies not only in the nature of the field but also in human nature.

Central to some of the experts' testimony is the application of various formulas, which in turn are dependent upon assumptions which provide the integers to be resolved by the equations employed.  In that regard, the "reasonable" assumptions employed by the expert, may, however innocently, be influenced by the trial needs of the expert's sponsor.[1]

Moreover, and perhaps more to the point, the applied science being contested was developed for purposes quite distinct from the questions asked in trial.  In the real world, the applied science at issue seeks to determine where cleanups are necessary and how to proceed with the cleanup.  In that regard, a defense expert, in essence, agreed with the court when asked whether the use of

---

[1] All of the assumptions employed were supported by other expert writing, EPA guidance documents or the like.

2

inexact, but experience-based, assumptions was sufficient for the purpose of cleanup.  Such applications, however, may not be sufficient to carry the burden of proof at trial, since quite different questions are being asked.  That is true even though that burden is no more than the preponderance of the evidence.

Nonetheless, the court is able to make a sufficient number of ultimate factual determinations.

The court concludes as follows:

1) PCE is listed as a hazardous substance under the act. 42 U.S.C. § 9601(14), 40 C.F.R. § 302.4.

2) The plaintiff's claims relative to the spill of DNAPL PCE are supported by the evidence.[2]

3) The defendant's assertion that, by virtue of leaks in the waste water system used by plaintiff, the plaintiff spilled waste water into the vadose zone, is supported by the evidence.

4) During defendants' operation on the property the waste water system also leaked.  Moreover, defendant engaged in both dry cleaning and the laundering of contaminated shop towels and other such items which contained PCE.  Both of these activities contributed to PCE being deposited in the soil.

5) At various times after plaintiff acquired the property, plaintiff added washing machines which increased the volume of waste water being leaked.

6) Although plaintiff did not engage in dry cleaning, for

---

[2] DNAPL PCE is dense nonaqueous phase liquid PCE. The parties agree it is pure PCE.

3

some period of time it also laundered PCE-laden shop towels and like items. After the danger of PCE became apparent, plaintiff refused to launder items which were thought to contain PCE, and, accordingly, thereafter the amount of PCE in the waste water was reduced.

    7) The waste water flow of both plaintiff and defendant touching the DNAPL carried the PCE to the ground water.

    8) Vapor emanating from the deposited DNAPL PCE also contributed to the PCE in the ground water.

    9) The contaminated ground water eventually reached property down stream, which caused the relevant governmental agencies to order plaintiff to undertake the cleanup of the site.

    10) The evidence does not permit a rational allocation of fault between plaintiff and defendant.[3]

The suit tests liability under CERLA. I now briefly sketch the court's understanding of the pertinent provisions of that statute.[4] Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution." Burlington Northern & Santa Fe Railway Company v. United States, 556 U.S. 599, --, 129 S.Ct. 1870, 1874 (2009). "The Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were

---

[3] This conclusion will be somewhat elaborated later in this opinion.

[4] The court here draws on its previous explanation of the statute during resolution of a motion for summary judgement entered May 12, 2011. See Order, ECF No. 735.

4

borne by those responsible for the contamination." Id. (internal citations omitted).

Under CERCLA section 107(a), 42 U.S.C. § 9607(a), the federal government, state governments, and private parties may all initiate cleanup of toxic areas, and each such entity may sue potentially responsible parties for reimbursement of response costs. See Carson Harbor v. County of Los Angeles, 433 F.3d 1260, 1265 (9th Cir. 2006) (Carson Harbor II) (quoting Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989)). The Ninth Circuit has identified four elements necessary to a private plaintiff's *prima facie* case under section 107(a):

> (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, Section 101(9), 42 U.S.C. § 9601(9);
>
> (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4);
>
> (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and
>
> (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a).

City of Colton v. American Promotional Events, Inc.-West, 614 F.3d 998, 1002-03 (9th Cir. 2010) (quoting Carson Harbor Village, Ltd. v. Unocal Corp., 270 F.3d 863, 870-71 (9th Cir. 2001) (en banc) (Carson Harbor I)). A "release" for purposes of this section includes "any spilling, leaking, pumping, pouring, emitting,

5

emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). The "four classes of persons subject to liability," also known as "potentially responsible parties," include, as is relevant to this case, "(1) the owner and operator of . . . a facility," and "(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(1)-(2). Under CERCLA section 113(g)(2), a party who prevails on a section 107 claim may also seek a declaratory judgment that it is entitled to reimbursement for future response costs as well. See City of Colton, 614 F.3d at 1008.

Absent from the four elements of a prima facie case is any requirement that the plaintiff be innocent with regard to the contamination at issue. United States v. Atlantic Research Corp., 551 U.S. 128, 139 (2007). Thus, where one potentially responsible party remediates the damage and incurs response costs, that party may seek to recover those costs from another. Id.

With regard to allocating responsibility among potentially responsible parties, CERCLA provides overlapping and somewhat convoluted mechanisms. Section 107 imposes strict liability on potentially responsible parties. Burlington Northern, 129 S.Ct. at 1879, 1881. Liability under section 107 is generally joint and several. Adobe Lumber, Inc. v. Hellman, 658 F. Supp. 2d 1188, 1192 (E.D. Cal. 2009). A defendant seeking to avoid liability for the entire response cost has two options under CERCLA. Under section

6

107, a defendant may avoid joint and several liability by proving that "a reasonable basis for apportionment exists." Burlington Northern, 129 S.Ct. at 1881 (citing United States v. Chem-Dyne Corp., 572 F. Supp. 802, 810 (S.D. Ohio 1983)). Apportionment on this basis looks solely to whether the defendant can "establish[] a fixed amount of damage for which [it] is liable," and not to any equitable concerns. Id. at 1882 n.9 (quotation omitted). Alternatively, CERCLA section 113(f)(1) authorizes claims for contribution "from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f)(1). Section 113(f) *does* allow for consideration of equitable factors. Id. ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."), Burlington Northern, 129 S.Ct. at 1882 n.9.

It is clear that plaintiff has established defendant's liability under § 107. Simply put, the site is a facility within the meaning of the statute, there were releases from that facility, the releases caused plaintiff to incur response costs consistent with the national contingency plan, and the defendant is responsible for the release of DNAPL PCE and for its discharge of waste water, which, together with the plaintiff's waste water, mobilized the DNAPL and resulted in contamination of the ground water. Moreover, as noted above, vapor transport also affected the

7

1  ground water.  Given that the court concluded above that defendant
2  cannot "establish[] a fixed amount of damage for which [it is]
3  liable," Burlington Northern, 129 S.Ct at 1882 n.9, defendant is
4  relegated to seeking equitable apportionment under § 113(f)(1).
5  Before addressing the issue of equitable apportionment, the court
6  must first address the question of damages.  The parties entered
7  into a written stipulation as follows:
8      1. AmerPride has directly incurred $7,570,921 in
9         investigation and remediation costs though August
10        2010.
11     2. AmeriPride has directly incurred $474,730 in
12        regulatory oversight costs through September 2010.
13     3. AmerPride paid $8,250,000 to Huhtamaki to
14        settle all claims Huhtamaki had against AmeriPride.
15     4. AmeriPride paid $2,000,000 to Cal-Am Water
16        Co. to settle all claims Cal-Water Co. had against
17        Ameripride.
18  Stipulation, ECF No. 861.
19      It is also undisputed that Ameripride received $ 500,000 in
20  settlement from Chromalloy and $2,750,000 from Petrolane.
21  See Final Pretrial Conf. Order, ECF No. 854, at 13, ¶ 93
22  (Undisputed Fact).  Both settlements related to the pollution at
23  issue in the instant case.  This court has previously held that
24  defendants are entitled to a credit for those sums.
25      There is no question that items 1 and 2 are sums subject to
26  equitable apportionment.  Defendant, however, contests whether it

8

should be considered responsible for any of the sums paid in settlement of the claims of Huhtamaki and Cal-Water. It asserts that it can only be responsible for "response costs," and since it cannot be said that those sums are exclusively response sums, plaintiff's claim must fail. For reasons explained in the court's summary judgment order, plaintiff cannot recover for those settlement payments under § 107. See Order, ECF No. 735, at 40. Nonetheless the court held there, and continues to believe, that it could and should consider those payments under §113. See id. Defendant argues, nevertheless, that those payments should not be considered because the settlements resolved all claims, including various state law claims, not only those which would be considered response costs if incurred in supplying settling plaintiffs with alternate sources of water. The court simply cannot agree.

Whether the settled claims were under the federal statute or pled as state claims, the gravamen of all those claims was the contamination of the ground water, the very claims at issue in the suit under CERCLA. The parties have not supplied the court with any authority addressing the question of how the court should account for AmeriPride's settlement with Cal-Am Water Co. and Huhtamaki, when that settlement involved multiple claims, nor, surprisingly, has the court's own research found any established guidance thereon.

While CERCLA § 9613 has provisions addressing contributions after settlement with a governmental party, there is no proviso directly dealing with settlements with nongovernmental parties.

1  See 42 U.S.C. § 9613(f)(3)(B) ("A person who has resolved its
2  liability to the United States or a State for some or all of a
3  response action ... in an administrative or judicially approved
4  settlement may seek contribution from any person who is not party
5  to a settlement ...."); see also City of Detroit v. Simon, 247 F.3d
6  619, 628 (6th Cir. 2001) (there is no contribution protection for
7  a party that entered into a settlement with Detroit because the
8  city cannot be equated with the United States or a state, as the
9  language of CERCLA requires); Akzo Coatings, Inc. v. Aigner Corp.,
10 30 F.3d 761, 771 (7th Cir. 1994) (noting that "§ 113(f)(2) says .
11 . . [n]othing . . . about resolving liability to private parties").
12 However, although the text of CERCLA is silent regarding the right
13 of contribution protection for private party settlements, to
14 facilitate settlement, a number of federal courts have interpreted
15 CERCLA's language to include private parties. City of Bangor v.
16 Citizens Communications Co., 532 F.3d 70, 90 fn.7 (1st Cir. 2008)
17 (citing 2 A.J. Topol & R. Snow, Superfund Law and Procedure, §
18 7:91, at 181 (2007 ed.)); K.C.1986 L.P. v. Reade Mfg., 472 F.3d
19 1009, 1017 (8th Cir.2007) ("Although § 9613(f)(2) governs only the
20 effect of settlements with the government, not private parties,
21 general equitable principles remain in play.").

22    Because the very purpose of § 113 is to do equity, such a
23 purpose is clearly served by recognizing payments made to private
24 claimants in settlement of state claims arising out of CERLA-
25 focused suits. Accordingly, the court finds that the total amount
26 subject to equitable apportionment is $18,295,651.00, less

$3,250,000 for a total of $15,045,651.00. After including the consultant and other costs of $446,656.84 paid for investigation and remediation at the AmeriPride site since August 2010, and the $16,604.52 paid for regulatory oversight of the AmeriPride site since January 2011, the total amount subject to equitable apportionment is $15,508,912.36.

Section 223(f) gives the trial court broad discretion to consider whatever equitable factors it deems appropriate under the circumstances of the case. 42 U.S.C. § 9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.")[5] Some courts, in making equitable apportionments use what are called the "Gore factors," named after a rejected attempt by then-Congressman Albert Gore to amend CERCLA that would have listed those factors as a basis for allocating liability. See, e.g., Acushnet Co. v. Mohasco Corp., 191 F.3d 69, 74 (1st Cir. 1999); Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 354 (6th Cir. 1998); United States v. Colorado & Eastern R.R. Co., 50 F.3d 1530, 1536 n.5 (10th Cir. 1995); Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 (7th Cir. 1994); In re Bell Petroleum Servs., Inc., 3 F.3d 889, 899-900 (5th Cir. 1993).

The "Gore factors" are as follows: (I) The ability of the

---

[5] A district court's equitable apportionment determinations are subject to an abuse of discretion standard of review on appeal. In re Dant & Russell, 951 F.2d 246, 249 (9th Cir. 1991).

11

parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) The amount of the hazardous waste involved; (iii) The degree of toxicity of the hazardous waste involved; (iv) The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such waste; and (vi) The degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment. Bell Petroleum, 3 F.3d 899-900; United States v. A & F Materials, Co., 578 F.Supp. 1249 (S.D. Ill. 1984).[6]

Another district court when applying the Gore Factors added "critical factors" for courts to take into account in making CERCLA contribution allocations, to wit: the financial resources of the liable parties; the extent of the benefit that the parties received from the hazardous waste disposal practices; the extent of the parties' knowledge and awareness of the environmental contamination of the site; and the efforts made, if any, to prevent environmental harm and the efforts made to settle the case. United States v. Davis, 31 F.Supp.2d 45, 63 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001).

---

[6] This court must confess some unwillingness to apply factors rejected by Congress.

Yet another district court has further considered: (1) economic benefits received by a party as a result of its cleanup actions; (2) a party's efforts to conduct source control at its facility; (3) windfalls from settlements a party made with other PRPs; and (4) a party's decision to release some PRPs from liability. City of Wichita, Kansas v. Trustees of APCO Oil orp. Liquidating Trust, 306 F.Supp.2d 1040, 1101 (D.Kan. 2003).

None of these lists is intended to be exhaustive or exclusive, and "in any given case, a court may consider several factors, a few factors, or only one determining factor . . . depending on the totality of the circumstances presented to the court." United States v. Consolidated Coal Co., 345 F.3d 409, 413-14 (6th Cir. 2003) (quoting Environmental Trans. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 509 (7th Cir. 1992).

It is this court's view that, in many ways, the factors noted above will not fairly measure apportionment. First, it is hardly insignificant that, until the decision of the Delaware Supreme Court, the defendants were defunct corporations who had no capacity to respond to cleanup orders. Second, as noted above, the is no way of clearly allocating responsibility for the contamination of either the vadose zone or the ground water. The best view of the evidence is that, but for the DNAPL PCE deposits of the defendant, the ground water would not have been affected; however, it appears equally true that, but for the leaks in waste water system, the

////

////

ground water might well not have been effected.[7]  Moreover, while it is certainly true that plaintiffs spilled more waste water because it increased the number of machines and processed laundry over a longer period, it is also true that during defendant's period of possession of the facility, the waste water it spilled contained more PCE and that it also engaged in dry cleaning using PCE as a solvent.[8]  Moreover, PCE's environmental danger was not appreciated during defendant's operation of the facility, or in the earlier years of plaintiff's operation.

Given the facts as the court has found them, it concludes that the fairest apportionment is to divide responsibility equally. This would result in each party being responsible for $7,754,456.18 in costs expended so far.  This number, however, fails to recognize that plaintiff has borne all of these costs for the many years since the first cleanup order.  To roughly address this fact, the court will order defendant to also pay interest in amounts calculated in accordance with 42 U.S.C. § 9607 (incorporating the interest rate calculation provided in 26 U.S.C. § 9507(d)(3)(C)).[9]

---

[7] It appears to be uncertain whether a cleanup order would have been issued if there had been no contamination of the ground water and the property continued to be used for commercial purposes.

[8] The extent of defendant's spill is not known because records were apparently not kept of its use of water, the extent of waste water, or contents of waste water.

[9] "Interest on advances made to the Superfund shall be at a rate determined by the Secretary of the Treasury (as of the close of the calendar month preceding the month in which the advance is made) to be equal to the current average market yield on outstanding marketable obligations of the United States with

14

The parties SHALL submit a stipulation within fourteen (14) days of the issuance of this order as to this interest rate as applied to plaintiff's past expended costs.    Finally, plaintiff seeks declaratory judgment as to future cleanup costs.  For the reasons explained above, the defendant shall be responsible for one half of all future costs.[10]

 Accordingly the court order as follows:

 1) Defendant shall pay to the plaintiff $7,754,456.18.

 2) The parties SHALL file a stipulation with the court within fourteen (14) days of the issuance of this order as to the interest payable by defendant by virtue of plaintiff's past expended costs, for which Defendant shall be liable.

 3) Defendant SHALL be responsible for one half of all future cleanup costs.

 IT IS SO ORDERED.

 DATED: April 4, 2012.

_(signature)_
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

remaining periods to maturity comparable to the anticipated period during which the advance will be outstanding and shall be compounded annually." 26 U.S.C. § 9507(d)(3)(C).

[10] Defendants liability may be limited by the amount of insurance available. The court has received no evidence concerning such limitation, and thus makes no finding as to that question.

15