UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERIPRIDE SERVICES, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>VALLEY INDUSTRIAL SERVICES, INC., a former California Corporation, et al.,<br><br>Defendants. | No.  2:00-cv-113-MCE-EFB<br><br>**MEMORANDUM AND ORDER** |

Plaintiff AmeriPride Services, Inc. ("AmeriPride") initiated this action under the Comprehensive Environmental Remediation, Contamination, and Liability Act ("CERCLA") more than sixteen years ago.  After a trial, an appeal, and settlements with numerous other parties, only Texas Eastern Overseas, Inc. ("TEO") remains as a defendant.  Presently before the Court are the parties' Motions for Summary Judgment.  ECF Nos. 1018, 1021, 1026.  For the reasons that follow, the Motions are GRANTED in part and DENIED in part.[1]

///

---

[1] AmeriPride's objections to the fact witness testimony of John Dankoff (ECF No. 1027-4 at 3:4-4:4) are GRANTED.  The remainder of the parties' evidentiary objections are OVERRULED.

1

**BACKGROUND**

2

3        This action arises out of the contamination of soil and groundwater at and around

4   an industrial laundry facility located at 7620 Wilbur Way in Sacramento, California ("the

5   Facility").  AmeriPride owns the Facility, which was previously owned and operated for

6   seventeen years by Valley Industrial Services, Inc. ("VIS") as an industrial dry cleaning

7   and laundry business.  VIS used perchloroethylene ("PCE") as a solvent in its dry

8   cleaning operations.  During its operations, VIS released PCE into the soil and

9   groundwater.

10       For part of the time that VIS operated the Facility, it was a wholly owned

11  subsidiary of Petrolane.  VIS eventually merged into Defendant Texas Eastern Overseas

12  ("TEO"), which expressly assumed VIS's liabilities.  TEO is a Delaware corporation that

13  dissolved in 1992.  It first appeared in this case on July 13, 2000, when it answered and

14  asserted a counterclaim.  In November 2009, a receiver was appointed for TEO for "the

15  sole purpose of establishing the capacity of TEO to be sued in [this action] solely to the

16  extent of its insurance assets . . . ."  That appointment was confirmed in 2010.

17       In 1983, Petrolane sold the Facility, which subsequently changed ownership

18  several times until AmeriPride became the owner.  AmeriPride did not conduct dry

19  cleaning operations at the Facility, but, during its ownership, there were additional

20  releases of PCE-contaminated water into the soil and groundwater.  The contamination

21  at the Facility migrated onto a neighboring property owned by Huhtamaki Foodservices,

22  Inc. ("Huhtamaki") and contaminated wells owned by California-American Water

23  Company ("Cal-Am").

24       In 1997, AmeriPride found evidence of PCE in the soil under the Facility and

25  reported the discovery to regulatory authorities.  In 2002, the California Regional Water

26  Quality Control Board took regulatory control over the investigation at the Facility.  Since

27  then, AmeriPride has performed investigation and remediation of the PCE in the soil and

28  ///

groundwater at and near the Facility under the direction of the California Regional Water Quality Control Board.  The cleanup is ongoing.

In January 2000, AmeriPride filed this action against VIS, TEO, Petrolane, Chromalloy, and other parties under CERCLA and various state laws to recover costs it incurred responding to the PCE contamination.  TEO answered and asserted a counterclaim against AmeriPride.

On July 9, 2002, Cal-Am filed a separate complaint against AmeriPride and TEO seeking recovery of its response costs, damages, and other relief in connection with the contamination of its wells.  AmeriPride paid Cal-Am $2 million to settle those claims. Two years later, on July 29, 2004, Huhtamaki sued AmeriPride; AmeriPride later paid Huhtamaki $8.25 million to settle.  In addition, in 2006, AmeriPride entered into settlement agreements with Chromalloy and Petrolane in which AmeriPride received $500,000 and $2.75 million, respectively.

Settlement attempts between TEO and AmeriPride in 2007 were ultimately unsuccessful so AmeriPride pursued its cost recovery claims against TEO.  In January 2011, AmeriPride filed a motion for summary judgment against TEO seeking an order that TEO was liable to AmeriPride for its response costs, including the settlement amount it paid to Cal-Am and Huhtamaki.  AmeriPride also moved to dismiss TEO's counterclaim for contribution.

On May 12, 2011, the Court granted in part AmeriPride's motion for summary judgment and determined as a matter of law that: (1) TEO is a potentially responsible party liable for AmeriPride's response costs under CERCLA; (2) AmeriPride paid for investigation and remediation costs of $7,750,921 through August 2010, and regulatory oversight costs of $474,730 through September 2010; and (3) AmeriPride's investigation and remediation costs are necessary and consistent with the National Contingency Plan, 40 C.F.R. pt. 300 ("NCP").  With respect to AmeriPride's claims under CERCLA section 107 for amounts it paid in settlement to Cal-Am and Huhtamaki, the Court denied summary judgment.  Specifically, the Court found that the settlement funds were not

1  response costs recoverable under section 107 but that AmeriPride could seek to recover

2  them under section 113(f)(1).  The Court also granted leave for AmeriPride to file an

3  amended complaint (which it did on May 24, 2011).  In light of this ruling, the Court did

4  not address whether those settlement amounts were paid to reimburse Cal-Am and

5  Huhtamaki for necessary response costs incurred consistent with the NCP.

6  The Court also denied several of AmeriPride's other summary judgment claims.

7  Because the Court determined that triable issues of fact remained about whether

8  AmeriPride released or disposed of PCE and regarding the equitable allocation of costs

9  between the parties, the Court:  (1) denied AmeriPride's summary judgment to the extent

10  it pertains to allocation of liability on AmeriPride's CERCLA claims; and (2) denied

11  AmeriPride's summary judgment of TEO's counterclaim.

12  The case proceeded to trial.  The main issue remaining at trial was the equitable

13  allocation of responsibility under AmeriPride's and TEO's respective CERCLA claims.

14  The parties presented their evidence to the Court over the course of a twelve-day bench

15  trial.  On April 4, 2012, the Court entered an order finding, in part, that:

16  [T]he total amount subject to equitable apportionment is
17  $18,295,651.00, less $3,250,000 for a total of
   $15,045,651.00. After including consultant fees and other
   costs of $446,656.84 paid for investigation and remediation at
18  the AmeriPride site since August 2010, and the $16,604.52
   paid for regulatory oversight of the AmeriPride site since
19  January 2011, the total amount subject to equitable
   apportionment is $15,508,912.36.
20

21  The Court calculated the total amount subject to equitable apportionment by

22  combining AmeriPride's investigation, remediation, and regulatory oversight costs, then

23  adding the $10.25 million AmeriPride paid in settlement to Huhtamaki and Cal-Am.

24  From this total the Court then deducted the $3.25 million AmeriPride received from

25  settling its claims against Chromalloy and Petrolane, in effect applying the Uniform

26  Contribution Among Tortfeasors Act's ("UCATA") pro tanto approach to equitably

27  account for these settlements.

28  ///

4

Next, the Court apportioned the total liability fifty-fifty between TEO and AmeriPride, concluding that "given the facts as the Court has found them . . . the fairest apportionment is to divide responsibility equally." ECF No. 915, at 14. The Court also issued a declaratory judgment that TEO is responsible for one-half of all future cleanup costs. To "roughly address" the fact that AmeriPride had "borne all of [the] costs for the many years since the first cleanup order," the Court also ordered TEO to pay prejudgment interest to AmeriPride "in amounts calculated in accordance with 42 U.S.C. § 9607." Because the Court found that the interest accrual date was a matter of equity rather than statutory dictate, it ordered the parties to submit a stipulation as to the amount of interest. The parties filed the interest stipulation on April 18, 2012, agreeing on the methodology for the calculation except as to when interest should start to accrue. In that regard, the parties proposed interest amounts based on their own views as to when interest should commence. The Court then determined interest accrued from the date the costs were first incurred by AmeriPride, rejecting TEO's argument that such interest did not begin to accrue until the date AmeriPride demanded payment of a specific amount in writing.

On April 20, 2012, the Court issued its Order determining the issues raised at trial, which included the Court's award of interest. The Court adopted all of the undisputed facts contained in its Pretrial Order, and entered judgment in accordance with the Court's order on the same day. The Court ordered TEO to pay AmeriPride $9,974,421.95 and issued a declaratory judgment that TEO is responsible for one-half of all future cleanup costs.

That decision was appealed, and, on April 2, 2015, the Court of Appeals vacated the judgment and remanded with instructions to:

1. Explain which equitable factors the Court considered in allocating the $3.25 million in settlement payments from Chromalloy and Petrolane to AmeriPride, or select those factors and allocate the settlement payments in accordance with those factors in the first instance;

1       2.      Determine the extent to which AmeriPride reimbursed Huhtamaki and

2 Cal-Am for necessary response costs incurred consistent with the NCP; and

3       3.      Apply the interest provisions in CERCLA section 107(a) to determine when

4 interest began to accrue on the costs paid by AmeriPride.

5       On September 28, 2015, the Court took its  first step towards responding to the

6 Ninth Circuit opinion's first directive by holding that the Uniform Comparative Fault Act's

7 pro rata approach would govern the allocation of liability to the Settling Parties.  ECF

8 No. 1001.  Under the pro rata approach, the Court will determine the Settling Parties'

9 proportionate share of the liability for response costs and deduct that share from the total

10 amount of liability to be allocated between AmeriPride and TEO, regardless of the dollar

11 amounts of the settlements obtained by AmeriPride.

12       Now pending before the Court are TEO and AmeriPride's cross-motions for

13 summary judgment.  TEO's motion seeks a ruling that Petrolane, Chromalloy, and

14 Huhtamaki are liable in part for the clean-up costs incurred by AmeriPride, that

15 prejudgment interest could not begin to accrue until August 2010, that AmeriPride

16 cannot show that its settlements with Huhtamaki and Cal-Am reimbursed them for

17 necessary response costs incurred consistent with the NCP, and that AmeriPride cannot

18 recover approximately $780,000 in response costs that were not presented to  Judge

19 Karlton in the first trial in this case.  AmeriPride's motion seeks opposite rulings on the

20 same issues.

21

22 **STANDARD**

23

24       The Federal Rules of Civil Procedure provide for summary judgment when "the

25 movant shows that there is no genuine dispute as to any material fact and the movant is

26 entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

27 Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

28 dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

1  such that a reasonable jury could return a verdict for the nonmoving party." Anderson,

2  477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

3  before the evidence is left to the jury of "not whether there is literally no evidence, but

4  whether there is any upon which a jury could properly proceed to find a verdict for the

5  party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251

6  (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

7  As the Supreme Court explained, "[w]hen the moving party has carried its burden under

8  Rule [56(a)], its opponent must do more than simply show that there is some

9  metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Therefore,

10  "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

11  nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

12      In resolving a summary judgment motion, the evidence of the opposing party is to

13  be believed, and all reasonable inferences that may be drawn from the facts placed

14  before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

15  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

16  obligation to produce a factual predicate from which the inference may be drawn.

17  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

18  810 F.2d 898 (9th Cir. 1987).

19

20                                   **ANALYSIS**

21

22      **A.  Liability of Petrolane, Huhtamaki, Cal-Am, and Chromalloy**

23      One of the central issues remaining in this litigation is the liability of Petrolane,

24  Huhtamaki, Chromalloy, and Cal-Am (the "Settlors") for  contamination at the Facility.

25  The extent of the Settlors' liability as determined by this Court is important because

26  TEO's liability to AmeriPride will be reduced by the amount of the Settlors' liability for

27  contamination at the facility.  This places AmeriPride in a peculiar position:  although it

28  sued the Settlors under CERCLA, and extracted sizable settlements from Chromalloy

1  and Petrolane, AmeriPride now argues that the Court cannot find that they did anything

2  to cause contamination at the Facility.  AmeriPride further argues that even if the Settlors

3  are PRPs, the Court must allocate a zero percent share of liability to them.  TEO, on the

4  other hand, seeks a ruling that while the Settlors are potentially responsible for response

5  costs incurred by AmeriPride, any allocation of liability at summary judgment is

6  inappropriate.  Below, the Court discusses the parties' arguments as they apply to each

7  of the Settlors.[2]

8  ### 1.  Chromalloy's liability

9  AmeriPride's motion argues that no portion of the response costs it incurred can

10  be allocated to Chromalloy because TEO cannot establish that Chromalloy caused

11  AmeriPride to incur any such costs.  TEO counters that under CERCLA's strict liability

12  causation test, Chromalloy caused AmeriPride to incur response costs as a matter of

13  law.  In response, AmeriPride contends that CERCLA's causation test does not apply to

14  this inquiry, and that the Court should apply the UCFA's causation test.[3]

15  ### a.  The relevant causation standard

16  TEO has the better argument as to the standard of causation.  CERCLA does not

17  use the but-for causation test that governs traditional tort claims.  Boeing Co. v. Cascade

18  Corp., 207 F.3d 1177, 1185 (9th Cir. 2000).  In order to show that Chromalloy is liable in

19  part for AmeriPride's response costs, TEO can meet its burden on summary judgment if:

20  it (a) identifies contaminant at its site, (b) identifies the same
21  (or perhaps a chemically similar) contaminant at the
    defendant's site, and (c) provides evidence of a plausible
22  migration pathway by which the contaminant could have
    traveled from the defendant's facility to the plaintiff's site.  If
23  the plaintiff meets this burden, the defendant must then
    proffer evidence sufficient to create a genuine issue of fact as
24  to its ability to disprove causation.

25  [2] As an initial matter, however, the Court rejects TEO's argument that AmeriPride should be
    judicially estopped from denying the Settlors' liability because of statements it made in its superseded
26  Third Amended Complaint.  Judge Karlton already rejected this argument in ruling on one of its motions in
    limine, and TEO declined to appeal that ruling.  ECF No. 951.  Accordingly, the law of the case doctrine
27  precludes the Court from reconsidering this issue.

    [3] AmeriPride does not dispute that Chromalloy is a "covered person" under CERCLA § 107, and
28  the Court therefore GRANTS TEO's motion on that issue.  ECF No. 1025 at 24:23-24.

1   Castaic Lake Water Agency v. Whittaker Corp., 272 F.Supp.2d 1053, 1066 (C.D. Cal.
2   2003).

3          AmeriPride misguidedly relies on Pentair Thermal Management, LLC v. Rowe
4   Industries, Inc. to argue that TEO must show a greater degree of causal connection
5   between Chromalloy's conduct and AmeriPride's conduct to prevail on summary
6   judgment.  The Pentair order was issued after a bench trial.  Pentair Thermal
7   Management, LLC v. Rowe Industries, Inc., Nos. 06-cv-7164, 10-cv-1606, 2013 WL
8   1320422 at *1 (N.D. Cal. Mar. 31, 2013).  In Pentair, the defendant argued that costs
9   should be equitably allocated to two settling parties, thereby reducing the defendant's
10  share of liability.  Id. at 24.  The Court noted that "[a]lthough CERCLA imposes strict
11  liability for environmental contamination on any person who at the time of disposal of any
12  hazardous substance owned or operated any facility at which the hazardous substances
13  were disposed of, the conduct of [the settling parties] and the causal connection
14  between that conduct and the release of PCBs at the site will determine their percentage
15  of fault" pursuant to § 2 of the UCFA.  Id. (citations and internal quotation marks
16  omitted).

17         The procedural posture of Pentair is critical to understanding why TEO has the
18  better argument regarding the causation standard that applies at this stage of the case.
19  As previously mentioned, the Pentair order issued after a bench trial.  The question
20  before the Pentair court was how to equitably allocate a share of the response costs to
21  the settling parties.  The issue of whether such costs could be allocated to the settling
22  parties at all must have already been decided by the court before trial under CERCLA's
23  causation standard.

24         Here, on the other hand, TEO and AmeriPride's motions on the causation issue
25  seek to answer the initial question of whether any of AmeriPride's response costs can be
26  allocated to Chromalloy at all.  That initial question of liability must be decided under
27  CERCLA's causation standard as articulated in Castaic Lake, 272 F.Supp.2d at 1066.
28  The UCFA causation inquiry is triggered when the Court actually allocates Chromalloy's

1   share of response costs after trial.  Accordingly, the Court must determine whether TEO

2   has met is burden of establishing that Chromalloy caused AmeriPride to incur response

3   costs under the standard of causation discussed in <u>Castaic Lake</u>.

4   **b.  TEO has met its burden under <u>Castaic Lake</u>**

5   In order to establish that Chromalloy caused AmeriPride to incur response costs

6   at the Facility, TEO must show that: (1) the contaminants at issue were present at

7   Chromalloy's site; (2) those same contaminants are present at the Facility; and (3) a

8   plausible pathway exists for those contaminants to migrate from Chromalloy to the

9   Facility.  <u>Castaic Lake</u>, 272 F. Supp. 2d at 1066.  TEO easily meets this burden.

10   First, there is no dispute as to whether the contaminants at issue were present at

11   Chromalloy's facility.  AmeriPride's motion admits that "TCA was widely used, and

12   potentially PCE and TCE were used, at the Chromalloy facility."  ECF No. 1021-1 at

13   10:26-27.  Furthermore, AmeriPride's expert, Dr. Farr, admitted at her deposition that

14   PCE and TCA were present at the Chromalloy facility.  AmeriPride attempts to create a

15   disputed issue of fact by arguing that Dr. Farr indicated that it was only possible that

16   Chromalloy used PCE at its facility.  ECF No. 1025-1 at ¶ 113.  However, the <u>Castaic</u>

17   <u>Lake</u> test only requires TEO to establish that the contaminants at issue were <u>present</u> at

18   Chromalloy's facility.  <u>See</u> <u>Castaic Lake</u>, 272 F. Supp. 2d at 1066 (requiring <u>identification</u>

19   of contaminants at the defendant's site rather than use of such contaminants).

20   Furthermore, even if TEO was required to establish that Chromalloy actually used PCE

21   at its facility, Dr. Farr admitted that the presence and location of PCE at the Chromalloy

22   facility was likely associated with a surface release at the Chromalloy facility, which in

23   turn made it likely that PCE was used at the facility.  ECF No. 1018-7 at 11-13.

24   AmeriPride fails to point to any evidence in the record that would countermand Dr. Farr's

25   admission.  Therefore, there is no genuine dispute of material fact that Chromalloy more

26   likely than not used TCA and PCE at its facility.

27   Second, there is no dispute that TCA and PCE are present at the Facility.

28   Dr. Farr testified that there "was TCA in some influent to the soil vapor extraction system,

1  and also it was detected in waste water samples at the [Facility]."  ECF No. 1028-3 at 9.

2  The fact that TEO's expert, Dr. Hokkanen, admitted that TCA was not detected in the

3  groundwater plume does not create a genuine dispute of material fact that TCA was

4  present at the Facility.  ECF No. 1028-1 at ¶ 114.

5      Finally, there is no dispute that soil gas migration was a plausible pathway

6  through which PCE and TCA could have traveled from the Chromalloy site to the Facility.

7  Dr. Farr testified that it was possible that soil gas could travel in that direction, and only

8  stated that the data did not support that it had so traveled.  Id. at ¶ 117.  According to

9  Dr. Hokkanen, on the other hand,  soil boring logs from the remedial investigation show

10 that sandy subsurface materials between the Chromalloy site and the Facility "would

11 readily transmit soil vapor" from Chromalloy to the Facility.  Accordingly, TEO has met its

12 burden of establishing causation and the burden shifts to AmeriPride to "proffer evidence

13 sufficient to create a genuine issue of fact as to its ability to disprove causation."

14     AmeriPride, however, has not even attempted to establish a genuine dispute of

15 material fact as to its ability to affirmatively disprove causation.  Accordingly, TEO's

16 motion is GRANTED on the issue of Chromalloy's liability.

17         **2.  Petrolane's liability**

18     Petrolane owned VIS during part of the time VIS owned the Facility.  VIS was one

19 of Petrolane's many subsidiaries until 1990, when VIS merged into TEO.  TEO expressly

20 assumed VIS' liabilities.  Accordingly, the parties agree that Petrolane must be

21 independently liable for contamination at the facility in order for the Court to allocate a

22 share of the total liability at issue to Petrolane directly.

23     Petrolane is liable under CERCLA if it owned or operated the Facility at the time

24 releases of PCE, TCA, and TCE occurred.  42 USC 9607(a).  TEO can establish that

25 Petrolane is directly liable under CERCLA if it "manage[d], direct[ed], or conduct[ed]

26 operations specifically related to pollution, that is, operations having to do with the

27 leakage or disposal of hazardous waste, or decisions about compliance with

28 environmental regulations."  United States v. Bestfoods, 524 U.S. 51, 66-67 (1998).

1    Alternatively, Petrolane is derivatively liable under CERCLA section 107 if Petrolane was

2    VIS' successor or if VIS was merely an alter ego of Petrolane.  AmeriPride contends that

3    there is no genuine dispute of material fact as to Petrolane's lack of liability under any of

4    these three theories.  TEO, on the other hand, argues that there is no dispute that

5    Petrolane is liable under all three theories.

6                              **a.  Direct liability**

7              There are multiple disputes of material fact as to the question of whether

8    Petrolane is directly liable under CERCLA.  The Supreme Court's decision in Bestfoods

9    provides that a parent corporation such as Petrolane can be directly liable as an

10   operator under CERCLA when: (1) the parent "operates the facility in the stead of its

11   subsidiary or alongside the subsidiary in some sort of a joint venture[;]" (2) "a dual officer

12   or director might depart so far from the norms of parental influence exercised through

13   dual officeholding as to serve the parent, even when ostensibly acting on behalf of the

14   subsidiary in operating the facility[;]" or (3) "an agent of the parent with no hat to wear

15   but the parent's hat might manage or direct activities at the facility."  Bestfoods, 524 U.S.

16   at 71.[4]

17             AmeriPride argues that TEO cannot point to any evidence that an agent of

18   Petrolane either directed actions that resulted in contamination at the Facility or

19   controlled operations relating to hazardous waste disposal and environmental

20   compliance.  In support of its motion, AmeriPride points only to the testimony of TEO's

21   business history expert (Dr. Lipartito), who admitted that day-to-day operations at the

22   Facility were left to VIS and its lower level managers, to show the absence of a genuine

23   dispute of material fact as to Petrolane's direct liability.  See ECF No. 1021-1 at 21.  In

24   doing so, AmeriPride has necessarily limited its motion for summary judgment to the first

25   prong of the Bestfoods direct liability test.  See Celotex, 477 U.S. at 323 (explaining that

26   the moving party has the initial burden of identifying portions in the record  "which it

27             [4] The Supreme Court's reference to "hats" alludes to the "well established principle of corporate
law that directors and officers holding positions with a parent and its subsidiary can and do change hats to
28   represent the two corporations separately, despite their common ownership.  Bestfoods, 524 U.S. at 69.

1    believes demonstrate the absence of a genuine issue of material fact.") Bestfoods,

2    524 U.S. at 71 (explaining that direct liability may be found where the parent corporation

3    operates the facility alongside its subsidiary).

4         The problem for AmeriPride is that it has previously alleged that Petrolane was an

5    operator of the Facility.  ECF No. 103 at ¶ 47.  Although that pleading was later

6    amended and the allegation withdrawn from AmeriPride's Fourth Amended Complaint,

7    that allegation remains admissible (though not conclusive) evidence that Petrolane

8    actually operated the Facility alongside VIS.  Huey v. Honeywell, 82 F.3d 327, 333 (9th

9    Cir. 1996).  Although AmeriPride argues that it only made the allegation on information

10   and belief, that qualifier impacts only the weight of the allegation as evidence, not its

11   admissibility.  Id.  Accordingly, there is a genuine dispute of material fact as to whether

12   Petrolane is directly liable for AmeriPride's response costs.

13                              **b.  Successor liability**

14        AmeriPride argues that Petrolane did not succeed to VIS' liabilities under any of

15   the four theories by which successor liability can occur.  ECF No. 1021-1 at 21-23; see

16   also United States v. Sterling Centrecorp Inc., 960 F. Supp. 2d 1025, 1034 (E.D. Cal.

17   June 24, 2013) (explaining that successor liability as a result of an asset sale only arises

18   where "unless (1) the purchasing corporation expressly or impliedly agrees to assume

19   the liability; (2) the transaction amounts to a 'de-facto' consolidation or merger; (3) the

20   purchasing corporation is merely a continuation of the selling corporation; or (4) the

21   transaction was fraudulently entered into in order to escape liability.").  TEO only

22   opposes AmeriPride's argument on one ground, contending that Petrolane's purchase of

23   VIS was a de facto merger.  Accordingly, AmeriPride is entitled to summary adjudication

24   on the issue of Petrolane's successor liability unless there a genuine dispute of material

25   fact as to whether Petrolane's purchase of VIS was a de facto merger.[5]

26   _____

         [5] In its reply brief, AmeriPride argues that the de facto merger doctrine cannot apply because
27   Petrolane's purchase of VIS was a stock purchase rather than an asset purchase.  AmeriPride cannot
     have it both ways: if the purchase was for stock rather than assets, then the test in Sterling that
28   AmeriPride advanced as the standard for determining whether Petrolane succeeded to VIS' liabilities does
     not apply, and summary adjudication on the issue is inappropriate.  In addition, the purchase agreement

Courts typically decide whether an asset purchase constitutes a de facto merger by reference to the following four factors:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Sterling, 960 F. Supp. 2d at 1042.  Although none of these factors alone is necessary or sufficient to establish a de facto merger, Courts generally look to the second factor—continuity of shareholders—as the most important.  Id.  At bottom, however, resolving the question of whether a de facto merger has occurred is a functional, holistic, and equitable inquiry that seeks to answer a basic question: was the result of the transaction the same as what would have occurred if a statutory merger had taken place? Id.

Here, AmeriPride argues that a de facto merger could not have taken place because VIS did not dissolve as soon as  "legally and practically possible[,]" and remained a subsidiary of Petrolane until 1990.  Id.; ECF No. 1027 at 14.[6]  This argument, which only goes to the third factor of the Sterling test, cannot overcome the fact that three of the other factors, including the most important one, favor TEO's position.  There is no dispute that VIS' personnel, physical location, assets, and general business operations continued unabated after the Petrolane transaction.  There is no question that

---

between Petrolane and VIS clearly identifies itself as an asset purchase agreement.  ECF No. 1021-8 at 87.

[6] AmeriPride further argues that the "concept of continuation makes no sense here, where the context is a much larger corporation purchasing the stock of a smaller one to become a subsidiary."  ECF No. 1027 at 14-15.  That argument is unsupported, nonsensical, and rejected.

1  Petrolane assumed VIS' obligations that were necessary for the continuation of VIS'

2  normal business operations.  See ECF No. 1021-8 at 98 ("Petrolane agrees . . . that it

3  will assume and agree to perform and pay when due all the debts, liabilities, obligations,

4  and contracts of Valley Subsidiary as reflected on the balance sheet of Valley Industrial

5  on June 24, 1972, excluding those [related to Valley Industrial's previously sold plastics

6  business].").   Finally, there is no dispute that Petrolane paid for VIS' assets with shares

7  of Petrolane stock such that VIS' former shareholders became a constituent part of

8  Petrolane.  See Sterling, 960 F. Supp. 2d at 1042 (continuity of shareholders factor).

9         Other undisputed evidence in the record further confirms that Petrolane's

10  purchase of VIS amounted to  a de facto merger.  For example, AmeriPride admits that

11  Petrolane executed a promissory note in 1978 that included a covenant in which it

12  agreed to "cause each of its subsidiaries to, comply with all applicable statutes and

13  regulations . . . . in respect of the conduct of business, and the ownership of property, by

14  [Petrolane] and such subsidiary, (including without limitation, applicable statutes,

15  regulations, orders and restrictions relating to . . . environmental standards and

16  controls. . . ."  ECF No. 1027-2 at ¶ 32.  AmeriPride also admits  "that the VIS profit

17  sharing plan was merged into the plan that covered Petrolane and its subsidiaries."

18         In light of the evidence that the Court has received and the Court's analysis of the

19  Sterling test, there is no genuine dispute of material fact that the sale of VIS' assets to

20  Petrolane was a de facto merger.  AmeriPride's Motion is therefore DENIED as to

21  Petrolane, and TEO's Motion is GRANTED.  Petrolane is therefore potentially liable for a

22  percentage of AmeriPride's response costs.  That percentage will be equitably allocated

23  by the Court after trial.  In light of this ruling, the Court need not address the parties' alter

24  ego arguments.

25                         **3.  Huhtamaki's liability**

26         The parties' discussion of Huhtamaki's liability on summary judgment speaks to

27  two different concerns.  TEO's Motion, which seeks to hold Huhtamaki liable for

28  contaminating its own property, is moot in light of the Court's holding below that

1    AmeriPride cannot recover the money it expended to settle with Huhtamaki.  See infra,

2    at _____.  Accordingly, TEO's Motion is DENIED on the issue of Huhtamaki's liability.

3          AmeriPride's Motion, on the other hand, disputes that Huhtamaki can have liability

4    for AmeriPride's response costs.  Specifically, AmeriPride argues that there is no

5    evidence in the record that Huhtamaki's release of hazardous substances at its facility

6    caused AmeriPride to incur response costs.

7          Applying the test set forth in Castaic Lake, 272 F. Supp. 2d at 1066, it is clear that

8    summary judgment is not appropriate on the issue of Huhtamaki's liability.  TEO has

9    identified PCE and TCA at Huhtamaki's property, identified the same substances at the

10   Facility, and identified a plausible pathway by which such contaminants could travel from

11   Huhtamaki's property to the Facility (i.e., via soil gas).  Id.  AmeriPride, however, has

12   proffered evidence that is sufficient to create a genuine dispute of material fact as to its

13   ability to disprove causation.  Id.; see ECF No. 1027 at 16.  Accordingly, summary

14   judgment on the issue of Huhtamaki's liability is DENIED.

15                      **4. Cal-Am's liability**

16         AmeriPride's argues that it is entitled to summary judgment on the issue of

17   Cal-Am's liability for contamination at the Facility because there is no evidence in the

18   record that points to conduct by Cal-Am that caused AmeriPride to incur response costs.

19   In opposing AmeriPride's Motion, TEO contends that AmeriPride's statements in other

20   pleadings that Cal-Am is liable under 42 U.S.C. § 9607 create a dispute of material fact

21   on the issue  sufficient to preclude summary judgment.  ECF No. 1026 at 15:14-21.

22         TEO's argument lacks merit.  Rule 56 provides that "[t]he court shall grant

23   summary judgment if the movant shows that there is no genuine dispute as to any

24   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

25   56(a) (emphasis added).  A dispute is "genuine" if the evidence is such that a reasonable

26   jury could return a verdict" for the nonmoving party.  DP-Tek, Inc. v. AT & T Global

27   Information Solutions Co., 100 F.3d 828, 831 (10th Cir. 1996); see also Bushie v.

28   Stenocord Corp., 460 F.2d 116, 119 (9th Cir. 1972) ("The showing of a genuine issue for

1  trial is predicated upon the existence of a legal theory which remains viable under the

2  asserted version of the facts, and which would entitle the party opposing the motion

3  (assuming his version to be true) to a judgment as a matter of law." (internal quotation

4  marks omitted)).

5         TEO's opposition to AmeriPride's Motion points to no evidence, other than

6  statements in previous AmeriPride pleadings, that would allow a reasonable jury to find

7  that Cal-Am's conduct caused AmeriPride to incur response costs.  In the Court's

8  estimation, no reasonable jury could find that Cal-Am caused AmeriPride to incur

9  response costs based solely on the statements proffered by TEO.  Accordingly, there is

10  no genuine dispute of fact on the issue of Cal-Am's liability and AmeriPride's Motion is

11  GRANTED on this issue.

12         **5.  Equitable allocation of costs at summary judgment**

13         AmeriPride argues that even if Petrolane and Chromalloy are deemed liable for a

14  portion of the response costs incurred at the Facility, the Court must allocate a zero

15  percent share of such liability to them without the benefit of hearing evidence at trial.  As

16  this Court has explained before, it "defies logic" to shoehorn the complicated equitable

17  inquiry necessary to allocate costs to Petrolane and Chromalloy into a summary

18  judgment motion.  United States v. Honeywell Intern., Inc., 542 F. Supp. 2d 1188, 1202

19  (E.D. Cal. Feb. 22, 2008).  The Court requires a complete record in order to responsibly

20  exercise its discretion on the question of Petrolane and Chromalloy's equitable shares of

21  AmeriPride's response costs.  Id. at 1203.  AmeriPride may well be able to persuade the

22  Court that it should not allocate any share of the liability to Petrolane and Chromalloy.

23  Such a decision, however, must occur after a trial.  Id.  AmeriPride's Motion is therefore

24  DENIED on the issue of allocation.

25        **B.  Prejudgment Interest**

26         In awarding prejudgment interest to AmeriPride following the 2011 trial, the Court

27  held that interest would accrue on the date when response costs were paid by

28  AmeriPride.  CERCLA provides that interest is recoverable on a claim beginning "the

1  later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date

2  of the expenditure concerned."  42 U.S.C. § 9607(a)(4)(i).  The Ninth Circuit found that

3  "the district court erred in holding that prejudgment interest began accruing on the date

4  AmeriPride incurred the relevant costs without determining whether that date was later

5  than the date on which AmeriPride demanded a specific amount in writing from TEO."

6  ECF No. 981 at 28.

7      TEO argues that interest could not begin to accrue until August 10, 2010.  TEO

8  reasons that because TEO was a defunct corporation, it did not exist for the purposes of

9  interest accrual until a receiver was appointed.   The appointment of a receiver occurred

10  in June 2010.  AmeriPride then demanded approximately $15 million on August 10,

11  2010.  TEO contends that interest could only have begun to accrue upon its receipt of

12  this demand.

13      AmeriPride opposes TEO's argument in this regard, contending that nothing in

14  § 9607(a) creates an exception for a polluter's corporate status.  Instead, AmeriPride

15  argues that prejudgment interest began to accrue on January 20, 2000, when it served

16  TEO with its First Amended Complaint (FAC) and demanded all past, present, and future

17  cleanup costs incurred in connection with PCE contamination from the Facility.  Although

18  the FAC did not specify an exact amount, AmeriPride cites cases from other circuits

19  holding that a complaint constitutes sufficient written demand of payment to satisfy the

20  statute's requirement regardless of whether it demands an exact amount.

21      Neither party's position is entirely persuasive.  As AmeriPride points out, nothing

22  in § 9607 exempts a defunct corporation from receiving a specific demand that triggers

23  the accrual of prejudgment interest.  Acquiescing to TEO's argument that it could not

24  have been liable for such interest until a receiver was appointed would likely discourage

25  parties subject to a clean-up order from incurring response costs until procedural

26  technicalities are resolved, with potentially deleterious effects to public health and the

27  environment.  Furthermore, such a ruling would also likely encourage knowing corporate

28  ///

1   polluters to disband and reorganize to strategically avoid significant prejudgment interest

2   costs.  Neither outcome is consistent with CERCLA's purposes.

3        Furthermore, TEO's past conduct contradicts its argument that it could not have

4   had notice of AmeriPride's demand.  Essentially, TEO argues that the purpose of the

5   demand requirement is notice, and that TEO could not have had notice of any demand

6   until a receiver was appointed in June 2010.  TEO, however, answered the FAC, filed a

7   counterclaim against AmeriPride, and served and responded to discovery.  Given its

8   ability to respond to the FAC, it clearly had actual notice of a demand.

9        On the other hand, the FAC does not substantially comply with § 9607's demand

10  requirement.  The FAC made no monetary demand whatsoever.  Although the Ninth

11  Circuit has not yet squarely addressed how specific a demand must be in order to satisfy

12  § 9607,  AmeriPride points to four decisions that it claims stand for the proposition that a

13  "complaint constitutes sufficient written demand of payment to satisfy the requirements

14  of [§ 9607]."  ECF No. 1021-1 at 28:20-21.  In fact, two of those decisions dealt with

15  complaints that contained at least some estimate of the costs for which the plaintiff

16  sought reimbursement.  See Bancamerica Commercial Corp. v. Mosher Steel of Kansas,

17  Inc., 100 F.3d 792, 801 (10th Cir. 1996) ("This demand of at least $1 million in response

18  costs satisfies § 107(a)'s requirement of a written demand of a specific dollar amount.");

19  K.C. 1986 Ltd. Partnership v. Reade Mfg, 472 F.3d 1009, 1019 (8th Cir. 2007) ("Borax

20  named specific amounts in the third-party complaints and the Rule 26 disclosures" that it

21  contended satisfied the demand requirement); see also U.S. v. Consolidation Coal Co.,

22  345 F.3d 409, 416 (6th Cir. 2003) (a complaint that demanded "over $47 million" from 59

23  third-party defendants but "did nothing to specify the amount being demanded from each

24  of [them]" did not satisfy the demand requirement because it was not sufficiently

25  specific.).

26       This Court agrees that a complaint must allege some dollar figure in order to

27  satisfy § 9607's demand requirement.  In doing so, the Court is sensitive to "CERCLA's

28  holistic and substantial compliance approach to the procedural aspects of remediation,

1    and its overarching and firm policy to encourage parties to clean up environmental

2    pollution . . . ." Pentair, 2013 WL 1320422 at *27.  To hold that a complaint bereft of any

3    dollar figure qualifies as a written demand for a "specified amount," however, would

4    directly contradict explicit statutory text.  42 U.S.C. § 9607(a)(4).  The Court cannot shirk

5    its duty to "give effect, if possible, to every clause and word of a statute[.]"  Gade v. Nat'l

6    Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 100 (1992).  Accordingly, AmeriPride's FAC

7    could not have triggered the accrual of interest, and AmeriPride's Motion is denied on

8    the issue of prejudgment interest.

9         Although the Court has rejected TEO's legal argument concerning a defunct

10   corporation's need for a receiver to take delivery of a demand letter, the fact remains

11   that the 2010 demand letter is the only evidence of a written demand that could trigger

12   interest accrual.  AmeriPride's failure to point to any evidence of another qualifying

13   demand letter means that there is no genuine dispute of material fact about when

14   prejudgment interest began to accrue.  Accordingly, TEO's Motion is GRANTED on the

15   issue of prejudgment interest.

16        **C. AmeriPride's Settlements with Cal-Am and Huhtamaki**

17        In 2002, AmeriPride settled a lawsuit brought against it by Cal-Am for $2 million

18   resulting from PCE contamination of its wells.  AmeriPride settled a similar lawsuit with

19   Huhtamaki for $8.25 million.  The Ninth Circuit held that the Court erred when it added

20   these settlements to the amount subject to equitable apportionment without determining

21   whether the money AmeriPride paid to settle Cal-Am and Huhtamaki's claims it

22   reimbursed them for necessary response costs incurred consistent with the NCP.

23        TEO makes two arguments in support of its Motion for Summary Judgment on

24   this issue.  First, TEO contends that the settlement agreements cannot be parsed to

25   distinguish between compensation for Cal-Am and Huhtamaki's CERCLA claims and

26   non-CERCLA claims.  Second, TEO argues that, based on the evidence in the record,

27   AmeriPride cannot meet its burden of showing that Cal-Am and Huhtamaki's

28   expenditures in dealing with the PCE contamination complied with the NCP.

1    TEO's first argument is dispositive.  The settlement agreements themselves make

2    no distinction whatsoever as to whether AmeriPride intended to settle Cal-Am and

3    Huhtamaki's CERCLA claims, their non-CERCLA claims, or some combination of both.

4    While the Ninth Circuit has not explicitly addressed how to construe settlement

5    agreements that resolve both CERCLA and non-CERCLA claims, the Tenth Circuit has

6    held that a settlement agreement must be interpreted against the party seeking to

7    allocate money between CERCLA recoverable and non-recoverable costs where the

8    agreement is silent on the issue.  Friedland v. TIC-The Industrial Company, 566 F.3d

9    1203, 1210 (10th Cir. 2009).  Furthermore, AmeriPride has stipulated that neither party

10    shall seek to admit evidence of the parties' intent in entering into those settlement

11    agreements.  ECF No. 1005.  If the settlement agreements are silent as to the allocation

12    of payment between Cal-Am and Huhtamaki's CERCLA and non-CERCLA claims, then

13    this Court cannot even begin to answer the question of the extent to which AmeriPride

14    reimbursed Huhtamaki and Cal-Am for necessary response costs incurred consistent

15    with the NCP.

16    AmeriPride argues that the real issue is how much money Cal-Am and Huhtamaki

17    spent on response costs rather than the parties' intent in the settlement agreement.  This

18    argument lacks merit.  On remand, the Ninth Circuit directed this Court to determine how

19    much of the settlements "reimbursed Huhtamaki and Cal-Am solely for necessary

20    response costs incurred consistent with the NCP."  AmeriPride, 782 F.3d at 490 n.11.

21    This is qualitatively different from a determination of how much Huhtamaki and Cal-Am

22    spent on NCP-compliant response costs.  Put simply, the Court cannot begin to make a

23    determination of how much Cal-Am and Huhtamaki spent on NCP-compliant response

24    costs without first determining that some portion of the settlement money paid was

25    intended to reimburse them for such costs under CERCLA.  Since the settlement

26    agreements themselves are the only admissible evidence of AmeriPride's intent to

27    reimburse per the parties' stipulation, and because they say nothing about any such

28    intent, TEO's Motion is GRANTED as to this issue.

### D. AmeriPride's $782,000 in Additional Response Costs

The final issue for resolution by the Court is AmeriPride's assertion that it is entitled to recover the approximately $780,000 in expenses incurred as it has continued to clean up the Facility.  Judge Karlton previously found that AmeriPride incurred approximately $8.5 million in necessary response costs that were consistent with the NCP.  ECF Nos. 735 at 46-47, 915 at 8, 11.  Judge Karlton further found that, "[t]o the extent that the court has determined that AmeriPride's existing response actions have substantially complied with the [NCP], the court determines that continuation of those actions will be similarly compliant."  ECF No. 735 at 45.  The parties recently stipulated that approximately $2 million of these additional response costs are recoverable, but could not agree on the recoverability of approximately $782,000 in costs that were incurred by AmeriPride before the Court's April 20, 2012 Order and Judgment that were not presented to the Court in the first trial.  AmeriPride avers that it did not present these costs at trial due to the deadlines in Judge Karlton's scheduling order.

AmeriPride argues that it is entitled to recover the $782,000 as further response costs pursuant to 42 USC 9613(g)(2).  That statute allows a party to recover further response costs consistent with a court's declaratory judgment.  TEO contends, on the other hand, that based on a case from the Western District of Washington, the $782,000 in costs can only be recovered if such costs were "incurred after the date of declaratory judgment entered pursuant to 42 USC 9613(g)(2) . . . ."  U.S. v. Washington State Dept. of Transp., 2014 WL 2860823 at *3 (W.D. Wash. June 23, 2014).  AmeriPride counters that the Washington decision is distinguishable because the Ninth Circuit vacated the declaratory judgment in this case.  ECF No. 1027 at 20.

Granting AmeriPride's motion on this issue would completely reopen the Court's previous declaratory judgment and effectively require the Court to start over from scratch, in contradiction to the Ninth Circuit's limited remand order requiring the Court to address three discrete questions.  AmeriPride had numerous opportunities to request that the additional $782,000 in costs be included in the declaratory judgment, but failed

1  to do so.  The parties did not appeal the over $8 million awarded as response costs, and

2  the amount awarded in Judge Karlton's declaratory judgment order is therefore final.

3  While the Ninth Circuit technically vacated that judgment, the remand order is quite

4  narrow, and addresses only the <u>allocation</u> of liability, not the total amount of liability at

5  issue.  The court's remarks in <u>Washington</u> are equally applicable to this case:

6                    A simplification of the foregoing events can be set out as

7                    follows: Plaintiff requested response costs of $9,343,765.00 for costs to certain dates. The Court asked if that was all

8                    Plaintiff wanted. Plaintiff said yes. The Court gave Plaintiff all it wanted. It can't ask for more now.

9  <u>Id.</u> at *2.  Because the Court's declaratory judgment was final as to the amount of

10  AmeriPride's response costs incurred prior to the entry of judgment, AmeriPride is not

11  entitled to re-litigate this issue.  Accordingly, TEO is entitled to summary judgment on

12  this issue as well.

13

14  **CONCLUSION**

15

16         TEO"s Motion for Summary Judgment (ECF No. 1018) is GRANTED in part and

17  DENIED in part for the reasons stated above.  AmeriPride's Motion for Summary

18  Judgment (ECF No. 1021) is GRANTED in part and DENIED in part for the reasons

19  stated above.

20         IT IS SO ORDERED.

21  Dated:  July 12, 2016

22

23  _____
     MORRISON C. ENGLAND, JR

     UNITED STATES DISTRICT JUDGE

24

25

26

27

28